No. 21-16806

---

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

KYM PARDINI and CARRIE WOOD,
on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants*,

and

UNILEVER UNITED STATES, INC., a Delaware corporation,

*Defendant-Appellee*.

---

On Appeal from the United States District Court, Northern District of California
Case No. 4:13-cv-01675-JSW (Hon. Jeffrey S. White)

---

## APPELLANTS' OPENING BRIEF

---

JUSTIN T. BERGER (SBN 250346)
jberger@cpmlegal.com
SARVENAZ J. FAHIMI (SBN 226148)
sfahimi@cpmlegal.com
**COTCHETT, PITRE &**
**McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

UREKA E. IDSTROM (*pro hac vice*)
uidstrom@eurekalaw.com
**THE EUREKA LAW FIRM**
5011 Summit Street
Kansas City, MO 64112
Telephone: (816) 665-3515

*Attorneys for Plaintiffs-Appellants Kym Pardini and Carrie Wood*

# <u>TABLE OF CONTENTS</u>

<u>Page No.</u>

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT .......................................................4

STATUTORY AND REGULATORY AUTHORITIES ..........................5

ISSUES PRESENTED............................................................................5

STATEMENT OF THE CASE................................................................5

SUMMARY OF THE ARGUMENT ......................................................8

STANDARD OF REVIEW ...................................................................10

ARGUMENT .......................................................................................11

     I.     Overview of Applicable Food and Drug Federal Regulations............12

     II.    The District Court erred in dismissing Plaintiffs' claims on the grounds that ICBINBS is a "spray type" as a matter of law...............14

          A.    Unilever failed to prove its affirmative defense because the pleadings do not support its "spray type" classification and instead create an issue of fact as to the product's proper reference category under 21 C.F.R. § 101.12. .........................15

               1.    Preemption is an affirmative defense. ............................15

               2.    The pleadings themselves dispute that ICBINBS is a "spray type." ................................................................15

               3.    At minimum, there is an issue of fact as to the product's proper reference category under 21 C.F.R. § 101.12. ....19

               4.    The District Court erred in classifying ICBINBS as a "spray type" without considering how the product is customarily consumed in its primary intended use. .......21

i

III.   The District Court erred in requiring Plaintiffs to plead how ICBINBS should be classified for preemption purposes; nonetheless, Plaintiffs plausibly alleged that ICBINBS belongs in the "butter, margarine, oil and shortening" category because it is a spread and "butter substitute." ..........................................................................................25

    A.   Plaintiffs were not required to plead the proper reference category or translate 1 tablespoon into an equivalent number of sprays..........................................................................................25

    B.   Plaintiffs plausibly allege that ICBINBS belongs in the "butter, margarine oil and shortening" category with a required serving size of 1 tablespoon because it is a spread and butter-substitute. ...................................................................................................26

    C.   Other courts have correctly held that at a minimum, there is a factual dispute about whether spray butters should be classified as "butter substitutes" or "cooking sprays." ...........................29

CONCLUSION .........................................................................................32

Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6..................33

Form 8. Certificate of Compliance for Briefs..........................................................34

ii

## <u>TABLE OF AUTHORITIES</u>

<u>Page No(s).</u>

**Cases**

*Allen v. ConAgra Foods, Inc*.
   No. 13-CV-01279-JST, 2013 WL 4737421 (N.D. Cal. Sept. 3, 2013) ....... passim

*Astiana v. Hain Celestial Grp., Inc.*
   783 F.3d 753 (9th Cir. 2015) ...............................................................22

*Brazil v. Dole Food Co*.
   935 F. Supp. 2d 947 (N.D. Cal. 2013) .................................................15

*Cohen v. ConAgra Brands, Inc*.
   16 F.4th 1283 (9th Cir. 2021) .............................................................15

*Curry v. Yelp Inc.*
   875 F.3d 1219 (9th Cir. 2017) ............................................................10

*Durnford v. Musclepharm Corp.*
   907 F.3d 595 (9th Cir. 2018) ........................................... 9, 15, 16, 25

*Gingery v. City of Glendale*
   831 F.3d 1222 (9th Cir. 2016) ............................................................11

*Greenberg v. Target Corp.*
   985 F.3d 650 (9th Cir. 2021) ..............................................................11

*Kosta v. Del Monte Corp*.
   No. 12-CV-01722-YGR, 2013 WL 2147413 (N.D. Cal. May 15, 2013)..... 21, 22

*Lilly v. ConAgra Foods, Inc.*
   743 F.3d 662 (9th Cir. 2014) ...................................................... passim

*New Mexico State Inv. Council v. Ernst & Young, LLP*
   641 F.3d 1089 (9th Cir. 2011) ............................................................10

*Stengel v. Medtronic*
   714 F.2d 1224 (9th Cir. 2013) ............................................................15

*Watkins v. Dollar Tree Stores, Inc*.
   No. 3:20-CV-00717-L-MSB, 2020 WL 7386024 (S.D. Cal. Dec. 16, 2020) .....25

**Regulations, Rules, and Statutes**

21 C.F.R. § 100.1(c)(4) ..................................................................................6

21 C.F.R. § 101.1 *et. seq* ...........................................................................12

21 C.F.R. § 101.9 .............................................................................. 8, 6, 19

21 C.F.R. § 101.9(b)(1) ................................................................. 7, 13, 16

21 C.F.R. § 101.9(c)(1-2) ............................................................................12

21 C.F.R. § 101.12 ........................................................................... passim

21 C.F.R. § 101.12(a)(7) ................................................................. passim

21 C.F.R. § 101.12(a)(7), (d) .....................................................................28

21 C.F.R. § 101.12(a)(9) ..........................................................................2, 9

21 C.F.R. § 101.12(b) ............................................................................ 13, 14

21 C.F.R. § 101.12(b)(6) .............................................................................20

21 C.F.R. § 101.12(d) ..................................................................... 3, 7, 13

21 C.F.R. § 101.12(h) ..................................................................................13

21 C.F.R. § 101.62(b)(1)(i)-(ii) ...................................................................8

21 C.F.R. § 101.62(b)(i-ii) ..........................................................................12

21 U.S.C. § 343(q) .......................................................................................12

21 U.S.C. § 343-1(a)(2)-(3) ..........................................................................6

21 U.S.C. § 393(b)(2)(A) .............................................................................12

28 U.S.C. § 1291 ...........................................................................................5

28 U.S.C. § 1332(a) and (d) .........................................................................4

55 FR 29517 ..................................................................................................7

FRCP 12(b)(6) .............................................................................................10

**Other Authorities**

Commercial Item Description, Buttery Spreads. U.S. Dept. of Agriculture,
Nov. 6, 2008 ..........................................................................................27

U.S. Food & Drug Administration & Int'l. Food Info. Council, Overview of
Food Ingredients, Additives & Colors (2004, rev. 2010) ....................17

United States Food & Drug. Admin., Center for Food Safety and Applied Nutrition
Office of Nutritional Prods., Labeling & Dietary Supplements, Guidance for
Industry:  A Food Labeling Guide .....................................................17

United States Food and Drug Admin., Inspections, Compliance, Enforcement, &
Criminal Investigations, Guide to Nutrition Labeling & Educ. Act (NLEA)
Regs., (1994) .........................................................................................16

## **INTRODUCTION**

Unilever sells "I Can't Believe It's Not Butter! Spray" ("ICBINBS"), one product in a line of products that the USDA classifies as a "spread," – a technical term describing a butter-flavored, water and oil emulsion. Unlike Unilever's other "spreads," ICBINBS is prominently labeled as 0-fat and 0-calories. Unilever makes these claims in the nutritional panel on the back of the product, and more loudly on the front-label. ICBINBS has the consistency of liquid butter and is sold to consumers in a plastic bottle fitted with a removable pump-action squirt nozzle.

Like other I Can't Believe It's Not Butter! products, ICBINBS is a butter-substitute (it looks like butter, it is marketed like butter and it is predictably used by consumers in place of butter). In contrast to butter, however, Unilever touts ICBINBS as "guilt-free" because it purportedly contains 0-fat and 0-calories. ICBINBS has proven a very popular product, in no small part because consumers believe it is actually 0-fat and 0-calories. They use it liberally as a butter-flavored topping in amounts comparable to butter – something that Unilever's 0-fat and 0-calories declarations encourage.

The truth is ICBINBS is not nutritionally different from any other "spread" or butter-substitute: it contains approximately 60 calories and 6g of fat per *tablespoon,* the serving-size mandated by the FDA for spreads and butter-substitutes. Unilever does not use a one tablespoon serving size when calculating

its nutritional claims, however.  Instead, it uses serving sizes of just *one squirt* (0.2g) or *five squirts* (1g), which purportedly allow Unilever to "round down" the statements of fats and calories on its product to zero.

Plaintiffs allege that ICBINBS is deceptively labeled because it is not 0-fat and 0-calories and because Unilever failed to use an authorized serving size as the basis for its 0-fat and 0-calories claims.  Like other spreads and butter-substitutes, Plaintiffs allege ICBINBS should have disclosed the amount of fat and calories in one tablespoon of product.

Unilever twice moved to dismiss Plaintiffs' claims as expressly preempted. 3-ER-499, 348.  The basis for Unilever's argument is that, despite its name, "I Can't Believe It's Not Butter! Spray" is *not* a butter substitute; rather, it is a non-stick cooking spray—like PAM—with a serving-size measured according to the amount consumers use to coat cookware.  According to Unilever, that amount is 1-spray.  And with 1-spray of product, the calorie and fat content is small enough that FDA regulations allow Unilever to claim that ICBINBS is free of fat and calories.

The FDA mandates that a product should be categorized according to its "primary intended use" based on its product characteristics and dietary uses.  21 C.F.R. §§ 101.12(a)(7), 101.12(a)(9). Imitation or substitute foods, such as a 'low calorie' version, belong in the same product category as the food they are intended

to replace. 21 C.F.R. § 101.12(d). In this case, just like the name, label, and marketing for the product shows, Plaintiffs allege that ICBINBS is primarily intended to be used as a spread and butter-substitute. The FDA has specifically mandated that the serving-size for spreads and butter substitutes is 1 tablespoon. Had Unilever used this serving-size, the product would be required to disclose 60 calories and 6g of fat per serving.

The District Court agreed with Unilever that the product belongs in the FDA "spray type" subcategory and dismissed Plaintiffs' claims at the pleadings stage as expressly preempted. The Court did not rule this way based on evidence that ICBINBS is primarily used as a nonstick cooking spray, but rather simply because Unilever claimed that the product *is* a spray (indeed, it is named ICBINB "spray") and *could* be used for nonstick cooking (a proposition Plaintiffs dispute because ICBINBS emits a stream of liquid, unlike Pam, which emits a dispersed aerosol mist).

The District Court's decision is reversible error. According to the USDA, "buttery sprays" meet the commercial item description of a "spread" and must use the same serving size as butter, 1 tablespoon, under federal regulations.[1] The fact that Unilever brands its product a "spray" does not mean that it belongs in the FDA

---

[1]https://www.ams.usda.gov/sites/default/files/media/CID%20Buttery%20Spreads.pdf

"spray type" subcategory—with a fractional serving size meant for nonstick cooking sprays. Indeed, this Court has held that the proper reference amount must be based on the "amount customarily consumed." *Lilly v. ConAgra*, 743 F.3d 662, 666 (9th Cir. 2014). Because plaintiffs contend that consumers customarily use ICBINBS as a spread, topping and butter substitute—not as a nonstick cooking spray—and in amounts far exceeding 1 spray, there is at minimum an issue of fact that cannot be decided at the pleadings stage.

Notably, while in this case Judge Samuel Conti dismissed Plaintiffs claims as expressly preempted, in a substantially similar case also in the Northern District of California, involving Parkay Spray, Judge Jon Tigar ruled differently—finding that "Plaintiffs allege that the serving sizes shown on the Parkay Spray bottle do not comply with the relevant regulations, [Defendant's] claim to the contrary does not mean the claim is preempted, but only that there is a live claim between the parties." *Allen v. ConAgra Foods, Inc.*, No. 13-CV-01279-JST, 2013 WL 4737421, at *6 (N.D. Cal. Sept. 3, 2013).

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiffs are citizens of a different state than Defendant. On July 9, 2013, the District Court granted Defendant's motion to dismiss based on

the affirmative defense of express preemption. The District Court entered final judgment on September 27, 2021. 1-ER-002. On October 27, 2021, Plaintiffs timely filed notice of Appeal to the Ninth Circuit. 4-ER-551. Plaintiffs perfected their appeal by paying the fees required by Federal Rule of Appellate Procedure 5(d) on October 27, 2021. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory and/or regulatory authorities are included in the Addendum to this brief.

## ISSUES PRESENTED

Whether the District Court erred in dismissing Plaintiffs' complaint as expressly preempted because Unilever's "I Can't Believe It's Not Butter! Spray" complies with the FDA's "Spray type" regulations—even though the Complaint alleges that ICBINBS is not a nonstick cooking spray and is not marketed or customarily consumed that way.

## STATEMENT OF THE CASE

Unilever markets and sells "I Can't Believe It's Not Butter! Spray" ("ICBINBS"), a liquid vegetable oil spread that is dispensed in a squirt bottle and primarily marketed to consumers as a "0 fat" and "0 calories" topping and butter-substitute. 3-ER-378, ¶¶ 18-25, 40. According to the Complaint, these "0 fat"

and "0 calories" claims are literally false and violate FDA regulations[2] that require products to disclose fat and calorie contents per serving. *Id.* at ¶¶ 26-60 (citing 21 C.F.R. §§ 101.9, 101.12.)

Unilever's motion to dismiss argued that ICBINBS is a "spray type," like PAM—i.e., an aerosol that is used to coat cookware and for which the FDA has established a serving size of 0.25g based on surveys of PAM's customary consumption. *See* 3-ER-348 at 13:9-26; *see also* 3-ER-463 ("spray types" include "nonstick cooking sprays" (e.g., Pam)); 21 C.F.R. § 101.12, Table 2, n.2 (reference amounts "derived from… Nationwide Food Consumption Surveys conducted by the U.S. Department of Agriculture."). As a "spray type," Unilever claims that ICBINBS contains less than 5 calories and 0.5g of fat per serving, and thus it may round down the fat and calorie contents and list them as zero. *Id.*

Plaintiffs responded that ICBINBS is *not* in fact a "spray type" under FDA regulations because it has none of the characteristics or dietary uses as PAM and other nonstick cooking sprays; unlike ICBINBS, those products are marketed and used to lubricate cookware via a dispersed aerosol oil mist.[3] Unilever does not

---

[2] The FDCA contains an express preemption provision, which provides that it preempts any state law that is "not identical to" what the FDA requires. 21 U.S.C. § 343-1(a)(2)-(3). The phrase "not identical to" means that "the State requirement directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food" that are "not imposed by or contained in the applicable provision [or regulation]" or "[d]iffer from those specifically imposed by or contained in the applicable provision [or regulation]." 21 C.F.R. § 100.1(c)(4).

[3] *See* 3-ER-472 at 1, 3,5-8; 3-ER-271 at 7-9; 2-ER-157 at 4-5, 10.

market its product as a cooking spray, and consumers do not use it that way. *Id.* Because companies must use a reference amount that is based on "the amount customarily consumed"—i.e., how it is actually consumed and marketed—ICBINBS does not belong in the "spray type" subcategory, and Unilever may not use the tiny serving-size mandated for those types of products (which would also not allow it to "round down" its disclosure of fats and calories to zero).[4]  Instead, ICBINBS belongs in the default "butter, margarine, oil and shortening" category, with a required serving size of 1 tablespoon. 3-ER-416.  Indeed, as its name implies, ICBINBS is a butter *substitute*. 3-ER-480; 3-ER-285-286; 3-ER-383-385 ¶¶ 18-24; 2-ER-165-166.  The FDA requires "Substitute products" to be categorized in the same as the product's they are intended to replace.  21 C.F.R. § 101.12(d) ("The reference amount for an imitation or substitute food or altered food, such as a 'low calorie' version, shall be the same as for the food for which it is offered as a substitute.").  This allows consumers to compare the nutritional value of foods that are used interchangeably, as the FDA itself has explained.  3-ER-390 ¶ 52 (citing 55 FR 29517 ("the agency is proposing these standard serving sizes to assure that nutrition labels on similar types of foods are consistent, so that

---

[4] *See* 21 C.F.R. § 101.12 ("Reference Amounts ***Customarily Consumed*** Per Eating Occasion") (emphasis added); 3-ER-378 ¶¶ 31, 33, 57; 3-ER-271 at 4, 7-11; 3-ER-472 at 3-4, 8, 18; *see also* 21 C.F.R. § 101.9(b)(1); *Lilly v. ConAgra Foods, Inc.*, 743 F.3d 662 (9th Cir. 2014).

consumers will be able to easily and readily make comparisons of nutrient content among products.")).

District Court Judge Samuel Conti agreed with Unilever, holding that ICBINBS is a "spray type" as a matter of law at the pleadings stage because: (1) it calls itself a spray on its label; and (2) Defendant claims it can be used for nonstick cooking. *See* 2-ER-224 at 12:7-8; 3-ER-409 at 10:2-11. Judge Conti therefore dismissed Plaintiffs' "0 fat" and "0 calories" claims as expressly preempted.[5] *See* 2-ER-224 at 13:6-8.

## SUMMARY OF THE ARGUMENT

The District Court dismissed Plaintiffs' claims based on the "0 fat" and "0 calories" labels as expressly preempted by 21 C.F.R. § 101.12; 21 C.F.R. § 101.9. The District Court held that I Can't Believe It's Not Butter! Spray ("ICBINBS") is a "spray type" nonstick cooking spray as a matter of law, reasoning that ICBINBS *is* a spray and can be used for nonstick cooking. 2-ER-224 at 11:6-18; 3-ER-409 at 10:2-14. That decision is reversible error for two reasons. First, to win a motion to

---

[5] The Court determined that Plaintiffs' claims were not preempted to the extent Unilever did not include an asterisk next to the listing of ingredients in the ingredient statement that supply certain amounts of fat. 3-ER-409 at 12:9-13:16-13 (citing 21 C.F.R. § 101.62(b)(1)(i)-(ii)). The asterisk was only missing on the label for approximately six months. 3-ER-032 at 1, 5. Ultimately, the Court granted summary judgment as to Plaintiffs' allegations that ICBINBS was deceptively labeled 0-fat during this 6-month period of time because in part Plaintiffs damages model did not measure the value of the missing asterisk but rather the value of the deceptive 0-fat claim. 1-ER-003. A decision in Plaintiffs' favor by this Court would moot that issue.

dismiss based on an affirmative defense at the pleadings stage, a defendant must show an "impenetrable defense." *Durnford v. Musclepharm Corp.*, 907 F.3d 595, n.8. (9th Cir. 2018). But Unilever failed to show that ICBINBS is a "spray type" based on its characteristics, dietary uses, and customarily consumed amounts— issues of fact that the Complaint vigorously disputes. A product must be classified under 21 C.F.R. § 101.12 based on its primary intended use, product characteristics and how it *is actually used and marketed* (i.e., "the amount customarily consumed"), not how a defendant argues that it *can* be used. 21 C.F.R. § 101.12(a)(7); 21 C.F.R. § 101.12(a)(9); *Lilly*, 743 F.3d at 665. The District Court erroneously disregarded Plaintiffs' allegations (and Unilever's concession that the product is used as a topping and butter substitute) and decided this issue of disputed fact.

Second, the District Court erred in requiring the complaint to allege how ICBINBS *should* have been classified under 21 C.F.R. § 101.12. This is not required: preemption based on the FDA's product categories is *Unilever's defense*. It is not Plaintiffs' burden to show that ICBINBS belongs in a specific category, just that the labels violate various state and federal laws. If Unilever fails to prove that ICBINBS is a "spray type," then it belongs in the default "butter, margarine, oil and shortening" category--which expressly includes "spreads" like ICBINBS and other "buttery sprays." 3-ER-463. Regardless, Plaintiffs **did** in fact allege that

9

ICBINBS belongs in this default category with a required serving size of 1 tablespoon. The record is replete with evidence that ICBINBS is a butter-substitute: it looks like butter, it is marketed like butter, and it is actually used like butter. Its name suggests that consumers will be unable to distinguish it from butter. As a butter substitute, the 1 tablespoon serving size was required.

Judge Conti disregarded these allegations on the basis that a serving size of 1 tablespoon is implausible. As a starting point, it is not for the district court to weigh the plausibility of the FDA's serving size requirements; the USDA performs consumer studies to determine serving sizes, and has classified "buttery sprays" as spreads with a 1 tablespoon serving size. To gain the benefit of preemption, a company must comply with these regulations. Further, the Complaint cites real-world examples of consumers routinely using the product like butter and in amounts comparable to butter. At the pleadings stage, the District Court was required to accept these allegations as true.

## STANDARD OF REVIEW

A district court's dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is reviewed de novo. *Curry v. Yelp Inc.*, 875 F.3d 1219, 1224 (9th Cir. 2017) (citing *New Mexico State Inv. Council v. Ernst & Young, LLP,* 641 F.3d 1089, 1094 (9th Cir. 2011)). Questions of preemption are also reviewed de novo. *Greenberg v. Target Corp.*, 985 F.3d 650, 654 (9th Cir.

2021) (citing *Gingery v. City of Glendale,* 831 F.3d 1222, 1226 (9th Cir. 2016))
(citation omitted).

## ARGUMENT

The District Court erred in dismissing Plaintiffs' claims as expressly
preempted for two reasons. First, preemption is an affirmative defense and
Unilever failed to show that ICBINBS is a "spray type" as a matter of law. The
pleadings raise an issue of fact as to whether the product is customarily consumed
as a "spray type," like PAM. Plaintiffs allege that ICBINBS has none of the same
product characteristics, dietary uses, or customarily consumed amounts as PAM.
Instead of accepting these allegations as true, the District Court disregarded them
in favor of Unilever's claims that its product *is* a spray and can be used for
cooking.

Second, the District Court erred in determining that Plaintiffs' claims are
expressly preempted because Plaintiffs failed to plead the proper reference
category for ICBINBS. Plaintiffs are not required to state the FDA category a
product belongs in; plaintiffs are merely required to plead justiciable claims. If
Unilever wants the benefit of preemption, *it* is required to show that it complied
with FDA regulations, including the category that applies to its product.
Regardless, Plaintiffs pled that ICBINBS belongs in the default "butter, margarine,
oil and shortening" category with a required serving size of 1 tablespoon because it

is technically a spread, because Unilever markets its product as a butter-substitute, and because consumers actually use it that way. Had Unilever used the FDA mandated serving size, it could not have declared 0-fat or 0-calories on its label. The District Court was required to accept these allegations as true. Instead, it dismissed them on the basis that a serving-size of 1 tablespoon—the size mandated by the FDA—is not plausible.

## I.  Overview of Applicable Food and Drug Federal Regulations

The Food Drug and Cosmetic Act ("FDCA") gives the Food and Drug Administration ("FDA") the responsibility to protect the public health by ensuring that "foods are safe, wholesome, sanitary, and properly labeled," 21 U.S.C. § 393(b)(2)(A), and the FDA has promulgated regulations pursuant to this authority. *See*, *e.g.*, 21 C.F.R. § 101.1 *et. seq.*

The FDCA requires food companies to disclose the amount of fat and calories per serving on their products. *See* 21 U.S.C. § 343(q). A food label may list "0 g fat" in the nutritional panel only if each serving contains less than 0.5 grams of fat, and may list "0 calories" in the nutritional panel only if each serving contains less than 5 calories. 21 C.F.R. § 101.9(c)(1-2). Outside of the nutrition panel, a food label may claim to be "fat free" or "zero calories" if each serving contains less than 0.5 grams of fat or 5 calories respectively. 21 C.F.R. § 101.62(b)(i-ii). However, manufacturers are not allowed to arbitrarily choose serving sizes so that they can

"round down" to make "0 g fat" or "0 calories" claims. They must use a serving size that represents **both** the "amount customarily consumed" and the product's "major intended use." *See generally* 21 C.F.R. §§ 101.9(b)(1), 101.12(a)(7).

To determine the appropriate serving size, a manufacturer must match its food to one of the FDA's many product categories, set forth in 21 C.F.R. § 101.12(b), Table 2 ("Serving Size Table") based on its "product characteristics, dietary usage and customarily consumed amounts" and use the corresponding reference to determine its serving size. 21 C.F.R. § 101.12(b), 21 C.F.R. § 101.12(d). "Substitute Products" – such as "low calorie versions" – must use the same serving size "as the food for which it is offered as a substitute." 21 C.F.R. § 101.12(d). If a manufacturer believes that an appropriate reference category for its product does not exist, it must contact the FDA with evidence to support its serving size and have it approved. 21 C.F.R. § 101.12(h).

The Serving Size Table includes a category for "Fats and Oils." *See* 21 C.F.R. § 101.12(b), Table 2. Within this category is the default category "Butter, Margarine, Oil and Shortening," which includes "All types of butter and margarine… **spreads**; oils and shortenings" whether liquid or solid. 3-ER-463. The FDA serving size for this default category is one tablespoon (about 14 grams). *Id*. The "Fats and Oils" category also includes a sub-category for "spray types" which encompasses "Nonstick cooking sprays" like "Pam" – a aerosol spray distributed in a pressurized

13

metal canister that emits a dispersed mist and is customarily used to lubricate cookware. 3-ER-463. Serving sizes for nonstick cooking sprays are measured by *how many seconds* a consumer customarily depresses the nozzle. 21 C.F.R. § 101.12(b), Table 2. The required serving size for cooking sprays is a mere 0.25 grams – *over 50 times less* than the serving size required for oils and butter. *Id.*

## II. The District Court erred in dismissing Plaintiffs' claims on the grounds that ICBINBS is a "spray type" as a matter of law.

Unilever failed to show its product is a "spray type" based on the pleadings, which dispute this classification and create an issue of fact as to ICBINBS' reference amount. In ruling in Unilever's favor, Judge Conti did not consider how the product is customarily consumed in its primary intended use, as the regulations require, but only what Unilever called its product and how Unilever claimed its product can be used. Branding and hypothetical arguments about how a product may be used are insufficient to prove that ICBINBS is a "spray type" as a matter of law. At most, Unilever's arguments created a live dispute between the parties (as Judge Tigar ruled in the case involving Parkay's spray butter product).

/ / /

/ / /

/ / /

/ / /

/ / /

14

**A.** **Unilever failed to prove its affirmative defense because the pleadings do not support its "spray type" classification and instead create an issue of fact as to the product's proper reference category under 21 C.F.R. § 101.12.**

> **1.** **Preemption is an affirmative defense.**

Preemption is an affirmative defense. *Durnford*, 907 F.3d at 603 n.8. "Only when the plaintiff pleads itself out of court – that is, admits all the ingredients of an impenetrable defense – may a complaint that otherwise states a claim be dismissed under Rule 12(b)(b)." *Id.* The Defendant bears the burden of pleading and supporting its preemption argument. *Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283, 1289-90 (9th Cir. 2021) (reversing dismissal where plaintiff disputed the basis for Defendant's affirmative defense, noting that it is the Defendant's burden to come forward with evidence bearing on preemption) (citing *Durnford* 907 F.3d at 603 n.8); *see also Brazil v. Dole Food Co.*, 935 F. Supp. 2d 947, 955 (N.D. Cal. 2013) (citing *Stengel v. Medtronic*, 714 F.2d 1224, 1227-28 (9th Cir. 2013) (holding that parties seeking to invalidate state law based on preemption bear the considerable burden of overcoming the presumption against preemption)).

> **2.** **The pleadings themselves dispute that ICBINBS is a "spray type."**

Plaintiffs did not plead themselves out of court. The complaints extensively recite that ICBINBS is marketed and used as a butter substitute, not as a cooking spray. 3-ER-472 ¶¶ 16, 17, 36; 3-ER-378 ¶¶ 18-25, 32-57, 61, 64-72. Unilever's

contention that ICBINBS should be categorized as a "spray type," with a required serving size of 0.25 grams (or "1 spray"), has not been admitted. In fact, the Complaint alleges that ICBINBS has none of the same characteristics, uses or customarily consumed amounts as PAM and other nonstick cooking sprays. *Id.* Under *Durnford*, there is a live issue of fact that precludes dismissal.

Those disputed facts bear directly on Unilever's preemption defense. Under federal regulations, a manufacturer must use a serving size that represents ***both*** the amount customarily consumed ***and*** the product's major intended use. 21 C.F.R. § 101.9(b)(1) ("The term serving or serving size means an amount of food customarily consumed per eating occasion."); 21 C.F.R. § 101.12(a)(7). The FDA has said that ***the "spray type" product category is limited to all forms of "nonstick cooking sprays."*** *See* 3-ER-463, United States Food and Drug Admin., Inspections, Compliance, Enforcement, & Criminal Investigations, Guide to Nutrition Labeling & Educ. Act (NLEA) Regs., (Attach. 26) (1994) (explaining that the "spray type" category (like all categories) incudes "all forms of products which belong to the category" and is limited to "nonstick cooking sprays" of which PAM is an example); *see also Allen*, 2013 WL 4737421, at *8 ("spray type" subcategory is limited to nonstick cooking sprays based on a plain reading of the FDA's guidance).

16

Plaintiffs' allegations that ICBINBS is not a nonstick cooking spray are not only plausible, they are the only plausible conclusion. First, nonstick cooking sprays (like PAM) are nearly 100% oil. 3-ER-271 at 7:9-10 (citing United States Food & Drug. Admin., Center for Food Safety and Applied Nutrition Office of Nutritional Prods., Labeling & Dietary Supplements, Guidance for Industry: A Food Labeling Guide (They are primarily used to lubricate cookware and, using gas as a propellant, emit a continuous spray of particularized lubricant) (citing 21 C.F.R. § 101.12, Table 2; U.S. Food & Drug Administration & Int'l. Food Info. Council, Overview of Food Ingredients, Additives & Colors (2004, rev. 2010)). ICBINBS does not possess these qualities. *Id.*; *see also* 3-ER-378 ¶¶ 37, 55. In contrast, ICBINBS is dispensed via pump-action nozzle, which (unlike an aerosol) does not disperse uniform amounts of a lubricant over a large surface area – the essential function of a nonstick cooking spray. *Id*. (citing 3-ER-384 ¶ 23.)

Second, ICBINBS *cannot* function like a nonstick cooking spray to provide a non-stick cooking surface because it contains mostly water--which does not create a non-stick cooking surface the way a cooking spray should. *See* 3-ER-271 at 7:9-13; 3-ER-384 ¶ 23. When exposed to heat, the water evaporates leaving approximately 0.08 grams of the .2 grams "spray" to act as a nonstick cooking surface. *Id.* PAM and other nonstick sprays do not contain water. *Id.* Tellingly, Defendant even recommends that consumers use ICBINBS *with non-stick*

17

*cookware*. *See* 3-ER-271 at 8:3-6; 3-ER-389, Figure 3 (cook mixture in "no-stick skillet"). True non-stick cooking sprays should not be used on non-stick cookware, however, because they will damage the non-stick surface. *See* 3-ER-271 at 8:3-6 (citing Proposed TAC 59.)

Third, the FDA regulations explain that "spray type" oils are to be expressed as a serving size based on the ***time*** that the spray is emitted. 3-ER-472 at 6:15-19; *see also* 3-ER-388 ¶ 46 ("0.25 g [or] ***About [[__]] second spray***.") ICBINBS's serving size cannot be (and is not) expressed in this manner, because it is a pump that delivers discrete squirts with each push—not a pressurized aerosol spray like Pam that is dispensed by pressing down for a period of time. *Id.*

Fourth, unlike ICBINBS, cooking sprays are not intended to impart flavor on food. *See* 3-ER-388 ¶ 44. Companies that market cooking sprays label their products "nonstock cooking sprays" and emphasize characteristics like the product's ability to prevent food from sticking to pans or make clean up easier. *Id.* ICBINBS is not labeled a "nonstick cooking spray," and Unilever has never touted such characteristics for ICBINBS—nor does Unilever intend for consumers to rely on such claims. *Id.* Rather, Unilever has consistently advertised the product as a butter substitute with a butter flavor. *Id.* Indeed, the name of the product itself implies the consumer will be unable to distinguish it from butter. Quite simply,

Unilever intends for consumers to use it on food in the same way they use butter. *Id.*

Fifth, consumers do not and cannot use ICBINBS as a lubricating spray in 0.25g quantities. *Id.* ¶ 23. The Complaint pleads that nobody uses "ONE spray." 3-ER-388 ¶ 48. And in fact, the pleadings indicate that some consumers—falsely believing that the product is 0-fat and 0-calorie—even bypass the spray mechanisms altogether, unscrewing the top to pour the product over foods like oatmeal and potatoes (Pam's nozzle cannot be removed). 3-ER-388-389 ¶¶ 47-49.

In sum, Plaintiffs' Complaint plausibly (and undeniably) alleges that ICBINBS is simply watered-down margarine—a butter substitute. The District Court erred in disregarding these allegations.

### 3. At minimum, there is an issue of fact as to the product's proper reference category under 21 C.F.R. § 101.12.

In *Lilly v. ConAgra Foods, Inc.*, 743 F.3d 662 (9th Cir. 2014), this Court examined express preemption in the context of the same regulations at issue here: 21 C.F.R. § 101.12 (mandating serving sizes based on product classifications) and 21 C.F.R. § 101.9 (requiring disclosure of nutritional content per serving). Reversing the district court, the *Lilly* Court recognized that a plaintiff's claims are not expressly preempted where there is a factual disagreement in the pleadings as to a product's classification under 21 C.F.R. § 101.12—the exact issue in this case.

The *Lilly* court examined whether the coating on the outside of sunflower seeds should be classified as part of the "shell" under 21 C.F.R. § 101.12(b)(6) – requiring no disclosure – or an "edible portion" where the nutritional content of the coating must be disclosed.  Like this case, in *Lilly*, the answer depended on how the product was customarily consumed; that is, whether the coating was eaten or simply discarded.  ("[B]ecause [the regulations] reflect the amount customarily consumed the reference amount and, in turn, the serving size declared on the product label are based only on the edible portion of food, and not bone, seed, shell or other inedible components.").  In its analysis, this Court held that a product's classification under 21 C.F.R. § 101.12 is a classic question of fact.  Reversing, it held that the plaintiff's allegations as to how the product is actually used and marketed were presumptive evidence that must be heeded—stating that the salty shell is *intended* to be ingested—and *is* ingested.  *Lilly,* 743 F.3d at 665 (summarizing factual dispute, adopting the plaintiff's allegations of fact, and reversing dismissal on express preemption grounds).

The Court explained,

> There may be any number of fact-specific reasons for why ConAgra's sodium-content labeling does not violate the California statutes invoked by Lilly.  But these issues must await summary judgment or trial. The question before us at this point is whether Lilly's action is facially preempted by federal law. It is not.

20

*Lilly,* 743 F.3d at 663; *see also Kosta v. Del Monte Corp.*, No. 12-CV-01722-YGR, 2013 WL 2147413 (N.D. Cal. May 15, 2013). A defendant may disagree as to both the meaning of the FDA requirements at issue here and whether its products conform to those requirements, that disagreement does not mean that the plaintiff's claims are preempted.

Like the *Lilly* plaintiffs, Plaintiffs' claims are not facially preempted because they allege that ICBINBS is not *intended* to be used as a cooking spray and *is* not used that way. 3-ER-378 ¶¶ 23, 45-50.

### 4. The District Court erred in classifying ICBINBS as a "spray type" without considering how the product is customarily consumed in its primary intended use.

The District Court disregarded allegations that ICBINBS is not marketed or used as a nonstick cooking spray. *See* 3-ER-417-418 (dismissing evidence that consumers do not in use ICBINBS as a lubricating spray like PAM); 2-ER-232-233 (dismissing allegations that: ICBINBS' squirt mechanism does not deliver a small amount of product over a large surface area like Pam; consumers bypass the spray mechanism by removing the cap and pouring the product; consumption is driven by its buttery flavor on foods in excess of 1 spray; Unilever's own recipes encourage consumers to use ICBINBS as a cooking medium in excess of 1 spray); *cf*, *Lilly*, 743 F.3d at 665 (Def's classification contradicted by allegations that consumers customarily eat the coating and that it is marketed as such). Under *Lilly*

21

and applicable FDA regulations, these allegations are not only relevant but must be accepted as true.

Instead, the District Court determined that ICBINBS is a "spray type" because it *is* a spray and Defendant claims it can be used to "coat pans for nonstick cooking." 3-ER-409 at 10:2-14; 2-ER-224 at 11:9-11 ("It is true that the food at issue is in the form of a liquid fat or oil, but more specifically it is a spray-type fat or oil."). The fact Unilever brands ICBINBS a "spray" does not automatically place it in a "spray type" category. Indeed, its name is irrelevant. The Ninth Circuit's decision in *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753 (9th Cir. 2015) rejected the idea that when the FDA does not define a word, manufacturers are free to define it as they wish. *Id.* at 758 (explaining that preempting claims on this basis would permit manufacturers to "make any claim – wild, untruthful, or otherwise – about a product whose contents are not addressed by a specific regulation"). Unilever's use of the word "spray" on its product is not dispositive. *See id.*; *Kosta*, 2013 WL 2147413, at *8 ("While Del Monte may disagree with Plaintiffs as to both the meaning of the FDA requirements at issue here and whether its products conform to those requirements, that disagreement does not mean that Plaintiffs are trying to impose additional requirements beyond the FDA's.").

The "spray type" subcategory is limited to nonstick cooking sprays; it does not automatically encompass all products outfitted with a pump mechanism. 3-ER-463; *Allen*, 2013 WL 4737421, at *6 ("spray type" subcategory limited to cooking sprays of which Pam is one example). By Unilever's logic, mayonnaise could be placed in a container with a pump-action nozzle, called "Mayo Spray," and thus be classified as a nonstock cooking spray and labeled as a 0-fat and 0-calorie product—regardless of the certainty that consumers would not use 1 spray of mayonnaise on sandwiches. Put simply, a product must be classified according to how it is customarily consumed, its product characteristics, and dietary uses. These requirements cannot be avoided with semantics and deceptive labeling.

Similarly, a claim that a product can be used to "coat pans for nonstick cooking" does not mean it is a "spray type" either. 3-ER-409 at 10:4-9. Indeed, the entire product category of "Fats and Oils" can be used that way (and commonly are). But importantly, as a cooking medium, butter is not customarily consumed in 0.25g amounts. Under this circular logic, the name decided by Unilever is the only thing that matters – and had Unilever instead called its product "I Can't Believe It's Not Butter Squirt", it would have been classified with butter (as is every other product in this line including ICBINBS Squeeze). *See also Allen,* 2013 WL 4737421, at *6 (describing similar arguments as "circular").

Notably, Unilever *admitted* that its product is used as a butter-flavored topping but did not use the reference amount for butter-substitutes. Instead, Unilever used a "5 spray" (1t) serving size which is not an authorized reference amount for any product. *See generally* 21 C.F.R. § 101.12; 3-ER-463. The District Court's disregarded this, holding that because ICBINBS *could be* used as a "cooking spray," it need not be labeled for its major intended use. *See* 3-ER-409 at 10:10-11 ("[T]he fact that ICBINBS can be used as a topping does not mean that it is not a cooking spray. As Defendant points out, the two categories are not mutually exclusive.") To receive the benefit of preemption, Unilever was required to show that its *major intended use* is that of a nonstick cooking spray. 21 C.F.R. § 101.12(a)(7). Unilever did not even attempt such a showing (likely because it could not), and instead argued this was not required. Indeed, the Complaint alleged that the major intended use is as a butter substitute—a claim supported by Unilever's own marketing and customer data. 3-ER-378 ¶¶ 18-25, 39-40; 2-ER-157 at 9:9-10:15.

In sum, Plaintiffs' allegations created a factual dispute as to ICBINBS's proper reference amount that should not have been decided on express preemption grounds at the pleadings stage. The District Court made a factual determination as to how consumers use ICBINBS but cited no evidence (indeed, none was presented) that consumers actually use ICBINBS as a "spray type," that it was

24

intended to be used as a "spray type," or that it can actually function as a "spray type" like Pam and other lubricating sprays that are used in 0.25g quantities. Because this is an issue of disputed fact, the District Court erred in dismissing Plaintiffs' claims on the basis of express preemption.

**III.    The District Court erred in requiring Plaintiffs to plead how ICBINBS should be classified for preemption purposes; nonetheless, Plaintiffs plausibly alleged that ICBINBS belongs in the "butter, margarine, oil and shortening" category because it is a spread and "butter substitute."**

**A.    Plaintiffs were not required to plead the proper reference category or translate 1 tablespoon into an equivalent number of sprays.**

The District Court also dismissed Plaintiffs' claims because the complaint failed to allege the proper reference category for ICBINBS and express the reference amount as an equivalent number of sprays.  2-ER-224 at 11:19-21.

Plaintiffs were not required to allege the proper reference amount, however, because preemption is an affirmative defense, which requires Unilever to show that their category applies.  It was Unilever's burden to show that its product is primarily marketed and used as a non-stick cooking spray – a classification that Plaintiffs dispute.  *Watkins v. Dollar Tree Stores, Inc*., No. 3:20-CV-00717-L-MSB, 2020 WL 7386024, at *3 (S.D. Cal. Dec. 16, 2020), *motion to reopen granted*, No. 3:20-CV-717-L-MSB, 2021 WL 1597930 (S.D. Cal. Apr. 23, 2021) (quoting *Durnford*, 907 F.3d at 604 n.8) ("As a general proposition, a plaintiff is not required to plead around potential affirmative defenses.").  Plaintiffs are

25

generally not required to plead evidence in support of their allegations. *Durnford*, 907 F.3d at 604 n.8.

Further, the "spray type" category is a *sub-category* of fats and oils. Thus, if ICBINBS is not a "spray type," then as the District Court itself recognized, it belongs in the default "butter, margarine, oil and shortening" category—which has a required serving size of 1 tablespoon. *Pardini I*, 2014 U.S. Dist. LEXIS 7900, at *14 (emphasis in original); ("[m]anufacturers must use the defaulted serving size of one tablespoon for any 'Fat and Oil' <u>unless the product fits within a more specific subcategory</u>"; *see al*so 3-ER-387 ¶ 36 (alleging default serving size of 1 tablespoon applies if product does not fit within a more specific subcategory).

The reference amount for this category is 1 tablespoon. That is the FDA's mandate. The "number of sprays" is a unit of measurement invented by Unilever and is irrelevant. Had Unilever used 1 tablespoon serving size, the label could not have declared 0-fat and 0-calories. That is the relevant inquiry.

**B.    Plaintiffs plausibly allege that ICBINBS belongs in the "butter, margarine oil and shortening" category with a required serving size of 1 tablespoon because it is a spread and butter-substitute.**

Even so, Plaintiffs *did* allege that ICBINBS belongs in the "butter, margarine, oil, and shortening" product category, which encompasses "All types of butter and margarine (regular, diet, liquid and whipped); spreads; oils and shortenings." 3-ER-463. This is plausible for two reasons.

First, the USDA[6] classifies ICBINBS and other "buttery sprays" as spreads –
an industry term meaning vegetable oil and water emulsions.  Commercial Item
Description, Buttery Spreads. U.S. Dept. of Agriculture, Nov. 6, 2008.[7]  3-ER-463
(the "butter, margarine, oil and shortening" category includes all types of butter
and margarine… *spreads*; oils and shortenings" whether *liquid* or solid).[8]  The
USDA itself has expressly acknowledged that the required serving size for "buttery
sprays" is "1 tablespoon according to 21 C.F.R. § 101.12."  *Id.* at 3.

Second, ICBINBS is marketed and used as a butter-substitute that is lower in
fat and calories than butter.  3-ER-378 ¶¶ 18-22, 24, 54-56, 69.  The complaint
notes that Unilever has consistently encouraged consumers to use ICBINBS as a
fat-free, calorie-free substitute for butter in its marketing.  3-ER-378 ¶¶ 23-25.
Unilever advertised, for example, that ICBINBS "tastes as delicious as fresh
butter."  *Id.* ¶ 20.  The label claimed, "America's Favorite Butter Spray" (notably,
PAM and other lubricating sprays are not butter flavored).  *Id.* ¶ 21.  One label
depicted ICBINBS being used as a topping or corn on the cob – a role traditionally
reserved for butter and for years the label claimed it could be used for "topping"

---

[6] The reference amounts are based on consumption studies performed by the
USDA.  *See* 21 C.F.R. § 101.12, Table 2, n.1.

[7] https://www.ams.usda.gov/sites/default/files/media/CID%20Buttery%20Spreads.pdf

[8] https://www.ams.usda.gov/sites/default/files/media/CID%20Buttery%20Spreads.pdf

and "cooking." *Id.* ¶¶ 22-23. Recipes encouraged consumers to use ICBINBS as a substitute for butter with grilled vegetables, as a topping for popcorn, and as a spread for muffins and toast. *Id.* ¶¶ 22, 50. Indeed, even the name draws a comparison to butter (i.e., "I Can't Believe It's Not Butter—Spray"). *Id.* ¶ 21.

Not surprisingly, Plaintiffs allege that consumers indeed use ICBINBS as a butter substitute —and *expect* that it is actually fat- and calorie-free. *Id.* ¶ 54. They routinely apply it to foods complimented by butter like potatoes and oatmeal and use it – like butter - as a topping and to a lesser extent as a cooking-medium. *Id.* ¶¶ 40, 49. Further, because ICBINBS is used to impart the flavor of butter, consumers use ICBINBS in quantities similar to that of butter, far in excess of the 0.2 grams (i.e. "1 spray") listed on the nutritional panel – a reality that Unilever's "0 calories" and "0 fat" claims encourage. *Id.* ¶¶ 44, 49, 55, 56. The Complaint even cites testimonials and forums online discussing how consumers actually use the product indicating that some consumers even bypass the spray mechanism altogether and pour the product over foods like oatmeal and potatoes. *Id.* ¶¶ 47-49.

The FDA requires manufacturers to select a reference amount that reflects a product's major intended use, *and* to use the same reference amount for a *substitute product* as the food it is intended to replace. *See* 21 C.F.R. § 101.12(a)(7), (d). As a substitute for butter, ICBINBS belongs in the same

28

category as butter itself, with a required reference amount of 1 tablespoon (about 40 sprays). Using this serving size, Unilever would not be allowed to claim it is calorie and fat-free and the label would have disclosed approximately 60 calories and 6grams of fat per serving. *Id.* ¶ 56-57. Instead, the product lists a serving size of *1 g (5 sprays)* for toppings, which falls short of the mandated reference amount. *Id*. ¶ 25, Fig. 2; *See* 21 C.F.R. § 101.12, Table 2.

The Complaint alleges that consumers *indeed* used the product as it was marketed—as a butter substitute—and *expected* that it was actually fat- and calorie-free. Unilever's failure to meet the FDA's requirements predictably resulted in consumer confusion, and a vast premium in the prices paid.

### C. Other courts have correctly held that at a minimum, there is a factual dispute about whether spray butters should be classified as "butter substitutes" or "cooking sprays."

A similar lawsuit, *Allen v. ConAgra Foods, Inc.,* was filed in the Northern District of California against ConAgra Foods, Inc. based on the marketing and sale of a nearly identical, competing spray-butter product called Parkay Spray. *See generally Allen*, 2013 WL 4737421. The *Allen* lawsuit alleged that Parkay Spray is deceptively labeled "0 fat" and "0 calories" in violation of the same regulations at issue here. *Id.* The district court in *Allen* denied Defendant's motion to dismiss on the basis of preemption. *See Allen*, 2013 WL 4737421.

This lawsuit and *Allen* were filed in March and April of 2013, respectively. *Id*.; *see also* Pardini Compl., March 12, 2013, 3-ER-525. The defendants in both cases made nearly identical arguments in support of their motions to dismiss, claiming preemption based on the premise that ICBINBS and Parkay are "spray types" like PAM, not butter-substitutes. *See* Pardini, Mot. to Dismiss at 13:8-26; *Allen*, 2013 WL 4737421; Def. ConAgra Foods, Inc.'s Notice of Mot. and Mot. to Dismiss and, alternatively, to transfer ("ConAgra Mot. to Dismiss") 8:18-23, 14:2-4, April 19, 2013, 3-ER-432. Each argued that FDA regulations permit the "0 fat" and "0 calories" claims for "spray type" products containing less than 0.5 g of fat and 5 calories per serving. Pardini, Mot. to Dismiss, 13:27-14:3l, 3-ER-348; Allen Mot. to Dismiss at 7:3-10, 3-ER-432. Each argued that its product belongs in the "spray type" category because it "*is* a spray." Pardini, Mot. to Dismiss at 13:24-26, 3-ER-348, *Allen*, Mot. to Dismiss at 5:21, 3-ER-432.

A few months after this lawsuit was dismissed, Judge Tigar in *Allen* considered the Orders of Dismissal rendered by Judge Conti and disagreed. Judge Tigar held that there was substantial factual support for Plaintiff's allegation that Parkay Spray uses the wrong serving sizes because it is *promoted and consumed as a butter-substitute*. *Allen*, 2013 WL 4737421, at *5-7 (citing allegations that Parkay Spray is butter-flavored, "creamy" like butter, promoted in applications where butter is normally used, i.e. for cooking and topping, and consumed like

butter).  "If Plaintiff is correct," the Court recognized, "then the correct reference amount is the reference amount for butter." *Id.* at *7.  While ConAgra insisted that "Parkay spray *is* a spray," and that Parkay is labeled in accordance with the "spray type" regulations, Judge Tigar recognized that a fact dispute existed concerning how Parkay Spray is customarily consumed and therefore the appropriate regulation governing the label.  Given this factual dispute, plaintiff's claims could not be dismissed on preemption grounds.  *Id.*[9]

Here, like the *Allen* case, Plaintiffs allege that ICBINBS spray tastes like liquid butter, looks like liquid butter, is marked with a shelf life like butter, and ***is in fact*** used as a topping like liquid butter.  These allegations are not only plausible—they are demonstrably true—and should not have been ignored for the purposes of a motion to dismiss.

---

[9] Subsequently, the *Allen* case was reassigned to Judge Orrick.  After certifying a very small class of California purchasers, Judge Orrick ultimately dismissed the case on summary judgment because the plaintiff failed to prove that Parkay Spray is a butter-substitute.  *See* ECF No. 328.  Judge Orrick's Order does not dictate the result here.  First, Judge Orrick applied the wrong legal framework because preemption is an affirmative defense and, in this case, if Unilever fails to prove its product is a "spray type" then it necessarily belongs in the "butter, margarine, oil and shortening" category which expressly includes "spreads" – like ICBINBS.  *See* Sec. III.A. *supra*.  Second, it cannot seriously be disputed that I Can't Believe It's Not ***Butter!*** Spray was marketed and used as an alternative to butter and butter-substitute.  Judge Orrick did not review evidence pertaining to this product, its marketing and amounts customarily consumed.  Third, the USDA did, in fact, perform consumption studies on ICBINBS and determined that as a "buttery spray" ICBINBS must use a serving size of 1 Tablespoon. https://www.ams.usda.gov/sites/default/files/media/CID%20Buttery%20Spreads.pdf. Judge Orrick was not presented with similar evidence in the case involving Parkay Spray.

## <u>CONCLUSION</u>

The District Court's dismissals are reversible error because Unilever did not show that Plaintiffs' claims are expressly preempted. At most there is a dispute of fact as to whether ICBINBS should be classified as a nonstick cooking spray in its primary intended use or a spread and butter substitute. Plaintiffs do not seek to impose any requirements that are different from those imposed by federal regulations and their claims should not have been dismissed at the pleadings stage.

Dated: April 8, 2022       **THE EUREKA LAW FIRM**

By: _/s/ Ureka E. Idstrom_
       UREKA E. IDSTROM

**COTCHETT, PITRE & McCARTHY LLP**
       JUSTIN T. BERGER
       SARVENAZ J. FAHIMI

*Attorneys for Plaintiffs-Appellants*
*Kym Pardini and Carrie Woo*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** _____No. 21-16806_____

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**___*/s/ Ureka E. Idstrom*_____ **Date** _____April 8, 2022_____
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 17**                                                                                    *New 12/01/18*

33

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____No. 21-16806_____

I am the attorney or self-represented party.

**This brief contains __7628__ words,** excluding the items exempted by Fed.
R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.
32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _ /s/ Ureka E. Idstrom_____ **Date** _____April 8, 2022_____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                              *Rev. 12/01/18*

**STATUTORY ADDENDUM**

# STATUTORY ADDENDUM

## TABLE OF CONTENTS

21 C.F.R. § 100.1 ........................................................................AD001

21 C.F.R. § 101.1 ........................................................................AD006

21 C.F.R. § 101.9 ........................................................................AD008

21 C.F.R. § 101.12 ......................................................................AD053

21 C.F.R. § 101.62 ......................................................................AD073

21 U.S.C. § 343 ...........................................................................AD087

21 U.S.C. § 343-1 ........................................................................AD111

21 U.S.C. § 393 ...........................................................................AD113

55 FR 29517 ................................................................................AD118

Code of Federal Regulations
Title 21. Food and Drugs
Chapter I. Food and Drug Administration, Department of Health and Human Services (Refs & Annos)
Subchapter B. Food for Human Consumption
Part 100. General (Refs & Annos)
Subpart A. State and Local Requirements (Refs & Annos)

21 C.F.R. § 100.1

§ 100.1 Petitions requesting exemption from preemption for State or local requirements.

Currentness

(a) Scope and purpose.

(1) This subpart applies to the submission and consideration of petitions under section 403A(b) of the Federal Food, Drug, and Cosmetic Act (the act), by a State or a political subdivision of a State, requesting exemption of a State requirement from preemption under section 403A(a) of the act.

(2) Section 403A(b) of the act provides that where a State requirement has been preempted under section 403A(a) of the act, the State may petition the agency for an exemption. The agency may grant the exemption, under such conditions as it may prescribe by regulation, if the agency finds that the State requirement will not cause any food to be in violation of any applicable requirement under Federal law, will not unduly burden interstate commerce, and is designed to address a particular need for information that is not met by the preemptive Federal requirement.

(b) Definitions.

(1) Act means the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321 et seq.).

(2) Agency means the Food and Drug Administration.

(3) Commissioner means the Commissioner of Food and Drugs.

(4) State means a State as defined in section 201(a)(1) of the act (which includes a territory of the United States, the District of Columbia, and Puerto Rico) or any political subdivision of a State having authority to issue food standards and food labeling regulations having force of law.

(5) State requirement means any statute, standard, regulation, or other requirement that is issued by a State.

(c) Prerequisites for petitions for exemption from preemption. The Food and Drug Administration will consider a petition for exemption from preemption on its merits only if the petition demonstrates that:

(1) The State requirement was enacted or was issued as a final rule by an authorized official of the State and is in effect or would be in effect but for the provisions of section 403A of the act.

(2) The State requirement is subject to preemption under section 403A(a) of the act because of a statutory provision listed in that section or because of a Federal standard or other Federal regulation that is in effect, or that has been published as a final rule with a designated effective date, and that was issued under the authority of a statutory provision listed in that section. For the purposes of this subpart, all petitions seeking exemption from preemption under section 403A(a)(3) through (a)(5) of the act submitted before May 8, 1992, will be considered timely even though the applicable statutory provisions or regulations are not yet in effect.

(3) The petitioner is an official of a State having authority to act for, or on behalf of, the Government in applying for an exemption of State requirements from preemption.

(4) The State requirement is subject to preemption under section 403A(a) of the act because it is not identical to the requirement of the preemptive Federal statutory provision or regulation including a standard of identity, quality, and fill. "Not identical to" does not refer to the specific words in the requirement but instead means that the State requirement directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food, or concerning a food container, that:

(i) Are not imposed by or contained in the applicable provision (including any implementing regulation) of section 401 or 403 of the act; or

(ii) Differ from those specifically imposed by or contained in the applicable provision (including any implementing regulation) of section 401 or 403 of the act.

(d) Form of petition.

(1) All information included in the petition should meet the general requirements of § 10.20(c) of this chapter.

(2) An original and one copy of the petition shall be submitted, or the petitioner may submit an original and a computer readable disk containing the petition. Contents of the disk should be in a standard format, such as ASCII format. (Petitioners interested in submitting a disk should contact the Center for Food Safety and Applied Nutrition for details.)

(3) Petitions for exemption from preemption for a State requirement shall be submitted to the Division of Dockets Management in the following form:

(Date) _____

Division of Dockets Management,

Food and Drug Administration,

Department of Health and Human Services,

5630 Fishers Lane, rm. 1061,

Rockville, MD 20852.

Petition Requesting Exemption from Preemption for State Requirement

The undersigned submits this petition under section 403A(b)of the Federal Food, Drug, and Cosmetic Act to request that the Food and Drug Administration exempt a State requirement from preemption.

The undersigned has authority to act for, or on behalf of, the (identify State or political subdivision of the State) because (document petitioner's authority to submit petition on behalf of the State).

A. Action Requested

1. Identify and give the exact wording of the State requirement and give date it was enacted or issued in final form.

2. Identify the specific standard or regulation that is believed to preempt the State requirement and the section and paragraph of the act that the standard or regulation implements.

B. Documentation of State Requirement

Provide a copy of the State requirement that is the subject of the application. Where available, the application should also include copies of any legislative history or background materials used in issuing the requirement, including hearing reports or studies concerning the development or consideration of the requirement.

C. Statement of Grounds

A petition for an exemption from preemption should contain the following:

1. An explanation of the State requirement and its rationale, and a comparison of State and Federal requirements to show differences.

2. An explanation of why compliance with the State requirement would not cause a food to be in violation of any applicable requirement under Federal law.

3. Information on the effect that granting the State petition will have on interstate commerce. The petition should contain information on economic feasibility, i.e., whether the State and Federal requirements have significantly different effects on the production and distribution of the food product; comparison of the costs of compliance as shown by data or information on the actual or anticipated effect of the State and Federal requirements on the sale and price of the food product in interstate commerce; and the effect of the State requirement on the availability of the food product to consumers. To the extent possible, the petition should include information showing that it is practical and feasible for producers of food products to comply with the State requirement. Such information may be submitted in the form of statements from affected persons indicating their ability to comply.

4. Identification of a particular need for information that the State requirement is designed to meet, which need is not met by Federal law. The petition should describe the conditions that require the State to petition for an exemption, the

information need that the State requirement fulfills, the inadequacy of the Federal requirement in addressing this need, and the geographical area or political subdivision in which such need exists.

### D. Environmental Impact

The petition shall contain a claim for categorical exclusion under 21 CFR 25.24 or an environmental assessment under 21 CFR 25.31.

### E. Notification

Provide name and address of person, branch, department, or other instrumentality of the State government that should be notified of the Commissioner's action concerning the petition.

### F. Certification

The undersigned certifies, that, to the best knowledge and belief of the undersigned, this petition includes all information and views on which the petition relies.

(Signature) _____

(Name of petitioner) _____

(Mailing address) _____

(Telephone number) _____

(Information collection requirements in this section were approved by the Office of Management and Budget (OMB) and assigned OMB number 0910–0277)

(e) Submission of petition for exemption; public disclosure. The availability for public disclosure of a petition for exemption will be governed by the rules specified in § 10.20(j) of this chapter.

(f) Agency consideration of petitions.

(1) Unless otherwise specified in this section, all relevant provisions and requirements of subpart B of part 10 of this chapter, are applicable to State petitions requesting exemption from Federal preemption under section 403A(b) of the act.

(2) If a petition does not meet the prerequisite requirements of paragraph (c) of this section, the agency will issue a letter to the petitioner denying the petition and stating in what respect the petition does not meet these requirements.

(3) If a petition appears to meet the prerequisite requirements in paragraph (c) of this section, it will be filed by the Division of Dockets Management, stamped with the date of filing, and assigned a docket number. The docket number identifies the file established by the Division of Dockets Management for all submissions relating to the petition, as provided in this part. Subsequent submissions relating to the matter must refer to the docket number and will be filed in the docket file. The Division of Dockets Management will promptly notify the petitioner in writing of the filing and docket number of a petition.

(4) Any interested person may submit written comments to the Division of Dockets Management on a filed petition as provided in § 10.30(d) of this chapter.

(5) Within 90 days of the date of filing the agency will furnish a response to the petitioner. The response will either:

(i) State that the agency has tentatively determined that the petition merits the granting of an exemption, and that it intends to publish in the Federal Register a proposal to grant the exemption through rulemaking;

(ii) Deny the petition and state the reasons for such denial; or

(iii) Provide a tentative response indicating why the agency has been unable to reach a decision on the petition, e.g., because of other agency priorities or a need for additional information.

(g) If a State submitted a petition for exemption of a State requirement from preemption under section 403A(a)(3) through (a) (5) of the act before May 8, 1992, that State requirement will not be subject to preemption until:

(1) November 8, 1992; or

(2) Action on the petition, whichever occurs later.

SOURCE: 42 FR 14306, March 15, 1977; 54 FR 39632, Sept. 27, 1989; 58 FR 2467, Jan. 6, 1993; 58 FR 2468, Jan. 6, 1993; 62 FR 51513, Oct. 1, 1997; 81 FR 49895, July 29, 2016, unless otherwise noted.

AUTHORITY: 21 U.S.C. 321, 331, 337, 342, 343, 348, 371.

Notes of Decisions (3)

Current through March 31, 2022; 87 FR 18739.

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

§ 101.1 Principal display panel of package form food., 21 C.F.R. § 101.1

Code of Federal Regulations
   Title 21. Food and Drugs
      Chapter I. Food and Drug Administration, Department of Health and Human Services (Refs & Annos)
      Subchapter B. Food for Human Consumption
         Part 101. Food Labeling (Refs & Annos)
            Subpart A. General Provisions

21 C.F.R. § 101.1

§ 101.1 Principal display panel of package form food.

Currentness

The term principal display panel as it applies to food in package form and as used in this part, means the part of a label that is most likely to be displayed, presented, shown, or examined under customary conditions of display for retail sale. The principal display panel shall be large enough to accommodate all the mandatory label information required to be placed thereon by this part with clarity and conspicuousness and without obscuring design, vignettes, or crowding. Where packages bear alternate principal display panels, information required to be placed on the principal display panel shall be duplicated on each principal display panel. For the purpose of obtaining uniform type size in declaring the quantity of contents for all packages of substantially the same size, the term area of the principal display panel means the area of the side or surface that bears the principal display panel, which area shall be:

(a) In the case of a rectangular package where one entire side properly can be considered to be the principal display panel side, the product of the height times the width of that side;

(b) In the case of a cylindrical or nearly cylindrical container, 40 percent of the product of the height of the container times the circumference;

(c) In the case of any otherwise shaped container, 40 percent of the total surface of the container: *Provided, however*, That where such container presents an obvious "principal display panel" such as the top of a triangular or circular package of cheese, the area shall consist of the entire top surface. In determining the area of the principal display panel, exclude tops, bottoms, flanges at tops and bottoms of cans, and shoulders and necks of bottles or jars. In the case of cylindrical or nearly cylindrical containers, information required by this part to appear on the principal display panel shall appear within that 40 percent of the circumference which is most likely to be displayed, presented, shown, or examined under customary conditions of display for retail sale.

SOURCE: 42 FR 14308, March 15, 1977; 51 FR 25017, July 9, 1986; 52 FR 6971, March 9, 1987; 54 FR 39632, Sept. 27, 1989; 59 FR 350, Jan. 4, 1994; 60 FR 67174, Dec. 28, 1995; 61 FR 43446, Aug. 23, 1996; 62 FR 3600, Jan. 23, 1997; 62 FR 15342, March 31, 1997; 62 FR 51513, Oct. 1, 1997; 65 FR 76110, Dec. 5, 2000; 81 FR 49895, July 29, 2016, unless otherwise noted.

AUTHORITY: 15 U.S.C. 1453, 1454, 1455; 21 U.S.C. 321, 331, 342, 343, 348, 371; 42 U.S.C. 243, 264, 271.

Notes of Decisions (4)

AD006

§ 101.1 Principal display panel of package form food., 21 C.F.R. § 101.1

Current through March 31, 2022; 87 FR 18739.

**End of Document**                                                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**AD007**

Code of Federal Regulations
  Title 21. Food and Drugs
    Chapter I. Food and Drug Administration, Department of Health and Human Services (Refs & Annos)
      Subchapter B. Food for Human Consumption
        Part 101. Food Labeling (Refs & Annos)
          Subpart A. General Provisions

21 C.F.R. § 101.9

§ 101.9 Nutrition labeling of food.

Effective: December 21, 2018
Currentness

(a) Nutrition information relating to food shall be provided for all products intended for human consumption and offered for sale unless an exemption is provided for the product in paragraph (j) of this section.

(1) When food is in package form, the required nutrition labeling information shall appear on the label in the format specified in this section.

(2) When food is not in package form, the required nutrition labeling information shall be displayed clearly at the point of purchase (e.g., on a counter card, sign, tag affixed to the product, or some other appropriate device). Alternatively, the required information may be placed in a booklet, looseleaf binder, or other appropriate format that is available at the point of purchase.

(3) Solicitation of requests for nutrition information by a statement "For nutrition information write to _____" on the label or in the labeling or advertising for a food, or providing such information in a direct written reply to a solicited or unsolicited request, does not subject the label or the labeling of a food exempted under paragraph (j) of this section to the requirements of this section if the reply to the request conforms to the requirements of this section.

(4) If any vitamin or mineral is added to a food so that a single serving provides 50 percent or more of the Reference Daily Intake (RDI) for the age group for which the product is intended, as specified in paragraph (c)(8)(iv) of this section, of any one of the added vitamins or minerals, unless such addition is permitted or required in other regulations, e.g., a standard of identity or nutritional quality guideline, or is otherwise exempted by the Commissioner, the food shall be considered a food for special dietary use within the meaning of § 105.3(a)(1)(iii) of this chapter.

(b) Except as provided in § 101.9(h)(3), all nutrient and food component quantities shall be declared in relation to a serving as defined in this section.

(1) The term serving or serving size means an amount of food customarily consumed per eating occasion by persons 4 years of age or older which is expressed in a common household measure that is appropriate to the food. When the food is specially formulated or processed for use by infants or by toddlers, a serving or serving size means an amount of food

customarily consumed per eating occasion by infants up to 12 months of age or by children 1 through 3 years of age, respectively.

(2) Except as provided in paragraphs (b)(3), (b)(4), and (b)(6) of this section and for products that are intended for weight control and are available only through a weight-control or weight-maintenance program, serving size declared on a product label shall be determined from the "Reference Amounts Customarily Consumed Per Eating Occasion * * * *" (reference amounts) that appear in § 101.12(b) using the procedures described below. For products that are both intended for weight control and available only through a weight-control program, a manufacturer may determine the serving size that is consistent with the meal plan of the program. Such products must bear a statement, "for sale only through the _____ program" (fill in the blank with the name of the appropriate weight-control program, e.g., Smith's Weight Control), on the principal display panel. However, the reference amounts in § 101.12(b) shall be used for purposes of evaluating whether weight-control products that are available only through a weight-control program qualify for nutrient content claims or health claims.

(i) For products in discrete units (e.g., muffins, sliced products, such as sliced bread, or individually packaged products within a multiserving package) and for products which consist of two or more foods packaged and presented to be consumed together where the ingredient represented as the main ingredient is in discrete units (e.g., pancakes and syrup), the serving size shall be declared as follows:

(A) If a unit weighs 50 percent or less of the reference amount, the serving size shall be the number of whole units that most closely approximates the reference amount for the product category;

(B) If a unit weighs more than 50 percent, but less than 67 percent of the reference amount, the manufacturer may declare one unit or two units as the serving size;

(C) If a unit weighs 67 percent or more, but less than 200 percent of the reference amount, the serving size shall be one unit;

(D) If a unit weighs at least 200 percent and up to and including 300 percent of the applicable reference amount, the serving size shall be the amount that approximates the reference amount. In addition to providing a column within the Nutrition Facts label that lists the quantitative amounts and percent Daily Values per serving size, the manufacturer shall provide a column within the Nutrition Facts label that lists the quantitative amounts and percent Daily Values per individual unit. The first column would be based on the serving size for the product and the second column would be based on the individual unit. The exemptions in paragraphs (b)(12)(i)(A), (B), and (C) of this section apply to this provision.

(E) The serving size for maraschino cherries shall be expressed as 1 cherry with the parenthetical metric measure equal to the average weight of a medium size cherry.

(F) The serving size for products that naturally vary in size (e.g., pickles, shellfish, whole fish, and fillet of fish) may be the amount in ounces that most closely approximates the reference amount for the product category. Manufacturers shall adhere to the requirements in paragraph (b)(5)(vi) of this section for expressing the serving size in ounces.

(G) For products which consist of two or more foods packaged and presented to be consumed together where the ingredient represented as the main ingredient is in discrete units (e.g., pancakes and syrup), the serving size may be the number of discrete units represented as the main ingredient plus proportioned minor ingredients used to make the reference amount for the combined product determined in § 101.12(f).

(H) For packages containing several individual single-serving containers, each of which is labeled with all required information including nutrition labeling as specified in § 101.9 (that is, are labeled appropriately for individual sale as single-serving containers), the serving size shall be 1 unit.

(ii) For products in large discrete units that are usually divided for consumption (e.g., cake, pie, pizza, melon, cabbage), for unprepared products where the entire contents of the package is used to prepare large discrete units that are usually divided for consumption (e.g., cake mix, pizza kit), and for products which consist of two or more foods packaged and presented to be consumed together where the ingredient represented as the main ingredient is a large discrete unit usually divided for consumption (e.g., prepared cake packaged with a can of frosting), the serving size shall be the fractional slice of the ready-to-eat product (e.g., $^1/_{12}$ cake, ⅛ pie, ¼ pizza, ¼ melon, $^1/_6$ cabbage) that most closely approximates the reference amount for the product category, and may be the fraction of the package used to make the reference amount for the unprepared product determined in § 101.12(c) or the fraction of the large discrete unit represented as the main ingredient plus proportioned minor ingredients used to make the reference amount for the combined product determined in § 101.12(f). In expressing the fractional slice, manufacturers shall use ½, ⅓, ¼, $^1/_5$, $^1/_6$, or smaller fractions that can be generated by further division by 2 or 3.

(iii) For nondiscrete bulk products (e.g., breakfast cereal, flour, sugar, dry mixes, concentrates, pancake mixes, macaroni and cheese kits), and for products which consist of two or more foods packaged and presented to be consumed together where the ingredient represented as the main ingredient is a bulk product (e.g., peanut butter and jelly), the serving size shall be the amount in household measure that most closely approximates the reference amount for the product category and may be the amount of the bulk product represented as the main ingredient plus proportioned minor ingredients used to make the reference amount for the combined product determined in § 101.12(f).

(3) The serving size for meal products and main dish products as defined in § 101.13(l) and (m) that comes in single-serving containers as defined in paragraph (b)(6) of this section shall be the entire content (edible portion only) of the package. Serving size for meal products and main dish products in multiserving containers shall be based on the reference amount applicable to the product in § 101.12(b) if the product is listed in § 101.12(b). Serving size for meal products and main dish products in multiserving containers that are not listed in § 101.12(b) shall be based on the reference amount according to § 101.12(f).

(4) A variety pack, such as a package containing several varieties of single-serving units as defined in paragraph (b)(2)(i) of this section, and a product having two or more compartments with each compartment containing a different food, shall provide nutrition information for each variety or food per serving size that is derived from the reference amount in § 101.12(b) applicable for each variety or food and the procedures to convert the reference amount to serving size in paragraph (b)(2) of this section.

(5) For labeling purposes, the term common household measure or common household unit means cup, tablespoon, teaspoon, piece, slice, fraction (e.g., ¼ pizza), ounce (oz), fluid ounce (fl oz), or other common household equipment

used to package food products (e.g., jar, tray). In expressing serving size in household measures, except as specified in paragraphs (b)(5)(iv), (b)(5)(v), (b)(5)(vi), and (b)(5)(vii) of this section, the following rules shall be used:

(i) Cups, tablespoons, or teaspoons shall be used wherever possible and appropriate except for beverages. For beverages, a manufacturer may use fluid ounces. Cups shall be expressed in ¼ – or ⅓ –cup increments. Tablespoons shall be expressed as 1, 1 ⅓, 1 ½, 1 $^{2}/_{3}$, 2, or 3 tablespoons. Teaspoons shall be expressed as ⅛, ¼, ½, ¾, 1, or 2 teaspoons.

(ii) If cups, tablespoons or teaspoons are not applicable, units such as piece, slice, tray, jar, and fraction shall be used.

(iii) If paragraphs (b)(5)(i) and (b)(5)(ii) of this section are not applicable, ounces may be used with an appropriate visual unit of measure such as a dimension of a piece, e.g., 1 oz (28 g/about ½ pickle). Ounce measurements shall be expressed in 0.5 oz increments most closely approximating the reference amount.

(iv) A description of the individual container or package shall be used for single serving containers and for individually packaged products within multiserving containers (e.g., can, box, package). A description of the individual unit shall be used for other products in discrete units (e.g., piece, slice, cracker, bar).

(v) For unprepared products where the entire contents of the package is used to prepare large discrete units that are usually divided for consumption (e.g., cake mix, pizza kit), the fraction or portion of the package may be used.

(vi) Ounces with an appropriate visual unit of measure, as described in paragraph (b)(5)(iii) of this section, may be used for products that naturally vary in size as provided for in paragraph (b)(2)(i)(F) of this section.

(vii) As provided for in § 101.9(h)(1), for products that consist of two or more distinct ingredients or components packaged and presented to be consumed together (e.g. dry macaroni and cheese mix, cake and muffin mixes with separate ingredient packages, pancakes and syrup), nutrition information may be declared for each component or as a composite. The serving size may be provided in accordance with the provisions of paragraphs (b)(2)(i), (b)(2)(ii), and (b)(2)(iii) of this section, or alternatively in ounces with an appropriate visual unit of measure, as described in paragraph (b)(5)(iii) of this section (e.g., declared as separate components: "3 oz dry macaroni (84 g/about $^{2}/_{3}$ cup)" and "1 oz dry cheese mix (28 g/about 2 tbsp);" declared as a composite value: "4 oz (112 g/about $^{2}/_{3}$ cup macaroni and 2 tbsp dry cheese mix)").

(viii) For nutrition labeling purposes, a teaspoon means 5 milliliters (mL), a tablespoon means 15 mL, a cup means 240 mL, 1 fl oz means 30 mL, and 1 oz in weight means 28 g.

(ix) When a serving size, determined from the reference amount in § 101.12(b) and the procedures described in this section, falls exactly half way between two serving sizes, e.g., 2.5 tbsp, manufacturers shall round the serving size up to the next incremental size.

(6) A product that is packaged and sold individually that contains less than 200 percent of the applicable reference amount must be considered to be a single-serving container, and the entire content of the product must be labeled as one serving. In addition to providing a column within the Nutrition Facts label that lists the quantitative amounts and percent Daily

Values per serving, for a product that is packaged and sold individually that contains more than 150 percent and less than 200 percent of the applicable reference amount, the Nutrition Facts label may voluntarily provide, to the left of the column that provides nutrition information per container (i.e., per serving), an additional column that lists the quantitative amounts and percent Daily Values per common household measure that most closely approximates the reference amount.

(7) A label statement regarding a serving shall be the serving size expressed in common household measures as set forth in paragraphs (b)(2) through (b)(6) of this section and shall be followed by the equivalent metric quantity in parenthesis (fluids in milliliters and all other foods in grams) except for single-serving containers.

(i) For a single-serving container, the parenthetical metric quantity, which will be presented as part of the net weight statement on the principal display panel, is not required except where nutrition information is required on a drained weight basis according to § 101.9(b)(9). However, if a manufacturer voluntarily provides the metric quantity on products that can be sold as single servings, then the numerical value provided as part of the serving size declaration must be identical to the metric quantity declaration provided as part of the net quantity of contents statement.

(ii) The gram or milliliter quantity equivalent to the household measure should be rounded to the nearest whole number except for quantities that are less than 5 g (mL). The gram (mL) quantity between 2 and 5 g (mL) should be rounded to the nearest 0.5 g (mL) and the g (mL) quantity less than 2 g (mL) should be expressed in 0.1–g (mL) increments.

(iii) In addition, serving size may be declared in ounce and fluid ounce, in parenthesis, following the metric measure separated by a slash where other common household measures are used as the primary unit for serving size, e.g., 1 slice (28 g/1 oz) for sliced bread. The ounce quantity equivalent to the metric quantity should be expressed in 0.1 oz increments.

(iv) If a manufacturer elects to use abbreviations for units, the following abbreviations shall be used: tbsp for tablespoon, tsp for teaspoon, g for gram, mL for milliliter, oz for ounce, and fl oz for fluid ounce.

(v) For products that only require the addition of water or another ingredient that contains insignificant amounts of nutrients in the amount added and that are prepared in such a way that there are no significant changes to the nutrient profile, the amount of the finished product may be declared in parentheses at the end of the serving size declaration (e.g., ½ cup (120 mL) concentrated soup (makes 1 cup prepared)).

(vi) To promote uniformity in label serving sizes in household measures declared by different manufacturers, FDA has provided a guidance document entitled, "Guidelines for Determining the Gram Weight of the Household Measure." The guidance document can be obtained from the Office of Nutritional Products, Labeling and Dietary Supplements (HFS–800), Center for Food Safety and Applied Nutrition, Food and Drug Administration, 5001 Campus Dr., College Park, MD 20740.

(8) Determination of the number of servings per container shall be based on the serving size of the product determined by following the procedures described in this section.

(i) The number of servings shall be rounded to the nearest whole number except for the number of servings between 2 and 5 servings and random weight products. The number of servings between 2 and 5 servings shall be rounded to the nearest 0.5 serving. Rounding should be indicated by the use of the term about (e.g., about 2 servings, about 3.5 servings).

(ii) When the serving size is required to be expressed on a drained solids basis and the number of servings varies because of a natural variation in unit size (e.g., maraschino cherries, pickles), the manufacturer may state the typical number of servings per container (e.g., usually 5 servings).

(iii) For random weight products, manufacturers may declare "varied" for the number of servings per container provided the nutrition information is based on the reference amount expressed in the appropriate household measure based on the hierarchy described in paragraph (b)(5) of this section. Random weight products are foods such as cheeses that are sold as random weights that vary in size, such that the net contents for different containers would vary. The manufacturer may provide the typical number of servings in parentheses following the "varied" statement.

(iv) For packages containing several individual single-serving containers, each of which is labeled with all required information including nutrition labeling as specified in § 101.9 (that is, are labeled appropriately for individual sale as single-serving containers), the number of servings shall be the number of individual packages within the total package.

(v) For packages containing several individually packaged multiserving units, the number of servings shall be determined by multiplying the number of individual multiserving units in the total package by the number of servings in each individual unit.

(9) The declaration of nutrient and food component content shall be on the basis of food as packaged or purchased with the exception of raw fish covered under § 101.42 (see 101.44), packaged single-ingredient products that consist of fish or game meat as provided for in paragraph (j)(11) of this section, and of foods that are packed or canned in water, brine, or oil but whose liquid packing medium is not customarily consumed (e.g., canned fish, maraschino cherries, pickled fruits, and pickled vegetables). Declaration of nutrient and food component content of raw fish shall follow the provisions in § 101.45. Declaration of the nutrient and food component content of foods that are packed in liquid which is not customarily consumed shall be based on the drained solids.

(10) Another column of figures may be used to declare the nutrient and food component information:

(i) Per 100 g or 100 mL, or per 1 oz or 1 fl oz of the food as packaged or purchased;

(ii) Per one unit if the serving size of a product in discrete units is more than 1 unit.

(iii) Per cup popped for popcorn in a multiserving container.

(11) If a product is promoted on the label, labeling, or advertising for a use that differs in quantity by twofold or greater from the use upon which the reference amount in § 101.12(b) was based (e.g., liquid cream substitutes promoted for use with breakfast cereals), the manufacturer shall provide a second column of nutrition information based on the amount customarily consumed in the promoted use, in addition to the nutrition information per serving derived from the reference amount in § 101.12(b), except that nondiscrete bulk products that are used primarily as ingredients (e.g., flour, sweeteners, shortenings, oils), or traditionally used for multipurposes (e.g., eggs, butter, margarine), and multipurpose baking mixes are exempt from this requirement.

(12)(i) Products that are packaged and sold individually and that contain at least 200 percent and up to and including 300 percent of the applicable reference amount must provide an additional column within the Nutrition Facts label that lists the quantitative amounts and percent Daily Values for the entire package, as well as a column listing the quantitative amounts and percent Daily Values for a serving that is less than the entire package (i.e., the serving size derived from the reference amount). The first column would be based on the serving size for the product and the second column would be based on the entire contents of the package.

(A) This provision does not apply to products that meet the requirements to use the tabular format in paragraph (j)(13)(ii)(A)(1) of this section or to products that meet the requirements to use the linear format in paragraph (j)(13)(ii)(A)(2) of this section.

(B) This provision does not apply to raw fruits, vegetables, and seafood for which voluntary nutrition labeling is provided in the product labeling or advertising or when claims are made about the product.

(C) This provision does not apply to products that require further preparation and provide an additional column of nutrition information under paragraph (e) of this section, to products that are commonly consumed in combination with another food and provide an additional column of nutrition information under paragraph (e) of this section, to products that provide an additional column of nutrition information for two or more groups for which RDIs are established (e.g., both infants and children less than 4 years of age), to popcorn products that provide an additional column of nutrition information per 1 cup popped popcorn, or to varied-weight products covered under paragraph (b)(8)(iii) of this section.

(ii) When a nutrient content claim or health claim is made on the label of a product that uses a dual column as required in paragraph (b)(2)(i)(D) or (b)(12)(i) of this section, the claim must be followed by a statement that sets forth the basis on which the claim is made, except that the statement is not required for products when the nutrient that is the subject of the claim meets the criteria for the claim based on the reference amount for the product and the entire container or the unit amount. When a nutrient content claim is made, the statement must express that the claim refers to the amount of the nutrient per serving (e.g., "good source of calcium per serving" or "per X [insert unit]_serving") or per reference amount (e.g., "good source of calcium per [insert reference amount (e.g., per 8 ounces)]), as required based on § 101.12(g). When a health claim is made, the statement shall be "A serving of _ounces of this product conforms to such a diet."

(c) The declaration of nutrition information on the label and in labeling of a food shall contain information about the level of the following nutrients, except for those nutrients whose inclusion, and the declaration of amounts, is voluntary as set forth in this paragraph. No nutrients or food components other than those listed in this paragraph as either mandatory or voluntary may be included within the nutrition label. Except as provided for in paragraphs (f) or (j) of this section, nutrient information shall be presented using the nutrient names specified and in the following order in the formats specified in paragraphs (d) or (e) of this section.

(1) "Calories, total," "Total calories," or "Calories": A statement of the caloric content per serving, expressed to the nearest 5–calorie increment up to and including 50 calories, and 10–calorie increment above 50 calories, except that amounts less than 5 calories may be expressed as zero. Energy content per serving may also be expressed in kilojoule units, added in parentheses immediately following the statement of the caloric content.

(i) Caloric content may be calculated by the following methods. Where either specific or general food factors are used, the factors shall be applied to the actual amount (i.e., before rounding) of food components (e.g., fat, carbohydrate, protein, or ingredients with specific food factors) present per serving.

(A) Using specific Atwater factors (i.e., the Atwater method) given in table 13, USDA Handbook No. 74 (slightly revised, 1973),

(B) Using the general factors of 4, 4, and 9 calories per gram for protein, total carbohydrate, and total fat, respectively, as described in USDA Handbook No. 74 (slightly revised, 1973) pp. 9–11;

(C) Using the general factors of 4, 4, and 9 calories per gram for protein, total carbohydrate (less the amount of non-digestible carbohydrates and sugar alcohols), and total fat, respectively, as described in USDA Handbook No. 74 (slightly revised, 1973) pp. 9–11. A general factor of 2 calories per gram for soluble non-digestible carbohydrates shall be used. The general factors for caloric value of sugar alcohols provided in paragraph (c)(1)(i)(F) of this section shall be used;

(D) Using data for specific food factors for particular foods or ingredients approved by the Food and Drug Administration (FDA) and provided in parts 172 or 184 of this chapter, or by other means, as appropriate;

(E) Using bomb calorimetry data subtracting 1.25 calories per gram protein to correct for incomplete digestibility, as described in USDA Handbook No. 74 (slightly revised, 1973) p. 10; or

(F) Using the following general factors for caloric value of sugar alcohols: Isomalt—2.0 calories per gram, lactitol—2.0 calories per gram, xylitol—2.4 calories per gram, maltitol—2.1 calories per gram, sorbitol—2.6 calories per gram, hydrogenated starch hydrolysates—3.0 calories per gram, mannitol—1.6 calories per gram, and erythritol—0 calories per gram.

(ii) "Calories from saturated fat" or "Calories from saturated" (VOLUNTARY): A statement of the caloric content derived from saturated fat as defined in paragraph (c)(2)(i) of this section in a serving may be declared voluntarily, expressed to the nearest 5–calorie increment, up to and including 50 calories, and the nearest 10–calorie increment above 50 calories, except that amounts less than 5 calories may be expressed as zero. This statement shall be indented under the statement of calories as provided in paragraph (d)(5) of this section.

(2) "Fat, total" or "Total fat": A statement of the number of grams of total fat in a serving defined as total lipid fatty acids and expressed as triglycerides where fatty acids are aliphatic carboxylic acids consisting of a chain of alkyl groups and characterized by a terminal carboxyl group. Amounts shall be expressed to the nearest 0.5 ( ½ ) gram increment below 5 grams and to the nearest gram increment above 5 grams. If the serving contains less than 0.5 gram, the content shall be expressed as zero.

(i) "Saturated fat," or "Saturated": A statement of the number of grams of saturated fat in a serving defined as the sum of all fatty acids containing no double bonds, except that label declaration of saturated fat content information is not required for products that contain less than 0.5 gram of total fat in a serving if no claims are made about fat, fatty acid, or cholesterol

content, and if "calories from saturated fat" is not declared. Except as provided for in paragraph (f) of this section, if a statement of the saturated fat content is not required and, as a result, not declared, the statement "Not a significant source of saturated fat" shall be placed at the bottom of the table of nutrient values. Saturated fat content shall be indented and expressed as grams per serving to the nearest 0.5 gram ( ½ ) gram increment below 5 grams and to the nearest gram increment above 5 grams. If the serving contains less than 0.5 gram, the content shall be expressed as zero.

(ii) "Trans fat" or "Trans": A statement of the number of grams of trans fat in a serving, defined as the sum of all unsaturated fatty acids that contain one or more isolated (i.e., nonconjugated) double bonds in a trans configuration, except that label declaration of trans fat content information is not required for products that contain less than 0.5 gram of total fat in a serving if no claims are made about fat, fatty acid or cholesterol content. The word "trans" may be italicized to indicate its Latin origin. Trans fat content shall be indented and expressed as grams per serving to the nearest 0.5 ( ½ )-gram increment below 5 grams and to the nearest gram increment above 5 grams. If the serving contains less than 0.5 gram, the content, when declared, shall be expressed as zero. Except as provided for in paragraph (f) of this section, if a statement of the trans fat content is not required and, as a result, not declared, the statement "Not a significant source of trans fat" shall be placed at the bottom of the table of nutrient values.

(iii) "Polyunsaturated fat" or "Poly-unsaturated" (VOLUNTARY): A statement of the number of grams of polyunsaturated fat in a serving defined as cis,cis-methylene-interrupted polyunsaturated fatty acids may be declared voluntarily, except that when monounsaturated fat is declared, or when a claim about fatty acids or cholesterol is made on the label or in labeling of a food other than one that meets the criteria in § 101.62(b)(1) for a claim for "fat free," label declaration of polyunsaturated fat is required. Polyunsaturated fat content shall be indented and expressed as grams per serving to the nearest 0.5 ( ½ ) gram increment below 5 grams and to the nearest gram increment above 5 grams. If the serving contains less than 0.5 gram, the content shall be expressed as zero.

(iv) "Monounsaturated fat" or "Monounsaturated" (VOLUNTARY): A statement of the number of grams of monounsaturated fat in a serving defined as cis-monounsaturated fatty acids may be declared voluntarily except that when polyunsaturated fat is declared, or when a claim about fatty acids or cholesterol is made on the label or in labeling of a food other than one that meets the criteria in § 101.62(b)(1) for a claim for "fat free," label declaration of monounsaturated fat is required. Monounsaturated fat content shall be indented and expressed as grams per serving to the nearest 0.5 ( ½ ) gram increment below 5 grams and to the nearest gram increment above 5 grams. If the serving contains less than 0.5 gram, the content shall be expressed as zero.

(3) "Cholesterol": A statement of the cholesterol content in a serving expressed in milligrams to the nearest 5–milligram increment, except that label declaration of cholesterol information is not required for products that contain less than 2 milligrams cholesterol in a serving and make no claim about fat, fatty acids, or cholesterol content, or such products may state the cholesterol content as zero. Except as provided for in paragraph (f) of this section, if cholesterol content is not required and, as a result, not declared, the statement "Not a significant source of cholesterol" shall be placed at the bottom of the table of nutrient values in the same type size. If the food contains 2 to 5 milligrams of cholesterol per serving, the content may be stated as "less than 5 milligrams."

(4) "Sodium": A statement of the number of milligrams of sodium in a specified serving of food expressed as zero when the serving contains less than 5 milligrams of sodium, to the nearest 5–milligram increment when the serving contains 5 to 140 milligrams of sodium, and to the nearest 10–milligram increment when the serving contains greater than 140 milligrams.

(5) "Fluoride" (VOLUNTARY): A statement of the number of milligrams of fluoride in a specified serving of food may be declared voluntarily, except that when a claim is made about fluoride content, label declaration shall be required. Fluoride content shall be expressed as zero when the serving contains less than 0.1 milligrams of fluoride, to the nearest 0.1–milligram increment when the serving contains less than or equal to 0.8 milligrams of fluoride, and the nearest 0.2 milligram-increment when a serving contains more than 0.8 milligrams of fluoride. Bottled water that bears a statement about added fluoride, as permitted by § 101.13(q)(8), must bear nutrition labeling that complies with requirements for the simplified format in paragraph (f) of this section.

(6) "Carbohydrate, total" or "Total carbohydrate": A statement of the number of grams of total carbohydrate in a serving expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, or if the serving contains less than 0.5 gram, the content may be expressed as zero. Total carbohydrate content shall be calculated by subtraction of the sum of the crude protein, total fat, moisture, and ash from the total weight of the food. This calculation method is described in A. L. Merrill and B. K. Watt, "Energy Value of Foods—Basis and Derivation," USDA Handbook 74 (slightly revised 1973) pp. 2 and 3, which is incorporated by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51 (the availability of this incorporation by reference is given in paragraph (c)(1)(i)(A) of this section).

(i) "Dietary fiber": A statement of the number of grams of total dietary fiber in a serving, indented and expressed to the nearest gram, except that if a serving contains less than 1 gram, declaration of dietary fiber is not required or, alternatively, the statement "Contains less than 1 gram" or "less than 1 gram" may be used, and if the serving contains less than 0.5 gram, the content may be expressed as zero. Dietary fiber is defined as non-digestible soluble and insoluble carbohydrates (with 3 or more monomeric units), and lignin that are intrinsic and intact in plants; isolated or synthetic non-digestible carbohydrates (with 3 or more monomeric units) determined by FDA to have physiological effects that are beneficial to human health. Except as provided for in paragraph (f) of this section, if dietary fiber content is not required, and as a result not declared, the statement "Not a significant source of dietary fiber" shall be placed at the bottom of the table of nutrient values in the same type size. The following isolated or synthetic nondigestible carbohydrate(s) have been determined by FDA to have physiological effects that are beneficial to human health and, therefore, shall be included in the calculation of the amount of dietary fiber: β-glucan soluble fiber (as described in § 101.81(c)(2)(ii)(A)), psyllium husk (as described in § 101.81(c)(2)(ii)(B)(1)), cellulose, guar gum, pectin, locust bean gum, and hydroxypropylmethylcellulose. The manufacturer must make and keep records in accordance with paragraphs (g)(10) and (11) of this section to verify the declared amount of dietary fiber in the label and labeling of food when a mixture of dietary fiber, and added nondigestible carbohydrate(s) that does not meet the definition of dietary fiber, is present in the food.

(A) "Soluble fiber" (VOLUNTARY): A statement of the number of grams of soluble dietary fiber in a serving may be declared voluntarily except that when a claim is made on the label or in labeling about soluble fiber, label declaration shall be required. Soluble fiber must meet the definition of dietary fiber in this paragraph (c)(6)(i). The manufacturer must make and keep records in accordance with paragraphs (g)(10) and (11) of this section to verify the declared amount of soluble fiber in the label and labeling of food when a mixture of soluble fiber and added non-digestible carbohydrate(s) that does not meet the definition of dietary fiber is present in the food. Soluble fiber content shall be indented under dietary fiber and expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero."

(B) "Insoluble fiber" (VOLUNTARY): A statement of the number of grams of insoluble dietary fiber in a serving may be declared voluntarily except that when a claim is made on the label or in labeling about insoluble fiber, label declaration shall be required. Insoluble fiber must meet the definition of dietary fiber in this paragraph (c)(6)(i). The

manufacturer must make and keep records in accordance with paragraphs (g)(10) and (11) of this section to verify the declared amount of insoluble fiber in the label and labeling of food when a mixture of insoluble and added non-digestible carbohydrate(s) that does not meet the definition of dietary fiber is present in the food. Insoluble fiber content shall be indented under dietary fiber and expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero.

(ii) "Total Sugars": A statement of the number of grams of sugars in a serving, except that the label declaration of sugars content is not required for products that contain less than 1 gram of sugars in a serving if no claims are made about sweeteners, sugars, or sugar alcohol content. Except as provided for in paragraph (f) of this section, if a statement of the total sugars content is not required and, as a result, not declared, the statement "Not a significant source of total sugars" shall be placed at the bottom of the table of nutrient values in the same type size. Total sugars shall be defined as the sum of all free mono- and disaccharides (such as glucose, fructose, lactose, and sucrose). Total sugars content shall be indented and expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero.

(iii) "Added Sugars": A statement of the number of grams of added sugars in a serving, except that label declaration of added sugars content is not required for products that contain less than 1 gram of added sugars in a serving if no claims are made about sweeteners, sugars, added sugars, or sugar alcohol content. Except as provided for in paragraph (f) of this section, if a statement of the added sugars content is not required and, as a result, not declared, the statement "Not a significant source of added sugars" shall be placed at the bottom of the table of nutrient values in the same type size. Added sugars are either added during the processing of foods, or are packaged as such, and include sugars (free, mono and disaccharides), sugars from syrups and honey, and sugars from concentrated fruit or vegetable juices that are in excess of what would be expected from the same volume of 100 percent fruit or vegetable juice of the same type, except that fruit or vegetable juice concentrated from 100 percent juices sold to consumers, fruit or vegetable juice concentrates used towards the total juice percentage label declaration under § 101.30 or for Brix standardization under § 102.33(g)(2) of this chapter, fruit juice concentrates which are used to formulate the fruit component of jellies, jams, or preserves in accordance with the standard of identities set forth in §§ 150.140 and 150.160 of this chapter, or the fruit component of fruit spreads shall not be labeled as added sugars. Added sugars content shall be indented under Total Sugars and shall be prefaced with the word "Includes" followed by the amount (in grams) "Added Sugars" ("Includes 'X' g Added Sugars"). It shall be expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero. When a mixture of naturally occurring and added sugars is present in the food, and for specific foods containing added sugars, alone or in combination with naturally occurring sugars, where the added sugars are subject to fermentation and/or non-enzymatic browning, the manufacturer must make and keep records in accordance with paragraphs (g)(10) and (11) of this section to verify the declared amount of added sugars in the label and labeling of food.

(iv) "Sugar alcohol" (VOLUNTARY): A statement of the number of grams of sugar alcohols in a serving may be declared voluntarily on the label, except that when a claim is made on the label or in labeling about sugar alcohol or total sugars, or added sugars when sugar alcohols are present in the food, sugar alcohol content shall be declared. For nutrition labeling purposes, sugar alcohols are defined as the sum of saccharide derivatives in which a hydroxyl group replaces a ketone or aldehyde group and whose use in the food is listed by FDA (e.g., mannitol or xylitol) or is generally recognized as safe (e.g., sorbitol). In lieu of the term "sugar alcohol," the name of the specific sugar alcohol (e.g., "xylitol") present in the food may be used in the nutrition label provided that only one sugar alcohol is present in the food. Sugar alcohol content shall be indented and expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains

less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero.

(7) "Protein": A statement of the number of grams of protein in a serving, expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero. When the protein in foods represented or purported to be for adults and children 4 or more years of age has a protein quality value that is a protein digestibility-corrected amino acid score of less than 20 expressed as a percent, or when the protein in a food represented or purported to be for children greater than 1 but less than 4 years of age has a protein quality value that is a protein digestibility-corrected amino acid score of less than 40 expressed as a percent, either of the following shall be placed adjacent to the declaration of protein content by weight: The statement "not a significant source of protein," or a listing aligned under the column headed "Percent Daily Value" of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the Daily Reference Value (DRV) or Reference Daily Intake (RDI), as appropriate, for protein and expressed as a Percent of Daily Value. When the protein quality in a food as measured by the Protein Efficiency Ratio (PER) is less than 40 percent of the reference standard (casein) for a food represented or purported to be specifically for infants through 12 months, the statement "not a significant source of protein" shall be placed adjacent to the declaration of protein content. Protein content may be calculated on the basis of the factor 6.25 times the nitrogen content of the food as determined by the appropriate method of analysis as given in the "Official Methods of Analysis of the AOAC International," except when official AOAC procedures described in this paragraph (c) (7) require a specific factor other than 6.25, that specific factor shall be used.

(i) A statement of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the RDI or DRV for protein, as appropriate, and expressed as Percent of Daily Value, may be placed on the label, except that such a statement shall be given if a protein claim is made for the product, or if the product is represented or purported to be specifically for infants through 12 months or children 1 through 3 years of age. When such a declaration is provided, it should be placed on the label adjacent to the statement of grams of protein and aligned under the column headed "Percent Daily Value," and expressed to the nearest whole percent. However, the percentage of the RDI for protein shall not be declared if the food is represented or purported to be specifically for infants through 12 months and the protein quality value is less than 40 percent of the reference standard.

(ii) The "corrected amount of protein (gram) per serving" for foods represented or purported for adults and children 1 or more years of age is equal to the actual amount of protein (gram) per serving multiplied by the amino acid score corrected for protein digestibility. If the corrected score is above 1.00, then it shall be set at 1.00. The protein digestibility-corrected amino acid score shall be determined by methods given in sections 5.4.1, 7.2.1, and 8.00 in "Report of the Joint FAO/WHO Expert Consultation on Protein Quality Evaluation," except that when official AOAC procedures described in paragraph (c)(7) of this section require a specific factor other than 6.25, that specific factor shall be used. For foods represented or purported to be specifically for infants through 12 months, the corrected amount of protein (grams) per serving is equal to the actual amount of protein (grams) per serving multiplied by the relative protein quality value. The relative protein quality value shall be determined by dividing the subject food protein PER value by the PER value for casein. If the relative protein value is above 1.00, it shall be set at 1.00.

(iii) For the purpose of labeling with a percent of the DRV or RDI, a value of 50 grams of protein shall be the DRV for adults and children 4 or more years of age, a value of 11 grams of protein shall be the RDI for infants through 12 months, a value of 13 grams shall be the DRV for children 1 through 3 years of age, and a value of 71 grams of protein shall be the RDI for pregnant women and lactating women.

(8) "Vitamins and minerals": The requirements related to including a statement of the amount per serving of vitamins and minerals are described in this paragraph (c)(8).

(i) For purposes of declaration of percent of Daily Value as provided for in paragraphs (d), (e), and (f) of this section, foods represented or purported to be specifically for infants through 12 months, children 1 through 3 years, pregnant women, and lactating women shall use the RDIs that are specified for the intended group. For foods represented or purported to be specifically for both infants through 12 months of age and children 1 through 3 years of age, the percent of Daily Value shall be presented by separate declarations according to paragraph (e) of this section based on the RDI values for infants through 12 months of age and children 1 through 3 years of age. When such dual declaration is used on any label, it shall be included in all labeling, and equal prominence shall be given to both values in all such labeling. The percent Daily Value based on the RDI values for pregnant women and lactating women shall be declared on food represented or purported to be specifically for pregnant women and lactating women. All other foods shall use the RDI for adults and children 4 or more years of age.

(ii) The declaration of vitamins and minerals as a quantitative amount by weight and percent of the RDI shall include vitamin D, calcium, iron, and potassium in that order, for infants through 12 months, children 1 through 3 years of age, pregnant women, lactating women, and adults and children 4 or more years of age, except quantitative weights for these vitamins and minerals are not required for labels described in paragraph (j)(13) of this section. The declaration of folic acid shall be included as a quantitative amount by weight when added as a nutrient supplement or a claim is made about the nutrient. The declaration of vitamins and minerals in a food, as a quantitative amount by weight and percent of the RDI, may include any of the other vitamins and minerals listed in paragraph (c)(8)(iv) of this section. The declaration of vitamins and minerals shall include any of the other vitamins and minerals listed in paragraph (c)(8)(iv) of this section as a statement of the amount per serving of the vitamins and minerals as described in this paragraph (c)(8)(ii), calculated as a percent of the RDI and expressed as a percent of the Daily Value, when they are added as a nutrient supplement, or when a claim is made about them, unless otherwise stated as quantitative amount by weight and percent of the Daily Value. Other vitamins and minerals need not be declared if neither the nutrient nor the component is otherwise referred to on the label or the labeling or advertising and the vitamins and minerals are:

(A) Required or permitted in a standardized food (e.g., thiamin, riboflavin, and niacin in enriched flour) and that standardized food is included as an ingredient (i.e., component) in another food; or

(B) Included in a food solely for technological purposes and declared only in the ingredient statement. The declaration may also include any of the other vitamins and minerals listed in paragraph (c)(8)(iv) of this section when they are naturally occurring in the food. The additional vitamins and minerals shall be listed in the order established in paragraph (c)(8)(iv) of this section.

(iii) The percentages for vitamins and minerals shall be expressed to the nearest 2–percent increment up to and including the 10–percent level, the nearest 5–percent increment above 10 percent and up to and including the 50–percent level, and the nearest 10–percent increment above the 50–percent level. Quantitative amounts and percentages of vitamins and minerals present at less than 2 percent of the RDI are not required to be declared in nutrition labeling but may be declared by a zero or by the use of an asterisk (or other symbol) that refers to another asterisk (or symbol) that is placed at the bottom of the table and that is followed by the statement "Contains less than 2 percent of the Daily Value of this (these) nutrient (nutrients)" or "Contains < 2 percent of the Daily Value of this (these) nutrient (nutrients)." Alternatively, except as provided for in paragraph (f) of this section, if vitamin D, calcium, iron, or potassium is present in amounts less than 2 percent of the RDI, label declaration of the nutrient(s) is not required if the statement "Not a significant source of—

§ 101.9 Nutrition labeling of food., 21 C.F.R. § 101.9

(listing the vitamins or minerals omitted)" is placed at the bottom of the table of nutrient values. Either statement shall be in the same type size as nutrients that are indented. The quantitative amounts of vitamins and minerals, excluding sodium, shall be the amount of the vitamin or mineral included in one serving of the product, using the units of measurement and the levels of significance given in paragraph (c)(8)(iv) of this section, except that zeros following decimal points may be dropped, and additional levels of significance may be used when the number of decimal places indicated is not sufficient to express lower amounts (e.g., the RDI for zinc is given in whole milligrams, but the quantitative amount may be declared in tenths of a milligram).

(iv) The following RDIs, nomenclature, and units of measure are established for the following vitamins and minerals which are essential in human nutrition:

| Nutrient | Unit of measure | Adults and children ≥ 4 years | Infants[1] through 12 months | Children 1 through 3 years | Pregnant women and lactating women |
|---|---|---|---|---|---|
| Vitamin D................... | Micrograms (mcg)[2] ........... | 20 | 10 | 15 | 15 |
| Calcium...................... | Milligrams (mg)................. | 1,300 | 260 | 700 | 1,300 |
| Iron............................ | Milligrams (mg)................. | 18 | 11 | 7 | 27 |
| Potassium................... | Milligrams (mg)................. | 4,700 | 700 | 3,000 | 5,100 |
| Vitamin A................... | Micrograms RAE[3] (mcg)... | 900 | 500 | 300 | 1,300 |
| Vitamin C................... | Milligrams (mg)................. | 90 | 50 | 15 | 120 |
| Vitamin E................... | Milligrams (mg)[4] ............. | 15 | 5 | 6 | 19 |
| Vitamin K................... | Micrograms (mcg)............. | 120 | 2.5 | 30 | 90 |
| Thiamin...................... | Milligrams (mg)................. | 1.2 | 0.3 | 0.5 | 1.4 |
| Riboflavin................... | Milligrams (mg)................. | 1.3 | 0.4 | 0.5 | 1.6 |
| Niacin........................ | Milligrams NE[5] (mg)........ | 16 | 4 | 6 | 18 |
| Vitamin $B_6$.................. | Milligrams (mg)................. | 1.7 | 0.3 | 0.5 | 2.0 |
| Folate[6] ....................... | Micrograms DFE[7] (mcg).... | 400 | 80 | 150 | 600 |
| Vitamin $B_{12}$................. | Micrograms (mcg)............. | 2.4 | 0.5 | 0.9 | 2.8 |
| Biotin.......................... | Micrograms (mcg)............. | 30 | 6 | 8 | 35 |
| Pantothenic acid.......... | Milligrams (mg)................. | 5 | 1.8 | 2 | 7 |
| Phosphorus................. | Milligrams (mg)................. | 1,250 | 275 | 460 | 1,250 |
| Iodine......................... | Micrograms (mcg)............. | 150 | 130 | 90 | 290 |

AD021

§ 101.9 Nutrition labeling of food., 21 C.F.R. § 101.9

| | | | | |
|---|---|---|---|---|
| Magnesium.................Milligrams (mg)................ | 420 | 75 | 80 | 400 |
| Zinc............................Milligrams (mg)................ | 11 | 3 | 3 | 13 |
| Selenium.....................Micrograms (mcg)............. | 55 | 20 | 20 | 70 |
| Copper........................Milligrams (mg)................ | 0.9 | 0.2 | 0.3 | 1.3 |
| Manganese..................Milligrams (mg)................ | 2.3 | 0.6 | 1.2 | 2.6 |
| Chromium...................Micrograms (mcg)............. | 35 | 5.5 | 11 | 45 |
| Molybdenum...............Micrograms (mcg)............. | 45 | 3 | 17 | 50 |
| Chloride......................Milligrams (mg)................ | 2,300 | 570 | 1,500 | 2,300 |
| Choline.......................Milligrams (mg)................ | 550 | 150 | 200 | 550 |
| Protein........................Grams (g)........................... | N/A | 11 | N/A | [8] 71 |

(v) The following synonyms may be added in parentheses immediately following the name of the nutrient or dietary component:

Calories—Energy

Vitamin C—Ascorbic acid

Thiamin—Vitamin $B_1$

Riboflavin—Vitamin $B_2$

(vi) A statement of the percent of vitamin A that is present as beta-carotene may be declared voluntarily. When the vitamins and minerals are listed in a single column, the statement shall be indented under the information on vitamin A. When vitamins and minerals are arrayed horizontally, the statement of percent shall be presented in parenthesis following the declaration of vitamin A and the percent DV of vitamin A in the food (e.g., "Percent Daily Value: Vitamin A 50 (90 percent as beta-carotene)"). When declared, the percentages shall be expressed in the same increments as are provided for vitamins and minerals in paragraph (c)(8)(iii) of this section.

(vii) When the amount of folate is declared in the labeling of a conventional food or a dietary supplement, the nutrient name "folate" shall be listed for products containing folate (natural folate, and/or synthetic folate as a component of dietary supplement, such as calcium salt of L–5–MTHF), folic acid, or a mixture of folate and folic acid. The name of the synthetic form of the nutrient "folic acid", when added or a claim is made about the nutrient, shall be included in parentheses after this declaration with the amount of folic acid. The declaration must be folate in mcg DFE (when expressed as a quantitative amount by weight in a conventional food or a dietary supplement) and the percent DV based on folate in mcg DFE, or for conventional food, may be expressed as folate and the percent DV based on folate in mcg DFE. When declared, folic acid must be in parentheses, mcg of folic acid as shown in paragraph (d)(12) of this section in the display that illustrates voluntary declaration of nutrition information.

(9) The following DRVs, nomenclature, and units of measure are established for the following food components:

| Food component | Unit of measure | Adults and children ≥ 4 years | Infants through 12 months | Children 1 through 3 years | Pregnant women and lactating women |
|---|---|---|---|---|---|
| Fat....................................Grams (g)................... | | [1] 78 | 30 | [2] 39 | [1] 78 |
| Saturated fat.....................Grams (g)................... | | [1] 20 | N/A | [2] 10 | [1] 20 |
| Cholesterol........................Milligrams (mg).......... | | 300 | N/A | 300 | 300 |
| Total carbohydrate.............Grams (g)................... | | [1] 275 | 95 | [2] 150 | [1] 275 |
| Sodium..............................Milligrams (mg).......... | | 2,300 | N/A | 1,500 | 2,300 |
| Dietary Fiber.....................Grams (g)................... | | [1] 28 | N/A | [2] 14 | [1] 28 |
| Protein..............................Grams (g)................... | | [1] 50 | N/A | [2] 13 | N/A |
| Added Sugars....................Grams (g)................... | | [1] 50 | N/A | [2] 25 | [1] 50 |

(d)(1) Nutrient information specified in paragraph (c) of this section shall be presented on foods in the following format, as shown in paragraph (d)(12) of this section, except on foods where the tabular display is permitted as provided for in paragraph (d)(11) of this section, on which dual columns of nutrition information are declared as provided for in paragraph (e) of this section, on those food products on which the simplified format is required to be used as provided for in paragraph (f) of this section, on foods for infants through 12 months of age and children 1 through 3 years of age as provided for in paragraph (j) (5) of this section, and on foods in small or intermediate-sized packages as provided for in paragraph (j)(13) of this section. In the interest of uniformity of presentation, FDA strongly recommends that the nutrition information be presented using the graphic specifications set forth in appendix B to part 101.

(i) The nutrition information shall be set off in a box by use of hairlines and shall be all black or one color type, printed on a white or other neutral contrasting background whenever practical.

(ii) All information within the nutrition label shall utilize:

(A) Except as provided for in paragraph (c)(2)(ii) of this section, a single easy-to-read type style,

(B) Upper and lower case letters,

(C) At least one point leading (i.e., space between two lines of text) except that at least four points leading shall be utilized for the information required by paragraphs (d)(7) and (d)(8) of this section as shown in paragraph (d)(12), and

(D) Letters should never touch.

(iii) Information required in paragraphs (d)(7) and (8) of this section shall be in type size no smaller than 8 point. Information required in paragraph (d)(5) of this section for the "Calories" declaration shall be highlighted in bold or extra bold and shall be in a type size no smaller than 16 point except the type size for this information required in the tabular displays as shown in paragraphs (d)(11), (e)(6)(ii), and (j)(13)(ii)(A)(1) of this section and the linear display for small packages as shown in paragraph (j)(13)(ii)(A)(2) of this section shall be in a type size no smaller than 10 point. The numeric amount for the information required in paragraph (d)(5) of this section shall also be highlighted in bold or extra bold type and shall be in a type size no smaller than 22 point, except the type size for this information required for the tabular display for small packages as shown in paragraph (j)(13)(ii)(A)(1) of this section, and for the linear display for small packages as shown in paragraph (j)(13)(ii)(A)(2) of this section no smaller than 14 point. The information required in paragraphs (d)(4), (6), and (9) of this section shall be in a type size no smaller than 6 point. When provided, the information described in paragraph (d)(10) of this section shall be in a type size no smaller than 6 point.

(iv) The headings required by paragraphs (d)(2), (d)(3)(ii), (d)(4), and (d)(6) of this section (i.e., "Nutrition Facts," "Serving size," "Amount per serving," and "% Daily Value*"), the names of all nutrients that are not indented according to requirements of paragraph (c) of this section (i.e., "Calories," "Total Fat," "Cholesterol," "Sodium," "Total Carbohydrate" and "Protein"), and the percentage amounts required by paragraph (d)(7)(ii) of this section shall be highlighted in bold or extra bold type or other highlighting (reverse printing is not permitted as a form of highlighting) that prominently distinguishes it from other information. No other information shall be highlighted.

(v) A hairline rule that is centered between the lines of text shall separate "Nutrition Facts" from the servings per container statement required in paragraph (d)(3)(i) of this section and shall separate each nutrient and its corresponding Daily Value required in paragraphs (d)(7)(i) and (ii) of this section from the nutrient and percent Daily Value above and below it, as shown in paragraph (d)(12) of this section and in Appendix B to Part 101.

(2) The information shall be presented under the identifying heading of "Nutrition Facts" which shall be set in a type size no smaller than all other print size in the nutrition label except for the numerical information for "Calories" required in paragraph (d)(5) of this section, and except for labels presented according to the format provided for in paragraphs (d)(11), (d)(13)(ii), (e)(6)(ii), (j)(13)(ii)(A)(1), and (j)(13)(ii)(A)(2) of this section, unless impractical, shall be set the full width of the information provided under paragraph (d)(7) of this section, as shown in paragraph (d)(12) of this section.

(3) Information on servings per container and serving size shall immediately follow the heading as shown in paragraph (d)(12) of this section. Such information shall include:

(i) "__ servings per container": The number of servings per container, except that this statement is not required on single serving containers as defined in paragraph (b)(6) of this section or on other food containers when this information is stated in the net quantity of contents declaration. The information required in this paragraph shall be located immediately after the "Nutrition Facts" heading and shall be in a type size no smaller than 10 point, except the type size for this information shall be no smaller than 9 point in the tabular display for small packages as shown in paragraph (j)(13)(ii)(A)(1) of this section and the linear display for small packages as shown in paragraph (j)(13)(ii)(A)(2) of this section. For the linear display for small packages as shown in paragraph (j)(13)(ii)(A)(2) of this section, the actual number of servings may be listed after the servings per container declaration.

(ii) "Serving size": A statement of the serving size as specified in paragraph (b)(7) of this section which shall immediately follow the "__ servings per container" declaration. The information required in this paragraph shall be highlighted in bold or extra bold and be in a type size no smaller than 10 point, except the type size shall be no smaller than 9 point for this information in the tabular displays as shown in paragraphs (d)(11) and (e)(6)(ii) of this section, the tabular display for small packages as shown in paragraph (j)(13)(ii)(A)(1) of this section, and the linear display for small packages as shown in paragraph (j)(13)(ii)(A)(2) of this section. The serving size amount must be right justified if adequate space is available. If the "Serving size" declaration does not fit in the allocated space a type size of no smaller than 8 point may be used on packages of any size.

(4) A subheading "Amount per serving" shall be separated from the serving size information by a bar as shown in paragraph (d)(12) of this section, except this information is not required for the dual column formats shown in paragraphs (e)(5), (e)(6)(i), and (e)(6)(ii) of this section.

(5) Information on calories shall immediately follow the subheading "Amount per serving" and shall be declared in one line. If "Calories from saturated fat" is declared, it shall be indented under "Calories" and shall be in a type size no smaller than 8 point.

(6) The column heading "% Daily Value," followed by an asterisk (e.g., "% Daily Value*"), shall be separated from information on calories by a bar as shown in paragraph (d)(12) of this section. The position of this column heading shall allow for a list of nutrient names and amounts as described in paragraph (d)(7) of this section to be to the left of, and below, this column heading. The column headings "Percent Daily Value," "Percent DV," or "% DV" may be substituted for "% Daily Value."

(7) Except as provided for in paragraph (j)(13)(ii)(A)(2) of this section, nutrient information for both mandatory and any voluntary nutrients listed in paragraph (c) of this section that are to be declared in the nutrition label, except for folic acid in conventional food and voluntarily declared vitamins and minerals expressed as a statement of the amount per serving calculated as a percent of the RDI and expressed as a percent Daily Value, shall be declared as follows:

(i) The name of each nutrient, as specified in paragraph (c) of this section, shall be given in a column and followed immediately by the quantitative amount by weight for that nutrient appended with a "g" for grams, "mg" for milligrams, or "mcg" for micrograms as shown in paragraph (d)(12) of this section. The symbol "<" may be used in place of "less than."

(ii) A listing of the percent of the DRV as established in paragraphs (c)(7)(iii) and (c)(9) of this section shall be given in a column aligned under the heading "% Daily Value" established in paragraph (d)(6) of this section with the percent expressed to the nearest whole percent for each nutrient declared in the column described in paragraph (d)(7)(i) of this section for which a DRV has been established, except that the percent for protein may be omitted as provided in paragraph (c)(7) of this section. The percent shall be calculated by dividing either the amount declared on the label for each nutrient or the actual amount of each nutrient (i.e., before rounding) by the DRV for the nutrient, except that the percent for protein shall be calculated as specified in paragraph (c)(7)(ii) of this section. The numerical value shall be followed by the symbol for percent (i.e., %).

(8) Nutrient information for vitamins and minerals (except sodium) shall be separated from information on other nutrients by a bar and may be arrayed vertically as shown in paragraph (d)(12) of this section (e.g., Vitamin D 2 mcg 10%, Calcium

260 mg 20%, Iron 8 mg 45%, Potassium 235 mg 6%) or may be listed horizontally. When listed horizontally in two columns, vitamin D and calcium should be listed on the first line and iron and potassium should be listed on the second line, as shown in paragraph (d)(12) of this section in the side-by-side display. When more than four vitamins and minerals are declared voluntarily as shown in paragraph (d)(12) of this section in the label which illustrates the mandatory plus voluntary provisions of paragraph (d) of this section, they may be declared vertically with percentages listed under the column headed "% Daily Value."

(9) A footnote, preceded by an asterisk, shall be placed beneath the list of vitamins and minerals and shall be separated from the list by a bar, except that the footnote may be omitted from foods that can use the terms "calorie free," "free of calories," "without calories," "trivial source of calories," "negligible source of calories," or "dietary insignificant source of calories" on the label or in the labeling of foods as defined in § 101.60(b). The first sentence of the footnote: "The % Daily Value tells you how much a nutrient in a serving of food contributes to a daily diet" may be used on foods that can use the terms "calorie free," "free of calories," "without calories," "trivial source of calories," "negligible source of calories," or "dietary insignificant source of calories" on the label or in the labeling of foods as defined in § 101.60(b). The footnote shall state: "*The % Daily Value tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice." If the food product is represented or purported to be for children 1 through 3 years of age, the second sentence of the footnote shall substitute "1,000 calories" for "2,000 calories."

(10) Caloric conversion information on a per gram basis for fat, carbohydrate, and protein may be presented beneath the information required in paragraph (d)(9) of this section, separated from that information by a hairline. This information may be presented horizontally as shown in paragraph (d)(12) of this section (i.e., "Calories per gram: fat 9, carbohydrate 4, protein 4") or vertically in columns.

(11)(i) If the space beneath the information on vitamins and minerals is not adequate to accommodate the information required in paragraph (d)(9) of this section, the information required in paragraph (d)(9) may be moved to the right of the column required in paragraph (d)(7)(ii) of this section and set off by a line that distinguishes it and sets it apart from the percent Daily Value information. The caloric conversion information provided for in paragraph (d)(10) of this section may be presented beneath either side or along the full length of the nutrition label.

(ii) If the space beneath the mandatory declaration of potassium is not adequate to accommodate any remaining vitamins and minerals to be declared or the information required in paragraph (d)(9) of this section, the remaining information may be moved to the right and set off by a line that distinguishes it and sets it apart from the nutrients and the percent DV information given to the left. The caloric conversion information provided for in paragraph (d)(10) of this section may be presented beneath either side or along the full length of the nutrition label.

(iii) If there is not sufficient continuous vertical space (i.e., approximately 3 in) to accommodate the required components of the nutrition label up to and including the mandatory declaration of potassium, the nutrition label may be presented in a tabular display as shown in the following sample label.

§ 101.9 Nutrition labeling of food., 21 C.F.R. § 101.9

**Tabular Format**

| Nutrition Facts | Amount/serving | % Daily Value* | Amount/serving | % Daily Value* | |
|---|---|---|---|---|---|
| 10 servings per container | **Total Fat** 15g | 2% | **Total Carbohydrate** 36g | 13% | * The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice. |
| Serving size 2 slices (56g) | Saturated Fat 0.5g | 3% | Dietary Fiber 2g | 7% | |
| | Trans Fat 0.5g | | Total Sugars 1g | | |
| | **Cholesterol** 0mg | 0% | Includes 1g of Added Sugars | 2% | |
| **Calories** per serving **170** | **Sodium** 280mg | 12% | **Protein** 4g | | |
| | Vitamin D 0mcg 0% • Calcium 80mg 6% • Iron 1mg 6% • Potassium 470mg 10% | | | | |
| | Thiamin 15% • Riboflavin 8% • Niacin 10% | | | | |

(12) The following sample labels illustrate the mandatory provisions and mandatory plus voluntary provisions of paragraph (d) of this section and the side-by-side display.

**Standard Vertical**



**AD027**

§ 101.9 Nutrition labeling of food., 21 C.F.R. § 101.9

Standard Vertical
(w/ Voluntary)

# Nutrition Facts

17 servings per container

**Serving size      3/4 cup (28g)**

**Amount per serving**

## Calories                        140

| | % Daily Value* |
|---|---|
| **Total Fat** 1.5g | **2%** |
| Saturated Fat 0g | **0%** |
| Trans Fat 0g | |
| Polyunsaturated Fat 0.5g | |
| Monounsaturated Fat 0.5g | |
| **Cholesterol** 0mg | **0%** |
| **Sodium** 160mg | **7%** |
| **Total Carbohydrate** 22g | **8%** |
| Dietary Fiber 2g | **7%** |
| Soluble Fiber <1g | |
| Insoluble Fiber 1g | |
| Total Sugars 9g | |
| Includes 8g Added Sugars | **16%** |
| **Protein** 9g | **18%** |
| Vitamin D 2mcg (80 IU) | 10% |
| Calcium 130mg | 10% |
| Iron 4.5mg | 25% |
| Potassium 115mg | 2% |
| Vitamin A 90mcg | 10% |
| Vitamin C 9mg | 10% |
| Thiamin 0.3mg | 25% |
| Riboflavin 0.3mg | 25% |
| Niacin 4mg | 25% |
| Vitamin B₆ 0.4mg | 25% |
| Folate 200mcg DFE (120mcg folic acid) | 50% |
| Vitamin B₁₂ 0.6mcg | 25% |
| Phosphorus 100mg | 8% |
| Magnesium 25mg | 6% |
| Zinc 3mg | 25% |

* The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.

Calories per gram:
Fat 9   •   Carbohydrate 4   •   Protein 4

AD028

§ 101.9 Nutrition labeling of food., 21 C.F.R. § 101.9

Standard Vertical
(Side-by-Side Display)



(13)(i) Nutrition labels on the outer label of packages of products that contain two or more separately packaged foods that are intended to be eaten individually (e.g., variety packs of cereals or snack foods) or of packages that are used interchangeably for the same type of food (e.g., round ice cream containers) may use an aggregate display.

(ii) Aggregate displays shall comply with the format requirements of paragraph (d) of this section to the maximum extent possible, except that the identity of each food shall be specified immediately to the right of the "Nutrition Facts" heading, and both the quantitative amount by weight (i.e., g/mg/mcg amounts) and the percent Daily Value for each nutrient shall be listed in separate columns under the name of each food. The following sample label illustrates an aggregate display.

AD029

Aggregate Display

| Nutrition Facts | | Wheat Squares Sweetened | | Corn Flakes Not Sweetened | | Mixed Grain Flakes Sweetened | |
|---|---|---|---|---|---|---|---|
| 1 serving per container | | | | | | | |
| **Serving size** | **1 box** | (35g) | | (19g) | | (27g) | |
| Amount per serving **Calories** | | **130** | | **70** | | **100** | |
| | | % Daily Value* | | % Daily Value* | | % Daily Value* | |
| **Total Fat** | | 0g | **0%** | 0g | **0%** | 0g | **0%** |
| Saturated Fat | | 0g | **0%** | 0g | **0%** | 0g | **0%** |
| Trans Fat | | 0g | | 0g | | 0g | |
| **Cholesterol** | | 0mg | **0%** | 0mg | **0%** | 0mg | **0%** |
| **Sodium** | | 0mg | **0%** | 200mg | **9%** | 120mg | **5%** |
| **Total Carbohydrate** | | 29g | **11%** | 17g | **6%** | 24g | **9%** |
| Dietary Fiber | | 3g | **11%** | 1g | **4%** | 1g | **4%** |
| Total Sugars | | 8g | | 6g | | 13g | |
| Includes Added Sugars | | 8g | **16%** | 5g | **10%** | 13g | **26%** |
| **Protein** | | 4g | | 1g | | 1g | |
| * The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice. | Vitamin D | 2mcg | 10% | 2mcg | 10% | 0mcg | 0% |
| | Calcium | 0mg | 0% | 0mg | 0% | 0mg | 0% |
| | Iron | 2mg | 10% | 1mg | 6% | 4mg | 20% |
| | Potassium | 125mg | 4% | 25mg | 1% | 30mg | 1% |
| | Vitamin A | | 0% | | 10% | | 10% |
| | Vitamin C | | 0% | | 15% | | 90% |
| | Thiamin | | 35% | | 15% | | 25% |
| | Riboflavin | | 30% | | 10% | | 25% |
| | Niacin | | 30% | | 10% | | 20% |
| | Vitamin B₆ | | 30% | | 20% | | 20% |

(14) In accordance with § 101.15(c)(2), when nutrition labeling must appear in a second language, the nutrition information may be presented in a separate nutrition label for each language or in one nutrition label with the information in the second language following that in English. Numeric characters that are identical in both languages need not be repeated (e.g., "Protein/Proteinas 2 g"). All required information must be included in both languages.

(e) Nutrition information may be presented for two or more forms of the same food (e.g., both "as purchased" and "as prepared") or for common combinations of food as provided for in paragraph (h)(4) of this section, for different units (e.g., slices of bread or per 100 grams) as provided for in paragraph (b) of this section, or for two or more groups for which RDIs are established (e.g., both infants through 12 months of age and children 1 through 3 years of age) as shown in paragraph (e)(5) of this section. When such dual labeling is provided, equal prominence shall be given to both sets of values. Information shall be presented in a format consistent with paragraph (d) of this section, except that:

(1) Following the serving size information there shall be two or more column headings accurately describing the amount per serving size of the form of the same food (e.g., "Per ¼ cup mix" and "Per prepared portion"), the combinations of food, the units, or the RDI groups that are being declared as shown in paragraph (e)(5) of this section.

(2) The quantitative information by weight as required in paragraph (d)(7)(i) and the information required in paragraph (d)(7)(ii) of this section shall be presented for the form of the product as packaged and for any other form of the product (e.g., "as prepared" or combined with another ingredient as shown in paragraph (e)(5) of this section).

(3) When the dual labeling is presented for two or more forms of the same food, for combinations of food, for different units, or for two or more groups for which RDIs are established, the quantitative information by weight and the percent Daily Value shall be presented in two columns and the columns shall be separated by vertical lines as shown in paragraph (e)(5) of this section.

(4) Nutrient information for vitamins and minerals (except sodium) shall be separated from information on other nutrients by a bar and shall be arrayed vertically in the following order: Vitamin D, calcium, iron, potassium as shown in paragraph (e)(5) of this section.

(5) The following sample label illustrates the provisions of paragraph (e) of this section:

## Dual Columns, Two Forms of the Same Food

# Nutrition Facts

12 servings per container
**Serving size      1/4 cup dry mix (44g)**

|  | Per 1/4 cup dry mix | | Per baked portion | |
|---|---|---|---|---|
| **Calories** | **170** | | **300** | |
|  | | % DV* | | % DV* |
| **Total Fat** | 1.5g | **2%** | 16g | **21%** |
| Saturated Fat | 1g | **5%** | 5g | **25%** |
| *Trans* Fat | 0g | | 0g | |
| **Cholesterol** | 0mg | **0%** | 60mg | **20%** |
| **Sodium** | 300mg | **13%** | 375mg | **16%** |
| **Total Carb.** | 36g | **13%** | 36g | **13%** |
| Dietary Fiber | <1g | **2%** | <1g | **2%** |
| Total Sugars | 18g | | 18g | |
| Incl. Added Sugars | 18g | **36%** | 18g | **36%** |
| **Protein** | 2g | | 3g | |
| Vitamin D | 0mcg | 0% | 0mcg | 0% |
| Calcium | 100mg | 8% | 100mg | 8% |
| Iron | 1mg | 6% | 1mg | 6% |
| Potassium | 40mg | 0% | 40mg | 0% |

* The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.

AD031

(6) When dual labeling is presented for a food on a per serving basis and per container basis as required in paragraph (b) (12)(i) of this section or on a per serving basis and per unit basis as required in paragraph (b)(2)(i)(D) of this section, the quantitative information by weight as required in paragraph (d)(7)(i) and the percent Daily Value as required in paragraph (d)(7)(ii) shall be presented in two columns, and the columns shall be separated by vertical lines as shown in the displays in paragraph (e)(6)(i) of this section.

(i) Nutrient information for vitamins and minerals shall be separated from information on other nutrients by a bar and shall be arrayed vertically in the following order: Vitamin D, calcium, iron, and potassium as shown in the following sample labels.

## Dual Column Display, Per Serving and Per Container

| Nutrition Facts | | | | |
|---|---|---|---|---|
| 2 servings per container | | | | |
| **Serving size** | | | **1 cup (255g)** | |
| | **Per serving** | | **Per container** | |
| **Calories** | **220** | | **440** | |
| | | % DV* | | % DV* |
| **Total Fat** | 5g | **6%** | 10g | **13%** |
| Saturated Fat | 2g | **10%** | 4g | **20%** |
| Trans Fat | 0g | | 0g | |
| **Cholesterol** | 15mg | **5%** | 30mg | **10%** |
| **Sodium** | 240mg | **10%** | 480mg | **21%** |
| **Total Carb.** | 35g | **13%** | 70g | **25%** |
| Dietary Fiber | 6g | **21%** | 12g | **43%** |
| Total Sugars | 7g | | 14g | |
| Incl. Added Sugars | 4g | **8%** | 8g | **16%** |
| **Protein** | 9g | | 18g | |
| Vitamin D | 5mcg | 25% | 10mcg | 50% |
| Calcium | 200mg | 15% | 400mg | 30% |
| Iron | 1mg | 6% | 2mg | 10% |
| Potassium | 470mg | 10% | 940mg | 20% |

* The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.

AD032

§ 101.9 Nutrition labeling of food., 21 C.F.R. § 101.9

**Dual Columns, Per Serving and Per Unit**

# Nutrition Facts

12 servings per container

**Serving size**      **1/2 muffin (144g)**

| | Per 1/2 muffin | | Per 1 muffin | |
|---|---|---|---|---|
| **Calories** | **380** | | **760** | |
| | | % DV* | | % DV* |
| **Total Fat** | 16g | **21%** | 32g | **41%** |
| Saturated Fat | 3g | **15%** | 6g | **30%** |
| *Trans* Fat | 0g | | 0g | |
| **Cholesterol** | 50mg | **17%** | 100mg | **33%** |
| **Sodium** | 480mg | **21%** | 960mg | **42%** |
| **Total Carb.** | 56g | **20%** | 112g | **41%** |
| Dietary Fiber | 2g | **7%** | 4g | **14%** |
| Total Sugars | 32g | | 64g | |
| Incl. Added Sugars | 30g | **60%** | 60g | **120%** |
| **Protein** | 3g | | 6g | |
| Vitamin D | 0.1mcg | 0% | 0.2mcg | 2% |
| Calcium | 40mg | 4% | 80mg | 6% |
| Iron | 2mg | 10% | 4mg | 20% |
| Potassium | 190mg | 4% | 380mg | 8% |

\* The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.

(ii) The following sample label illustrates the provisions of paragraphs (b)(2)(i)(D) and (b)(12)(i) of this section for labels that use the tabular display.

**Tabular Dual Column Display**

| Nutrition Facts | | Per serving % DV* | | Per container % DV* | | | | Per serving % DV* | | Per container % DV* | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 servings per container | **Total Fat** | 5g | **6%** | 10g | **13%** | **Total Carb.** | 35g | **13%** | 70g | **25%** |
| **Serving size**<br>**1 cup (255g)** | Saturated Fat | 2g | **10%** | 4g | **20%** | Dietary Fiber | 6g | **21%** | 12g | **43%** |
| | *Trans* Fat | 0g | | 0g | | Total Sugars | 7g | | 14g | |
| **Calories** | **Cholesterol** | 15mg | **5%** | 30mg | **10%** | Incl. Added Sugars | 4g | **8%** | 8g | **16%** |
| **220** **440** | **Sodium** | 240mg | **10%** | 480mg | **21%** | **Protein** | 9g | | 18g | |
| per serving   per container | Vitamin D | 5mcg | 25% | 10mcg | 50% | Iron | 1mg | 6% | 2mg | 10% |
| | Calcium | 200mg | 15% | 400mg | 30% | Potassium | 470mg | 10% | 940mg | 20% |

*The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.

(f) The declaration of nutrition information may be presented in the simplified format set forth herein when a food product contains insignificant amounts of eight or more of the following: Calories, total fat, saturated fat, trans fat, cholesterol, sodium, total carbohydrate, dietary fiber, total sugars, added sugars, protein, vitamin D, calcium, iron, and potassium; except that for foods intended for infants through 12 months of age and children 1 through 3 years of age to which paragraph (j)(5)(i) of this section applies, nutrition information may be presented in the simplified format when a food product contains insignificant amounts of six or more of the following: Calories, total fat, sodium, total carbohydrate, dietary fiber, total sugars, added sugars, protein, vitamin D, calcium, iron, and potassium.

**AD033**

(1) An "insignificant amount" shall be defined as that amount that allows a declaration of zero in nutrition labeling, except that for total carbohydrate, dietary fiber, and protein, it shall be an amount that allows a declaration of "less than 1 gram."

(2) The simplified format shall include information on the following nutrients:

(i) Total calories, total fat, total carbohydrate, protein, and sodium;

(ii) Any other nutrients identified in paragraph (f) of this section that are present in the food in more than insignificant amounts; and

(iii) Any vitamins and minerals listed in paragraph (c)(8)(iv) of this section when they are required to be added as a nutrient supplement to foods for which a standard of identity exists.

(iv) Any vitamins or minerals listed in paragraph (c)(8)(iv) of this section voluntarily added to the food as nutrient supplements.

(3) Other nutrients that are naturally present in the food in more than insignificant amounts may be voluntarily declared as part of the simplified format.

(4) If any nutrients are declared as provided in paragraphs (f)(2)(iii), (f)(2)(iv), or (f)(3) of this section as part of the simplified format or if any nutrition claims are made on the label or in labeling, the statement "Not a significant source of _____" (with the blank filled in with the name(s) of any nutrient(s) identified in paragraph (f) of this section that are present in insignificant amounts) shall be included at the bottom of the nutrition label.

## Simplified Display

**Nutrition Facts**

64 servings per container
**Serving size          1 tbsp (14g)**

**Amount per serving**
**Calories                        130**

| | % DV* |
|---|---|
| **Total Fat** 14g | 18% |
| Saturated Fat 2g | 10% |
| Trans Fat 2g | |
| Polyunsaturated Fat 4g | |
| Monounsaturated Fat 6g | |
| **Sodium** 0mg | 0% |
| **Total Carbohydrate** 0g | 0% |
| **Protein** 0g | |

Not a significant source of cholesterol, dietary fiber, total sugars, added sugars, vitamin D, calcium, iron, and potassium.

* %DV = %Daily Value

(5) Except as provided for in paragraphs (j)(5) and (j)(13) of this section, nutrient information declared in the simplified format shall be presented in the same manner as specified in paragraphs (d) or (e) of this section, except that the footnote required in paragraph (d)(9) of this section is not required, and an asterisk shall be placed at the bottom of the label followed by the statement "% DV = % Daily Value" when "Daily Value" is not spelled out in the heading, as shown in paragraph (f)(4).

(g) Compliance with this section shall be determined as follows:

(1) A collection of primary containers or units of the same size, type, and style produced under conditions as nearly uniform as possible, designated by a common container code or marking, or in the absence of any common container code or marking, a day's production, constitutes a "lot."

(2) The sample for nutrient analysis shall consist of a composite of 12 subsamples (consumer units), taken 1 from each of 12 different randomly chosen shipping cases, to be representative of a lot. Unless a particular method of analysis is specified in paragraph (c) of this section, composites shall be analyzed by appropriate methods as given in the "Official Methods of Analysis of the AOAC International," or, if no AOAC method is available or appropriate, by other reliable and appropriate analytical procedures.

(3) Two classes of nutrients are defined for purposes of compliance:

(i) Class I. Added nutrients in fortified or fabricated foods; and

(ii) Class II. Naturally occurring (indigenous) nutrients. When a nutrient is naturally occurring (indigenous) in a food or an ingredient that is added to a food, the total amount of such nutrient in the final food product is subject to class II requirements, except that when an exogenous source of the nutrient is also added to the final food product, the total amount of the nutrient in the final food product (indigenous and exogenous) is subject to class I requirements.

(4) A food with a label declaration of a vitamin, mineral, protein, total carbohydrate, dietary fiber, soluble fiber, insoluble fiber, polyunsaturated or monounsaturated fat shall be deemed to be misbranded under section 403(a) of the Federal Food, Drug, and Cosmetic Act (the act) unless it meets the following requirements:

(i) When a vitamin, mineral, protein, or dietary fiber meets the definition of a Class I nutrient, the nutrient content of the composite must be formulated to be at least equal to the value for that nutrient declared on the label.

(ii) When a vitamin, mineral, protein, total carbohydrate, polyunsaturated or monounsaturated fat, or dietary fiber meets the definition of a Class II nutrient, the nutrient content of the composite must be at least equal to 80 percent of the value for that nutrient declared on the label. *Provided*, That no regulatory action will be based on a determination of a nutrient value that falls below this level by a factor less than the variability generally recognized for the analytical method used in that food at the level involved.

(5) A food with a label declaration of calories, total sugars, added sugars (when the only source of sugars in the food is added sugars), total fat, saturated fat, trans fat, cholesterol, or sodium shall be deemed to be misbranded under section 403(a) of the act if the nutrient content of the composite is greater than 20 percent in excess of the value for that nutrient declared on the label. *Provided*, That no regulatory action will be based on a determination of a nutrient value that falls above this level by a factor less than the variability generally recognized for the analytical method used in that food at the level involved.

(6) Reasonable excesses of vitamins, minerals, protein, total carbohydrate, dietary fiber, soluble fiber, insoluble fiber, sugar alcohols, polyunsaturated or monounsaturated fat over labeled amounts are acceptable within current good manufacturing practice. Reasonable deficiencies of calories, total sugars, added sugars, total fat, saturated fat, trans fat, cholesterol, or sodium under labeled amounts are acceptable within current good manufacturing practice.

(7) Compliance will be based on the metric measure specified in the label statement of serving size.

(8) Alternatively, compliance with the provisions set forth in paragraphs (g)(1) through (6) of this section may be provided by use of an FDA approved database that has been computed following FDA guideline procedures and where food samples have been handled in accordance with current good manufacturing practice to prevent nutrition loss. FDA approval of a database shall not be considered granted until the Center for Food Safety and Applied Nutrition has agreed to all aspects of the database in writing. The approval will be granted where a clear need is presented (e.g., raw produce and seafood).

Approvals will be in effect for a limited time, e.g., 10 years, and will be eligible for renewal in the absence of significant changes in agricultural or industry practices. Approval requests shall be submitted in accordance with the provisions of § 10.30 of this chapter. Guidance in the use of databases may be found in the "FDA Nutrition Labeling Manual—A Guide for Developing and Using Data Bases," available from the Office of Nutrition and Food Labeling (HFS–800), Center for Food Safety and Applied Nutrition, Food and Drug Administration, 5001 Campus Dr., College Park, MD 20740 or by going to http://www.fda.gov.

(9) When it is not technologically feasible, or some other circumstance makes it impracticable, for firms to comply with the requirements of this section (e.g., to develop adequate nutrient profiles to comply with the requirements of paragraph (c) of this section), FDA may permit alternative means of compliance or additional exemptions to deal with the situation. Firms in need of such special allowances shall make their request in writing to the Center for Food Safety and Applied Nutrition (HFS–800), Food and Drug Administration, 5001 Campus Dr., College Park, MD 20740.

(10) The manufacturer must make and keep written records (e.g., analyses of databases, recipes, formulations, information from recipes or formulations, or batch records) to verify the declared amount of that nutrient on the Nutrition Facts label as follows:

(i) When a mixture of dietary fiber, and added non-digestible carbohydrate(s) that does not meet the definition of dietary fiber, is present in the food, a manufacturer must make and keep written records of the amount of non-digestible carbohydrate(s) added to the food that does not meet the definition of dietary fiber.

(ii) When a mixture of soluble fiber and added non-digestible carbohydrate(s) that does not meet the definition of dietary fiber is present in the food, a manufacturer must make and keep written records necessary to verify the amount of the non-digestible carbohydrate(s) added to the food that does not meet the definition of dietary fiber.

(iii) When a mixture of insoluble fiber and added non-digestible carbohydrate(s) that does not meet the definition of dietary fiber is present in the food, a manufacturer must make and keep written records necessary to verify the amount of the non-digestible carbohydrate(s) added to the food that does not meet the definition of dietary fiber.

(iv) When a mixture of naturally occurring and added sugars is present in the food, a manufacturer must make and keep written records of the amount of added sugars added to the food during the processing of the food, and if packaged as a separate ingredient, as packaged (whether as part of a package containing one or more ingredients or packaged as a single ingredient).

(v) When the amount of sugars added to food products is reduced through non-enzymatic browning and/or fermentation, manufacturers must:

(A) Make and keep records of all relevant scientific data and information relied upon by the manufacturer that demonstrates the amount of added sugars in the food after non-enzymatic browning and/or fermentation and a narrative explaining why the data and information are sufficient to demonstrate the amount of added sugars declared in the finished food, provided the data and information used is specific to the type of food that is subject to non-enzymatic browning and/or fermentation; or

(B) Make and keep records of the amount of added sugars added to the food before and during the processing of the food, and if packaged as a separate ingredient, as packaged (whether as part of a package containing one or more ingredients or packaged as a single ingredient) and in no event shall the amount of added sugars declared exceed the amount of total sugars on the label; or

(C) Submit a petition, under 21 CFR 10.30, to request an alternative means of compliance. The petition must provide scientific data or other information for why the amount of added sugars in a serving of the product is likely to have a significant reduction in added sugars compared to the amount added prior to non-enzymatic browning and/or fermentation. A significant reduction would be where reduction in added sugars after non-enzymatic browning and/or fermentation may be significant enough to impact the label declaration for added sugars by an amount that exceeds the reasonable deficiency acceptable within good manufacturing practice under paragraph (g)(6) of this section. In addition, the scientific data or other information must include the reason that the manufacturer is unable to determine a reasonable approximation of the amount of added sugars in a serving of their finished product and a description of the process that they used to come to that conclusion.

(vi) When a mixture of all rac-α-tocopherol and RRR–α-tocopherol is present in a food, manufacturers must make and keep written records of the amount of all rac-α-tocopherol added to the food and RRR–α-tocopherol in the finished food.

(vii) When a mixture of folate and folic acid is present in a food, manufacturers must make and keep written records of the amount of synthetic folate and/or folic acid added to the food and the amount of naturally-occurring folate in the finished food.

(11) Records necessary to verify certain nutrient declarations that are specified in paragraph (g)(10) of this section must be kept for a period of at least 2 years after introduction or delivery for introduction of the food into interstate commerce. Such records must be provided to FDA upon request, during an inspection, for official review and photocopying or other means of reproduction. Records required to verify information on the label may be kept either as original records, true copies (such as photocopies, pictures, scanned copies, microfilm, microfiche, or other accurate reproductions of the original records), or electronic records which must be kept in accordance with part 11 of this chapter. These records must be accurate, indelible, and legible.

Failure to make and keep the records or provide the records to appropriate regulatory authorities, as required by this paragraph (g)(11), would result in the food being misbranded under section 403(a)(1) of the act.

(h) Products with separately packaged ingredients or foods, with assortments of food, or to which other ingredients are added by the user may be labeled as follows:

(1) If a product consists of two or more separately packaged ingredients enclosed in an outer container or of assortments of the same type of food (e.g., assorted nuts or candy mixtures) in the same retail package, nutrition labeling shall be located on the outer container or retail package (as the case may be) to provide information for the consumer at the point of purchase. However, when two or more food products are simply combined together in such a manner that no outer container is used, or no outer label is available, each product shall have its own nutrition information, e.g., two boxes taped together or two cans combined in a clear plastic overwrap. When separately packaged ingredients or assortments of the same type of food are intended to be eaten at the same time, the nutrition information may be specified per serving for each component or as a composite value.

(2) If a product consists of two or more separately packaged foods that are intended to be eaten individually and that are enclosed in an outer container (e.g., variety packs of cereals or snack foods), the nutrition information shall:

(i) Be specified per serving for each food in a location that is clearly visible to the consumer at the point of purchase; and

(ii) Be presented in separate nutrition labels or in one aggregate nutrition label with separate columns for the quantitative amount by weight and the percent Daily Value for each food.

(3) If a package contains a variety of foods, or an assortment of foods, and is in a form intended to be used as a gift, the nutrition labeling shall be in the form required by paragraphs (a) through (f) of this section, but it may be modified as follows:

(i) Nutrition information may be presented on the label of the outer package or in labeling within or attached to the outer package.

(ii) In the absence of a reference amount customarily consumed in § 101.12(b) that is appropriate for the variety or assortment of foods in a gift package, the following may be used as the standard serving size for purposes of nutrition labeling of foods subject to this paragraph: 1 ounce for solid foods; 2 fluid ounces for nonbeverage liquids (e.g., syrups); 8 ounces for beverages that consist of milk and fruit juices, nectars and fruit drinks; and 12 fluid ounces for other beverages. However, the reference amounts customarily consumed in § 101.12(b) shall be used for purposes of evaluating whether individual foods in a gift package qualify for nutrient content claims or health claims.

(iii) The number of servings per container may be stated as "varied."

(iv) Nutrition information may be provided per serving for individual foods in the package, or, alternatively, as a composite per serving for reasonable categories of foods in the package having similar dietary uses and similar significant nutritional characteristics. Reasonable categories of foods may be used only if accepted by FDA. In determining whether a proposed category is reasonable, FDA will consider whether the values of the characterizing nutrients in the foods proposed to be in the category meet the compliance criteria set forth in paragraphs (g)(3) through (6) of this section. Proposals for such categories may be submitted in writing to the Office of Nutrition and Food Labeling (HFS–800), Center for Food Safety and Applied Nutrition, Food and Drug Administration, 5001 Campus Dr., College Park, MD 20740.

(v) If a food subject to paragraph (j)(13) of this section because of its small size is contained in a gift package, the food need not be included in the determination of nutrition information under paragraph (h) of this section if it is not specifically listed in a promotional catalogue as being present in the gift package, and:

(A) It is used in small quantities primarily to enhance the appearance of the gift package; or

(B) It is included in the gift package as a free gift or promotional item.

(4) If a food is commonly combined with other ingredients or is cooked or otherwise prepared before eating, and directions for such combination or preparations are provided, another column of figures may be used to declare nutrition information on the basis of the food as consumed in the format required in paragraph (e) of this section; e.g., a dry ready-to-eat cereal may be described with the percent Daily Value and the quantitative amounts for the cereal as sold (e.g., per ounce), and the percent Daily Value and the quantitative amounts for the cereal and milk as suggested in the label (e.g., per ounce of cereal and ½ cup of vitamin D fortified skim milk); and a cake mix may be labeled with the percent Daily Value and the quantitative amounts for the dry mix (per serving) and the percent Daily Value and the quantitative amounts for the serving of the final cake when prepared, as shown in paragraph (e)(5) of this section: *Provided*, that, the type and quantity of the other ingredients to be added to the product by the user and the specific method of cooking and other preparation shall be specified prominently on the label.

(i) Except as provided in paragraphs (j)(13) and (j)(17) of this section, the location of nutrition information on a label shall be in compliance with § 101.2.

(j) The following foods are exempt from this section or are subject to special labeling requirements:

(1)(i) Food offered for sale by a person who makes direct sales to consumers (e.g., a retailer) who has annual gross sales made or business done in sales to consumers that is not more than $500,000 or has annual gross sales made or business done in sales of food to consumers of not more than $50,000, *Provided*, That the food bears no nutrition claims or other nutrition information in any context on the label or in labeling or advertising. Claims or other nutrition information subject the food to the provisions of this section, § 101.10, or § 101.11, as applicable.

(ii) For purposes of this paragraph, calculation of the amount of sales shall be based on the most recent 2–year average of business activity. Where firms have been in business less than 2 years, reasonable estimates must indicate that annual sales will not exceed the amounts specified. For foreign firms that ship foods into the United States, the business activities to be included shall be the total amount of food sales, as well as other sales to consumers, by the firm in the United States.

(2) Except as provided in § 101.11, food products that are:

(i) Served in restaurants, *Provided*, That the food bears no nutrition claims or other nutrition information in any context on the label or in labeling or advertising. Claims or other nutrition information subject the food to the provisions of this section;

(ii) Served in other establishments in which food is served for immediate human consumption (e.g., institutional food service establishments, such as schools, hospitals, and cafeterias; transportation carriers, such as trains and airplanes; bakeries, delicatessens, and retail confectionery stores where there are facilities for immediate consumption on the premises; food service vendors, such as lunch wagons, ice cream shops, mall cookie counters, vending machines, and sidewalk carts where foods are generally consumed immediately where purchased or while the consumer is walking away, including similar foods sold from convenience stores; and food delivery systems or establishments where ready-to-eat foods are delivered to homes or offices), *Provided*, That the food bears no nutrition claims or other nutrition information in any context on the label or in labeling or advertising, except as provided in § 101.8(c). Claims or other nutrition information, except as provided in § 101.8(c), subject the food to the provisions of this section;

(iii) Sold only in such facilities, *Provided*, That the food bears no nutrition claims or other nutrition information in any context on the label or in labeling or advertising. Claims or other nutrition information subject the food to the provisions of this section;

(iv) Used only in such facilities and not served to the consumer in the package in which they are received (e.g., foods that are not packaged in individual serving containers); or

(v) Sold by a distributor who principally sells food to such facilities: *Provided*, That:

(A) This exemption shall not be available for those foods that are manufactured, processed, or repackaged by that distributor for sale to any persons other than restaurants or other establishments that serve food for immediate human consumption, and

(B) The manufacturer of such products is responsible for providing the nutrition information on the products if there is a reasonable possibility that the product will be purchased directly by consumers.

(3) Except as provided in § 101.11, food products that are:

(i) Of the type of food described in paragraphs (j)(2)(i) and (j)(2)(ii) of this section,

(ii) Ready for human consumption,

(iii) Offered for sale to consumers but not for immediate human consumption,

(iv) Processed and prepared primarily in a retail establishment, and

(v) Not offered for sale outside of that establishment (e.g., ready-to-eat foods that are processed and prepared on-site and sold by independent delicatessens, bakeries, or retail confectionery stores where there are no facilities for immediate human consumption; by in-store delicatessen, bakery, or candy departments; or at self-service food bars such as salad bars), *Provided*, That the food bears no nutrition claims or other nutrition information in any context on the label or in labeling or advertising. Claims or other nutrition information subject the food to the provisions of this section.

(4) Except as provided in § 101.11, foods that contain insignificant amounts of all of the nutrients and food components required to be included in the declaration of nutrition information under paragraph (c) of this section, *Provided*, That the food bears no nutrition claims or other nutrition information in any context on the label or in labeling or advertising. Claims or other nutrition information, except as provided in § 101.8(c), subject the food to the provisions of this section. An insignificant amount of a nutrient or food component shall be that amount that allows a declaration of zero in nutrition labeling, except that for total carbohydrate, dietary fiber, and protein, it shall be an amount that allows a declaration of "less than 1 gram." Examples of foods that are exempt under this paragraph include coffee beans (whole or ground), tea leaves, plain unsweetened instant coffee and tea, condiment-type dehydrated vegetables, flavor extracts, and food colors.

(5)(i) Foods, other than infant formula, represented or purported to be specifically for infants through 12 months of age and children 1 through 3 years of age shall bear nutrition labeling. The nutrients declared for infants through 12 months of age and children 1 through 3 years of age shall include calories, total fat, saturated fat, trans fat, cholesterol, sodium, total carbohydrates, dietary fiber, total sugars, added sugars, protein, and the following vitamins and minerals: Vitamin D, calcium, iron, and potassium.

(ii) Foods, other than infant formula, represented or purported to be specifically for infants through 12 months of age shall bear nutrition labeling, except that:

(A) Such labeling shall not declare a percent Daily Value for saturated fat, trans fat, cholesterol, sodium, dietary fiber, total sugars, or added sugars and shall not include a footnote.

(B) The following sample label illustrates the provisions of paragraph (j)(5)(ii) of this section.



(C) to (E) [Reserved by 81 FR 33978]

(iii) Foods, other than infant formula, represented or purported to be specifically for children 1 through 3 years of age shall include a footnote that states: " *The % Daily Value tells you how much a nutrient in a serving of food contributes to a daily diet. 1,000 calories a day is used for general nutrition advice."

(A) The following sample label illustrates the provisions of paragraph (j)(5)(iii) of this section.

### Children 1-3 Years

| Nutrition Facts | |
|---|---|
| 1 serving per container | |
| **Serving size**    1 container (85g) | |
| **Amount per serving** | |
| **Calories** | **70** |
| | **% Daily Value*** |
| **Total Fat** 1.5g | 4% |
| Saturated Fat 0.5g | 5% |
| *Trans* Fat 0g | |
| **Cholesterol** 10mg | 3% |
| **Sodium** 240mg | 16% |
| **Total Carbohydrate** 11g | 7% |
| Dietary Fiber 1g | 7% |
| Total Sugars 1g | |
| Includes 1g Added Sugars | 4% |
| **Protein** 3g | 23% |
| Vitamin D 0mcg | 0% |
| Calcium 35mg | 6% |
| Iron 0.6mg | 8% |
| Potassium 30mg | 0% |
| * The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 1,000 calories a day is used for general nutrition advice. | |

(B) [Reserved]

(6) Dietary supplements, except that such foods shall be labeled in compliance with § 101.36.

(7) Infant formula subject to section 412 of the act, as amended, except that such foods shall be labeled in compliance with part 107 of this chapter.

(8) Medical foods as defined in section 5(b) of the Orphan Drug Act (21 U.S.C. 360ee(b)(3)). A medical food is a food which is formulated to be consumed or administered enterally under the supervision of a physician and which is intended

for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation. A food is subject to this exemption only if:

(i) It is a specially formulated and processed product (as opposed to a naturally occurring foodstuff used in its natural state) for the partial or exclusive feeding of a patient by means of oral intake or enteral feeding by tube;

(ii) It is intended for the dietary management of a patient who, because of therapeutic or chronic medical needs, has limited or impaired capacity to ingest, digest, absorb, or metabolize ordinary foodstuffs or certain nutrients, or who has other special medically determined nutrient requirements, the dietary management of which cannot be achieved by the modification of the normal diet alone;

(iii) It provides nutritional support specifically modified for the management of the unique nutrient needs that result from the specific disease or condition, as determined by medical evaluation;

(iv) It is intended to be used under medical supervision; and

(v) It is intended only for a patient receiving active and ongoing medical supervision wherein the patient requires medical care on a recurring basis for, among other things, instructions on the use of the medical food.

(9) Food products shipped in bulk form that are not for distribution to consumers in such form and that are for use solely in the manufacture of other foods or that are to be processed, labeled, or repacked at a site other than where originally processed or packed.

(10) Raw fruits, vegetables, and fish subject to section 403(q)(4) of the act, except that the labeling of such foods should adhere to guidelines in § 101.45. This exemption is contingent on the food bearing no nutrition claims or other nutrition information in any context on the label or in labeling or advertising. Claims or other nutrition information subject the food to nutrition labeling in accordance with § 101.45. The term fish includes freshwater or marine fin fish, crustaceans, and mollusks, including shellfish, amphibians, and other forms of aquatic animal life.

(11) Packaged single-ingredient products that consist of fish or game meat (i.e., animal products not covered under the Federal Meat Inspection Act or the Poultry Products Inspection Act, such as flesh products from deer, bison, rabbit, quail, wild turkey, or ostrich) subject to this section may provide required nutrition information for a 3–ounce cooked edible portion (i.e., on an "as prepared" basis), except that:

(i) Such products that make claims that are based on values as packaged must provide nutrition information on an as packaged basis, and

(ii) Nutrition information is not required for custom processed fish or game meats.

(12) Game meats (i.e., animal products not covered under the Federal Meat Inspection Act or the Poultry Products Inspection Act, such as flesh products from deer, bison, rabbit, quail, wild turkey, or ostrich) may provide required nutrition information on labeling in accordance with the provisions of paragraph (a)(2) of this section.

(13)(i) Foods in small packages that have a total surface area available to bear labeling of less than 12 square inches, *Provided*, That the labels for these foods bear no nutrition claims or other nutrition information in any context on the label or in labeling or advertising, except as provided in § 101.8(c). Claims or other nutrition information, except as provided in § 101.8(c), subject the food to the provisions of this section.

(A) The manufacturer, packer, or distributor shall provide on the label of packages that qualify for and use this exemption an address or telephone number that a consumer can use to obtain the required nutrition information (e.g., "For nutrition information, call 1–800–123–4567").

(B) When such products bear nutrition labeling, either voluntarily or because nutrition claims or other nutrition information is provided, all required information shall be in type size no smaller than 6 point or all upper-case type of 1–16 inches minimum height, except that individual serving-size packages of food served with meals in restaurants, institutions, and on board passenger carriers, and not intended for sale at retail, may comply with § 101.2(c)(2).

(ii) Foods in packages that have a total surface area available to bear labeling of 40 or less square inches may modify the requirements of paragraphs (c) through (f) and (i) of this section by one or more of the following means:

(A) Presenting the required nutrition information in a tabular or, as provided below, linear (i.e., string) fashion rather than in vertical columns if the product has a total surface area available to bear labeling of less than 12 square inches, or if the product has a total surface area available to bear labeling of 40 or less square inches and the package shape or size cannot accommodate a standard vertical column or tabular display on any label panel. Nutrition information may be given in a linear fashion only if the label will not accommodate a tabular display.

(1) The following sample label illustrates the tabular display for small packages.

## Tabular Display for Small Packages

| Nutrition Facts | Amount/serving | % DV* | Amount/serving | % DV* |
|---|---|---|---|---|
| 5 servings per container | **Total Fat** 2g | 3% | **Total Carb.** 15g | 5% |
| | Sat. Fat 1g | 5% | Fiber 0g | 0% |
| **Serving size 1/6 cup (28g)** | *Trans* Fat 0.5g | | Total Sugars 14g | |
| | **Cholesterol** 10mg | 3% | Incl. 13g Added Sugars | 26% |
| **Calories** per serving 90 | **Sodium** 200mg | 9% | **Protein** 3g | |
| | Vitamin D 0% • Calcium 6% • Iron 6% • Potassium 10% | | | |

(2) The following sample label illustrates the linear display.

## Linear Display for Small Packages

**Nutrition Facts** Servings: 12, **Serv. size: 1 mint (2g),** Amount per serving: **Calories 5, Total Fat** 0g (0% DV), Sat. Fat 0g (0% DV), *Trans* Fat 0g. **Cholest.** 0mg (0% DV), **Sodium** 0mg (0% DV), **Total Carb.** 2g (1% DV), Fiber 0g (0% DV), Total Sugars 2g (incl. 2g Added Sugars, 4% DV), **Protein** 0g, Vit. D (0% DV), Calcium (0% DV), Iron (0% DV), Potas. (5% DV).

(B) Using any of the following abbreviations:

Serving size—Serv size

Servings per container—Servings

Calories from saturated fat—Sat fat cal

Saturated fat—Sat fat

Monounsaturated fat—Monounsat fat

Polyunsaturated fat—Polyunsat fat

Cholesterol—Cholest

Total carbohydrate—Total carb. This abbreviation can also be used on dual-column displays as shown in paragraphs (e)(5), (e)(6)(i), and (e)(6)(ii).

Dietary fiber—Fiber

Soluble fiber—Sol fiber

Insoluble fiber—Insol fiber

Sugar alcohol—Sugar alc

Vitamin—Vit

Potassium—Potas

Includes—Incl. This abbreviation can also be used on dual-column displays as shown in paragraphs (e)(5), (e)(6)(i), and (e) (6)(ii) of this section.

(C) Presenting the required nutrition information on any label panel.

AD046

(14) Shell eggs packaged in a carton that has a top lid designed to conform to the shape of the eggs are exempt from outer carton label requirements where the required nutrition information is clearly presented immediately beneath the carton lid or in an insert that can be clearly seen when the carton is opened.

(15) The unit containers in a multiunit retail food package where:

(i) The multiunit retail food package labeling contains all nutrition information in accordance with the requirements of this section;

(ii) The unit containers are securely enclosed within and not intended to be separated from the retail package under conditions of retail sale; and

(iii) Each unit container is labeled with the statement "This Unit Not Labeled For Retail Sale" in type size not less than $^{1}/_{16}$ –inch in height, except that this statement shall not be required when the inner unit containers bear no labeling at all. The word "individual" may be used in lieu of or immediately preceding the word "Retail" in the statement.

(16) Food products sold from bulk containers: *Provided*, That nutrition information required by this section be displayed to consumers either on the labeling of the bulk container plainly in view or in accordance with the provisions of paragraph (a)(2) of this section.

(17) Foods in packages that have a total surface area available to bear labeling greater than 40 square inches but whose principal display panel and information panel do not provide sufficient space to accommodate all required information may use any alternate panel that can be readily seen by consumers for the nutrition label. The space needed for vignettes, designs, and other nonmandatory label information on the principal display panel may be considered in determining the sufficiency of available space on the principal display panel for the placement of the nutrition label. Nonmandatory label information on the information panel shall not be considered in determining the sufficiency of available space for the placement of the nutrition label.

(18) Food products that are low-volume (that is, they meet the requirements for units sold in paragraphs (j)(18)(i) or (j)(18)(ii) of this section); that, except as provided in paragraph (j)(18)(iv) of this section, are the subject of a claim for an exemption that provides the information required under paragraph (j)(18)(iv) of this section, that is filed before the beginning of the time period for which the exemption is claimed, and that is filed by a person, whether it is the manufacturer, packer, or distributor, that qualifies to claim the exemption under the requirements for average full-time equivalent employees in paragraphs (j)(18)(i) or (j)(18)(ii) of this section; and whose labels, labeling, and advertising do not provide nutrition information or make a nutrient content or health claim.

(i) For food products first introduced into interstate commerce before May 8, 1994, the product shall be exempt for the period:

(A) Between May 8, 1995, and May 7, 1996, if, for the period between May 8, 1994, and May 7, 1995, the person claiming the exemption employed fewer than an average of 300 full-time equivalent employees and fewer than 400,000 units of that product were sold in the United States; and

(B) Between May 8, 1996, and May 7, 1997, if for the period between May 8, 1995, and May 7, 1996, the person claiming the exemption employed fewer than an average of 200 full-time equivalent employees and fewer than 200,000 units of that product were sold in the United States.

(ii) For all other food products, the product shall be eligible for an exemption for any 12–month period if, for the preceding 12 months, the person claiming the exemption employed fewer than an average of 100 full-time equivalent employees and fewer than 100,000 units of that product were sold in the United States, or in the case of a food product that was not sold in the 12–month period preceding the period for which exemption is claimed, fewer than 100,000 units of such product are reasonably anticipated to be sold in the United States during the period for which exemption is claimed.

(iii) If a person claims an exemption under paragraphs (j)(18)(i) or (j)(18)(ii) of this section for a food product and then, during the period of such exemption, the number of full-time equivalent employees of such person exceeds the appropriate number, or the number of food products sold in the United States exceeds the appropriate number, or, if at the end of the period of such exemption, the food product no longer qualifies for an exemption under the provisions of paragraphs (j)(18)(i) or (j)(18)(ii) of this section, such person shall have 18 months from the date that the product was no longer qualified as a low-volume product of a small business to comply with this section.

(iv) A notice shall be filed with the Office of Nutrition and Food Labeling (HFS–800), Center for Food Safety and Applied Nutrition, Food and Drug Administration, 5001 Campus Dr., College Park, MD 20740 and contain the following information, except that if the person is not an importer and has fewer than 10 full-time equivalent employees, that person does not have to file a notice for any food product with annual sales of fewer than 10,000 total units:

(A) Name and address of person requesting exemption. This should include a telephone number or FAX number that can be used to contact the person along with the name of a specific contact;

(B) Names of the food products (including the various brand names) for which exemption is claimed;

(C) Name and address of the manufacturer, distributor, or importer of the food product for which an exemption is claimed, if different than the person that is claiming the exemption;

(D) The number of full-time equivalent employees. Provide the average number of full-time equivalent individuals employed by the person and its affiliates for the 12 months preceding the period for which a small business exemption is claimed for a product. The average number of full-time equivalent employees is to be determined by dividing the total number of hours of salary or wages paid to employees of the person and its affiliates by the number of hours of work in a year, 2,080 hours (i.e., 40 hoursx52 weeks);

(E) Approximate total number of units of the food product sold by the person in the United States in the 12–month period preceding that for which a small business exemption is claimed. Provide the approximate total number of units sold, or expected to be sold, in a 12–month period for each product for which an exemption is claimed. For products that have been in production for 1 year or more prior to the period for which exemption is claimed, the 12–month period is the period immediately preceding the period for which an exemption is claimed. For other products, the 12–month period is the period for which an exemption is claimed; and

(F) The notice shall be signed by a responsible individual for the person who can certify the accuracy of the information presented in the notice. The individual shall certify that the information contained in the notice is a complete and accurate statement of the average number of full-time equivalent employees of this person and its affiliates and of the number of units of the product for which an exemption is claimed sold by the person. The individual shall also state that should the average number of full-time equivalent employees or the number of units of food products sold in the United States by the person exceed the applicable numbers for the time period for which exemption is claimed, the person will notify FDA of that fact and the date on which the number of employees or the number of products sold exceeded the standard.

(v) FDA may by regulation lower the employee or units of food products requirements of paragraph (j)(18)(ii) of this section for any food product first introduced into interstate commerce after May 8, 2002, if the agency determines that the cost of compliance with such lower requirement will not place an undue burden on persons subject to it.

(vi) For the purposes of this paragraph, the following definitions apply:

(A) Unit means the packaging or, if there is no packaging, the form in which a food product is offered for sale to consumers.

(B) Food product means food in any sized package which is manufactured by a single manufacturer or which bears the same brand name, which bears the same statement of identity, and which has similar preparation methods.

(C) Person means all domestic and foreign affiliates, as defined in 13 CFR 121.401, of the corporation, in the case of a corporation, and all affiliates, as defined in 13 CFR 121.401, of a firm or other entity, when referring to a firm or other entity that is not a corporation.

(D) Full-time equivalent employee means all individuals employed by the person claiming the exemption. This number shall be determined by dividing the total number of hours of salary or wages paid directly to employees of the person and of all of its affiliates by the number of hours of work in a year, 2,080 hours (i.e., 40 hoursx52 weeks).

(k) A food labeled under the provisions of this section shall be deemed to be misbranded under sections 201(n) and 403(a) of the act if its label or labeling represents, suggests, or implies:

(1) That the food, because of the presence or absence of certain dietary properties, is adequate or effective in the prevention, cure, mitigation, or treatment of any disease or symptom. Information about the relationship of a dietary property to a disease or health-related condition may only be provided in conformance with the requirements of § 101.14 and part 101, subpart E.

(2) That the lack of optimum nutritive quality of a food, by reason of the soil on which that food was grown, is or may be responsible for an inadequacy or deficiency in the quality of the daily diet.

(3) That the storage, transportation, processing, or cooking of a food is or may be responsible for an inadequacy or deficiency in the quality of the daily diet.

(4) That a natural vitamin in a food is superior to an added or synthetic vitamin.

(l) The standards required in this section are incorporated by reference into this section with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. All approved material is available for inspection at the Office of Nutrition and Food Labeling (HFS–800), Center for Food Safety and Applied Nutrition, Food and Drug Administration, 5001 Campus Dr., College Park, MD 20740, 240–402–2404 and is available from the sources indicated below. It is also available for inspection at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.

(1) AOAC Reseller. Techstreet, 6300 Interfirst Dr., Ann Arbor, MI 48108, Toll free in United States: 1–800–699–9277, Outside United States: 1–734–780–8000, Fax: 1–734–780–2046, www.techstreet.com,techstreet.service@thomsonreuters.com. FDA does not endorse any particular reseller and notes that other resellers also may have the reference for sale. Consult FDA at 240–402–2404 for more information on additional resellers.

(i) "Official Methods of Analysis of the AOAC INTERNATIONAL," 19th Edition, Volumes 1 and 2, 2012.

(ii) [Reserved]

(2) Food and Agriculture Organization of the United Nations/World Health Organization (FAO/WHO), Publications Division, Viale delle Terme di Caracalla, 00100 Rome, Italy

(i) FAO Food and Nutrition Paper 51,"Report of the Joint FAO/WHO Expert Consultation on Protein Quality Evaluation," Rome, 1991. http://apps.who.int/iris/bitstream/10665/38133/1/9251030979_eng.pdf.

(ii) [Reserved]

(3) United States Department of Agriculture (USDA), Agricultural Research Service, Washington, DC, Nutrient Data Laboratory, Bldg. 005 Room 105 BARC–West, Beltsville, MD 20705, 301–504–0630. http://www.ars.usda.gov/News/docs.htm?docid=9447.

(i) USDA Handbook No. 74, Energy Value of Foods—basis and derivation, by A. L. Merrill and B. K. Watt, (slightly revised, 1973) http://www.ars.usda.gov/SP2UserFiles/Place/80040525/Data/Classics/ah74.pdf.

(ii) [Reserved]

**Credits**

[42 FR 14308, March 15, 1977; 42 FR 27226, May 27, 1977; 44 FR 16006, March 16, 1979; 45 FR 37422, June 3, 1980; 47 FR 11820, March 19, 1982; 49 FR 5609, Feb. 14, 1984; 49 FR 15533, April 18, 1984; 49 FR 26572, June 28, 1984; 50 FR 26987, July 1, 1985; 52 FR 28691, Aug. 3, 1987; 54 FR 24891, June 12, 1989; 58 FR 2175, 2227, 2291, 2533, Jan. 6, 1993; 58 FR 17086, 17097, 17104, April 1, 1993; 58 FR 17328–17331, April 2, 1993; 58 FR 44048, 44076, Aug. 18, 1993; 58 FR 59363, Nov. 9, 1993; 58 FR 60109, Nov. 15, 1993; 59 FR 371, Jan. 4, 1994; 59 FR 62317, Dec. 5, 1994; 60 FR 17205, April 5, 1995; 60 FR 30788, June 12, 1995; 60 FR 67174, Dec. 28, 1995; 61 FR 8779, March 5, 1996; 61 FR 14479, April 2, 1996; 61 FR 40978, Aug. 7, 1996; 62 FR 15342, March 31, 1997; 62 FR 49848, Sept. 23, 1997; 64 FR 12889, March 16, 1999; 65 FR 56479, Sept. 19, 2000; 68 FR 41502, July 11, 2003; 79 FR 71253, Dec. 1, 2014; 79 FR 71293, Dec. 1, 2014; 80 FR 39675, July 10, 2015; 81 FR 33978, May 27, 2016; 81 FR 34040, May 27, 2016; 81 FR 84465, Nov. 23, 2016; 81 FR 96364, Dec. 30, 2016; 82 FR 20826, May 4, 2017; 83 FR 19619, May 4, 2018; 83 FR 65497, Dec. 21, 2018]

SOURCE: 42 FR 14308, March 15, 1977; 51 FR 25017, July 9, 1986; 52 FR 6971, March 9, 1987; 54 FR 39632, Sept. 27, 1989; 59 FR 350, Jan. 4, 1994; 60 FR 67174, Dec. 28, 1995; 61 FR 43446, Aug. 23, 1996; 62 FR 3600, Jan. 23, 1997; 62 FR 15342, March 31, 1997; 62 FR 51513, Oct. 1, 1997; 65 FR 76110, Dec. 5, 2000; 81 FR 49895, July 29, 2016, unless otherwise noted.

AUTHORITY: 15 U.S.C. 1453, 1454, 1455; 21 U.S.C. 321, 331, 342, 343, 348, 371; 42 U.S.C. 243, 264, 271.

Notes of Decisions (28)

Current through March 31, 2022; 87 FR 18739.

**Footnotes**

1     RDIs are based on dietary reference intake recommendations for infants through 12 months of age.

2     The amount of vitamin D may, but is not required to, be expressed in international units (IU), in addition to the mandatory declaration in mcg. Any declaration of the amount of vitamin D in IU must appear in parentheses after the declaration of the amount of vitamin D in mcg.

3     RAE = Retinol activity equivalents; 1 microgram RAE = 1 microgram retinol, 2 microgram supplemental β-carotene, 12 micrograms dietary β-carotene, or 24 micrograms dietary α-carotene, or dietary 24 micrograms dietary β-cryptoxanthin.

4     1 mg α-tocopherol (label claim) = 1 mg α-tocopherol = 1 mg RRR- α-tocopherol = 2 mg all rac-α-tocopherol.

5     NE = Niacin equivalents, 1 mg NE = 1 mg niacin = 60 milligrams tryptophan.

6     "Folate" and "Folic Acid" must be used for purposes of declaration in the labeling of conventional foods and dietary supplements. The declaration for folate must be in mcg DFE (when expressed as a quantitative amount by weight in a conventional food or a dietary supplement), and percent DV based on folate in mcg DFE. Folate may be expressed as a percent DV in conventional foods. When folic acid is added or when a claim is made about the nutrient, folic acid must be declared in parentheses, as mcg of folic acid.

7     DFE = Dietary Folate Equivalents; 1 DFE = 1 mcg naturally occurring folate = 0.6 mcg folic acid.

8     Based on the reference caloric intake of 2,000 calories for adults and children aged 4 years and older, and for pregnant women and lactating women.

1     Based on the reference caloric intake of 2,000 calories for adults and children aged 4 years and older, and for pregnant women and lactating women

2     Based on the reference caloric intake of 1,000 calories for children 1 through 3 years of age.

§ 101.9 Nutrition labeling of food., 21 C.F.R. § 101.9

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**AD052**

Code of Federal Regulations
  Title 21. Food and Drugs
    Chapter I. Food and Drug Administration, Department of Health and Human Services (Refs & Annos)
      Subchapter B. Food for Human Consumption
        Part 101. Food Labeling (Refs & Annos)
          Subpart A. General Provisions

21 C.F.R. § 101.12

§ 101.12 Reference amounts customarily consumed per eating occasion.

Effective: July 26, 2016

Currentness

(a) The general principles and factors that the Food and Drug Administration (FDA) considered in arriving at the reference amounts customarily consumed per eating occasion (reference amounts) which are set forth in paragraph (b) of this section, are that:

(1) FDA calculated the reference amounts for persons 4 years of age or older to reflect the amount of food customarily consumed per eating occasion by persons in this population group. These reference amounts are based on data set forth in appropriate national food consumption surveys.

(2) FDA calculated the reference amounts for an infant or child under 4 years of age to reflect the amount of food customarily consumed per eating occasion by infants up to 12 months of age or by children 1 through 3 years of age, respectively. These reference amounts are based on data set forth in appropriate national food consumption surveys. Such reference amounts are to be used only when the food is specially formulated or processed for use by an infant or by a child under 4 years of age.

(3) An appropriate national food consumption survey includes a large sample size representative of the demographic and socioeconomic characteristics of the relevant population group and must be based on consumption data under actual conditions of use.

(4) To determine the amount of food customarily consumed per eating occasion, FDA considered the mean, median, and mode of the consumed amount per eating occasion.

(5) When survey data were insufficient, FDA took various other sources of information on serving sizes of food into consideration. These other sources of information included:

(i) Serving sizes used in dietary guidance recommendations or recommended by other authoritative systems or organizations;

(ii) Serving sizes recommended in comments;

AD053

(iii) Serving sizes used by manufacturers and grocers; and

(iv) Serving sizes used by other countries.

(6) Because they reflect the amount customarily consumed, the reference amount and, in turn, the serving size declared on the product label are based on only the edible portion of food, and not bone, seed, shell, or other inedible components.

(7) The reference amount is based on the major intended use of the food (e.g., milk as a beverage and not as an addition to cereal).

(8) The reference amounts for products that are consumed as an ingredient of other foods, but that may also be consumed in the form in which they are purchased (e.g., butter), are based on use in the form purchased.

(9) FDA sought to ensure that foods that have similar dietary usage, product characteristics, and customarily consumed amounts have a uniform reference amount.

(b) The following reference amounts shall be used as the basis for determining serving sizes for specific products:

**Table 1—Reference Amounts Customarily Consumed per Eating Occasion: Foods for Infants and Young Children 1 Through 3 Years of Age** [1] [2] [3]

| Product category | Reference amount | Label statement [4] |
|---|---|---|
| Cereals, dry instant................................ | 15 g........................................................ | _ cup (_ g) |
| Cereals, prepared, ready-to-serve............. | 110 g...................................................... | _ cup(s) (_ g) |
| Other cereal and grain products, dry ready-to-eat, e.g., ready-to-eat cereals, cookies, teething biscuits, and toasts........ | 7 g for infants and 20 g for young children (1 through 3 years of age) for ready-to-eat cereals; 7 g for all others....... | _ cup(s) (_ g) for ready-to-eat cereals; piece(s) (_ g) for others |
| Dinners, deserts, fruits, vegetables or soups, dry mix.......................................... | 15 g........................................................ | _ tbsp(s) (_ g); _ cup(s) (_ g) |
| Dinners, desserts, fruits, vegetables or soups, ready-to-serve, junior type............. | 110 g...................................................... | _ cup(s) (_ g); cup(s) (_ mL) |
| Dinners, desserts, fruits, vegetables or soups, ready-to-serve, strained type......... | 110 g...................................................... | _ cup(s) (_ g); cup(s) (_ mL) |
| Dinners, stews or soups for young children, ready-to-serve.......................... | 170 g...................................................... | _ cup(s) (_ g); cup(s) (_ mL) |
| Fruits for young children, ready-to-serve.. | 125 g...................................................... | _ cup(s) (_ g) |

§ 101.12 Reference amounts customarily consumed per eating..., 21 C.F.R. § 101.12

| | | |
|---|---|---|
| Vegetables for young children, ready-to-serve................................................................... 70 g | | _ cup(s) (_ g) |
| Eggs/egg yolks, ready-to serve................ 55 g | | _ cup(s) (_ g) |
| Juices all varieties..................................... 120 mL | | 4 fl oz (120 mL) |

**Table 2—Reference Amounts Customarily Consumed Per Eating Occasion: General Food Supply** [1] [2] [3]

| Product category | Reference amount | Label statement [4] |
|---|---|---|
| Bakery Products: | | |
| Bagels, toaster pastries, muffins (excluding English muffins) | 110 g | _ piece(s) (_ g) |
| Biscuits, croissants, tortillas, soft bread sticks, soft pretzels, corn bread, hush puppies, scones, crumpets, English muffins | 55 g | _ piece(s) (_ g) |
| Breads (excluding sweet quick type), rolls | 50 g | _ piece(s) (_ g) for sliced bread and distinct pieces (e.g., rolls); 2 oz (56 g/_ inch slice) for unsliced bread |
| Bread sticks—see crackers | | |
| Toaster pastries—see bagels, toaster pastries, muffins (excluding English muffins) | | |
| Brownies | 40 g | _ piece(s) (_ g) for distinct pieces; fractional slice (_ g) for bulk |
| Cakes, heavyweight (cheese cake; pineapple upside-down cake; fruit, nut, and vegetable cakes with more than or equal to 35 percent of the finished weight as fruit, nuts, or vegetables or any of these combinations) [5] | 125 g | _ piece(s) (_ g) for distinct pieces (e.g., sliced or individually packaged products); _ fractional slice (_ g) for large discrete units |
| Cakes, mediumweight (chemically leavened | 80 g | _ piece(s) (_ g) for distinct pieces (e.g., cupcake); _ |

AD055

| | | |
|---|---|---|
| cake with or without icing or filling except those classified as light weight cake; fruit, nut, and vegetable cake with less than 35 percent of the finished weight as fruit, nuts, or vegetables or any of these combinations; light weight cake with icing; Boston cream pie; cupcake; eclair; cream puff)[6] | | fractional slice (_ g) for large discrete units |
| Cakes, lightweight (angel food, chiffon, or sponge cake without icing or filling)[7] | 55 g | _ piece(s) (_ g) for distinct pieces (e.g., sliced or individually packaged products); _ fractional slice (_ g) for large discrete units |
| Coffee cakes, crumb cakes, doughnuts, Danish, sweet rolls, sweet quick type breads | 55 g | _ piece(s) (_ g) for sliced bread and distinct pieces (e.g., doughnut); 2 oz (56 g/visual unit of measure) for bulk products (e.g., unsliced bread) |
| Cookies | 30 g | _ piece(s) (_ g) |
| Crackers that are usually not used as snack, melba toast, hard bread sticks, ice cream cones[8] | 15 g | _ piece(s) (_ g) |
| Crackers that are usually used as snacks | 30 g | _ piece(s) (_ g) |
| Croutons | 7 g | _ tbsp(s) (_ g); _ cup(s) (_ g); _ piece(s) (_ g) for large pieces |
| Eggroll, dumpling, wonton, or potsticker wrappers | 20 g | _ sheet (_ g); wrapper (_ g) |
| French toast, crepes, pancakes, variety mixes | 110 g prepaed for French toast, crepes, and pancakes; 40 g dry mix for variety mixes | _ piece(s) (_ g); _ cup(s) (_ g) for dry mix |
| Grain-based bars with or without filling or coating, e.g., breakfast bars, granola bars, rice cereal bars | 40 g | _ piece(s) (_ g) |

AD056

| | | |
|---|---|---|
| Ice cream cones—see crackers | | |
| Pies, cobblers, fruit crisps, turnovers, other pastries | 125 g | _ piece(s) (_ g) for distinct pieces; _ fractional slice (_ g) for large discrete units |
| Pie crust, pie shells, pastry sheets, (e.g., phyllo, puff pastry sheets) | the allowable declaration closest to an 8 square inch surface area | _fractional slice(s) (_ g) for large discrete units; _ shells (_ g); _ fractional _ sheet(s) (_ g) for distinct pieces (e.g., Pastry sheet). |
| Pizza crust | 55 g | _ fractional slice (_ g) |
| Taco shells, hard | 30 g | _ shell(s) (_ g) |
| Waffles | 85 g | _ piece(s) (_ g) |
| Beverages: | | |
| Carbonated and noncarbonated beverages, wine coolers, water | 360 mL | 12 fl oz (360 mL) |
| Coffee or tea, flavored and sweetened | 360 mL prepared | 12 fl oz (360 mL) |
| Cereals and Other Grain Products: | | |
| Breakfast cereals (hot cereal type), hominy grits | 1 cup prepared; 40 g plain dry cereal; 55 g flavored, sweetened cereal | _ cup(s) (_ g) |
| Breakfast cereals, ready-to-eat, weighing less than 20 g per cup, e.g., plain puffed cereal grains | 15 g | _ cup(s) (_ g) |
| Breakfast cereals, ready-to-eat, weighing 20 g or more but less than 43 g per cup; high fiber cereals containing 28 g or more of fiber per 100 g | 40 g | _ cup(s) (_ g) |
| Breakfast cereals, ready-to-eat, weighing 43 g or more per cup; biscuit types | 60 g | _ piece(s) (_ g) for large distinct pieces (e.g., biscuit type); _ cup(s) (_ g) for all others |
| Bran or wheat germ | 15 g | _ tbsp(s) (_ g); _ cup(s) (_ g) |
| Flours or cornmeal | 30 g | _ tbsp(s) (_ g); _ cup(s) (_ g) |

AD057

§ 101.12 Reference amounts customarily consumed per eating..., 21 C.F.R. § 101.12

| | | |
|---|---|---|
| Grains, e.g., rice, barley, plain | 140 g prepared; 45 g dry | _ cup(s) (_ g) |
| Pastas, plain | 140 g prepared; 55 g dry | _ cup(s) (_ g); _ piece(s) (_ g) for large pieces (e.g., large shells or lasagna noodles) or 2 oz (56 g/ visual unit of measure) for dry bulk products (e.g., spaghetti) |
| Pastas, dry, ready-to-eat, e.g., fried canned chow mein noodles | 25 g | _ cup(s) (_ g) |
| Starches, e.g., cornstarch, potato starch, tapioca, etc | 10 g | _ tbsp (_ g) |
| Stuffing | 100 g | _ cup(s) (_ g) |
| Dairy Products and Substitutes: | | |
| Cheese, cottage | 110 g | _ cup (_ g) |
| Cheese used primarily as ingredients, e.g., dry cottage cheese, ricotta cheese | 55 g | _ cup (_ g) |
| Cheese, grated hard, e.g., Parmesan, Romano | 5 g | _ tbsp (_ g) |
| Cheese, all others except those listed as separate categories—includes cream cheese and cheese spread | 30 g | _ piece(s) (_ g) for distinct pieces; _ tbsp(s) (_ g) for cream cheese and cheese spread; 1 oz (28 g/visual unit of measure) for bulk |
| Cheese sauce—see sauce category | | |
| Cream or cream substitutes, fluid | 15 mL | 1 tbsp (15 mL) |
| Cream or cream substitutes, powder | 2 g | _ tsp (_ g) |
| Cream, half & half | 30 mL | 2 tbsp (30 mL) |
| Eggnog | 120 mL | ½ cup (120 mL); 4 fl oz (120 mL) |
| Milk, condensed, undiluted | 30 mL | 2 tbsp (30 mL) |
| Milk, evaporated, undiluted | 30 mL | 2 tbsp (30 mL) |

AD058

§ 101.12 Reference amounts customarily consumed per eating..., 21 C.F.R. § 101.12

| | | |
|---|---|---|
| Milk, milk-substitute beverages, milk-based drinks, e.g., instant breakfast, meal replacement, cocoa, soy beverage | 240 mL | 1 cup (240 mL); 8 fl oz (240 mL) |
| Shakes or shake substitutes, e.g., dairy shake mixes, fruit frost mixes | 240 mL | 1 cup (240 mL); 8 fl oz (240 mL) |
| Sour cream | 30 g | _ tbsp (_ g) |
| Yogurt | 170 g | _ cup (_ g) |
| Desserts: | | |
| Ice cream, frozen yogurt, sherbet, frozen flavored and sweetened ice and pops, frozen fruit juices: all types bulk and novelties (e.g., bars, sandwiches, cones, cups) | $^2/_3$ cup—includes the volume for coatings and wafers | $^2/_3$ cup (_ g), _ piece(s) (_ g) for individually wrapped or packaged products |
| Sundae | 1 cup | 1 cup (_ g) |
| Custards, gelatin, or pudding | ½ cup prepared; amount to make ½ cup prepared when dry | _ piece(s) (_ g) for distinct unit (e.g., individually packaged products); ½ cup (_ g) for bulk |
| Dessert Toppings and Fillings: | | |
| Cake frostings or icings | 2 tbsp | _ tbsp(s) (_ g) |
| Other dessert toppings, e.g., fruits, syrups, spreads, marshmallow cream, nuts, dairy and non-dairy whipped toppings | 2 tbsp | 2 tbsp (_ g); 2 tbsp (30 mL) |
| Pie fillings | 85 g | _ cup(s) (_ g) |
| Egg and Egg Substitutes: | | |
| Egg mixtures, e.g., egg foo young, scrambled eggs, omelets | 110 g | _ piece(s) (_ g) for discrete pieces; _ cup(s) (_ g) |
| Eggs (all sizes) [8] | 50 g | 1 large, medium, etc. (_ g) |

§ 101.12 Reference amounts customarily consumed per eating..., 21 C.F.R. § 101.12

| | | |
|---|---|---|
| Egg whites, sugared eggs, sugared egg yolks, and egg substitutes (fresh, frozen, dried) | An amount to make 1 large (50 g) egg | _ cup(s) (_ g); _ cup(s) (_ mL) |
| Fats and Oils: | | |
| Butter, margarine, oil, shortening | 1 tbsp | 1 tbsp (_ g); 1 tbsp (15 mL) |
| Butter replacement, powder | 2 g | _ tsp(s) (_ g) |
| Dressings for salads | 30 g | _ tbsp (_ g); _ tbsp (_ mL) |
| Mayonnaise, sandwich spreads, mayonnaise-type dressings | 15 g | _ tbsp (_ g) |
| Spray types | 0.25 g | About _ seconds spray (_ g) |
| Fish, Shellfish, Game Meats,[9] and Meat or Poultry Substitutes: | | |
| Bacon substitutes, canned anchovies,[10] anchovy pastes, caviar | 15 g | _ piece(s) (_ g) for discrete pieces; _ tbsp(s) (_ g) for others |
| Dried, e.g., jerky | 30 g | _ piece(s) (_ g) |
| Entrees with sauce, e.g., fish with cream sauce, shrimp with lobster sauce | 140 g cooked | _ cup(s) (_ g); 5 oz (140 g/ visual unit of measure) if not measurable by cup |
| Entrees without sauce, e.g., plain or fried fish and shellfish, fish and shellfish cake | 85 g cooked; 110 g uncooked[11] | _ piece(s) (_ g) for discrete pieces; _ cup(s) (_ g); _ oz (_ g/visual unit of measure) if not measurable by cup[12] |
| Fish, shellfish, or game meat[9], canned[10] | 85 g | _ piece(s) (_ g) for discrete pieces; _ cup(s) (_ g); 3 oz (85 g/_ cup) for products that are difficult to measure the g weight of cup measure (e.g., tuna); 3 oz (85 g/_ pieces) for products that naturally vary in size (e.g., sardines) |
| Substitute for luncheon meat, meat spreads, Canadian bacon, sausages, frankfurters, and seafood | 55 g | _ piece(s) (_ g) for distinct pieces (e.g., slices, links); _ cup(s) (_ g); 2 oz (56 g/ visual unit of measure) for nondiscrete bulk product |

**AD060**

§ 101.12 Reference amounts customarily consumed per eating..., 21 C.F.R. § 101.12

| | | |
|---|---|---|
| Smoked or pickled fish,[10] shellfish, or game meat[9]; fish or shellfish spread | 55 g | _ piece(s) (_ g) for distinct pieces (e.g., slices, links) or _ cup(s) (_ g); 2 oz (56 g/visual unit of measure) for nondiscrete bulk product |
| Substitutes for bacon bits —see Miscellaneous | | |
| Fruits and Fruit Juices: | | |
| Candied or pickled[10] | 30 g | _ piece(s) (_ g) |
| Dehydrated fruits—see snack category | | |
| Dried | 40 g | _ piece(s) (_ g) for large pieces (e.g., dates, figs, prunes); _ cup(s) (_ g) for small pieces (e.g., raisins) |
| Fruits for garnish or flavor, e.g., maraschino cherries[10] | 4 g | 1 cherry (_ g); _ piece(s) (_ g) |
| Fruit relishes, e.g., cranberry sauce, cranberry relish | 70 g | _ cup(s) (_ g) |
| Fruits used primarily as ingredients, avocado | 50 g | See footnote[12] |
| Fruits used primarily as ingredients, others (cranberries, lemon, lime) | 50 g | _ piece(s) (_ g) for large fruits; _ cup(s) (_ g) for small fruits measurable by cup[12] |
| Watermelon | 280 g | See footnote[12] |
| All other fruits (except those listed as separate categories), fresh, canned or frozen | 140 g | _ piece(s) (_ g) for large pieces (e.g., strawberries, prunes, apricots, etc.); _ cup(s) (_ g) for small pieces (e.g., blueberries, raspberries, etc.)[12] |
| Juices, nectars, fruit drinks | 240 mL | 8 fl oz (240 mL) |
| Juices used as ingredients, e.g., lemon juice, lime juice | 5 mL | 1 tsp (5 mL) |
| Legumes: | | |

AD061

§ 101.12 Reference amounts customarily consumed per eating..., 21 C.F.R. § 101.12

| | | |
|---|---|---|
| Tofu, [10] tempeh | 85 g | _ piece(s) (_ g) for discrete pieces; 3 oz (84 g/ visual unit of measure) for bulk products |
| Beans, plain or in sauce | 130 g for beans in sauce or canned in liquid and refried beans prepared; 90 g for others prepared; 35 g dry | _ cup (_ g) |
| Miscellaneous: | | |
| Baking powder, baking soda, pectin | 0.6 g | _ tsp (_ g) |
| Baking decorations, e.g., colored sugars and sprinkles for cookies, cake decorations | 1 tsp or 4 g if not measurable by teaspoon | _ piece(s) (_ g) for discrete pieces; 1 tsp (_ g) |
| Batter mixes, bread crumbs | 30 g | _ tbsp(s) (_ g); _ cup(s) (_ g) |
| Chewing gum [8] | 3 g | _ piece(s) (_ g) |
| Cocoa powder, carob powder, unsweetened | 1 tbsp | 1 tbsp (_ g) |
| Cooking wine | 30 mL | 2 tbsp (30 mL) |
| Dietary supplements | The maximum amount recommended, as appropriate, on the label for consumption per eating occasion or, in the absence of recommendations, 1 unit, e.g., tablet, capsule, packet, teaspoonful, etc | _ tablet(s), _ capsules(s), _ packet(s), _ tsp(s) (_ g), etc. |
| Meat, poultry, and fish coating mixes, dry; seasoning mixes, dry, e.g., chili seasoning mixes, pasta salad seasoning mixes | Amount to make one reference amount of final dish | _ tsp(s) (_ g); _ tbsp(s) (_ g) |
| Milk, milk substitute, and fruit juice concentrates (without alcohol) (e.g., drink mixers, frozen fruit juice concentrate, sweetened cocoa powder) | Amount to make 240 mL drink (without ice) | _ fl oz (_ mL); _ tsp (_ g); tbsp (_ g) |
| Drink mixes (without alcohol): All other types | Amount to make 360 mL drink (without ice) | _ fl oz (_ mL); _ tsp (_ g); _ tbsp (_ g) |

AD062

§ 101.12 Reference amounts customarily consumed per eating..., 21 C.F.R. § 101.12

| | | |
|---|---|---|
| (e.g., flavored syrups and powdered drink mixes) | | |
| Salad and potato toppers, e.g., salad crunchies, salad crispins, substitutes for bacon bits | 7 g | _ tbsp(s) (_ g) |
| Salt, salt substitutes, seasoning salts (e.g., garlic salt) | ¼ tsp | ¼ tsp (_ g); _ piece(s) (_ g) for discrete pieces (e.g., individually packaged products) |
| Seasoning oils and seasoning sauces (e.g., coconut concentrate, sesame oil, almond oil, chili oil, coconut oil, walnut oil) | 1 tbsp | 1 tbsp (_ g) |
| Seasoning pastes (e.g., garlic paste, ginger paste, curry paste, chili paste, miso paste), fresh or frozen | 1 tsp | 1 tsp (_ g) |
| Spices, herbs (other than dietary supplements) | ¼ tsp or 0.5 g if not measurable by teaspoon | ¼ tsp (_ g); _ piece(s) (_ g) if not measurable by teaspoons (e.g., bay leaf) |
| Mixed Dishes: | | |
| Appetizers, hors d'oeuvres, mini mixed dishes, e.g., mini bagel pizzas, breaded mozzarella sticks, egg rolls, dumplings, potstickers, wontons, mini quesadillas, mini quiches, mini sandwiches, mini pizza rolls, potato skins | 85 g, add 35 g for products with gravy or sauce topping | _ piece(s) (_ g) |
| Measurable with cup, e.g., casseroles, hash, macaroni and cheese, pot pies, spaghetti with sauce, stews, etc | 1 cup | 1 cup (_ g) |
| Not measurable with cup, e.g., burritos, enchiladas, pizza, pizza rolls, quiche, all types of sandwiches | 140 g, add 55 g for products with gravy or sauce topping, e.g., enchilada with cheese sauce, crepe with white sauce [13] | _ piece(s) (_ g) for discrete pieces; _ fractional slice (_ g) for large discrete units |
| Nuts and Seeds: | | |

AD063

§ 101.12 Reference amounts customarily consumed per eating..., 21 C.F.R. § 101.12

| | | |
|---|---|---|
| Nuts, seeds and mixtures, all types: Sliced, chopped, slivered, and whole | 30 g | _ piece(s) (_ g) for large pieces (e.g., unshelled nuts); _ tbsp(s) (_ g); _ cup(s) (_ g) for small pieces (e.g., peanuts, sunflower seeds) |
| Nut and seed butters, pastes, or creams | 2 tbsp | 2 tbsp (_ g) |
| Coconut, nut and seed flours | 15 g | _ tbsp(s) (_ g); _ cup (_ g) |
| Potatoes and Sweet Potatoes/Yams: | | |
| French fries, hash browns, skins, or pancakes | 70 g prepared; 85 g for frozen unprepared French fries | _ piece(s) (_ g) for large distinct pieces (e.g., patties, skins); 2.5 oz (70 g/_ pieces) for prepared fries; 3 oz (84 g/_ pieces) for unprepared fries |
| Mashed, candied, stuffed or with sauce | 140 g | _ piece(s) (_ g) for discrete pieces (e.g., stuffed potato); _ cup(s) (_ g) |
| Plain, fresh, canned, or frozen | 110 g for fresh or frozen; 125 g for vacuum packed; 160 g for canned in liquid | _ piece(s) (_ g) for discrete pieces; _ cup(s) (_ g) for sliced or chopped products |
| Salads: | | |
| Gelatin salad | 120 g | _ cup (_ g) |
| Pasta or potato salad | 140 g | _ cup(s) (_ g) |
| All other salads, e.g., egg, fish, shellfish, bean, fruit, or vegetable salads | 100 g | _ cup(s) (_ g) |
| Sauces, Dips, Gravies, and Condiments: | | |
| Barbecue sauce, hollandaise sauce, tartar sauce, tomato chili sauce, other sauces for dipping (e.g., mustard sauce, sweet and sour sauce), all dips (e.g., bean dips, dairy-based dips, salsa) | 2 tbsp | 2 tbsp (_ g); 2 tbsp (30 mL) |
| Major main entree sauces, e.g., spaghetti sauce | 125 g | _ cup (_ g); _ cup (_ mL) |

AD064

§ 101.12 Reference amounts customarily consumed per eating..., 21 C.F.R. § 101.12

| | | |
|---|---|---|
| Minor main entree sauces (e.g., pizza sauce, pesto sauce, Alfredo sauce), other sauces used as toppings (e.g., gravy, white sauce, cheese sauce), cocktail sauce | ¼ cup | ¼ cup (_ g); ¼ cup (60 mL) |
| Major condiments, e.g., catsup, steak sauce, soy sauce, vinegar, teriyaki sauce, marinades | 1 tbsp | 1 tbsp (_ g); 1 tbsp (15 mL) |
| Minor condiments, e.g., horseradish, hot sauces, mustards, Worcestershire sauce | 1 tsp | 1 tsp (_ g); 1 tsp (5 mL) |
| Snacks: | | |
| All varieties, chips, pretzels, popcorn, extruded snacks, fruit and vegetable-based snacks (e.g., fruit chips), grain-based snack mixes | 30 g | _ cup (_ g) for small pieces (e.g., popcorn); _ piece(s) (_ g) for large pieces (e.g., large pretzels; pressed dried fruit sheet); 1 oz (28g/visual unit of measure) for bulk products (e.g., potato chips) |
| Soups: | | |
| All varieties | 245 g | _ cup (_ g); _ cup (_ mL) |
| Dry soup mixes, bouillon | Amount to make 245 g | _ cup (_ g); _ cup (_ mL) |
| Sugars and Sweets: | | |
| Baking candies (e.g., chips) | 15 g | _ piece(s) (_ g) for large pieces; _ tbsp(s) (_ g) for small pieces; ½ oz (14 g/ visual unit of measure) for bulk products |
| After-dinner confectioneries | 10 g | _ piece(s) (_ g) |
| Hard candies, breath mints [8] | 2 g | _ piece(s) (_ g) |
| Hard candies, roll-type, mini-size in dispenser packages | 5 g | _ piece(s) (_ g) |
| Hard candies, others; powdered candies, liquid candies | 15 mL for liquid candies; 15 g for all others | _ piece(s) (_ g) for large pieces; _ tbsp(s) (_ g) for "mini-size" candies |

AD065

§ 101.12 Reference amounts customarily consumed per eating..., 21 C.F.R. § 101.12

| | | |
|---|---|---|
| | | measurable by tablespoon; _ straw(s) (_ g) for powdered candies; _ wax bottle(s) (_ mL) for liquid candies; ½ oz (14 g/visual unit of measure) for bulk products |
| All other candies | 30 g | _ piece(s) (_ g); 1 oz (30 g/visual unit of measure) for bulk products |
| Confectioner's sugar | 30 g | _ cup (_ g) |
| Honey, jams, jellies, fruit butter, molasses, fruit pastes, fruit chutneys | 1 tbsp | 1 tbsp (_ g); 1 tbsp (15 mL) |
| Marshmallows | 30 g | _ cup(s) (_ g) for small pieces; _ piece(s) (_ g) for large pieces |
| Sugar | 8 g | _ tsp (_ g); _ piece(s) (_ g) for discrete pieces (e.g., sugar cubes, individually packaged products) |
| Sugar substitutes | An amount equivalent to one reference amount for sugar in sweetness | _ tsp(s) (_ g) for solids; _ drop(s) (_ g) for liquid; _ piece(s) (_ g) (e.g., individually packaged products) |
| Syrups | 30 mL for all syrups | 2 tbsp (30 mL) |
| Vegetables: | | |
| Dried vegetables, dried tomatoes, sun-dried tomatoes, dried mushrooms, dried seaweed | 5 g, add 5 g for products packaged in oil | _ piece(s); ⅓ cup (_ g) |
| Dried seaweed sheets | 3 g | _ piece(s) (_ g); _ cup(s) (_ g) |
| Vegetables primarily used for garnish or flavor (e.g., pimento,[10] parsley, fresh or dried) | 4 g | _ piece(s) (_ g); _ tbsp(s) (_ g) for chopped products |
| Fresh or canned chili peppers, jalapeno peppers, other hot peppers, green onion | 30 g | _ piece(s) (_ g)[12]; _ tbsp(s) (_ g); _ cup(s) (_ g) for sliced or chopped products |

AD066

§ 101.12 Reference amounts customarily consumed per eating..., 21 C.F.R. § 101.12

| | | |
|---|---|---|
| All other vegetables without sauce: Fresh, canned, or frozen | 85 g for fresh or frozen; 95 g for vacuum packed; 130 g for canned in liquid, cream-style corn, canned or stewed tomatoes, pumpkin, or winter squash | _ piece(s) (_ g) for large pieces (e.g., Brussels sprouts); _ cup(s) (_ g) for small pieces (e.g., cut corn, green peas); 3 oz (84 g/visual unit of measure) if not measurable by cup |
| All other vegetables with sauce: Fresh, canned, or frozen | 110 g | _ piece(s) (_ g) for large pieces (e.g., Brussels sprouts); _ cup(s) (_ g) for small pieces (e.g., cut corn, green peas); 4 oz (112 g/visual unit of measure) if not measurable by cup |
| Vegetable juice | 240 mL | 8 fl oz (240 mL) |
| Olives [10] | 15 g | _ piece(s) (_ g); _ tbsp(s) (_ g) for sliced products |
| Pickles and pickled vegetables, all types [10] | 30 g | 1 oz (28 g/visual unit of measure) |
| Pickle relishes | 15 g | _ tbsp (_ g) |
| Sprouts, all types: Fresh or canned | 1/4 cup | ¼ cup (_ g) |
| Vegetable pastes, e.g., tomato paste | 30 g | _ tbsp (_ g) |
| Vegetable sauces or purees, e.g., tomato sauce, tomato puree | 60 g | _ cup (_ g); _ cup (_ mL) |

(c) If a product requires further preparation, e.g., cooking or the addition of water or other ingredients, and if paragraph (b) of this section provides a reference amount for the product in the prepared form, but not the unprepared form, then the reference amount for the unprepared product must be the amount of the unprepared product required to make the reference amount for the prepared product as established in paragraph (b) of this section.

(d) The reference amount for an imitation or substitute food or altered food, such as a "low calorie" version, shall be the same as for the food for which it is offered as a substitute.

(e) If a food is modified by incorporating air (aerated), and thereby the density of the food is lowered by 25 percent or more in weight than that of an appropriate reference regular food as described in § 101.13(j)(1)(ii)(A), and the reference amount of the regular food is in grams, the manufacturer may determine the reference amount of the aerated food by adjusting for the difference in density of the aerated food relative to the density of the appropriate reference food provided that the manufacturer will show FDA detailed protocol and records of all data that were used to determine the density-adjusted reference amount for the aerated food. The reference amount for the aerated food shall be rounded to the nearest 5–g increment. Such products shall bear a descriptive term indicating that extra air has been incorporated (e.g., whipped, aerated). The density-adjusted reference

amounts described in paragraph (b) of this section may not be used for cakes except for cheese cake. The differences in the densities of different types of cakes having different degrees of air incorporation have already been taken into consideration in determining the reference amounts for cakes in § 101.12(b). In determining the difference in density of the aerated and the regular food, the manufacturer shall adhere to the following:

(1) The regular and the aerated product must be the same in size, shape, and volume. To compare the densities of products having nonsmooth surfaces (e.g., waffles), manufacturers shall use a device or method that ensures that the volumes of the regular and the aerated products are the same.

(2) Sample selections for the density measurements shall be done in accordance with the provisions in § 101.9(g).

(3) Density measurements of the regular and the aerated products shall be conducted by the same trained operator using the same methodology (e.g., the same equipment, procedures, and techniques) under the same conditions.

(4) Density measurements shall be replicated a sufficient number of times to ensure that the average of the measurements is representative of the true differences in the densities of the regular and the ''aerated'' products.

(f) For products that have no reference amount listed in paragraph (b) of this section for the unprepared or the prepared form of the product and that consist of two or more foods packaged and presented to be consumed together (e.g., peanut butter and jelly, cracker and cheese pack, pancakes and syrup, cake and frosting), the reference amount for the combined product shall be determined using the following rules:

(1) The reference amount for the combined product must be the reference amount, as established in paragraph (b) of this section, for the ingredient that is represented as the main ingredient (e.g., peanut butter, pancakes, cake) plus proportioned amounts of all minor ingredients.

(2) If the reference amounts are in compatible units, the weights or volumes must be summed (e.g., the reference amount for equal volumes of peanut butter and jelly for which peanut butter is represented as the main ingredient would be 4 tablespoons (tbsp) (2 tbsp peanut butter plus 2 tbsp jelly)). If the reference amounts are in incompatible units, all amounts must be converted to weights and summed, e.g., the reference amount for pancakes and syrup would be 110 g (the reference amount for pancakes) plus the weight of the proportioned amount of syrup.

(g) The reference amounts set forth in paragraphs (b) through (f) of this section shall be used in determining whether a product meets the criteria for nutrient content claims, such as "low calorie," and for health claims. If the serving size declared on the product label differs from the reference amount, and the product meets the criteria for the claim only on the basis of the reference amount, the claim shall be followed by a statement that sets forth the basis on which the claim is made. That statement shall include the reference amount as it appears in paragraph (b) of this section followed, in parenthesis, by the amount in common household measure if the reference amount is expressed in measures other than common household measures (e.g., for a beverage, "Very low sodium, 35 mg or less per 240 mL (8 fl oz)").

(h) The Commissioner of Food and Drugs, either on his or her own initiative or in response to a petition submitted pursuant to part 10 of this chapter, may issue a proposal to establish or amend a reference amount in paragraph (b) of this section. A petition to establish or amend a reference amount shall include:

(1) Objective of the petition;

(2) A description of the product;

(3) A complete sample product label including nutrition label, using the format established by regulation;

(4) A description of the form (e.g., dry mix, frozen dough) in which the product will be marketed;

(5) The intended dietary uses of the product with the major use identified (e.g., milk as a beverage and chips as a snack);

(6) If the intended use is primarily as an ingredient in other foods, list of foods or food categories in which the product will be used as an ingredient with information on the prioritization of the use;

(7) The population group for which the product will be offered for use (e.g., infants, children under 4 years of age);

(8) The names of the most closely related products (or in the case of foods for special dietary use and imitation or substitute foods, the names of the products for which they are offered as substitutes);

(9) The suggested reference amount (the amount of edible portion of food as consumed, excluding bone, seed, shell, or other inedible components) for the population group for which the product is intended with full description of the methodology and procedures that were used to determine the suggested reference amount. In determining the reference amount, general principles and factors in paragraph (a) of this section should be followed.

(10) The suggested reference amount shall be expressed in metric units. Reference amounts for fluids shall be expressed in milliliters. Reference amounts for other foods shall be expressed in grams except when common household units such as cups, tablespoons, and teaspoons, are more appropriate or are more likely to promote uniformity in serving sizes declared on product labels. For example, common household measures would be more appropriate if products within the same category differ substantially in density, such as frozen desserts.

(i) In expressing the reference amounts in milliliters, the following rules shall be followed:

(A) For volumes greater than 30 milliliters (mL), the volume shall be expressed in multiples of 30 mL.

(B) For volumes less than 30 mL, the volume shall be expressed in milliliters equivalent to a whole number of teaspoons or 1 tbsp, i.e., 5, 10, or 15 mL.

(ii) In expressing the reference amounts in grams, the following general rules shall be followed:

(A) For quantities greater than 10 g, the quantity shall be expressed in the nearest 5–g increment.

(B) For quantities less than 10 g, exact gram weights shall be used.

(11) A petition to create a new subcategory of food with its own reference amount shall include the following additional information:

(i) Data that demonstrate that the new subcategory of food will be consumed in amounts that differ enough from the reference amount for the parent category to warrant a separate reference amount. Data must include sample size; and the mean, standard deviation, median, and modal consumed amount per eating occasion for the petitioned product and for other products in the category, excluding the petitioned product. All data must be derived from the same survey data.

(ii) Documentation supporting the difference in dietary usage and product characteristics that affect the consumption size that distinguishes the petitioned product from the rest of the products in the category.

(12) A claim for categorical exclusion under § 25.30 or § 25.32 of this chapter or an environmental assessment under § 25.40 of this chapter, and

(13) In conducting research to collect or process food consumption data in support of the petition, the following general guidelines should be followed.

(i) Sampled population selected should be representative of the demographic and socioeconomic characteristics of the target population group for which the food is intended.

(ii) Sample size (i.e., number of eaters) should be large enough to give reliable estimates for customarily consumed amounts.

(iii) The study protocol should identify potential biases and describe how potential biases are controlled for or, if not possible to control, how they affect interpretation of results.

(iv) The methodology used to collect or process data should be fully documented and should include: study design, sampling procedures, materials used (e.g., questionnaire, and interviewer's manual), procedures used to collect or process data, methods or procedures used to control for unbiased estimates, and procedures used to correct for nonresponse.

(14) A statement concerning the feasibility of convening associations, corporations, consumers, and other interested parties to engage in negotiated rulemaking to develop a proposed rule consistent with the Negotiated Rulemaking Act (5 U.S.C. 561).

**Credits**

[58 FR 2293, Jan. 6, 1993; 58 FR 17086, 17087, 17091, April 1, 1993; 58 FR 44051, Aug. 18, 1993; 58 FR 60109, Nov. 15, 1993; 59 FR 371, Jan. 4, 1994; 59 FR 24039, May 10, 1994; 62 FR 40598, July 29, 1997; 62 FR 49848, Sept. 23, 1997; 62 FR 63653, Dec. 2, 1997; 63 FR 14818, March 27, 1998; 64 FR 12890, March 16, 1999; 81 FR 34041, May 27, 2016; 83 FR 19619, May 4, 2018]

SOURCE: 42 FR 14308, March 15, 1977; 51 FR 25017, July 9, 1986; 52 FR 6971, March 9, 1987; 54 FR 39632, Sept. 27, 1989; 59 FR 350, Jan. 4, 1994; 60 FR 67174, Dec. 28, 1995; 61 FR 43446, Aug. 23, 1996; 62 FR 3600, Jan. 23, 1997; 62 FR 15342, March 31, 1997; 62 FR 51513, Oct. 1, 1997; 65 FR 76110, Dec. 5, 2000; 81 FR 49895, July 29, 2016, unless otherwise noted.

AUTHORITY: 15 U.S.C. 1453, 1454, 1455; 21 U.S.C. 321, 331, 342, 343, 348, 371; 42 U.S.C. 243, 264, 271.

Notes of Decisions (4)

Current through March 31, 2022; 87 FR 18739.

**Footnotes**

1    These values represent the amount of food customarily consumed per eating occasion and were primarily derived from the 1977-1978 and the 1987-1988 Nationwide Food Consumption Surveys conducted by the U.S. Department of Agriculture. We further considered data from the National Health and Nutrition Examination Survey, 2003-2004, 2005-2006, and 2007-2008 conducted by the Centers for Disease Control and Prevention, in the U.S. Department of Health and Human Services.

2    Unless otherwise noted in the reference amount column, the reference amounts are for the ready-to-serve or almost ready-to-serve form of the product (e.g., heat and serve, brown and serve). If not listed separately, the reference amount for the unprepared form (e.g., dry mixes, concentrates, dough, batter, fresh and frozen pasta) is the amount required to make the reference amount of the prepared form. Prepared means prepared for consumption (e.g., cooked).

3    Manufacturers are required to convert the reference amount to the label serving size in a household measure most appropriate to their specific product using the procedures in 21 CFR 101.9(b).

4    The label statements are meant to provide examples of serving size statements that may be used on the label, but the specific wording may be changed as appropriate for individual products. The term "piece" is used as a generic description of a discrete unit. Manufacturers should use the description of a unit that is most appropriate for the specific product (e.g., sandwich for sandwiches, cookie for cookies, and bar for frozen novelties).

1    These values represent the amount (edible portion) of food customarily consumed per eating occasion and were primarily derived from the 1977-1978 and the 1987-1988 Nationwide Food Consumption Surveys conducted by the U.S. Department of Agriculture and updated with data from the National Health and Nutrition Examination Survey, 2003-2004, 2005-2006 and 2007-2008 conducted by the Centers for Diseases Control and Prevention, in the Department of Health and Human Services.

AD071

2    Unless otherwise noted in the Reference Amount column, the reference amounts are for the ready-to-serve or almost ready-to-serve form of the product (e.g., heat and serve, brown and serve). If not listed separately, the reference amount for the unprepared form (e.g., dry mixes, concentrates, dough, batter, fresh and frozen pasta) is the amount required to make the reference amount of the prepared form. Prepared means prepared for consumption (e.g., cooked).

3    Manufacturers are required to convert the reference amount to the label serving size in a household measure most appropriate to their specific product using the procedures in 21 CFR 101.9(b).

4    The label statements are meant to provide examples of serving size statements that may be used on the label, but the specific wording may be changed as appropriate for individual products. The term "piece" is used as a generic description of a discrete unit. Manufacturers should use the description of a unit that is most appropriate for the specific product (e.g., sandwich for sandwiches, cookie for cookies, and bar for ice cream bars). The guidance provided is for the label statement of products in ready-to-serve or almost ready-to-serve form. The guidance does not apply to the products which require further preparation for consumption (e.g., dry mixes, concentrates) unless specifically stated in the product category, reference amount, or label statement column that it is for these forms of the product. For products that require further preparation, manufacturers must determine the label statement following the rules in § 101.9(b) using the reference amount determined according to § 101.12(c).

5    Includes cakes that weigh 10 g or more per cubic inch. The serving size for fruitcake is 1 1/2 ounces.

6    Includes cakes that weigh 4 g or more per cubic inch but less than 10 g per cubic inch.

7    Includes cakes that weigh less than 4 g per cubic inch.

8    Label serving size for ice cream cones, eggs, and breath mints of all sizes will be 1 unit. Label serving size of all chewing gums that weigh more than the reference amount that can reasonably be consumed at a single-eating occasion will be 1 unit.

9    Animal products not covered under the Federal Meat Inspection Act or the Poultry Products Inspection Act, such as flesh products from deer, bison, rabbit, quail, wild turkey, geese, ostrich, etc.

10    If packed or canned in liquid, the reference amount is for the drained solids, except for products in which both the solids and liquids are customarily consumed (e.g., canned chopped clam in juice).

11    The reference amount for the uncooked form does not apply to raw fish in § 101.45 or to single-ingredient products that consist of fish or game meat as provided for in § 101.9(j)(11).

12    For raw fruit, vegetables, and fish, manufacturers should follow the label statement for the serving size specified in Appendices C and D to part 101 (21 CFR part 101) Code of Federal Regulations.

13    Pizza sauce is part of the pizza and is not considered to be sauce topping.

---

**End of Document**                                   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

AD072

Code of Federal Regulations
  Title 21. Food and Drugs
    Chapter I. Food and Drug Administration, Department of Health and Human Services (Refs & Annos)
      Subchapter B. Food for Human Consumption
        Part 101. Food Labeling (Refs & Annos)
          Subpart D. Specific Requirements for Nutrient Content Claims (Refs & Annos)

21 C.F.R. § 101.62

§ 101.62 Nutrient content claims for fat, fatty acid, and cholesterol content of foods.

Effective: January 12, 2007
Currentness

(a) General requirements. A claim about the level of fat, fatty acid, and cholesterol in a food may only be made on the label or in the labeling of foods if:

(1) The claim uses one of the terms defined in this section in accordance with the definition for that term;

(2) The claim is made in accordance with the general requirements for nutrient content claims in § 101.13;

(3) The food for which the claim is made is labeled in accordance with § 101.9, § 101.10, or § 101.36, as applicable; and

(4) For dietary supplements, claims for fat, saturated fat, and cholesterol may not be made on products that meet the criteria in § 101.60(b)(1) or (b)(2) for "calorie free" or "low calorie" claims.

(b) Fat content claims.

(1) The terms "fat free," "free of fat," "no fat," "zero fat," "without fat," "negligible source of fat," or "dietarily insignificant source of fat" or, in the case of milk products, "skim" may be used on the label or in labeling of foods, provided that:

(i) The food contains less than 0.5 gram (g) of fat per reference amount customarily consumed and per labeled serving or, in the case of a meal product or main dish product, less than 0.5 g of fat per labeled serving; and

(ii) The food contains no added ingredient that is a fat or is generally understood by consumers to contain fat unless the listing of the ingredient in the ingredient statement is followed by an asterisk that refers to the statement below the list of ingredients, which states "adds a trivial amount of fat," "adds a negligible amount of fat," or "adds a dietarily insignificant amount of fat;" and

(iii) As required in § 101.13(e)(2), if the food meets these conditions without the benefit of special processing, alteration, formulation, or reformulation to lower fat content, it is labeled to disclose that fat is not usually present in the food (e.g., "broccoli, a fat free food").

(2) The terms "low fat," "low in fat," "contains a small amount of fat," "low source of fat," or "little fat" may be used on the label or in labeling of foods, except meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m), provided that:

(i)(A) The food has a reference amount customarily consumed greater than 30 g or greater than 2 tablespoons and contains 3 g or less of fat per reference amount customarily consumed; or

(B) The food has a reference amount customarily consumed of 30 g or less or 2 tablespoons or less and contains 3 g or less of fat per reference amount customarily consumed and per 50 g of food (for dehydrated foods that must be reconstituted before typical consumption with water or a diluent containing an insignificant amount, as defined in § 101.9(f)(1), of all nutrients per reference amount customarily consumed, the per 50–g criterion refers to the "as prepared" form); and

(ii) If the food meets these conditions without the benefit of special processing, alteration, formulation, or reformulation to lower fat content, it is labeled to clearly refer to all foods of its type and not merely to the particular brand to which the label attaches (e.g., "frozen perch, a low fat food").

(3) The terms defined in paragraph (b)(2) of this section may be used on the label or in labeling of meal products as defined in § 101.13(l) or main dish products as defined in § 101.13(m), provided that:

(i) The product contains 3 g or less of total fat per 100 g and not more than 30 percent of calories from fat; and

(ii) If the product meets these conditions without the benefit of special processing, alteration, formulation, or reformulation to lower fat content, it is labeled to clearly refer to all foods of its type and not merely to the particular brand to which the label attaches.

(4) The terms "reduced fat," "reduced in fat," "fat reduced," "less fat," "lower fat," or "lower in fat" may be used on the label or in the labeling of foods, except meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m), provided that:

(i) The food contains at least 25 percent less fat per reference amount customarily consumed than an appropriate reference food as described in § 101.13(j)(1); and

(ii) As required in § 101.13(j)(2) for relative claims:

(A) The identity of the reference food and the percent (or fraction) that the fat differs between the two foods and are declared in immediate proximity to the most prominent such claim (e.g., "reduced fat—50 percent less fat than our regular brownies"); and

(B) Quantitative information comparing the level of fat in the product per labeled serving with that of the reference food that it replaces (e.g., "Fat content has been reduced from 8 g to 4 g per serving.") is declared adjacent to the most prominent claim or to the nutrition label, except that if the nutrition label is on the information panel, the quantitative information may be located elsewhere on the information panel in accordance with § 101.2.

(iii) Claims described in paragraph (b)(4) of this section may not be made on the label or in the labeling of a food if the nutrient content of the reference food meets the definition for "low fat."

(5) The terms defined in paragraph (b)(4) of this section may be used on the label or in the labeling of meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m), provided that:

(i) The food contains at least 25 percent less fat per 100 g of food than an appropriate reference food as described in § 101.13(j)(1); and

(ii) As required in § 101.13(j)(2) for relative claims:

(A) The identity of the reference food and the percent (or fraction) that the fat differs between the two foods are declared in immediate proximity to the most prominent such claim (e.g., reduced fat spinach souffle, "33 percent less fat per 3 oz than our regular spinach souffle"); and

(B) Quantitative information comparing the level of fat in the product per specified weight with that of the reference food that it replaces (e.g., "Fat content has been reduced from 7.5 g per 3 oz to 5 g per 3 oz.") is declared adjacent to the most prominent claim, to the nutrition label, or, if the nutrition label is located on the information panel, it may appear elsewhere on the information panel in accordance with § 101.2.

(iii) Claims described in paragraph (b)(5) of this section may not be made on the label or in the labeling of a food if the nutrient content of the reference food meets the definition for "low fat."

(6) The term "___ percent fat free" may be used on the label or in the labeling of foods, provided that:

(i) The food meets the criteria for "low fat" in paragraph (b)(2) or (b)(3) of this section;

(ii) The percent declared and the words "fat free" are in uniform type size; and

(iii) A "100 percent fat free" claim may be made only on foods that meet the criteria for "fat free" in paragraph (b)(1) of this section, that contain less than 0.5 g of fat per 100 g, and that contain no added fat.

(c) Fatty acid content claims. The label or labeling of foods that bear claims with respect to the level of saturated fat shall disclose the level of total fat and cholesterol in the food in immediate proximity to such claim each time the claim is made and in type that shall be no less than one-half the size of the type used for the claim with respect to the level of saturated fat. Declaration of cholesterol content may be omitted when the food contains less than 2 milligrams (mg) of cholesterol per reference amount customarily consumed or in the case of a meal or main dish product less than 2 mg of cholesterol per labeled serving. Declaration of total fat may be omitted with the term defined in paragraph (c)(1) of this section when the food contains less than 0.5 g of total fat per reference amount customarily consumed or, in the case of a meal product or a main dish product, when the product contains less than 0.5 g of total fat per labeled serving. The declaration of total fat may be omitted with the terms defined in paragraphs (c)(2) through (c)(5) of this section when the food contains 3 g or less of total fat per reference amount customarily consumed or in the case of a meal product or a main dish product, when the product contains 3 g or less of total fat per 100 g and not more than 30 percent calories from fat.

(1) The terms "saturated fat free," "free of saturated fat," "no saturated fat," "zero saturated fat," "without saturated fat," "trivial source of saturated fat," "negligible source of saturated fat," or "dietarily insignificant source of saturated fat" may be used on the label or in the labeling of foods, provided that:

(i) The food contains less than 0.5 g of saturated fat and less than 0.5 g trans fatty acid per reference amount customarily consumed and per labeled serving, or in the case of a meal product or main dish product, less than 0.5 g of saturated fat and less than 0.5 g trans fatty acid per labeled serving; and

(ii) The food contains no ingredient that is generally understood by consumers to contain saturated fat unless the listing of the ingredient in the ingredient statement is followed by an asterisk that refers to the statement below the list of ingredients which states, "adds a trivial amount of saturated fat," "adds a negligible amount of saturated fat," or "adds a dietarily insignificant amount of saturated fat;" and

(iii) As required in § 101.13(e)(2), if the food meets these conditions without the benefit of special processing, alteration, formulation, or reformulation to lower saturated fat content, it is labeled to disclose that saturated fat is not usually present in the food.

(2) The terms "low in saturated fat," "low saturated fat," "contains a small amount of saturated fat," "low source of saturated fat," or "a little saturated fat" may be used on the label or in the labeling of foods, except meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m), provided that:

(i) The food contains 1 g or less of saturated fatty acids per reference amount customarily consumed and not more than 15 percent of calories from saturated fatty acids; and

(ii) If a food meets these conditions without benefit of special processing, alteration, formulation, or reformulation to lower saturated fat content, it is labeled to clearly refer to all foods of its type and not merely to the particular brand to which the label attaches (e.g., "raspberries, a low saturated fat food").

(3) The terms defined in paragraph (c)(2) of this section may be used on the label or in the labeling of meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m), provided that:

(i) The product contains 1 g or less of saturated fatty acids per 100 g and less than 10 percent calories from saturated fat; and

(ii) If the product meets these conditions without the benefit of special processing, alteration, formulation, or reformulation to lower saturated fat content, it is labeled to clearly refer to all foods of its type and not merely to the particular brand to which the label attaches.

(4) The terms "reduced saturated fat," "reduced in saturated fat," "saturated fat reduced," "less saturated fat," "lower saturated fat," or "lower in saturated fat" may be used on the label or in the labeling of foods, except as limited by § 101.13(j)(1)(i) and except meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m), provided that:

(i) The food contains at least 25 percent less saturated fat per reference amount customarily consumed than an appropriate reference food as described in § 101.13(j)(1); and

(ii) As required in § 101.13(j)(2) for relative claims:

(A) The identity of the reference food and the percent (or fraction) that the saturated fat differs between the two foods are declared in immediate proximity to the most prominent such claim (e.g., "reduced saturated fat. Contains 50 percent less saturated fat than the national average for nondairy creamers"); and

(B) Quantitative information comparing the level of saturated fat in the product per labeled serving with that of the reference food that it replaces (e.g., "Saturated fat reduced from 3 g to 1.5 g per serving") is declared adjacent to the most prominent claim or to the nutrition label, except that if the nutrition label is on the information panel, the quantitative information may be located elsewhere on the information panel in accordance with § 101.2.

(iii) Claims described in paragraph (c)(4) of this section may not be made on the label or in the labeling of a food if the nutrient content of the reference food meets the definition for "low saturated fat."

(5) The terms defined in paragraph (c)(4) of this section may be used on the label or in the labeling of meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m), provided that:

(i) The food contains at least 25 percent less saturated fat per 100 g of food than an appropriate reference food as described in § 101.13(j)(1), and

(ii) As required in § 101.13(j)(2) for relative claims:

(A) The identity of the reference food, and the percent (or fraction) that the fat differs between the two foods are declared in immediate proximity to the most prominent such claim (e.g., reduced saturated fat Macaroni and Cheese, "33 percent less saturated fat per 3 oz than our regular Macaroni and Cheese").

(B) Quantitative information comparing the level of saturated fat in the product per specified weight with that of the reference food that it replaces (e.g., "Saturated fat content has been reduced from 2.5 g per 3 oz to 1.7 g per 3 oz.") is declared adjacent to the most prominent claim or to the nutrition label, except that if the nutrition label in on the information panel, the quantitative information may be located elsewhere on the information panel in accordance with § 101.2.

(iii) Claims described in paragraph (c)(5) of this section may not be made on the label or in the labeling of a food if the nutrient content of the reference food meets the definition for "low saturated fat."

(d) Cholesterol content claims.

(1) The terms "cholesterol free," "free of cholesterol," "zero cholesterol," "without cholesterol," "no cholesterol," "trivial source of cholesterol," "negligible source of cholesterol," or "dietarily insignificant source of cholesterol" may be used on the label or in the labeling of foods, provided that:

(i) For foods that contain 13 g or less of total fat per reference amount customarily consumed, per labeled serving, and per 50 g if the reference amount customarily consumed is 30 g or less or 2 tablespoons or less (for dehydrated foods that must be reconstituted before typical consumption with water or a diluent containing an insignificant amount, as defined in § 101.9(f)(1), of all nutrients per reference amount customarily consumed, the per 50–g criterion refers to the "as prepared" form), or, in the case of meal products, 26.0 g or less total fat per labeled serving, or, in the case of main dish products, 19.5 g or less total fat per labeled serving:

(A) The food contains less than 2 mg of cholesterol per reference amount customarily consumed and per labeling serving or, in the case of a meal product or main dish product, less than 2 mg of cholesterol per labeled serving; and

(B) The food contains no ingredient that is generally understood by consumers to contain cholesterol, unless the listing of the ingredient in the ingredient statement is followed by an asterisk that refers to the statement below the list of ingredients, which states "adds a trivial amount of cholesterol," "adds a negligible amount of cholesterol," or "adds a dietarily insignificant amount of cholesterol;" and

(C) The food contains 2 g or less of saturated fatty acids per reference amount customarily consumed or, in the case of a meal product or main dish product, 2 g or less of saturated fatty acids per labeled serving; and

(D) As required in § 101.13(e)(2), if the food contains less than 2 mg of cholesterol per reference amount customarily consumed or in the case of a meal product or main dish product, less than 2 mg of cholesterol per labeled serving without the benefit of special processing, alteration, formulation, or reformulation to lower cholesterol content, it is labeled to disclose that cholesterol is not usually present in the food (e.g., "applesauce, a cholesterol-free food").

(ii) For food that contain more than 13 g of total fat per reference amount customarily consumed, per labeling serving, or per 50 g if the reference amount customarily consumed is 30 g or less or 2 tablespoons or less (for dehydrated foods that must be reconstituted before typical consumption with water or a diluent containing an insignificant amount, as defined in § 101.9(f)(1), of all nutrients per reference amount customarily consumed, the per 50–g criterion refers to the "as prepared"

form), or in the case of a meal product, more than 26 g of total fat per labeled serving, or, in the case of a main dish product more than 19.5 g of total fat per labeled serving:

(A) The food contains less than 2 mg of cholesterol per reference amount customarily consumed and per labeling serving or, in the case of a meal product or main dish product, less than 2 mg of cholesterol per labeled serving; and

(B) The food contains no ingredient that is generally understood by consumers to contain cholesterol, unless the listing of the ingredient in the ingredient statement is followed by an asterisk that refers to the statement below the list of ingredients, which states "adds a trivial amount of cholesterol," "adds a negligible amount of cholesterol," or "adds a dietarily insignificant amount of cholesterol;" and

(C) The food contains 2 g or less of saturated fatty acids per reference amount customarily consumed or, in the case of a meal product or main dish product less than 2 g of saturated fatty acids per labeled serving; and

(D) The label or labeling discloses the level of total fat in a serving (as declared on the label) of the food. Such disclosure shall appear in immediate proximity to such claim preceding any disclosure statement required under § 101.13(h) in type that shall be no less than one-half the size of the type used for such claim. If the claim appears on more than one panel, the disclosure shall be made on each panel except for the panel that bears nutrition labeling. If the claim appears more than once on a panel, the disclosure shall be made in immediate proximity to the claim that is printed in the largest type; and

(E) As required in § 101.13(e)(2), if the food contains less than 2 mg of cholesterol per reference amount customarily consumed or in the case of a meal product or main dish product less than 2 mg of cholesterol per labeled serving without the benefit of special processing, alteration, formulation, or reformulation to lower cholesterol content, it is labeled to disclose that cholesterol is not usually present in the food (e.g., "canola oil, a cholesterol-free food, contains 14 g of fat per serving"); or

(F) If the food contains less than 2 mg of cholesterol per reference amount customarily consumed or in the case of a meal product or main dish product less than 2 mg of cholesterol per labeled serving only as a result of special processing, alteration, formulation, or reformulation, the amount of cholesterol is substantially less (i.e., meets requirements of paragraph (d)(4)(ii)(A) of this section) than the food for which it substitutes as specified in § 101.13(d) that has a significant (e.g., 5 percent or more of a national or regional market) market share. As required in § 101.13(j)(2) for relative claims:

(1) The identity of the reference food and the percent (or fraction) that the cholesterol was reduced are declared in immediate proximity to the most prominent such claim (e.g., "cholesterol-free margarine, contains 100 percent less cholesterol than butter"); and

(2) Quantitative information comparing the level of cholesterol in the product per labeled serving with that of the reference food that it replaces (e.g., "Contains no cholesterol compared with 30 mg cholesterol in one serving of butter. Contains 13 g of fat per serving.") is declared adjacent to the most prominent claim or to the nutrition label, except that if the nutrition label is on the information panel, the quantitative information may be located elsewhere on the information panel in accordance with § 101.2.

(2) The terms "low in cholesterol," "low cholesterol," "contains a small amount of cholesterol," "low source of cholesterol," or "little cholesterol" may be used on the label or in the labeling of foods, except meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m), provided that:

(i) For foods that have a reference amount customarily consumed greater than 30 g or greater than 2 tablespoons and contain 13 g or less of total fat per reference amount customarily consumed and per labeled serving:

(A) The food contains 20 mg or less of cholesterol per reference amount customarily consumed;

(B) The food contains 2 g or less of saturated fatty acids per reference amount customarily consumed; and

(C) As required in § 101.13(e)(2), if the food meets these conditions without the benefit of special processing, alteration, formulation, or reformulation to lower cholesterol content, it is labeled to clearly refer to all foods of that type and not merely to the particular brand to which the label attaches (e.g., "low fat cottage cheese, a low cholesterol food.").

(ii) For foods that have a reference amount customarily consumed of 30 g or less or 2 tablespoons or less and contain 13 g or less of total fat per reference amount customarily consumed, per labeled serving, and per 50 g (for dehydrated foods that must be reconstituted before typical consumption with water or a diluent containing an insignificant amount, as defined in § 101.9(f)(1), of all nutrients per reference amount customarily consumed, the per 50–g criterion refers to the "as prepared" form);

(A) The food contains 20 mg or less of cholesterol per reference amount customarily consumed and per 50 g (for dehydrated foods that must be reconstituted before typical consumption with water or a diluent containing an insignificant amount, as defined in § 101.9(f)(1), of all nutrients per reference amount customarily consumed, the per 50–g criterion refers to the "as prepared" form);

(B) The food contains 2 g or less of saturated fatty acids per reference amount customarily consumed; and

(C) As required in § 101.13(e)(2), if the food meets these conditions without the benefit of special processing, alteration, formulation, or reformulation to lower cholesterol content, it is labeled to clearly refer to all foods of that type and not merely to the particular brand to which the label attaches (e.g., "low fat cottage cheese, a low cholesterol food").

(iii) For foods that have a reference amount customarily consumed greater than 30 g or greater than 2 tablespoons and contain more than 13 g of total fat per reference amount customarily consumed or per labeled serving,

(A) The food contains 20 mg or less of cholesterol per reference amount customarily consumed;

(B) The food contains 2 g or less of saturated fatty acids per reference amount customarily consumed;

(C) The label or labeling discloses the level of total fat in a serving (as declared on the label) of the food. Such disclosure shall appear in immediate proximity to such claim preceding any disclosure statement required under § 101.13(h) in type that shall be no less than one-half the size of the type used for such claim. If the claim appears on more than one panel, the disclosure shall be made on each panel except for the panel that bears nutrition labeling. If the claim is made more than once on a panel, the disclosure shall be made in immediate proximity to the claim that is printed in the largest type; and

(D) As required in § 101.13(e)(2), if the food meets these conditions without the benefit of special processing, alteration, formulation, or reformulation to lower cholesterol content, it is labeled to clearly refer to all foods of that type and not merely to the particular brand to which the label attaches; or

(E) If the food contains 20 mg or less of cholesterol only as a result of special processing, alteration, formulation, or reformulation, the amount of cholesterol is substantially less (i.e., meets requirements of paragraph (d)(4)(ii)(A) of this section) than the food for which it substitutes as specified in § 101.13(d) that has a significant (e.g., 5 percent or more of a national or regional market) market share. As required in § 101.13(j)(2) for relative claims:

> (1) The identity of the reference food and the percent (or fraction) that the cholesterol has been reduced are declared in immediate proximity to the most prominent such claim (e.g., "low-cholesterol peanut butter sandwich crackers, contains 83 percent less cholesterol than our regular peanut butter sandwich crackers"); and

> (2) Quantitative information comparing the level of cholesterol in the product per labeled serving with that of the reference food that it replaces (e.g., "Cholesterol lowered from 30 mg to 5 mg per serving; contains 13 g of fat per serving.") is declared adjacent to the most prominent claim or to the nutrition label, except that if the nutrition label is on the information panel, the quantitative information may be located elsewhere on the information panel in accordance with § 101.2.

(iv) For foods that have a reference amount customarily consumed of 30 g or less or 2 tablespoons or less and contain more than 13 g of total fat per reference amount customarily consumed, per labeled serving, or per 50 g (for dehydrated foods that must be reconstituted before typical consumption with water or a diluent containing an insignificant amount, as defined in § 101.9(f)(1), of all nutrients per reference amount customarily consumed, the per 50–g criterion refers to the "as prepared" form),

(A) The food contains 20 mg or less of cholesterol per reference amount customarily consumed and per 50 g (for dehydrated foods that must be reconstituted before typical consumption with water or a diluent containing an insignificant amount, as defined in § 101.9(f)(1), of all nutrients per reference amount customarily consumed, the per 50–g criterion refers to the "as prepared" form),

(B) The food contains 2 g or less of saturated fatty acids per reference amount customarily consumed;

(C) The label or labeling discloses the level of total fat in a serving (as declared on the label) of the food. Such disclosure shall appear in immediate proximity to such claim preceding any disclosure statement required under § 101.13(h) in type that shall be no less than one-half the size of the type used for such claim. If the claim appears on

more than one panel, the disclosure shall be made on each panel except for the panel that bears nutrition labeling. If the claim is made more than once on a panel, the disclosure shall be made in immediate proximity to the claim that is printed in the largest type; and

(D) As required in § 101.13(e)(2), if the food meets these conditions without the benefit of special processing, alteration, formulation, or reformulation to lower cholesterol content, it is labeled to clearly refer to all foods of that type and not merely to the particular brand to which the label attaches; or

(E) If the food contains 20 mg or less of cholesterol only as a result of special processing, alteration, formulation, or reformulation, the amount of cholesterol is substantially less (i.e., meets requirements of paragraph (d)(4)(ii)(A) of this section) than the food for which it substitutes as specified in § 101.13(d) that has a significant (i.e., 5 percent or more of a national or regional market) market share. As required in § 101.13(j)(2) for relative claims:

(1) The identity of the reference food and the percent (or fraction) that the cholesterol has been reduced are declared in immediate proximity to the most prominent such claim (e.g., "low-cholesterol peanut butter sandwich crackers, contains 83 percent less cholesterol than our regular peanut butter sandwich crackers"); and

(2) Quantitative information comparing the level of cholesterol in the product per labeled serving with that of the reference food that it replaces (e.g., "Cholesterol lowered from 30 mg to 5 mg per serving; contains 13 g of fat per serving.") is declared adjacent to the most prominent claim or to the nutrition label, except that if the nutrition label is on the information panel, the quantitative information may be located elsewhere on the information panel in accordance with § 101.2.

(3) The terms defined in paragraph (d)(2) of this section may be used on the label and in labeling of meal products as defined in § 101.13(l) or a main dish product as defined in § 101.13(m) provided that the product meets the requirements of paragraph (d)(2) of this section except that the determination as to whether paragraph (d)(2)(i) or (d)(2)(iii) of this section applies to the product will be made only on the basis of whether the meal product contains 26 g or less of total fat per labeled serving or the main dish product contain 19.5 g or less of total fat per labeled serving, the requirement in paragraphs (d)(2)(i)(A) and (d)(2)(iii)(A) of this section shall be limited to 20 mg of cholesterol per 100 g, and the requirement in paragraphs (d)(2)(i)(B) and (d)(2)(iii)(B) of this section shall be modified to require that the food contain 2 g or less of saturated fat per 100 g rather than per reference amount customarily consumed.

(4) The terms "reduced cholesterol," "reduced in cholesterol," "cholesterol reduced," "less cholesterol," "lower cholesterol," or "lower in cholesterol" except as limited by § 101.13(j)(1)(i) may be used on the label or in labeling of foods or foods that substitute for those foods as specified in § 101.13(d), excluding meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m), provided that:

(i) For foods that contain 13 g or less of total fat per reference amount customarily consumed, per labeled serving, and per 50 g if the reference amount customarily consumed is 30 g or less or 2 tablespoons or less (for dehydrated foods that must be reconstituted before typical consumption with water or a diluent containing an insignificant amount, as defined in § 101.9(f)(1), of all nutrients per reference amount customarily consumed, the per 50–g criterion refers to the "as prepared" form):

(A) The food has been specifically formulated, altered, or processed to reduce its cholesterol by 25 percent or more from the reference food it resembles as defined in § 101.13(j)(1) and for which it substitutes as specified in § 101.13(d) that has a significant (i.e., 5 percent or more) market share; and

(B) The food contains 2 g or less of saturated fatty acids per reference amount customarily consumed; and

(C) As required in § 101.13(j)(2) for relative claims:

(1) The identity of the reference food and the percent (or fraction) that the cholesterol has been reduced are declared in immediate proximity to the most prominent such claim; and

(2) Quantitative information comparing the level of cholesterol in the product per labeled serving with that of the reference food that it replaces (e.g., "[labeled product] 50 mg cholesterol per serving; [reference product] 30 mg cholesterol per serving") is declared adjacent to the most prominent claim or to the nutrition label, except that if the nutrition label is on the information panel, the quantitative information may be located elsewhere on the information panel in accordance with § 101.2.

(ii) For foods that contain more than 13 g of total fat per reference amount customarily consumed, per labeled serving, or per 50 g if the reference amount customarily consumed is 30 g or less or 2 tablespoons or less (for dehydrated foods that must be reconstituted before typical consumption with water or a diluent containing an insignificant amount, as defined in § 101.9(f)(1), of all nutrients per reference amount customarily consumed, the per 50–g criterion refers to the "as prepared" form):

(A) The food has been specifically formulated, altered, or processed to reduce its cholesterol by 25 percent or more from the reference food it resembles as defined in § 101.13(j)(1) and for which it substitutes as specified in § 101.13(d) that has a significant (i.e., 5 percent or more of a national or regional market) market share;

(B) The food contains 2 g or less of saturated fatty acids per reference amount customarily consumed;

(C) The label or labeling discloses the level of total fat in a serving (as declared on the label) of the food. Such disclosure shall appear in immediate proximity to such claim preceding any disclosure statement required under § 101.13(h) in type that shall be no less than one-half the size of the type used for such claim. If the claim appears on more than one panel, the disclosure shall be made on each panel except for the panel that bears nutrition labeling. If the claim is made more than once on a panel, the disclosure shall be made in immediate proximity to the claim that is printed in the largest type; and

(D) As required in § 101.13(j)(2) for relative claims:

(1) The identity of the reference food and the percent (or fraction) that the cholesterol has been reduced are declared in immediate proximity to the most prominent such claim (e.g., 25 percent less cholesterol than _____); and

(2) Quantitative information comparing the level of cholesterol in the product per labeled serving with that of the reference food that it replaces (e.g., "Cholesterol lowered from 55 mg to 30 mg per serving. Contains 13 g of fat per serving.") is declared adjacent to the most prominent claim or to the nutrition label, except that if the nutrition label is on the information panel, the quantitative information may be located elsewhere on the information panel in accordance with § 101.2.

(iii) Claims described in paragraph (d)(4) of this section may not be made on the label or in labeling of a food if the nutrient content of the reference food meets the definition for "low cholesterol."

(5) The terms defined in paragraph (d)(4) of this section may be used on the label or in the labeling of meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m), provided that:

(i) For meal products that contain 26.0 g or less of total fat per labeled serving or for main dish products that contain 19.5 g or less of total fat per labeled serving;

(A) The food has been specifically formulated, altered, or processed to reduce its cholesterol by 25 percent or more from the reference food it resembles as defined in § 101.13(j)(1) and for which it substitutes as specified in § 101.13(d) that has a significant (e.g., 5 percent or more of a national or regional market) market share;

(B) The food contains 2 g or less of saturated fatty acids per 100 g; and

(C) As required in § 101.13(j)(2) for relative claims:

(1) The identity of the reference food, and the percent (or fraction) that the cholesterol has been reduced are declared in immediate proximity to the most prominent such claim (e.g., "25% less cholesterol per 3 oz than ___"); and

(2) Quantitative information comparing the level of cholesterol in the product per specified weight with that of the reference food that it replaces (e.g., "Cholesterol content has been reduced from 35 mg per 3 oz to 25 mg per 3 oz.") is declared adjacent to the most prominent claim or to the nutrition label, except that if the nutrition label is on the information panel, the quantitative information may be located elsewhere on the information panel in accordance with § 101.2.

(ii) For meal products that contain more than 26.0 g of total fat per labeled serving or for main dish products that contain more than 19.5 g of total fat per labeled serving:

(A) The food has been specifically formulated, altered, or processed to reduce its cholesterol by 25 percent or more from the reference food it resembles as defined in § 101.13(j)(1) and for which it substitutes as specified in § 101.13(d) that has a significant (e.g., 5 percent or more of a national or regional market) market share.

(B) The food contains 2 g or less of saturated fatty acids per 100 g;

(C) The label or labeling discloses the level of total fat in a serving (as declared on the label) of the food. Such disclosure shall appear in immediate proximity to such claim preceding any disclosure statement required under § 101.13(h) in type that shall be no less than one-half the size of the type used for such claim. If the claim appears on more than one panel the disclosure shall be made on each panel except for the panel that bears nutrition labeling. If the claim is made more than once on a panel, the disclosure shall be made in immediate proximity to the claim that is printed in the largest type; and

(D) As required in § 101.13(j)(2) for relative claims:

(1) The identity of the reference food and the percent (or fraction) that the cholesterol has been reduced are declared in immediate proximity to the most prominent such claim (e.g., 25 percent less cholesterol than ___); and

(2) Quantitative information comparing the level of cholesterol in the product per specified weight with that of the reference food that it replaces (e.g., "Cholesterol lowered from 30 mg to 22 mg per 3 oz of product.") is declared adjacent to the most prominent claim or to the nutrition label, except that if the nutrition label is on the information panel, the quantitative information may be located elsewhere on the information panel in accordance with § 101.2.

(iii) Claims described in paragraph (d)(5) of this section may not be made on the label or in the labeling of a food if the nutrient content of the reference food meets the definition for "low cholesterol."

(e) "Lean" and "extra lean" claims.

(1) The term "lean" may be used on the label or in labeling of foods except meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m) provided that the food is a seafood or game meat product and as packaged contains less than 10 g total fat, 4.5 g or less saturated fat, and less than 95 mg cholesterol per reference amount customarily consumed and per 100 g;

(2) The term defined in paragraph (e)(1) of this section may be used on the label or in labeling of a mixed dish not measurable with a cup as defined in § 101.12(b) in table 2, provided that the food contains less than 8 g total fat, 3.5 g or less saturated fat and less than 80 mg cholesterol per reference amount customarily consumed;

(3) The term defined in paragraph (e)(1) of this section may be used on the label or in the labeling of meal products as defined in § 101.13(l) or main dish products as defined in § 101.13(m) provided that the food contains less than 10 g total fat, 4.5 g or less saturated fat, and less than 95 mg cholesterol per 100 g and per labeled serving;

(4) The term "extra lean" may be used on the label or in the labeling of foods except meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m) provided that the food is a discrete seafood or game meat product and as

packaged contains less than 5 g total fat, less than 2 g saturated fat, and less than 95 mg cholesterol per reference amount customarily consumed and per 100 g; and

(5) The term defined in paragraph (e)(4) of this section may be used on the label or in labeling of meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m) provided that the food contains less than 5 g of fat, less than 2 g of saturated fat, and less than 95 mg of cholesterol per 100 g and per labeled serving.

(f) Misbranding. Any label or labeling containing any statement concerning fat, fatty acids, or cholesterol that is not in conformity with this section shall be deemed to be misbranded under sections 201(n), 403(a), and 403(r) of the Federal Food, Drug, and Cosmetic Act.

**Credits**

[58 FR 17342, 17343, April 2, 1993; 58 FR 44032, Aug. 18, 1993; 58 FR 60105, Nov. 15, 1993; 59 FR 394, Jan. 4, 1994; 60 FR 17207, April 5, 1995; 61 FR 59001, Nov. 20, 1996; 63 FR 26980, May 15, 1998; 72 FR 1459, Jan. 12, 2007]

SOURCE: 42 FR 14308, March 15, 1977; 51 FR 25017, July 9, 1986; 52 FR 6971, March 9, 1987; 54 FR 39632, Sept. 27, 1989; 58 FR 2413, Jan. 6, 1993; 58 FR 17341, April 2, 1993; 59 FR 350, Jan. 4, 1994; 60 FR 67174, Dec. 28, 1995; 61 FR 43446, Aug. 23, 1996; 62 FR 3600, Jan. 23, 1997; 62 FR 15342, March 31, 1997; 62 FR 51513, Oct. 1, 1997; 65 FR 76110, Dec. 5, 2000; 81 FR 49895, July 29, 2016, unless otherwise noted.

AUTHORITY: 15 U.S.C. 1453, 1454, 1455; 21 U.S.C. 321, 331, 342, 343, 348, 371; 42 U.S.C. 243, 264, 271.

Notes of Decisions (7)

Current through March 31, 2022; 87 FR 18739.

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

📒 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Negative Treatment Reconsidered by   Florida ex rel. Atty. Gen. v. U.S. Dept. of Health and Human Services,   11th Cir.(Fla.), Aug. 12, 2011

📒 KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
   Title 21. Food and Drugs (Refs & Annos)
      Chapter 9. Federal Food, Drug, and Cosmetic Act (Refs & Annos)
         Subchapter IV. Food

21 U.S.C.A. § 343

§ 343. Misbranded food

Effective: March 23, 2010

Currentness

A food shall be deemed to be misbranded--

**(a) False or misleading label**

If (1) its labeling is false or misleading in any particular, or (2) in the case of a food to which section 350 of this title applies, its advertising is false or misleading in a material respect or its labeling is in violation of section 350(b)(2) of this title.

**(b) Offer for sale under another name**

If it is offered for sale under the name of another food.

**(c) Imitation of another food**

If it is an imitation of another food, unless its label bears, in type of uniform size and prominence, the word "imitation" and, immediately thereafter, the name of the food imitated.

**(d) Misleading container**

If its container is so made, formed, or filled as to be misleading.

**(e) Package form**

If in package form unless it bears a label containing (1) the name and place of business of the manufacturer, packer, or distributor; and (2) an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count,

AD087

except that under clause (2) of this paragraph reasonable variations shall be permitted, and exemptions as to small packages shall be established, by regulations prescribed by the Secretary.

**(f) Prominence of information on label**

If any word, statement, or other information required by or under authority of this chapter to appear on the label or labeling is not prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or devices, in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

**(g) Representation as to definition and standard of identity**

If it purports to be or is represented as a food for which a definition and standard of identity has been prescribed by regulations as provided by section 341 of this title, unless (1) it conforms to such definition and standard, and (2) its label bears the name of the food specified in the definition and standard, and, insofar as may be required by such regulations, the common names of optional ingredients (other than spices, flavoring, and coloring) present in such food.

**(h) Representation as to standards of quality and fill of container**

If it purports to be or is represented as--

**(1)** a food for which a standard of quality has been prescribed by regulations as provided by section 341 of this title, and its quality falls below such standard, unless its label bears, in such manner and form as such regulations specify, a statement that it falls below such standard;

**(2)** a food for which a standard or standards of fill of container have been prescribed by regulations as provided by section 341 of this title, and it falls below the standard of fill of container applicable thereto, unless its label bears, in such manner and form as such regulations specify, a statement that it falls below such standard; or

**(3)** a food that is pasteurized unless--

**(A)** such food has been subjected to a safe process or treatment that is prescribed as pasteurization for such food in a regulation promulgated under this chapter; or

**(B)(i)** such food has been subjected to a safe process or treatment that--

**(I)** is reasonably certain to achieve destruction or elimination in the food of the most resistant microorganisms of public health significance that are likely to occur in the food;

**(II)** is at least as protective of the public health as a process or treatment described in subparagraph (A);

**(III)** is effective for a period that is at least as long as the shelf life of the food when stored under normal and moderate abuse conditions; and

**(IV)** is the subject of a notification to the Secretary, including effectiveness data regarding the process or treatment; and

**(ii)** at least 120 days have passed after the date of receipt of such notification by the Secretary without the Secretary making a determination that the process or treatment involved has not been shown to meet the requirements of subclauses (I) through (III) of clause (i).

For purposes of paragraph (3), a determination by the Secretary that a process or treatment has not been shown to meet the requirements of subclauses (I) through (III) of subparagraph (B)(i) shall constitute final agency action under such subclauses.

**(i) Label where no representation as to definition and standard of identity**

Unless its label bears (1) the common or usual name of the food, if any there be, and (2) in case it is fabricated from two or more ingredients, the common or usual name of each such ingredient and if the food purports to be a beverage containing vegetable or fruit juice, a statement with appropriate prominence on the information panel of the total percentage of such fruit or vegetable juice contained in the food; except that spices, flavorings, and colors not required to be certified under section 379e(c) of this title [1] unless sold as spices, flavorings, or such colors, may be designated as spices, flavorings, and colorings without naming each. To the extent that compliance with the requirements of clause (2) of this paragraph is impracticable, or results in deception or unfair competition, exemptions shall be established by regulations promulgated by the Secretary.

**(j) Representation for special dietary use**

If it purports to be or is represented for special dietary uses, unless its label bears such information concerning its vitamin, mineral, and other dietary properties as the Secretary determines to be, and by regulations prescribes as, necessary in order fully to inform purchasers as to its value for such uses.

**(k) Artificial flavoring, artificial coloring, or chemical preservatives**

If it bears or contains any artificial flavoring, artificial coloring, or chemical preservative, unless it bears labeling stating that fact, except that to the extent that compliance with the requirements of this paragraph is impracticable, exemptions shall be established by regulations promulgated by the Secretary. The provisions of this paragraph and paragraphs (g) and (i) with respect to artificial coloring shall not apply in the case of butter, cheese, or ice cream. The provisions of this paragraph with respect to chemical preservatives shall not apply to a pesticide chemical when used in or on a raw agricultural commodity which is the produce of the soil.

**(l) Pesticide chemicals on raw agricultural commodities**

If it is a raw agricultural commodity which is the produce of the soil, bearing or containing a pesticide chemical applied after harvest, unless the shipping container of such commodity bears labeling which declares the presence of such chemical in or on such commodity and the common or usual name and the function of such chemical, except that no such declaration shall

be required while such commodity, having been removed from the shipping container, is being held or displayed for sale at retail out of such container in accordance with the custom of the trade.

**(m) Color additives**

If it is a color additive, unless its packaging and labeling are in conformity with such packaging and labeling requirements, applicable to such color additive, as may be contained in regulations issued under section 379e of this title.

**(n) Packaging or labeling of drugs in violation of regulations**

If its packaging or labeling is in violation of an applicable regulation issued pursuant to section 1472 or 1473 of Title 15.

**(o) Repealed. Pub.L. 106-554, § 1(a)(1) [Title V, § 517], Dec. 21, 2000, 114 Stat. 2763, 2763A-73**

**(p) Repealed. Pub.L. 104-124, § 1, Apr. 1, 1996, 110 Stat. 882**

**(q) Nutrition information**

**(1)** Except as provided in subparagraphs (3), (4), and (5), if it is a food intended for human consumption and is offered for sale, unless its label or labeling bears nutrition information that provides--

    **(A)(i)** the serving size which is an amount customarily consumed and which is expressed in a common household measure that is appropriate to the food, or

    **(ii)** if the use of the food is not typically expressed in a serving size, the common household unit of measure that expresses the serving size of the food,

    **(B)** the number of servings or other units of measure per container,

    **(C)** the total number of calories--

      **(i)** derived from any source, and

      **(ii)** derived from the total fat,

      in each serving size or other unit of measure of the food,

    **(D)** the amount of the following nutrients: Total fat, saturated fat, cholesterol, sodium, total carbohydrates, complex carbohydrates, sugars, dietary fiber, and total protein contained in each serving size or other unit of measure,

**(E)** any vitamin, mineral, or other nutrient required to be placed on the label and labeling of food under this chapter before October 1, 1990, if the Secretary determines that such information will assist consumers in maintaining healthy dietary practices.

The Secretary may by regulation require any information required to be placed on the label or labeling by this subparagraph or subparagraph (2)(A) to be highlighted on the label or labeling by larger type, bold type, or contrasting color if the Secretary determines that such highlighting will assist consumers in maintaining healthy dietary practices.

**(2)(A)** If the Secretary determines that a nutrient other than a nutrient required by subparagraph (1)(C), (1)(D), or (1)(E) should be included in the label or labeling of food subject to subparagraph (1) for purposes of providing information regarding the nutritional value of such food that will assist consumers in maintaining healthy dietary practices, the Secretary may by regulation require that information relating to such additional nutrient be included in the label or labeling of such food.

**(B)** If the Secretary determines that the information relating to a nutrient required by subparagraph (1)(C), (1)(D), or (1)(E) or clause (A) of this subparagraph to be included in the label or labeling of food is not necessary to assist consumers in maintaining healthy dietary practices, the Secretary may by regulation remove information relating to such nutrient from such requirement.

**(3)** For food that is received in bulk containers at a retail establishment, the Secretary may, by regulation, provide that the nutrition information required by subparagraphs (1) and (2) be displayed at the location in the retail establishment at which the food is offered for sale.

**(4)(A)** The Secretary shall provide for furnishing the nutrition information required by subparagraphs (1) and (2) with respect to raw agricultural commodities and raw fish by issuing voluntary nutrition guidelines, as provided by clause (B) or by issuing regulations that are mandatory as provided by clause (D).

**(B)(i)** Upon the expiration of 12 months after November 8, 1990, the Secretary, after providing an opportunity for comment, shall issue guidelines for food retailers offering raw agricultural commodities or raw fish to provide nutrition information specified in subparagraphs (1) and (2). Such guidelines shall take into account the actions taken by food retailers during such 12-month period to provide to consumers nutrition information on raw agricultural commodities and raw fish. Such guidelines shall only apply--

**(I)** in the case of raw agricultural commodities, to the 20 varieties of vegetables most frequently consumed during a year and the 20 varieties of fruit most frequently consumed during a year, and

**(II)** to the 20 varieties of raw fish most frequently consumed during a year.

The vegetables, fruits, and raw fish to which such guidelines apply shall be determined by the Secretary by regulation and the Secretary may apply such guidelines regionally.

**(ii)** Upon the expiration of 12 months after November 8, 1990, the Secretary shall issue a final regulation defining the circumstances that constitute substantial compliance by food retailers with the guidelines issued under subclause (i). The regulation shall provide that there is not substantial compliance if a significant number of retailers have failed to comply with

the guidelines. The size of the retailers and the portion of the market served by retailers in compliance with the guidelines shall be considered in determining whether the substantial-compliance standard has been met.

**(C)(i)** Upon the expiration of 30 months after November 8, 1990, the Secretary shall issue a report on actions taken by food retailers to provide consumers with nutrition information for raw agricultural commodities and raw fish under the guidelines issued under clause (A). Such report shall include a determination of whether there is substantial compliance with the guidelines.

**(ii)** If the Secretary finds that there is substantial compliance with the guidelines, the Secretary shall issue a report and make a determination of the type required in subclause (i) every two years.

**(D)(i)** If the Secretary determines that there is not substantial compliance with the guidelines issued under clause (A), the Secretary shall at the time such determination is made issue proposed regulations requiring that any person who offers raw agricultural commodities or raw fish to consumers provide, in a manner prescribed by regulations, the nutrition information required by subparagraphs (1) and (2). The Secretary shall issue final regulations imposing such requirements 6 months after issuing the proposed regulations. The final regulations shall become effective 6 months after the date of their promulgation.

**(ii)** Regulations issued under subclause (i) may require that the nutrition information required by subparagraphs (1) and (2) be provided for more than 20 varieties of vegetables, 20 varieties of fruit, and 20 varieties of fish most frequently consumed during a year if the Secretary finds that a larger number of such products are frequently consumed. Such regulations shall permit such information to be provided in a single location in each area in which raw agricultural commodities and raw fish are offered for sale. Such regulations may provide that information shall be expressed as an average or range per serving of the same type of raw agricultural commodity or raw fish. The Secretary shall develop and make available to the persons who offer such food to consumers the information required by subparagraphs (1) and (2).

**(iii)** Regulations issued under subclause (i) shall permit the required information to be provided in each area of an establishment in which raw agricultural commodities and raw fish are offered for sale. The regulations shall permit food retailers to display the required information by supplying copies of the information provided by the Secretary, by making the information available in brochure, notebook or leaflet form, or by posting a sign disclosing the information. Such regulations shall also permit presentation of the required information to be supplemented by a video, live demonstration, or other media which the Secretary approves.

**(E)** For purposes of this subparagraph, the term "fish" includes freshwater or marine fin fish, crustaceans, and mollusks, including shellfish, amphibians, and other forms of aquatic animal life.

**(F)** No person who offers raw agricultural commodities or raw fish to consumers may be prosecuted for minor violations of this subparagraph if there has been substantial compliance with the requirements of this paragraph.

**(5)(A)** Subparagraphs (1), (2), (3), and (4) shall not apply to food--

**(i)** except as provided in clause (H)(ii)(III), which is served in restaurants or other establishments in which food is served for immediate human consumption or which is sold for sale or use in such establishments,

**(ii)** except as provided in clause (H)(ii)(III), which is processed and prepared primarily in a retail establishment, which is ready for human consumption, which is of the type described in subclause (i), and which is offered for sale to consumers but not for immediate human consumption in such establishment and which is not offered for sale outside such establishment,

**(iii)** which is an infant formula subject to section 350a of this title,

**(iv)** which is a medical food as defined in section 360ee(b) of this title, or

**(v)** which is described in section 345(2) of this title.

**(B)** Subparagraphs (1) and (2) shall not apply to the label of a food if the Secretary determines by regulations that compliance with such subparagraphs is impracticable because the package of such food is too small to comply with the requirements of such subparagraphs and if the label of such food does not contain any nutrition information.

**(C)** If a food contains insignificant amounts, as determined by the Secretary, of all the nutrients required by subparagraphs (1) and (2) to be listed in the label or labeling of food, the requirements of such subparagraphs shall not apply to such food if the label, labeling, or advertising of such food does not make any claim with respect to the nutritional value of such food. If a food contains insignificant amounts, as determined by the Secretary, of more than one-half the nutrients required by subparagraphs (1) and (2) to be in the label or labeling of the food, the Secretary shall require the amounts of such nutrients to be stated in a simplified form prescribed by the Secretary.

**(D)** If a person offers food for sale and has annual gross sales made or business done in sales to consumers which is not more than $500,000 or has annual gross sales made or business done in sales of food to consumers which is not more than $50,000, the requirements of subparagraphs (1), (2), (3), and (4) shall not apply with respect to food sold by such person to consumers unless the label or labeling of food offered by such person provides nutrition information or makes a nutrition claim.

**(E)(i)** During the 12-month period for which an exemption from subparagraphs (1) and (2) is claimed pursuant to this subclause, the requirements of such subparagraphs shall not apply to any food product if--

**(I)** the labeling for such product does not provide nutrition information or make a claim subject to paragraph (r),

**(II)** the person who claims for such product an exemption from such subparagraphs employed fewer than an average of 100 full-time equivalent employees,

**(III)** such person provided the notice described in subclause (iii), and

**(IV)** in the case of a food product which was sold in the 12-month period preceding the period for which an exemption was claimed, fewer than 100,000 units of such product were sold in the United States during such preceding period, or in the case of a food product which was not sold in the 12-month period preceding the period for which such exemption is claimed, fewer than 100,000 units of such product are reasonably anticipated to be sold in the United States during the period for which such exemption is claimed.

**(ii)** During the 12-month period after the applicable date referred to in this sentence, the requirements of subparagraphs (1) and (2) shall not apply to any food product which was first introduced into interstate commerce before May 8, 1994, if the labeling for such product does not provide nutrition information or make a claim subject to paragraph (r), if such person provided the notice described in subclause (iii), and if--

**(I)** during the 12-month period preceding May 8, 1994, the person who claims for such product an exemption from such subparagraphs employed fewer than an average of 300 full-time equivalent employees and fewer than 600,000 units of such product were sold in the United States,

**(II)** during the 12-month period preceding May 8, 1995, the person who claims for such product an exemption from such subparagraphs employed fewer than an average of 300 full-time equivalent employees and fewer than 400,000 units of such product were sold in the United States, or

**(III)** during the 12-month period preceding May 8, 1996, the person who claims for such product an exemption from such subparagraphs employed fewer than an average of 200 full-time equivalent employees and fewer than 200,000 units of such product were sold in the United States.

**(iii)** The notice referred to in subclauses (i) and (ii) shall be given to the Secretary prior to the beginning of the period during which the exemption under subclause (i) or (ii) is to be in effect, shall state that the person claiming such exemption for a food product has complied with the applicable requirements of subclause (i) or (ii), and shall--

**(I)** state the average number of full-time equivalent employees such person employed during the 12 months preceding the date such person claims such exemption,

**(II)** state the approximate number of units the person claiming the exemption sold in the United States,

**(III)** if the exemption is claimed for a food product which was sold in the 12-month period preceding the period for which the exemption was claimed, state the approximate number of units of such product which were sold in the United States during such preceding period, and, if the exemption is claimed for a food product which was not sold in such preceding period, state the number of units of such product which such person reasonably anticipates will be sold in the United States during the period for which the exemption was claimed, and

**(IV)** contain such information as the Secretary may require to verify the information required by the preceding provisions of this subclause if the Secretary has questioned the validity of such information.

If a person is not an importer, has fewer than 10 full-time equivalent employees, and sells fewer than 10,000 units of any food product in any year, such person is not required to file a notice for such product under this subclause for such year.

**(iv)** In the case of a person who claimed an exemption under subclause (i) or (ii), if, during the period of such exemption, the number of full-time equivalent employees of such person exceeds the number in such subclause or if the number of food

products sold in the United States exceeds the number in such subclause, such exemption shall extend to the expiration of 18 months after the date the number of full-time equivalent employees or food products sold exceeded the applicable number.

**(v)** For any food product first introduced into interstate commerce after May 8, 2002, the Secretary may by regulation lower the employee or units of food products requirement of subclause (i) if the Secretary determines that the cost of compliance with such lower requirement will not place an undue burden on persons subject to such lower requirement.

**(vi)** For purposes of subclauses (i), (ii), (iii), (iv), and (v)--

**(I)** the term "unit" means the packaging or, if there is no packaging, the form in which a food product is offered for sale to consumers,

**(II)** the term "food product" means food in any sized package which is manufactured by a single manufacturer or which bears the same brand name, which bears the same statement of identity, and which has similar preparation methods, and

**(III)** the term "person" in the case of a corporation includes all domestic and foreign affiliates of the corporation.

**(F)** A dietary supplement product (including a food to which section 350 of this title applies) shall comply with the requirements of subparagraphs (1) and (2) in a manner which is appropriate for the product and which is specified in regulations of the Secretary which shall provide that--

**(i)** nutrition information shall first list those dietary ingredients that are present in the product in a significant amount and for which a recommendation for daily consumption has been established by the Secretary, except that a dietary ingredient shall not be required to be listed if it is not present in a significant amount, and shall list any other dietary ingredient present and identified as having no such recommendation;

**(ii)** the listing of dietary ingredients shall include the quantity of each such ingredient (or of a proprietary blend of such ingredients) per serving;

**(iii)** the listing of dietary ingredients may include the source of a dietary ingredient; and

**(iv)** the nutrition information shall immediately precede the ingredient information required under subclause (i), except that no ingredient identified pursuant to subclause (i) shall be required to be identified a second time.

**(G)** Subparagraphs (1), (2), (3), and (4) shall not apply to food which is sold by a food distributor if the food distributor principally sells food to restaurants or other establishments in which food is served for immediate human consumption and does not manufacture, process, or repackage the food it sells.

**(H) Restaurants, retail food establishments, and vending machines**

**(i) General requirements for restaurants and similar retail food establishments**

Except for food described in subclause (vii), in the case of food that is a standard menu item that is offered for sale in a restaurant or similar retail food establishment that is part of a chain with 20 or more locations doing business under the same name (regardless of the type of ownership of the locations) and offering for sale substantially the same menu items, the restaurant or similar retail food establishment shall disclose the information described in subclauses (ii) and (iii).

**(ii) Information required to be disclosed by restaurants and retail food establishments**

Except as provided in subclause (vii), the restaurant or similar retail food establishment shall disclose in a clear and conspicuous manner--

**(I)(aa)** in a nutrient content disclosure statement adjacent to the name of the standard menu item, so as to be clearly associated with the standard menu item, on the menu listing the item for sale, the number of calories contained in the standard menu item, as usually prepared and offered for sale; and

**(bb)** a succinct statement concerning suggested daily caloric intake, as specified by the Secretary by regulation and posted prominently on the menu and designed to enable the public to understand, in the context of a total daily diet, the significance of the caloric information that is provided on the menu;

**(II)(aa)** in a nutrient content disclosure statement adjacent to the name of the standard menu item, so as to be clearly associated with the standard menu item, on the menu board, including a drive-through menu board, the number of calories contained in the standard menu item, as usually prepared and offered for sale; and

**(bb)** a succinct statement concerning suggested daily caloric intake, as specified by the Secretary by regulation and posted prominently on the menu board, designed to enable the public to understand, in the context of a total daily diet, the significance of the nutrition information that is provided on the menu board;

**(III)** in a written form, available on the premises of the restaurant or similar retail establishment and to the consumer upon request, the nutrition information required under clauses (C) and (D) of subparagraph (1); and

**(IV)** on the menu or menu board, a prominent, clear, and conspicuous statement regarding the availability of the information described in item (III).

**(iii) Self-service food and food on display**

Except as provided in subclause (vii), in the case of food sold at a salad bar, buffet line, cafeteria line, or similar self-service facility, and for self-service beverages or food that is on display and that is visible to customers, a restaurant or similar retail food establishment shall place adjacent to each food offered a sign that lists calories per displayed food item or per serving.

**(iv) Reasonable basis**

For the purposes of this clause, a restaurant or similar retail food establishment shall have a reasonable basis for its nutrient content disclosures, including nutrient databases, cookbooks, laboratory analyses, and other reasonable means, as described in section 101.10 of title 21, Code of Federal Regulations (or any successor regulation) or in a related guidance of the Food and Drug Administration.

**(v) Menu variability and combination meals**

The Secretary shall establish by regulation standards for determining and disclosing the nutrient content for standard menu items that come in different flavors, varieties, or combinations, but which are listed as a single menu item, such as soft drinks, ice cream, pizza, doughnuts, or children's combination meals, through means determined by the Secretary, including ranges, averages, or other methods.

**(vi) Additional information**

If the Secretary determines that a nutrient, other than a nutrient required under subclause (ii)(III), should be disclosed for the purpose of providing information to assist consumers in maintaining healthy dietary practices, the Secretary may require, by regulation, disclosure of such nutrient in the written form required under subclause (ii)(III).

**(vii) Nonapplicability to certain food**

**(I) In general**

Subclauses (i) through (vi) do not apply to--

**(aa)** items that are not listed on a menu or menu board (such as condiments and other items placed on the table or counter for general use);

**(bb)** daily specials, temporary menu items appearing on the menu for less than 60 days per calendar year, or custom orders; or

**(cc)** such other food that is part of a customary market test appearing on the menu for less than 90 days, under terms and conditions established by the Secretary.

**(II) Written forms**

Subparagraph (5)(C) shall apply to any regulations promulgated under subclauses (ii)(III) and (vi).

**(viii) Vending machines**

**(I) In general**

In the case of an article of food sold from a vending machine that--

**(aa)** does not permit a prospective purchaser to examine the Nutrition Facts Panel before purchasing the article or does not otherwise provide visible nutrition information at the point of purchase; and

**(bb)** is operated by a person who is engaged in the business of owning or operating 20 or more vending machines,

the vending machine operator shall provide a sign in close proximity to each article of food or the selection button that includes a clear and conspicuous statement disclosing the number of calories contained in the article.

**(ix) Voluntary provision of nutrition information**

**(I) In general**

An authorized official of any restaurant or similar retail food establishment or vending machine operator not subject to the requirements of this clause may elect to be subject to the requirements of such clause, by registering biannually the name and address of such restaurant or similar retail food establishment or vending machine operator with the Secretary, as specified by the Secretary by regulation.

**(II) Registration**

Within 120 days of March 23, 2010, the Secretary shall publish a notice in the Federal Register specifying the terms and conditions for implementation of item (I), pending promulgation of regulations.

**(III) Rule of construction**

Nothing in this subclause shall be construed to authorize the Secretary to require an application, review, or licensing process for any entity to register with the Secretary, as described in such item.

**(x) Regulations**

**(I) Proposed regulation**

Not later than 1 year after March 23, 2010, the Secretary shall promulgate proposed regulations to carry out this clause.

**(II) Contents**

In promulgating regulations, the Secretary shall--

**(aa)** consider standardization of recipes and methods of preparation, reasonable variation in serving size and formulation of menu items, space on menus and menu boards, inadvertent human error, training of food service workers, variations in ingredients, and other factors, as the Secretary determines; and

**(bb)** specify the format and manner of the nutrient content disclosure requirements under this subclause.

**(III) Reporting**

The Secretary shall submit to the Committee on Health, Education, Labor, and Pensions of the Senate and the Committee on Energy and Commerce of the House of Representatives a quarterly report that describes the Secretary's progress toward promulgating final regulations under this subparagraph.

**(xi) Definition**

In this clause, the term "menu" or "menu board" means the primary writing of the restaurant or other similar retail food establishment from which a consumer makes an order selection.

**(r) Nutrition levels and health-related claims**

**(1)** Except as provided in clauses (A) through (C) of subparagraph (5), if it is a food intended for human consumption which is offered for sale and for which a claim is made in the label or labeling of the food which expressly or by implication--

**(A)** characterizes the level of any nutrient which is of the type required by paragraph (q)(1) or (q)(2) to be in the label or labeling of the food unless the claim is made in accordance with subparagraph (2), or

**(B)** characterizes the relationship of any nutrient which is of the type required by paragraph (q)(1) or (q)(2) to be in the label or labeling of the food to a disease or a health-related condition unless the claim is made in accordance with subparagraph (3) or (5)(D).

A statement of the type required by paragraph (q) that appears as part of the nutrition information required or permitted by such paragraph is not a claim which is subject to this paragraph and a claim subject to clause (A) is not subject to clause (B).

**(2)(A)** Except as provided in subparagraphs (4)(A)(ii) and (4)(A)(iii) and clauses (A) through (C) of subparagraph (5), a claim described in subparagraph (1)(A)--

**(i)** may be made only if the characterization of the level made in the claim uses terms which are defined in regulations of the Secretary,

**(ii)** may not state the absence of a nutrient unless--

**(I)** the nutrient is usually present in the food or in a food which substitutes for the food as defined by the Secretary by regulation, or

**(II)** the Secretary by regulation permits such a statement on the basis of a finding that such a statement would assist consumers in maintaining healthy dietary practices and the statement discloses that the nutrient is not usually present in the food,

**(iii)** may not be made with respect to the level of cholesterol in the food if the food contains, as determined by the Secretary by regulation, fat or saturated fat in an amount which increases to persons in the general population the risk of disease or a health related condition which is diet related unless--

**(I)** the Secretary finds by regulation that the level of cholesterol is substantially less than the level usually present in the food or in a food which substitutes for the food and which has a significant market share, or the Secretary by regulation permits a statement regarding the absence of cholesterol on the basis of a finding that cholesterol is not usually present in the food and that such a statement would assist consumers in maintaining healthy dietary practices and the regulation requires that the statement disclose that cholesterol is not usually present in the food, and

**(II)** the label or labeling of the food discloses the level of such fat or saturated fat in immediate proximity to such claim and with appropriate prominence which shall be no less than one-half the size of the claim with respect to the level of cholesterol,

**(iv)** may not be made with respect to the level of saturated fat in the food if the food contains cholesterol unless the label or labeling of the food discloses the level of cholesterol in the food in immediate proximity to such claim and with appropriate prominence which shall be no less than one-half the size of the claim with respect to the level of saturated fat,

**(v)** may not state that a food is high in dietary fiber unless the food is low in total fat as defined by the Secretary or the label or labeling discloses the level of total fat in the food in immediate proximity to such statement and with appropriate prominence which shall be no less than one-half the size of the claim with respect to the level of dietary fiber, and

**(vi)** may not be made if the Secretary by regulation prohibits the claim because the claim is misleading in light of the level of another nutrient in the food.

**(B)** If a claim described in subparagraph (1)(A) is made with respect to a nutrient in a food and the Secretary makes a determination that the food contains a nutrient at a level that increases to persons in the general population the risk of a disease or health-related condition that is diet related, the label or labeling of such food shall contain, prominently and in immediate proximity to such claim, the following statement: "See nutrition information for _____ content." The blank shall identify the nutrient associated with the increased disease or health-related condition risk. In making the determination described in this clause, the Secretary shall take into account the significance of the food in the total daily diet.

**(C)** Subparagraph (2)(A) does not apply to a claim described in subparagraph (1)(A) and contained in the label or labeling of a food if such claim is contained in the brand name of such food and such brand name was in use on such food before October 25, 1989, unless the brand name contains a term defined by the Secretary under subparagraph (2)(A)(i). Such a claim is subject to paragraph (a).

**(D)** Subparagraph (2) does not apply to a claim described in subparagraph (1)(A) which uses the term "diet" and is contained in the label or labeling of a soft drink if (i) such claim is contained in the brand name of such soft drink, (ii) such brand name was in use on such soft drink before October 25, 1989, and (iii) the use of the term "diet" was in conformity with section 105.66 of title 21 of the Code of Federal Regulations. Such a claim is subject to paragraph (a).

**(E)** Subclauses (i) through (v) of subparagraph (2)(A) do not apply to a statement in the label or labeling of food which describes the percentage of vitamins and minerals in the food in relation to the amount of such vitamins and minerals recommended for daily consumption by the Secretary.

**(F)** Subclause (i) clause (A) does not apply to a statement in the labeling of a dietary supplement that characterizes the percentage level of a dietary ingredient for which the Secretary has not established a reference daily intake, daily recommended value, or other recommendation for daily consumption.

**(G)** A claim of the type described in subparagraph (1)(A) for a nutrient, for which the Secretary has not promulgated a regulation under clause (A)(i), shall be authorized and may be made with respect to a food if--

**(i)** a scientific body of the United States Government with official responsibility for public health protection or research directly relating to human nutrition (such as the National Institutes of Health or the Centers for Disease Control and Prevention) or the National Academy of Sciences or any of its subdivisions has published an authoritative statement, which is currently in effect, which identifies the nutrient level to which the claim refers;

**(ii)** a person has submitted to the Secretary, at least 120 days (during which the Secretary may notify any person who is making a claim as authorized by clause (C) that such person has not submitted all the information required by such clause) before the first introduction into interstate commerce of the food with a label containing the claim, (I) a notice of the claim, which shall include the exact words used in the claim and shall include a concise description of the basis upon which such person relied for determining that the requirements of subclause (i) have been satisfied, (II) a copy of the statement referred to in subclause (i) upon which such person relied in making the claim, and (III) a balanced representation of the scientific literature relating to the nutrient level to which the claim refers;

**(iii)** the claim and the food for which the claim is made are in compliance with clauses (A) and (B), and are otherwise in compliance with paragraph (a) and section 321(n) of this title; and

**(iv)** the claim is stated in a manner so that the claim is an accurate representation of the authoritative statement referred to in subclause (i) and so that the claim enables the public to comprehend the information provided in the claim and to understand the relative significance of such information in the context of a total daily diet.

For purposes of this clause, a statement shall be regarded as an authoritative statement of a scientific body described in subclause (i) only if the statement is published by the scientific body and shall not include a statement of an employee of the scientific body made in the individual capacity of the employee.

**(H)** A claim submitted under the requirements of clause (G) may be made until--

**(i)** such time as the Secretary issues a regulation--

**(I)** prohibiting or modifying the claim and the regulation has become effective, or

**(II)** finding that the requirements of clause (G) have not been met, including finding that the petitioner had not submitted all the information required by such clause; or

**(ii)** a district court of the United States in an enforcement proceeding under subchapter III has determined that the requirements of clause (G) have not been met.

**(3)(A)** Except as provided in subparagraph (5), a claim described in subparagraph (1)(B) may only be made--

**(i)** if the claim meets the requirements of the regulations of the Secretary promulgated under clause (B), and

**(ii)** if the food for which the claim is made does not contain, as determined by the Secretary by regulation, any nutrient in an amount which increases to persons in the general population the risk of a disease or health-related condition which is diet related, taking into account the significance of the food in the total daily diet, except that the Secretary may by regulation permit such a claim based on a finding that such a claim would assist consumers in maintaining healthy dietary practices and based on a requirement that the label contain a disclosure of the type required by subparagraph (2)(B).

**(B)(i)** The Secretary shall promulgate regulations authorizing claims of the type described in subparagraph (1)(B) only if the Secretary determines, based on the totality of publicly available scientific evidence (including evidence from well-designed studies conducted in a manner which is consistent with generally recognized scientific procedures and principles), that there is significant scientific agreement, among experts qualified by scientific training and experience to evaluate such claims, that the claim is supported by such evidence.

**(ii)** A regulation described in subclause (i) shall describe--

**(I)** the relationship between a nutrient of the type required in the label or labeling of food by paragraph (q)(1) or (q)(2) and a disease or health-related condition, and

**(II)** the significance of each such nutrient in affecting such disease or health-related condition.

**(iii)** A regulation described in subclause (i) shall require such claim to be stated in a manner so that the claim is an accurate representation of the matters set out in subclause (ii) and so that the claim enables the public to comprehend the information provided in the claim and to understand the relative significance of such information in the context of a total daily diet.

**(C)** Notwithstanding the provisions of clauses (A)(i) and (B), a claim of the type described in subparagraph (1)(B) which is not authorized by the Secretary in a regulation promulgated in accordance with clause (B) shall be authorized and may be made with respect to a food if--

**(i)** a scientific body of the United States Government with official responsibility for public health protection or research directly relating to human nutrition (such as the National Institutes of Health or the Centers for Disease Control and Prevention) or the National Academy of Sciences or any of its subdivisions has published an authoritative statement, which is currently in effect, about the relationship between a nutrient and a disease or health-related condition to which the claim refers;

**(ii)** a person has submitted to the Secretary, at least 120 days (during which the Secretary may notify any person who is making a claim as authorized by clause (C) that such person has not submitted all the information required by such clause) before the first introduction into interstate commerce of the food with a label containing the claim, (I) a notice of the claim, which shall include the exact words used in the claim and shall include a concise description of the basis upon which such person relied for determining that the requirements of subclause (i) have been satisfied, (II) a copy of the statement referred to in subclause (i) upon which such person relied in making the claim, and (III) a balanced representation of the scientific literature relating to the relationship between a nutrient and a disease or health-related condition to which the claim refers;

**(iii)** the claim and the food for which the claim is made are in compliance with clause (A)(ii) and are otherwise in compliance with paragraph (a) and section 321(n) of this title; and

**(iv)** the claim is stated in a manner so that the claim is an accurate representation of the authoritative statement referred to in subclause (i) and so that the claim enables the public to comprehend the information provided in the claim and to understand the relative significance of such information in the context of a total daily diet.

For purposes of this clause, a statement shall be regarded as an authoritative statement of a scientific body described in subclause (i) only if the statement is published by the scientific body and shall not include a statement of an employee of the scientific body made in the individual capacity of the employee.

**(D)** A claim submitted under the requirements of clause (C) may be made until--

**(i)** such time as the Secretary issues a regulation under the standard in clause (B)(i)--

**(I)** prohibiting or modifying the claim and the regulation has become effective, or

**(II)** finding that the requirements of clause (C) have not been met, including finding that the petitioner has not submitted all the information required by such clause; or

**(ii)** a district court of the United States in an enforcement proceeding under subchapter III has determined that the requirements of clause (C) have not been met.

**(4)(A)(i)** Any person may petition the Secretary to issue a regulation under subparagraph (2)(A)(i) or (3)(B) relating to a claim described in subparagraph (1)(A) or (1)(B). Not later than 100 days after the petition is received by the Secretary, the Secretary shall issue a final decision denying the petition or file the petition for further action by the Secretary. If the Secretary does not act within such 100 days, the petition shall be deemed to be denied unless an extension is mutually agreed upon by the Secretary and the petitioner. If the Secretary denies the petition or the petition is deemed to be denied, the petition shall not be made available to the public. If the Secretary files the petition, the Secretary shall deny the petition or issue a proposed regulation to take the action requested in the petition not later than 90 days after the date of such decision. If the Secretary does not act within such 90 days, the petition shall be deemed to be denied unless an extension is mutually agreed upon by the Secretary and the petitioner. If the Secretary issues a proposed regulation, the rulemaking shall be completed within 540 days of the date the petition is received by the Secretary. If the Secretary does not issue a regulation within such 540 days, the Secretary shall provide the Committee on Commerce of the House of Representatives and the Committee on Labor and Human Resources of the Senate the reasons action on the regulation did not occur within such 540 days.

**(ii)** Any person may petition the Secretary for permission to use in a claim described in subparagraph (1)(A) terms that are consistent with the terms defined by the Secretary under subparagraph (2)(A)(i). Within 90 days of the submission of such a petition, the Secretary shall issue a final decision denying the petition or granting such permission.

**(iii)** Any person may petition the Secretary for permission to use an implied claim described in subparagraph (1)(A) in a brand name. After publishing notice of an opportunity to comment on the petition in the Federal Register and making the petition available to the public, the Secretary shall grant the petition if the Secretary finds that such claim is not misleading and is consistent with terms defined by the Secretary under subparagraph (2)(A)(i). The Secretary shall grant or deny the petition within 100 days of the date it is submitted to the Secretary and the petition shall be considered granted if the Secretary does not act on it within such 100 days.

**(B)** A petition under clause (A)(i) respecting a claim described in subparagraph (1)(A) or (1)(B) shall include an explanation of the reasons why the claim meets the requirements of this paragraph and a summary of the scientific data which supports such reasons.

**(C)** If a petition for a regulation under subparagraph (3)(B) relies on a report from an authoritative scientific body of the United States, the Secretary shall consider such report and shall justify any decision rejecting the conclusions of such report.

**(5)(A)** This paragraph does not apply to infant formulas subject to section 350a(h) of this title and medical foods as defined in section 360ee(b) of this title.

**(B)** Subclauses (iii) through (v) of subparagraph (2)(A) and subparagraph (2)(B) do not apply to food which is served in restaurants or other establishments in which food is served for immediate human consumption or which is sold for sale or use in such establishments.

**(C)** A subparagraph (1)(A) claim made with respect to a food which claim is required by a standard of identity issued under section 341 of this title shall not be subject to subparagraph (2)(A)(i) or (2)(B).

**(D)** A subparagraph (1)(B) claim made with respect to a dietary supplement of vitamins, minerals, herbs, or other similar nutritional substances shall not be subject to subparagraph (3) but shall be subject to a procedure and standard, respecting the validity of such claim, established by regulation of the Secretary.

**(6)** For purposes of paragraph (r)(1)(B), a statement for a dietary supplement may be made if--

**(A)** the statement claims a benefit related to a classical nutrient deficiency disease and discloses the prevalence of such disease in the United States, describes the role of a nutrient or dietary ingredient intended to affect the structure or function in humans, characterizes the documented mechanism by which a nutrient or dietary ingredient acts to maintain such structure or function, or describes general well-being from consumption of a nutrient or dietary ingredient,

**(B)** the manufacturer of the dietary supplement has substantiation that such statement is truthful and not misleading, and

**(C)** the statement contains, prominently displayed and in boldface type, the following: "This statement has not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease.".

A statement under this subparagraph may not claim to diagnose, mitigate, treat, cure, or prevent a specific disease or class of diseases. If the manufacturer of a dietary supplement proposes to make a statement described in the first sentence of this subparagraph in the labeling of the dietary supplement, the manufacturer shall notify the Secretary no later than 30 days after the first marketing of the dietary supplement with such statement that such a statement is being made.

**(7)** The Secretary may make proposed regulations issued under this paragraph effective upon publication pending consideration of public comment and publication of a final regulation if the Secretary determines that such action is necessary--

**(A)** to enable the Secretary to review and act promptly on petitions the Secretary determines provide for information necessary to--

**(i)** enable consumers to develop and maintain healthy dietary practices;

**(ii)** enable consumers to be informed promptly and effectively of important new knowledge regarding nutritional and health benefits of food; or

**(iii)** ensure that scientifically sound nutritional and health information is provided to consumers as soon as possible; or

**(B)** to enable the Secretary to act promptly to ban or modify a claim under this paragraph.

Such proposed regulations shall be deemed final agency action for purposes of judicial review.

**(s) Dietary supplements**

If--

**(1)** it is a dietary supplement; and

**(2)(A)** the label or labeling of the supplement fails to list--

**(i)** the name of each ingredient of the supplement that is described in section 321(ff) of this title; and

**(ii)(I)** the quantity of each such ingredient; or

**(II)** with respect to a proprietary blend of such ingredients, the total quantity of all ingredients in the blend;

**(B)** the label or labeling of the dietary supplement fails to identify the product by using the term "dietary supplement", which term may be modified with the name of such an ingredient;

**(C)** the supplement contains an ingredient described in section 321(ff)(1)(C) of this title, and the label or labeling of the supplement fails to identify any part of the plant from which the ingredient is derived;

**(D)** the supplement--

**(i)** is covered by the specifications of an official compendium;

**(ii)** is represented as conforming to the specifications of an official compendium; and

**(iii)** fails to so conform; or

**(E)** the supplement--

**(i)** is not covered by the specifications of an official compendium; and

**(ii)(I)** fails to have the identity and strength that the supplement is represented to have; or

**(II)** fails to meet the quality (including tablet or capsule disintegration), purity, or compositional specifications, based on validated assay or other appropriate methods, that the supplement is represented to meet.

A dietary supplement shall not be deemed misbranded solely because its label or labeling contains directions or conditions of use or warnings.

**(t) Catfish**

If it purports to be or is represented as catfish, unless it is fish classified within the family Ictaluridae.

**(u) Ginseng**

If it purports to be or is represented as ginseng, unless it is an herb or herbal ingredient derived from a plant classified within the genus Panax.

**(v) Failure to label; health threat**

If--

**(1)** it fails to bear a label required by the Secretary under section 381(n)(1) of this title (relating to food refused admission into the United States);

**(2)** the Secretary finds that the food presents a threat of serious adverse health consequences or death to humans or animals; and

**(3)** upon or after notifying the owner or consignee involved that the label is required under section 381 of this title, the Secretary informs the owner or consignee that the food presents such a threat.

**(w) Major food allergen labeling requirements**

**(1)** If it is not a raw agricultural commodity and it is, or it contains an ingredient that bears or contains, a major food allergen, unless either--

**(A)** the word "Contains", followed by the name of the food source from which the major food allergen is derived, is printed immediately after or is adjacent to the list of ingredients (in a type size no smaller than the type size used in the list of ingredients) required under subsections (g) and (i); or

**(B)** the common or usual name of the major food allergen in the list of ingredients required under subsections (g) and (i) is followed in parentheses by the name of the food source from which the major food allergen is derived, except that the name of the food source is not required when--

**(i)** the common or usual name of the ingredient uses the name of the food source from which the major food allergen is derived; or

**(ii)** the name of the food source from which the major food allergen is derived appears elsewhere in the ingredient list, unless the name of the food source that appears elsewhere in the ingredient list appears as part of the name of a food ingredient that is not a major food allergen under section 321(qq)(2)(A) or (B) of this title.

**(2)** As used in this subsection, the term "name of the food source from which the major food allergen is derived" means the name described in section 321(qq)(1) of this title; provided that in the case of a tree nut, fish, or Crustacean shellfish, the term "name of the food source from which the major food allergen is derived" means the name of the specific type of nut or species of fish or Crustacean shellfish.

**(3)** The information required under this subsection may appear in labeling in lieu of appearing on the label only if the Secretary finds that such other labeling is sufficient to protect the public health. A finding by the Secretary under this paragraph (including any change in an earlier finding under this paragraph) is effective upon publication in the Federal Register as a notice.

**(4)** Notwithstanding subsection (g), (i), or (k), or any other law, a flavoring, coloring, or incidental additive that is, or that bears or contains, a major food allergen shall be subject to the labeling requirements of this subsection.

**(5)** The Secretary may by regulation modify the requirements of subparagraph (A) or (B) of paragraph (1), or eliminate either the requirement of subparagraph (A) or the requirements of subparagraph (B) of paragraph (1), if the Secretary determines that the modification or elimination of the requirement of subparagraph (A) or the requirements of subparagraph (B) is necessary to protect the public health.

**(6)(A)** Any person may petition the Secretary to exempt a food ingredient described in section 321(qq)(2) of this title from the allergen labeling requirements of this subsection.

**(B)** The Secretary shall approve or deny such petition within 180 days of receipt of the petition or the petition shall be deemed denied, unless an extension of time is mutually agreed upon by the Secretary and the petitioner.

**(C)** The burden shall be on the petitioner to provide scientific evidence (including the analytical method used to produce the evidence) that demonstrates that such food ingredient, as derived by the method specified in the petition, does not cause an allergic response that poses a risk to human health.

**(D)** A determination regarding a petition under this paragraph shall constitute final agency action.

**(E)** The Secretary shall promptly post to a public site all petitions received under this paragraph within 14 days of receipt and the Secretary shall promptly post the Secretary's response to each.

**(7)(A)** A person need not file a petition under paragraph (6) to exempt a food ingredient described in section 321(qq)(2) of this title from the allergen labeling requirements of this subsection, if the person files with the Secretary a notification containing

**(i)** scientific evidence (including the analytical method used) that demonstrates that the food ingredient (as derived by the method specified in the notification, where applicable) does not contain allergenic protein; or

**(ii)** a determination by the Secretary that the ingredient does not cause an allergic response that poses a risk to human health under a premarket approval or notification program under section 348 of this title.

**(B)** The food ingredient may be introduced or delivered for introduction into interstate commerce as a food ingredient that is not a major food allergen 90 days after the date of receipt of the notification by the Secretary, unless the Secretary determines within the 90-day period that the notification does not meet the requirements of this paragraph, or there is insufficient scientific evidence to determine that the food ingredient does not contain allergenic protein or does not cause an allergenic response that poses a risk to human health.

**(C)** The Secretary shall promptly post to a public site all notifications received under this subparagraph within 14 days of receipt and promptly post any objections thereto by the Secretary.

**(x) Nonmajor food allergen labeling requirements**

Notwithstanding subsection (g), (i), or (k), or any other law, a spice, flavoring, coloring, or incidental additive that is, or that bears or contains, a food allergen (other than a major food allergen), as determined by the Secretary by regulation, shall be disclosed in a manner specified by the Secretary by regulation.

**(y) Dietary supplements**

If it is a dietary supplement that is marketed in the United States, unless the label of such dietary supplement includes a domestic address or domestic phone number through which the responsible person (as described in section 379aa-1 of this title) may receive a report of a serious adverse event with such dietary supplement.

### CREDIT(S)

(June 25, 1938, c. 675, § 403, 52 Stat. 1047; Pub.L. 86-537, § 1, June 29, 1960, 74 Stat. 251; Pub.L. 86-618, Title I, § 102(a) (3), July 12, 1960, 74 Stat. 398; Pub.L. 91-601, § 6(c), formerly § 7(c), Dec. 30, 1970, 84 Stat. 1673; renumbered § 6(c), Pub.L. 97-35, Title XII, § 1205(c), Aug. 13, 1981, 95 Stat. 716; amended Pub.L. 94-278, Title V, § 502(a)(1), Apr. 22, 1976, 90 Stat. 411; Pub.L. 95-203, § 4(a)(1), (b)(1), Nov. 23, 1977, 91 Stat. 1452, 1453; Pub.L. 101-535, §§ 2(a), 3(a), 7, Nov. 8, 1990, 104 Stat. 2353, 2357, 2364; Pub.L. 102-108, § 2(a), (c), Aug. 17, 1991, 105 Stat. 549; Pub.L. 102-571, Title I, § 107(5), (6), Oct. 29, 1992, 106 Stat. 4499; Pub.L. 103-80, §§ 2(b), 3(j), Aug. 13, 1993, 107 Stat. 773, 776; Pub.L. 103-417, §§ 6, 7(a) to (c), 10(c), Oct. 25, 1994, 108 Stat. 4329, 4330, 4332; Pub.L. 104-124, § 1, Apr. 1, 1996, 110 Stat. 882; Pub.L. 105-115, Title III, §§ 301 to 305, Nov. 21, 1997, 111 Stat. 2350 to 2353; Pub.L. 106-554, § 1(a)(1) [Title V, § 517], Dec. 21, 2000, 114 Stat. 2763, 2763A-73; Pub.L. 107-171, Title X, §§ 10806(a)(2), (b)(2), 10808(b), May 13, 2002, 116 Stat. 526, 527, 530; Pub.L. 107-188, Title III, § 308(b), June 12, 2002, 116 Stat. 672; Pub.L. 108-282, Title II, § 203(a), Aug. 2, 2004, 118 Stat. 906; Pub.L. 109-462, § 3(c), Dec. 22, 2006, 120 Stat. 3475; Pub.L. 111-148, Title IV, § 4205(a), (b), Mar. 23, 2010, 124 Stat. 573.)

Notes of Decisions (295)

**Footnotes**

1        So in original. Probably should be followed by a comma.

21 U.S.C.A. § 343, 21 USCA § 343

Current through P.L. 117-102. Some statute sections may be more current, see credits for details.

End of Document                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**AD110**

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Negative Treatment Reconsidered by  Florida ex rel. Atty. Gen. v. U.S. Dept. of Health and Human Services,  11th Cir.(Fla.), Aug. 12, 2011

🚩 KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

---

United States Code Annotated
   Title 21. Food and Drugs (Refs & Annos)
     Chapter 9. Federal Food, Drug, and Cosmetic Act (Refs & Annos)
      Subchapter IV. Food

---

21 U.S.C.A. § 343-1

§ 343-1. National uniform nutrition labeling

Effective: March 23, 2010

Currentness

**(a)** Except as provided in subsection (b), no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce--

**(1)** any requirement for a food which is the subject of a standard of identity established under section 341 of this title that is not identical to such standard of identity or that is not identical to the requirement of section 343(g) of this title, except that this paragraph does not apply to a standard of identity of a State or political subdivision of a State for maple syrup that is of the type required by sections 341 and 343(g) of this title,

**(2)** any requirement for the labeling of food of the type required by section 343(c), 343(e), 343(i)(2), 343(w), or 343(x) of this title that is not identical to the requirement of such section, except that this paragraph does not apply to a requirement of a State or political subdivision of a State that is of the type required by section 343(c) of this title and that is applicable to maple syrup,

**(3)** any requirement for the labeling of food of the type required by section 343(b), 343(d), 343(f), 343(h), 343(i)(1), or 343(k) of this title that is not identical to the requirement of such section, except that this paragraph does not apply to a requirement of a State or political subdivision of a State that is of the type required by section 343(h)(1) of this title and that is applicable to maple syrup,

**(4)** any requirement for nutrition labeling of food that is not identical to the requirement of section 343(q) of this title, except that this paragraph does not apply to food that is offered for sale in a restaurant or similar retail food establishment that is not part of a chain with 20 or more locations doing business under the same name (regardless of the type of ownership of the locations) and offering for sale substantially the same menu items unless such restaurant or similar retail food establishment complies with the voluntary provision of nutrition information requirements under section 343(q)(5)(H)(ix) of this title, or

**(5)** any requirement respecting any claim of the type described in section 343(r)(1) of this title made in the label or labeling of food that is not identical to the requirement of section 343(r) of this title, except a requirement respecting a claim made in the label or labeling of food which is exempt under section 343(r)(5)(B) of this title.

Paragraph (3) shall take effect in accordance with section 6(b) of the Nutrition Labeling and Education Act of 1990.

**(b)** Upon petition of a State or a political subdivision of a State, the Secretary may exempt from subsection (a), under such conditions as may be prescribed by regulation, any State or local requirement that--

**(1)** would not cause any food to be in violation of any applicable requirement under Federal law,

**(2)** would not unduly burden interstate commerce, and

**(3)** is designed to address a particular need for information which need is not met by the requirements of the sections referred to in subsection (a).

## CREDIT(S)

(June 25, 1938, c. 675, § 403A, as added Pub.L. 101-535, § 6(a), Nov. 8, 1990, 104 Stat. 2362; amended Pub.L. 102-108, § 2(b), Aug. 17, 1991, 105 Stat. 549; Pub.L. 103-396, § 3(a), Oct. 22, 1994, 108 Stat. 4154; Pub.L. 108-282, Title II, § 203(c)(2), Aug. 2, 2004, 118 Stat. 908; Pub.L. 111-148, Title IV, § 4205(c), Mar. 23, 2010, 124 Stat. 576.)

Notes of Decisions (44)

21 U.S.C.A. § 343-1, 21 USCA § 343-1
Current through P.L. 117-102. Some statute sections may be more current, see credits for details.

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

📙 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
 Title 21. Food and Drugs (Refs & Annos)
  Chapter 9. Federal Food, Drug, and Cosmetic Act (Refs & Annos)
   Subchapter X. Miscellaneous (Refs & Annos)

21 U.S.C.A. § 393

§ 393. Food and Drug Administration

Effective: January 4, 2011
Currentness

**(a) In general**

There is established in the Department of Health and Human Services the Food and Drug Administration (hereinafter in this section referred to as the "Administration").

**(b) Mission**

The Administration shall--

**(1)** promote the public health by promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products in a timely manner;

**(2)** with respect to such products, protect the public health by ensuring that--

**(A)** foods are safe, wholesome, sanitary, and properly labeled;

**(B)** human and veterinary drugs are safe and effective;

**(C)** there is reasonable assurance of the safety and effectiveness of devices intended for human use;

**(D)** cosmetics are safe and properly labeled; and

**(E)** public health and safety are protected from electronic product radiation;

**(3)** participate through appropriate processes with representatives of other countries to reduce the burden of regulation, harmonize regulatory requirements, and achieve appropriate reciprocal arrangements; and

AD113

(4) as determined to be appropriate by the Secretary, carry out paragraphs (1) through (3) in consultation with experts in science, medicine, and public health, and in cooperation with consumers, users, manufacturers, importers, packers, distributors, and retailers of regulated products.

**(c) Interagency collaboration**

The Secretary shall implement programs and policies that will foster collaboration between the Administration, the National Institutes of Health, and other science-based Federal agencies, to enhance the scientific and technical expertise available to the Secretary in the conduct of the duties of the Secretary with respect to the development, clinical investigation, evaluation, and postmarket monitoring of emerging medical therapies, including complementary therapies, and advances in nutrition and food science.

**(d) Commissioner**

**(1) Appointment**

There shall be in the Administration a Commissioner of Food and Drugs (hereinafter in this section referred to as the "Commissioner") who shall be appointed by the President by and with the advice and consent of the Senate.

**(2) General powers**

The Secretary, through the Commissioner, shall be responsible for executing this chapter and for--

**(A)** providing overall direction to the Food and Drug Administration and establishing and implementing general policies respecting the management and operation of programs and activities of the Food and Drug Administration;

**(B)** coordinating and overseeing the operation of all administrative entities within the Administration;

**(C)** research relating to foods, drugs, cosmetics, devices, and tobacco products in carrying out this chapter;

**(D)** conducting educational and public information programs relating to the responsibilities of the Food and Drug Administration; and

**(E)** performing such other functions as the Secretary may prescribe.

**(e) Technical and scientific review groups**

The Secretary through the Commissioner of Food and Drugs may, without regard to the provisions of Title 5 governing appointments in the competitive service and without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates, establish such technical and scientific review groups as

AD114

are needed to carry out the functions of the Administration, including functions under this chapter, and appoint and pay the members of such groups, except that officers and employees of the United States shall not receive additional compensation for service as members of such groups.

**(f) Agency plan for statutory compliance**

**(1) In general**

Not later than 1 year after November 21, 1997, the Secretary, after consultation with appropriate scientific and academic experts, health care professionals, representatives of patient and consumer advocacy groups, and the regulated industry, shall develop and publish in the Federal Register a plan bringing the Secretary into compliance with each of the obligations of the Secretary under this chapter. The Secretary shall review the plan biannually and shall revise the plan as necessary, in consultation with such persons.

**(2) Objectives of agency plan**

The plan required by paragraph (1) shall establish objectives and mechanisms to achieve such objectives, including objectives related to--

**(A)** maximizing the availability and clarity of information about the process for review of applications and submissions (including petitions, notifications, and any other similar forms of request) made under this chapter;

**(B)** maximizing the availability and clarity of information for consumers and patients concerning new products;

**(C)** implementing inspection and postmarket monitoring provisions of this chapter;

**(D)** ensuring access to the scientific and technical expertise needed by the Secretary to meet obligations described in paragraph (1);

**(E)** establishing mechanisms, by July 1, 1999, for meeting the time periods specified in this chapter for the review of all applications and submissions described in subparagraph (A) and submitted after November 21, 1997; and

**(F)** eliminating backlogs in the review of applications and submissions described in subparagraph (A), by January 1, 2000.

**(g) Annual report**

The Secretary shall annually prepare and publish in the Federal Register and solicit public comment on a report that--

**(1)** provides detailed statistical information on the performance of the Secretary under the plan described in subsection (f);

**(2)** compares such performance of the Secretary with the objectives of the plan and with the statutory obligations of the Secretary; and

**(3)** identifies any regulatory policy that has a significant negative impact on compliance with any objective of the plan or any statutory obligation and sets forth any proposed revision to any such regulatory policy.

**(h) Annual report regarding food**

Not later than February 1 of each year, the Secretary shall submit to Congress a report, including efforts to coordinate and cooperate with other Federal agencies with responsibilities for food inspections, regarding--

**(1)** information about food facilities including--

**(A)** the appropriations used to inspect facilities registered pursuant to section 350d of this title in the previous fiscal year;

**(B)** the average cost of both a non-high-risk food facility inspection and a high-risk food facility inspection, if such a difference exists, in the previous fiscal year;

**(C)** the number of domestic facilities and the number of foreign facilities registered pursuant to section 350d of this title that the Secretary inspected in the previous fiscal year;

**(D)** the number of domestic facilities and the number of foreign facilities registered pursuant to section 350d of this title that were scheduled for inspection in the previous fiscal year and which the Secretary did not inspect in such year;

**(E)** the number of high-risk facilities identified pursuant to section 350j of this title that the Secretary inspected in the previous fiscal year; and

**(F)** the number of high-risk facilities identified pursuant to section 350j of this title that were scheduled for inspection in the previous fiscal year and which the Secretary did not inspect in such year.

**(2)** information about food imports including--

**(A)** the number of lines of food imported into the United States that the Secretary physically inspected or sampled in the previous fiscal year;

**(B)** the number of lines of food imported into the United States that the Secretary did not physically inspect or sample in the previous fiscal year; and

**(C)** the average cost of physically inspecting or sampling a line of food subject to this chapter that is imported or offered for import into the United States; and

**(3)** information on the foreign offices of the Food and Drug Administration including--

**(A)** the number of foreign offices established; and

**(B)** the number of personnel permanently stationed in each foreign office.

**(i) Public availability of annual food reports**

The Secretary shall make the reports required under subsection (h) available to the public on the Internet Web site of the Food and Drug Administration.

**CREDIT(S)**

(June 25, 1938, c. 675, § 1003, formerly § 903, as added Pub.L. 100-607, Title V, § 503(a), Nov. 4, 1988, 102 Stat. 3121; amended Pub.L. 100-690, Title II, § 2631, Nov. 18, 1988, 102 Stat. 4244; Pub.L. 105-115, Title IV, §§ 406, 414, Nov. 21, 1997, 111 Stat. 2369, 2377; renumbered § 1003 and amended Pub.L. 111-31, Div. A, Title I, §§ 101(b)(2), 103(m), June 22, 2009, 123 Stat. 1784, 1838; Pub.L. 111-353, Title II, § 201(b), Jan. 4, 2011, 124 Stat. 3925.)

Notes of Decisions (5)

21 U.S.C.A. § 393, 21 USCA § 393
Current through P.L. 117-102. Some statute sections may be more current, see credits for details.

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

55 FR 29517-01, 1990 WL 335454(F.R.)
PROPOSED RULES
DEPARTMENT OF HEALTH AND HUMAN SERVICES
21 CFR PART 101
[Docket No. 90N-0165]
RIN 0905-AD08

Food Labeling; Serving Sizes

Thursday, July 19, 1990

AGENCY: Food and Drug Administration, HHS.

ACTION: Proposed rule.

SUMMARY: The Food and Drug Administration (FDA) is proposing to amend its nutrition labeling regulations (1) To define serving and portion size on the basis of the amount of food commonly consumed per eating occasion by persons 4 years of age or older, by infants, or by children under 4 years of age (toddlers); (2) to require the use of both U.S. and metric measures to declare serving size; (3) to permit the declaration of serving (portion) size in familiar household measures; (4) to permit the optional declaration of nutrient content per 100 grams (or 100 milliliters); and (5) to define a "single serving container" as that which contains 150 percent or less of the standard serving size for the food product. FDA also is proposing to establish standard serving sizes for 159 food product categories to assure reasonable and uniform serving sizes upon which consumers can make nutrition comparisons among food products.

DATES: Written comments by November 16, 1990. The agency is proposing that any final rule that may issue based upon this proposal become effective 1 year following its publication in the Federal Register.

ADDRESSES: Written comments to the Dockets Management Branch (HFA-305), Food and Drug Administration, rm. 4-62, 5600 Fishers Lane, Rockville, MD 20857, 301-443-4874.

FOR FURTHER INFORMATION CONTACT: Youngmee K. Park, Center for Food Safety and Applied Nutrition (HFF-265), Food and Drug Administration, 200 C Street SW., Washington, DC 20204, 202-485-0089.

SUPPLEMENTARY INFORMATION:

**I. Introduction**

*A. Overview*

In the Federal Register of August 8, 1989 (54 FR 32610), the FDA published an advance notice of proposed rulemaking (ANPRM) that solicited public comment on a wide range of food labeling issues to help the agency determine what, if any, changes in food labeling requirements were necessary to make the food label more useful and understandable to consumers. On March 7, 1990, Louis W. Sullivan, Secretary of the U.S. Department of Health and Human Services, announced plans for a comprehensive response to the comments on the ANPRM, to be undertaken by FDA. This document is a part of that response.

Elsewhere in this issue of the Federal Register, FDA is proposing to make nutrition labeling mandatory on foods that are a meaningful source of nutrients and to revise the contents of the nutrition label (see the document entitled "Food Labeling; Mandatory Status of Nutrition Labeling and Nutrient Content Revision"). In support of that document, FDA also is proposing in this issue of the Federal Register to establish two sets of reference values—Reference Daily Intakes (RDI's) and Daily Reference Values (DRV's)—for use in declaring nutrient content in nutrition labeling (see the document entitled "Food Labeling; Reference

Daily Intakes and Daily Reference Values"). In addition, in this document the agency is proposing to establish standard serving sizes for all food product categories for use in the nutrition label.

The agency is proposing these standard serving sizes to assure that nutrition labels on similar types of foods are consistent, so that consumers will be able to easily and readily make comparisons of nutrient content among products. In addition, FDA expects that standard serving sizes will eliminate some of the problems that occur when manufacturers manipulate serving sizes to make a product appear, for example, lower in calories or lower in sodium than it would if a more objective serving size were used. FDA also is proposing to clarify what constitutes a "single serving" to eliminate discrepancies in the marketplace that are confusing to consumers.

FDA is proposing to establish these standardized serving sizes under sections 201(n), 403(a), and 701(a) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321(n), 343(a), and 371(a)) (the act). Sections 201(n) and 403(a) of the act provide that a food's label is misleading, and that a food is accordingly misbranded if the label fails to reveal information that is material with respect to consequences which may result from the use of the food. The serving size is a material fact because it is the fundamental component of nutrition labeling. If nutrition labeling sets out the consequences that may result from consumption of a food, the serving size defines one of the essential **29518** conditions of that consumption by specifying the amount of food that is customarily eaten at one time. The nutrition label sets out the levels of nutrients and other food components that are found in that amount of the food. The consumer uses those levels to evaluate the nutritional value of the food, its overall contribution to the diet, and how it compares with other similar foods. Thus, as is explained in more detail below, a reasonable, standardized serving size is necessary if the labeling of the food is to be informative and not misleading.

### *B. Background*
In the Federal Register of March 30, 1972 (37 FR 6493), FDA proposed to establish a regulation on nutrition labeling, 21 CFR 1.16 (redesignated as 21 CFR 1.17 in the final rule and recodified as 21 CFR 101.9 (§ 101.9) in the Federal Register of March 15, 1977 (42 FR 14302)). The agency proposed to require that all nutrient quantities, including vitamins, minerals, calories, protein, fat, and carbohydrate, be declared in relation to the average or usual serving expressed in common household measurements (e.g., cupfuls or teaspoonfuls) or in terms of a unit that is easily identified as an average or usual serving (e.g., 12 fluid ounces of soft drinks). All who commented recognized the need for serving sizes applicable to nutrition labeling and recommended that FDA establish them (38 FR 2125; January 19, 1973).

After considering the comments and other available information, FDA issued a final rule in the Federal Register of January 19, 1973 (38 FR 2125), as amended (38 FR 6951; March 14, 1973) establishing nutrition labeling regulations. These regulations defined the terms "serving" and "portion" as:

that reasonable quantity of food suited for or practicable of consumption as part of a meal by an adult male engaged in light physical activity, or by an infant or child under 4 years of age when the article purports or is represented to be for consumption by an infant or child under 4 years of age. The term "portion" means the amount of a food customarily used only as an ingredient in the preparation of a meal component (e.g., ½ cup flour, ½ tablespoon cooking oil or ¼ cup tomato paste).
(21 CFR 1.17(b)(1) (recodified as 21 CFR 101.9(b)(1) in the Federal Register of March 15, 1977 (42 FR 14302))).

FDA also provided for the use of these terms as the basis for declaring nutrition information by requiring that:

A label statement regarding a serving (portion) shall be in terms of a convenient unit of such food or a convenient unit of measure that can be easily identified as an average or usual serving (portion) and can be readily understood by purchasers of such food (e.g., a serving (portion) may be expressed in slices, cookies, or wafers; or in terms of ounces, fluid ounces, teaspoonfuls, tablepoonsfuls, or cupfuls).

(21 CFR 1.17(b)(1) (recodified as 21 CFR 101.9(b)(1) in the Federal Register of March 15, 1977 (42 FR 14303))).

In addition, FDA required the declaration of nutrient quantities on the basis of the food as packaged, that is, declaration of the nutrient values of, for example, 1 oz of dry cereal. The agency concluded that requiring nutrient declaration on the basis of the product as consumed was not feasible because, for many products, there are numerous variations of cooking or other methods of preparation, and therefore such a requirement would be unenforceable (38 FR 6951 at 6953). However, in response to comments, FDA permitted manufacturers to declare, in a separate column, the nutrient quantities on the basis of the food as consumed after cooking or other preparation, provided that the specific method of cooking or other preparation was prominently disclosed on the label, that is, declaration of the nutrient values of, for example, 1 oz of dry cereal plus milk (21 CFR 1.17(b) (3) (recodified as 21 CFR 101.9(b)(3) in the Federal Register of March 15, 1977 (42 FR 14303)).

While FDA agreed with the comments that serving or portion size should be uniform, it did not attempt to establish such uniform serving or portion sizes at that time. Instead, FDA stated that "[u]nder the regulation, it is incumbent upon industry and consumers to work together to devise uniform serving and portion sizes" (38 FR 6951 at 6953), and that "[i]f this does not materialize the Commissioner will establish a procedure for adopting uniform serving and portion sizes that will be applicable to all foods" (38 FR 6951 at 6953).

On June 14, 1974 (39 FR 20887), FDA proposed to establish (1) General principles governing the establishment of a serving or portion size, (2) a petition process by which manufacturers could establish or amend a serving or portion size, and (3) serving sizes for noncarbonated breakfast beverage products (6 fl oz), formulated meal replacements (amount intended for a meal when reconstituted for consumption), ready-to-eat breakfast cereal (1 oz or the amount in a single-serving container), hot breakfast cereal (1 oz, uncooked), and fluid milk beverages (8 oz serving or 1 quart on a daily basis). In that document, FDA also proposed to clarify that the term "portion" was intended to be used as a basis for nutrition labeling only for foods not eaten directly but eaten only as an ingredient of other foods. FDA tentatively concluded that this clarification was necessary to avoid the consumer confusion that had resulted from manufacturers improperly using this term for foods, e.g., canned peaches, canned green beans, and canned tuna, that are obviously eaten alone frequently and for which a statement of the serving size rather than portion size is required. (The agency later withdrew this proposal as part of a blanket withdrawal of a number of proposed rules related to various food products that FDA had published in the Federal Register before 1977. The agency's decision to withdraw these proposals was based on its limited resources to complete these rulemaking proceedings and on the likelihood that they had become outdated since their publication (51 FR 15653; April 25, 1986).)

On June 9, 1978 (43 FR 25296), FDA, the U.S. Department of Agriculture (USDA), and the Federal Trade Commission (FTC) announced a series of public hearings to discuss several issues related to food labeling, including nutrition labeling. Based on their analysis and evaluation of the oral and written comments that they received on the announcement, the three agencies announced their tentative positions on several issues, including serving sizes, on December 21, 1979 (44 FR 75990).

The agencies stated that although serving size was not a major issue in the hearings and in written comments, those comments that did address this issue implied that the public would welcome standardization of serving sizes. Because serving size information is important in meaningful nutrition labeling, because of their commitment to make uniform serving sizes for some foods, and because industry had failed to set useful serving sizes in many cases, FDA and USDA stated that they had concluded that serving sizes should be established for foods needing them. However, neither USDA nor FDA took action on this conclusion.

### C. Need for Change in Procedure for Establishing Serving Size

Serving sizes act as the basis for providing nutrition information about a food product to consumers. If a serving size is unreasonably large or small, it can distort the nutrition information provided on the food label and impede understanding of the nutritional quality of a product. Moreover, large variations in the serving sizes of like products make comparison of nutrients difficult.

**\*29519** Since 1973, there has been support among consumer and professional groups and some manufacturers and trade associations for the standardization of serving sizes (38 FR 2125, January 19, 1973). On several occasions, FDA has stated that

reasonable and uniform serving sizes should be used and has expressed its intention to develop a procedure for standardizing serving sizes. The agency in 1974 (39 FR 20887) stated that it would propose serving sizes on it own initiative if divergent serving sizes continued to be used in the marketplace. More recently, comments on the 1989 ANPRM and in the food labeling hearings expressed strong concern about serving sizes.

### D. FDA's Response to Need for Change

In view of the many comments from the recent food labeling hearings and comments made to the ANPRM about the need for more realistic and consistent serving sizes, FDA has tentatively concluded that reasonable and standardized serving sizes should be established. The agency, therefore, is proposing to establish a new regulation, § 101.12 (21 CFR 101.12), that sets forth standard serving sizes for 159 food product categories for nutrition labeling and other food labeling purposes. FDA intends to use these standard servings sizes, if they are adopted, to evaluate whether claims on food labels, such as "low sodium" and "low cholesterol," are appropriate and not misleading to consumers.

## II. Comments

The ANPRM on food labeling (54 FR 32610; August 8, 1989) requested public comment on what criteria should be used in determining serving sizes for nutrition labeling. Specifically, FDA sought comment on whether serving sizes should be determined by FDA by regulation or by manufacturers following criteria established by FDA, or whether serving sizes should not be included on the nutrition label. In response, the agency received numerous comments on how serving sizes should be determined and presented on the food label. The agency has attempted to address the comments in this proposal. If there are any significant concerns that the agency has not addressed, these concerns should be brought to the agency's attention in comments on this proposal.

The agency will describe the comments that it received on serving sizes in more detail and respond to them as it considers each of the specific issues that they raised.

## III. Development of Proposed Action on Serving Size

### A. Regulatory Approach

As stated above, the serving size is the amount of a food that is used as the basis for presenting the food's nutrient content to the public. In deciding how serving sizes should be determined, the agency considered the purposes and uses of serving sizes, as well as the comments on serving size that it received in response to the ANPRM and its experience over the past 20 years in regulating nutrition information on food products. Based on its consideration of these factors, the agency reached a set of tentative conclusions about serving sizes. Frequently, it was not possible to meet all potential goals for the purposes and uses of serving sizes. When conflicts arose, priority was given to the option that FDA considered to be most useful to consumers.

### 1. Reasonable Serving Sizes

One purpose of the serving size is to provide an appropriate and usable reference point for evaluating the nutritional content of the food itself. To be an appropriate reference point, the serving size must include a meaningful quantity of food. Several comments pointed out that in the absence of limits on the amount of food in a serving, manufacturers had manipulated serving sizes on their products to achieve a per serving content that would allow claims such as "low calorie" or "low sodium" that made their products appear nutritionally superior relative to other products in light of public health concerns.

Both FDA's current and proposed definitions of "serving size" focus on the quantity of food commonly consumed per eating occasion. Many comments suggested that serving sizes of food should represent a reasonable average amount. Several comments further suggested that the determination of what is a reasonable average amount should be based on food consumption data in national surveys, such as the National Health and Nutrition Examination Survey (NHANES), which is conducted by the National Center for Health Statistics, or the Nationwide Food Consumption Survey (NFCS) and the Continuing Survey of Food

Intakes by Individuals (CSFII), which are conducted by USDA. Several comments suggested that FDA should use the serving sizes in standard exchange lists that are widely used for diabetic and other special diets. Other comments suggested that FDA use the serving sizes in standard food composition references such as USDA Agriculture Handbook No. 8 (Ref. 1) or those recommended in Government publications that offer dietary guidance (Refs. 2 and 3).

FDA agrees that serving sizes should represent reasonable average amounts that are commonly consumed. To reflect this fact, the agency tentatively concludes that the serving size for a particular food should be the amount that is commonly consumed by the population group for which the food is intended. FDA believes that use of the average amount consumed by a reference population group is more realistic for the purpose of establishing standard serving sizes that is the use of: (1) Food exchange lists, which have been developed for therapeutic diets and therefore may not represent the usual or average amount consumed in an eating occasion; (2) a type of person, such as the adult male, who would not be representative of the average target population; or (3) standard units in Government publications which were not designed necessarily to represent usual serving sizes.

Comments indicated that to be a useful reference point, the serving size should be expressed in units that are readily understood by consumers. Most of the comments recommended the use of familiar units, such as count, pieces, package, and household measures (e.g., cups or tablespoons). Several comments requested that manufacturers also be permitted to declare serving size by weight (e.g., oz) as well as household measures. Other comments, citing international harmonization in food labeling, recommended the use of metric units for weights and volume, with 100 grams (g) or 100 milliliters (mL) as the basis for providing nutrition information on most foods and 10 g or 10 mL on foods consumed in small amounts. Several comments cautioned, however, that consumers in the U.S. do not understand metric units and asserted that they therefore should not be required.

FDA recognizes that most consumers prefer the use of familiar household units such as count, pieces, cups, slices, and tablespoons. In responding to these comments, the agency initially considered requiring serving sizes in familiar household units, followed in parentheses by the equivalent metric measurement. However, it quickly became clear to the agency that the variability in size and weight of various food products (e.g., lack of standardization in bread size and in thickness of slices) would mean that for many products, this approach would create compliance problems and would **29520** make it difficult for consumers to make comparisons among similar products.

Therefore, to establish a basis for serving sizes that ensures that they will readily lend themselves to consumer comparisons and to agency compliance needs, FDA tentatively concludes that for most foods, manufacturers should be required to list on the label the standard serving size in U.S. units, such as oz or fluid ounces (fl oz), followed by the equivalent metric measurements (mL) in parentheses. As an example, the serving size for fluid milk should be described as "8 fl oz (240 mL)" and for bread as "2 oz (56 g)." FDA believes, however, that there are a few foods, for which exceptions to this general approach should be made, e.g., catsup, and for which familiar household units, such as tablespoons, are more appropriate and enforceable and therefore should be required. A discussion of these exceptions, and of FDA's rationale for proposing to require that the standard serving size for these products be declared in this manner, appears later in this document.

To be responsive to the many comments that requested that serving sizes be expressed in familiar household units, FDA also tentatively concludes that manufactures should be permitted voluntarily to declare the serving size in terms of familiar household measures, such as cups, pieces, or count. Thus, in addition to declaring the serving size for fluid milk as "8 fl oz (240 mL)," the manufacturer could add "1 cup." Similarly for bread, a manufacturer could declare "2 oz (56 g) (2 slices)" or "about 2 [or 1 or 3] slices" for breads for which 2 slices varies significantly from the 2-ounce (56 grams) standard serving size. Because of the general support from comments for the use of familiar household units, FDA especially requests comments on the proposed required approach of primarily using weight or volume measures (i.e., oz, fl oz) as the basis for determining the standard serving size used in nutrition labeling.

FDA also tentatively concludes that nutrient declaration per 100 grams (or 100 milliliters) should not be required at this time. U.S. consumers are not as familiar with the metric system as consumers in other countries and, as stated above, have expressed

strong preference for familiar units. However, because FDA wishes to support international harmonization in food labeling, FDA tentatively concludes that it will permit manufacturers to voluntarily provide nutrition information on the basis of 100 g or 100 mL in addition to the required information. (See also section III.B.3. of this document.)

**2. Standardized Serving Sizes**
The second purpose of the serving size is to provide a means by which consumers can make comparisons between foods. Many comments pointed out that a major impediment to effective consumer use of nutrition labeling information has been the multiplicity of serving sizes, including, in particular, those used on foods that are sold in obviously single-serving containers. The comments cited a number of examples that depicted misleading serving sizes. These examples included: (1) Multiple servings declared on container sizes that are typically consumed as single servings; (2) 1-oz servings on products commonly consumed in larger amounts; (3) 1-oz servings on foods when a slice or other apparent serving or portion is more than the 1 oz declared; and (4) unrealistically large or small serving sizes for some products. The comments argued that to permit consumers to readily compare the relative nutritional contributions of various foods, serving sizes must be standardized.

FDA recognizes the merits of these comments. As a result of its consideration of these comments, the agency tentatively concludes that standardized serving sizes should be established to provide consumers with a more realistic means for making food comparisons.

Standard serving sizes facilitate comparison of the nutritional values of foods that are the same types of products and that have similar uses in the diet. For example, they permit comparisons to be made among potato chips, corn chips, and pretzels consumed as snacks, as well as comparisons among different brands of the same food and between single and multiple serving packages or containers, so long as the serving sizes are based on the same unit of measurement. Many of the comments stated that this uniformity in serving size within each product class is essential if consumers are to make meaningful comparisons among competing foods.

The ability to make comparisons among products is important to assist consumers to change their food consumption patterns to conform to dietary guidelines such as the National Academy of Sciences' report on "Diet and Health, Implications for Reducing Chronic Disease Risk" (Ref. 4), "Nutrition and Your Health, Dietary Guidelines for Americans" (Ref. 5), and "The Surgeon General's Report on Nutrition and Health" (Ref. 6). These guidelines frequently suggest increasing the intake of one type of food (e.g., skim milk) while reducing the intakes of other foods (e.g., whole milk) as a means of meeting dietary guidelines such as reduced fat intake. Thus, a common basis for direct comparisons among different types of foods, as well as among similar types of foods, is helpful to consumers wishing to change their dietary choices and patterns to be more consistent with recent dietary recommendations.

The ability to make comparisons also facilitates FDA's enforcement of various provisions of its labeling regulations. Such comparisons provide a ready means of determining whether a substitute food is nutritionally inferior to the food that it resembles (21 CFR 101.3). Moreover, it provides a means of ensuring that adjectival descriptors (e.g., "reduced sodium") actually describe the nutritional quality of the food and not just a change in serving size.

For all these reasons, FDA tentatively concludes that serving sizes should be standardized by specific units of measurement.

**3. Conclusion**
Therefore, FDA tentatively concludes that serving sizes should be based on the average level of consumption by the population groups for which the food is intended, be declared in both U.S. and metric measures, and be standardized based on those units. In developing a regulation that reflects these conclusions, the agency considered three other factors:

a. Given its current efforts to harmonize labeling practices with Canada, the European community, and other members of the Codex Alimentarius Commission to facilitate international trade, the agency sought to formulate standards for serving sizes that are as consistent as possible with international practices.

b. To maintain flexibility in the package and container sizes that can be used by industry, the agency sought to develop a regulatory scheme that takes into account the fact that FDA cannot mandate standardized containers. Manufacturers have had a long history of using unique types of packages for their products. For this reason, several comments expressed concern that unnecessary changes in serving size requirements would affect flexibility in packaging, could damage product identification, and could place a considerable burden on the manufacturer.

c. To maintain flexibility for changing, revising, and updating serving sizes as changes occur in dietary patterns of the **\*29521** U.S. population and as food products in the marketplace change, the agency tentatively decided, as will be discussed in detail later in this document, to provide for a mechanism by which standardized serving sizes could be modified or could be developed for new classes of food.

### *B. Regulatory Options*

FDA identified five possible options for implementing its tentative conclusions on serving sizes. These options were as follows: (1) Maintain the current system in which manufacturers develop their own serving sizes; (2) allow manufacturers to develop their own serving size using criteria and procedures established by FDA; (3) adopt a single uniform serving size for all products, e.g. 100 g (or 100 mL) or 1 oz (28 g); (4) develop standard serving sizes on a food-by-food basis that are derived from nationally representative food consumption surveys and also include a petition process to provide a mechanism by which interested parties can add to or amend the standard serving sizes; and (5) use some combination of approaches, e.g., dual labeling of nutrition information based on two different serving size approaches. There are advantages and disadvantages to each of these options. Although FDA has tentatively chosen option 4, the agency solicits comments on which option will best serve the goals previously discussed.

### 1. Manufacturers Establish Serving Size

The first option, to permit manufacturers to establish their own serving sizes, obviously provides maximum flexibility for the food industry. Most of the food industry comments preferred this approach. However, this approach would provide little likelihood that any of the agency's other tentative conclusions would be met. For example, such an approach would not address the large number of concerns expressed by consumers about the confusion engendered by multiplicity of serving sizes in the marketplace. Furthermore, FDA believes that, given its proposal to make nutrition labeling mandatory on most foods, standard serving sizes will, in fact, be useful to manufacturers, especially in developing labels for products not previously labeled.

### 2. FDA Develop Criteria for Establishing Serving Size

The second option, to permit manufacturers to develop their own serving sizes by applying criteria established by FDA, was FDA's first choice when work began on this proposal. Several comments on the ANPRM, including some from industry, supported this option. The agency believed that while this option might not produce standardized serving sizes, there would be enough similarity in serving sizes to permit comparison of values for nutrients within the same types of products having similar usage. By basing the criteria and procedures on available and appropriate food consumption data bases, FDA also anticipated that manufacturers could obtain serving sizes that approximated average consumed intakes. The agency intended to make standardization of declaration units part of the criteria. The agency believed that this option would provide flexibility for manufacturers and not be a particular burden for the agency.

FDA, however, ran into major problems in attempting to develop criteria and procedures to implement this option. After defining what seemed to be reasonable criteria and procedures for using available data bases to estimate the average consumed serving sizes, which are described below, FDA tried to calculate serving sizes for several foods to evaluate the usefulness of the draft

criteria and procedures. What quickly became apparent was that the food consumption data bases could be used as a starting point and as a guide, but that numerous problems still had to be addressed, almost on a food-by-food basis, in arriving at a usable serving size for nutrition labeling purposes. Because of these problems, FDA has tentatively concluded that it is not possible to develop criteria or detailed enough guidelines to ensure that manufacturers and others using the same data bases and same set of instructions would necessarily come up with the same or even similar serving sizes.

Three examples can be given to illustrate the problems with establishing general criteria and procedures.

Example 1: Standard Serving Size for Frozen Desserts. FDA grouped ice cream, ice milk, frozen yogurt and sherbet together because they are frozen desserts that can be substituted for each other. Because of the variability in intakes among the four groups in the most recent (1977 and 1978) USDA Nationwide Food Consumption Survey (NFCS), the data base used by the agency, FDA considered the median as well as the mean in setting the standard serving size for this food group.

```
-------------------------------
Food Group Mean Median
-------------------------------
(cup) .. (cup)
Ice cream .......... 0.8 ... 0.8
Ice milk ........... 0.8 ... 0.7
Frozen yogurt ...... 0.6 ... 0.5
Sherbet ............ 0.8 ... 0.8
-------------------------------
```

After considering all of these values, the agency determined that the reasonable serving size for these products is 0.75 or ¾ cup. However, because some products in this category are sold in distinct shapes (e.g., bars or sandwiches) and cannot be measured in a cup, FDA set the standard serving size at 6 fl oz which is equivalent to ¾ cup.

Example 2: Standard Serving Size for Coffee. FDA considered both the mean and median intakes in setting a standard serving for coffee. The mean consumed serving size per eating occasion for coffee was 11 fl oz, and the median consumed serving was 8 fl oz. Because multiple servings of coffee are commonly consumed per eating occasion, and because many coffee cups hold 8 fl oz, FDA determined that the median 8 fl oz is more reasonable as the standard serving size for coffee than the mean consumed serving size.

Example 3: Standard Serving Size for Stews, Soups, and Dinners for Toddlers. Stews, soups, and dinners for toddlers were not reported in the 1977 and 1978 NFCS but are in the marketplace today. The average amount of similar items consumed by toddlers in the NFCS was 6 oz, which is the manufacturers' suggested serving size on labels of these toddler foods. Therefore, FDA determined that 6 oz is the appropriate standard serving size for toddler stews, soups, and dinners.

As can be seen in the above examples, the food consumption survey data did not necessarily provide information that led to a single reasonable serving size for products that are used interchangeably in the diet. Generally, a decision had to be made for each product category as to what is the most reasonable serving size.

Thus, FDA did not select this option because of its inability to develop criteria and procedures that are detailed enough to ensure that uniform serving sizes for similar products would result from their use. However, because of the many advantages of this option, FDA requests comments on criteria that would ensure uniform serving sizes.

**3. FDA Adopt a Single, Uniform Serving Size**
The third option, to adopt a uniform serving size for all products, e.g., 100 g (or 100 mL) or 1 oz (28 g), has the **\*29522** advantage of being simple, straightforward, and easy to develop, implement, and monitor. It would allow comparisons of nutritional value across all foods on an equal weight basis. The 100 g (or 100 mL) basis would provide harmonization with many other countries, thus facilitating international free trade (Refs. 7 and 8). A major disadvantage of this approach is that foods are

not necessarily consumed in 100 g or 1 oz quantities, and it does not respond to the strong consumer sentiment expressed to FDA that nutrition information should relate to commonly consumed amounts. FDA also has taken into consideration consumer experience and understanding in determining the most effective basis for nutrient declaration. In 1981, FDA conducted a survey of consumers, nutritionists, and food industry representatives concerning what nutrition information they thought should be included in food labels to make those labels most useful to consumers in improving nutritional status and reducing dietary health problems. All groups of respondents preferred having nutrition information continue to be presented on a per serving basis rather than per 100 calories or per 100 g (Ref. 9).

Moreover a metric value (100 g), rather than 1 oz, as the basis for standardization would be confusing to many American consumers. Use of 1 oz, on the other hand, would do nothing to facilitate trade.

For all these reasons, FDA has tentatively concluded not to put forward this option. Because of its potential usefulness, however, FDA requests comments on ways to make this approach more meaningful to consumers.

### 4. FDA Establish Standard Serving Sizes With a Petition Process

The fourth option, to have FDA develop standard serving sizes with a petition process to provide a mechanism by which interested parties could add to or amend the established serving sizes, is the basic approach incorporated in this document.

Many comments stated that uniformity in serving size within each product class is essential to allow consumers to make meaningful comparisons among competing foods. Several industry comments requested that FDA not adopt this option until it had received substantial input from the affected industry.

FDA is publishing as part of this regulation, proposed standard serving sizes for 159 food product categories (see proposed § 101.12(b), Tables 1 and 2). These product categories cover virtually all of the foods reported as being consumed by the U.S. population in the NFCS of 1977 and 1978 (Ref. 10). FDA also has added several serving sizes for newer foods in the marketplace that were not available at the time of that survey.

This approach is consistent with most of the agency's tentative conclusions with respect to serving size. It maximizes standardization for declaration of nutrition labeling information for most foods that are similar in type and in dietary usage, and it also standardizes the bases for nutrition claims across all foods that are similar in type and usage. At the same time, under this approach, manufacturers have maximum flexibility in establishing container or packages sizes, including single-serving containers, but have reduced motivation for "manipulating" these sizes to be able to make positive nutrition claims. Because this approach is directly linked to food consumption data bases, serving sizes developed under this approach will be based on the amount commonly consumed per eating occasion as reported by NFCS survey respondents and thus will meet the objective that serving size be based on a reasonable quantity of food.

Moreover, the agency is providing for a petition process to add or to amend the standardized serving sizes. While the petition process may be time-consuming, the need to update the listing of serving sizes should be minimal. The food product categories, as described, represent virtually all foods reported in the 1977-1978 NFCS as well as all food products currently in major supermarkets. The need for changes in standard serving sizes can be evaluated periodically as new food consumption data become available.

A major disadvantage of this approach is that serving sizes will differ by type of product, and thus comparison of nutritional value across a broad range of products will be limited. However, the agency has tried to minimize the significance of this factor by using oz for units as consistently as possible for all serving sizes. The other disadvantage is that this option will not be consistent with international practices, and thus it will not facilitate free trade.

FDA urges consumers, health professionals and their professional societies, and the various food industries and their associations to provide comments and suggestions in response to the approach the agency is taking. FDA will give all comments careful consideration in developing any final rule based on this proposal.

**5. Dual Declaration Based on Standard Serving Sizes and a Uniform Serving Size**

A fifth option to permit manufacturers to use dual declaration of nutrition information on the basis of both standard serving sizes developed by FDA and a uniform 100 g (or 100 mL) serving, is proposed in this document as an option for manufacturers. The agency has included the 100 g (or 100 mL) serving size, rather than 1 oz (or its equivalent), as the optional second mode of declaration because of its utility in international trade, where declaration on a metric basis is already the common practice, and because of the ease in calculating percentages for fractional units.

While this option would effectively meet virtually all of the agency's objectives for serving sizes, dual declaration of nutrition information on the basis of both a standardized and a uniform 100 g (or 100 mL) serving size would also effectively double the amount of nutrition information per container. Given the large amount of nutrition information proposed for inclusion on the label, the agency has decided not to propose to make this dual declaration mandatory but requests comments on whether it should be made mandatory on some or all foods. The agency intends to test the ability of consumers to use dual declaration as part of the testing of formats for nutrition labeling that the agency will conduct as part of this food labeling initiative.

Although not proposed, several alternative approaches for dual declaration are also possible. One alternative would be to allow manufacturers to set their own serving sizes but to require a 100 g declaration to provide a basis for comparisons across different types of products. This approach is analogous to the current common practice of many retail stores of providing shelf labeling information on container and unit costs of products. Consumers' acceptance of, and ability to understand, unit pricing information suggests that consumers may likewise be able to understand and be able to benefit from nutrition and other food label information based upon a standardized unit declaration. The agency specifically requests comments on the usefulness of such an approach.

Additional information about consumer experience with, and response to, unit pricing could provide valuable insights into the effects of the various options under consideration. For example, has unit pricing led to any **\*29523** desirable or undesirable outcomes in terms of product quality or in other ways? Are there important differences between food and nonfood items with respect to these effects? FDA seeks comments on the applicability of the unit pricing experience analogy to nutritional information, as well as any supporting data and studies. FDA plans to incorporate all useful information into its analysis of the options being considered.

Another alternative would be to have the uniform serving size be based on 1 oz rather than in metric units. This approach also would accommodate consumers' negative reactions to use of metric units. FDA requests comments on the concept of dual declaration of nutrition information and on how this approach could be developed.

**IV. The Proposed Regulation**

*A. General Description*

**1. Introduction**

The agency is proposing in § 101.9(b) to retain the current requirement that nutrition information in the labeling of food be declared in relation to a serving or, where the food is customarily not consumed directly, in relation to a portion of the food. Likewise, the agency is retaining current § 101.9(b)(2), redesignated as § 101.9(b)(4), which defines standard household measures.

Section 101.9(b) currently allows for the optional use of a column of figures to declare nutritional information in relation to the average or usual amount of the food consumed on a daily basis. The agency is not aware of any food labels other than some brands of breads and muffins, that take advantage of this part of the regulation, and, therefore, to simplify the regulation, FDA is proposing to delete this provision.

In contrast, § 101.9(b)(3), which provides for the use of an additional column of figures to declare nutrient information on the basis of the food as consumed, is used extensively for foods that are combined with other ingredients or that are cooked or otherwise prepared before consumption (e.g., cake and other dry mixes and breakfast cereals). Inasmuch as current § 101.9(b)(3) is repetitive of current § 101.9(d)(2), and because this issue is not directly related to serving size, the agency is proposing in the document entitled "Food Labeling: Mandatory Status of Nutrition Labeling and Nutrient Content Revision," published elsewhere in this issue of the Federal Register, to modify § 101.9(d)(2) to incorporate the provisions of both paragraphs to allow manufacturers to voluntarily declare an additional column of figures on the basis of the food as consumed. Therefore, FDA proposes to delete § 101.9(b)(3).

## 2. Definition of Serving (Portion) Size

FDA is proposing definitions for the terms "serving" (or "serving size") and "portion" in § 101.9(b)(1). The current definition of "serving size" states that it is "the reasonable quantity of food suited for or practicable of consumption as part of a meal by an adult male engaged in light physical activity, or by an infant or child under 4 years of age when the article purports or is represented to be for consumption by an infant or child under 4 years of age." The agency is proposing to modify the definition in two ways.

First, the agency is proposing to define "serving size" as "that amount commonly consumed per eating occasion" by the target population. The agency's approach in this regulation, as in the companion document on RDI's and DRV's, is to calculate values on a population weighted average, rather than on the basis of the adult male. Second, by focusing in the proposed definition on the "amount commonly consumed," the agency is proposing to link the amount of the serving size to objective measures of average serving sizes as reported in appropriate food consumption surveys. This approach is consistent with several comments from the recent food labeling hearings that supported the use of food consumption survey data for establishing serving sizes. In contrast to the proposed approach, the current definition uses the terms "reasonable" and "practicable" to describe the quantity of food that constitutes the serving but does not define those terms.

FDA is proposing in § 101.9(b)(1) to modify the definition of "portion" to state that it is the amount of a food customarily used only as an ingredient in the preparation of "other foods," rather than of "a meal component." This change clarifies that the use of the term "portion" need not be tied to a component of a specific meal. The agency is proposing to establish in § 101.12(b) standard portion sizes for foods that are used primarily as ingredients to assure uniformity for classes of products.

## 3. Description of Serving Size

a. Single-serving container. FDA is proposing in § 101.9(b)(2) that a package containing 150 percent or less of the standard serving size specified in Tables 1 or 2 is a single-serving container. FDA is proposing the cutoff level of 150 percent or less based on a survey conducted by FDA in the Washington, DC area and on FDA's Food Label and Package Survey (Ref. 15). These surveys revealed that 150 percent of the standard serving size covers almost all packages whose contents are likely to be consumed at a single eating occasion. The agency also considers the 150 percent cutoff level to be appropriate for defining single-serving packages because it is well within the one standard deviation of the mean consumed serving size for most product categories.

The agency is also proposing to require that for single-serving containers, the unit of the container, e.g, bar, box, carton, dinner, package, or pouch, be declared as the serving size. Thus, the serving size should be the same as the net weight or volume of the package.

AD128

b. Units of measure used in serving size. FDA is proposing in § 101.9(b)(3) that the serving size be identified in nutrition labeling as that amount specified in column 1 of Tables 1 and 2 of proposed § 101.12(b). The agency is proposing that the metric weight or volume (see column 2 in Tables 1 and 2) be included, for compliance purposes, in parentheses after the serving size.

For some food product categories, the weight of the standard serving size for individual products within the group can vary depending upon the density of the product. For example, the standard serving size for ice creams and frozen yogurts is proposed in column 1 of Table 2 to be 6-fluid ounces (equivalent to ¾ cup). The weight for ¾ cup of ice cream is usually about 100 g, while the weight of ¾ cup of many frozen yogurts is 145 g. Each of these foods can vary greatly depending upon the amount of air incorporated during manufacture into the product. When density varies within a food group, the metric quantity is left blank in Tables 1 and 2. In these situations, under the proposed rule manufacturers will be required to provide the g weight of a standard serving size of their product. FDA can check nutrient content most accurately on the basis of g weight. Moreover, declaration of metric quantity will facilitate international trade. Therefore, the agency has tentatively concluded that metric quantity is an essential part of the serving size.

FDA also is proposing in § 101.9(b)(3) to permit manufacturers to voluntarily declare the serving size in familiar household measures (column 3 in Tables 1 and 2) following the required declaration in U.S. and metric units. This action responds to the many comments that expressed preference for the use of household measures.

 *29524  c. Declaration of number of servings per container. FDA is proposing in § 101.9(b)(5) that the label of a package or container (other than a single-serving container) declare the number of servings to the nearest 0.5 servings. FDA is proposing to require the rounding of number of servings, where necessary, and that this rounding may be indicated by the use of the term "about" before the number of servings. FDA has tentatively concluded that this requirement will help reduce the number of fractional servings declared on nutrition labeling and help reduce consumer confusion. Comments on the ANPRM indicated that consumers do not know how to deal with nutrition labeling claiming 2¾ or 1.4 servings per container.

d. Listing of nutrient contents based on 100 grams or 100 milliliters (voluntary). FDA is proposing in § 101.9(b)(6) to retain the requirement in current § 101.9(b)(3) that nutrient quantities be declared on the basis of the food as packaged. FDA also is proposing in this paragraph to permit, in a separate, additional column, the voluntary declaration of nutrient and other food component information on the basis of 100 g of the product.

### B. Proposed Serving (Portion) Sizes

#### 1. Introduction

FDA is proposing to adopt a new regulation, § 101.12, that will provide a set of standardized serving (portion) sizes for 159 food product categories that food manufacturers are to use declaring nutrient content information for their products. These standardized serving sizes, presented in Tables 1 and 2, should not be interpreted as dietary recommendations. Rather, they represent commonly consumed amounts and therefore are reasonable quantities by which consumers can evaluate the nutritional content of a product. FDA solicits comments on whether there are other categories of food for which serving sizes should be established.

#### 2. General Principles Considered in Determining Serving (Portion) Sizes

FDA used the following general principles in determining the serving sizes listed in § 101.12(b). FDA believes that these principles define the appropriate basis on which to calculate standard serving sizes for nutrition labeling purposes. These principles are set forth in § 101.12(a). The agency solicits comments on these principles.

a. As explained in section IV.A.2., above, serving size should reflect the amount of food commonly consumed per eating occasion by the target population group. To determine this amount of food, a mean, or, where appropriate, median, consumed

serving size should be derived from an appropriate food consumption data base. An appropriate data base must include a large sample and broad representation of the age groups for which the food is intended for use.

b. For nutrition labeling purposes, FDA has considered that foods intended for the general population are intended for persons 4 years of age or older (see companion document entitled "Food Labeling; Reference Daily Intakes and Daily Reference Values" published elsewhere in this issue of the Federal Register). For foods specifically labeled for infants, the target population group includes infants up to 12 months of age. For foods labeled for toddlers, the target population group is children 1 through 3 years of age.

c. Serving size should, as one comment suggested, be based on the edible portion of the food, i.e., inedible parts such as bone, seed, shell, or rind should be excluded. Inedible parts are not consumed and thus do not contribute to the nutritional value of the food.

d. Many foods are consumed both as a serving (i.e., in the form as purchased) and as a portion (i.e., as an ingredient of other foods). For example, butter and margarine are consumed as such and as ingredients of cookies and cakes. Since the amount of such foods used as an ingredient (i.e., portion size) varies tremendously from recipe to recipe, basing the information in the nutrition label on the use of the food in the form purchased (i.e., serving size) will allow for more consistency. Therefore, the serving sizes declared for these foods in nutrition labeling should be based on the use of the food in the form purchased, e.g., 1 tablespoon of butter.

e. Serving size should reflect the major dietary use of the food. For example, milk may be used as a beverage or as a liquid to add to coffee or cereal. Because the major usage of milk is as a beverage, the serving size for milk should reflect the amount consumed as a beverage. However, if the product, as packaged, is intended for other purposes, and that fact is clear from the package, the product should be labeled with the serving size that is consistent with the intended use.

f. Serving size should be uniform for foods that have similar dietary usage and that have similar product characteristics that affect consumption size. For example, all chips and other snacks that are consumed in a similar manner and that can replace one another (such as pretzels and extruded salty snacks) should have the same serving size. If these foods all bear the same serving size, consumers will be able to make comparisons among these products for such factors as sodium content and nutritive value.

**3. Determination of Standard Serving Size**

This section describes in detail the methodology that FDA used in applying the general principles listed in the preceding section to determine the standard serving sizes for nutrition labeling.

a. Selection of food consumption data base. FDA needed a food consumption data base that contained individual food intake data representative of the food consumption practices of the three age groups of interest as its starting point for determining serving sizes. Several large scale, nationally representative food consumption surveys were available. USDA's 1977-1978 Nationwide Food Consumption Survey (NFCS) (Ref. 10), the Second National Health and Nutrition Examination Survey (NHANES II) conducted by DHHS from 1976 to 1980 (Ref. 11), and USDA's Continuing Survey of Food Intakes by Individuals (CSFII), conducted between 1985 and 1986 (Refs. 12 to 14), were the most recent survey data available at the time of this analysis.

FDA chose USDA's 1977-1978 NFCS as the data base for determining the standard serving sizes because it contained: (1) The largest number of persons, 30,777; (2) data on 3-day dietary intakes; and (3) data for all ages.

Results from two more recent nationwide food consumption surveys, the NFCS conducted by the USDA in 1987-1988 and the NHANES III conducted by the DHHS, would have been helpful in assuring that the results from the 1977-1978 NFCS are still appropriate. However, neither data base was available to FDA at the time of this serving size data analysis. The NHANES III is currently in the field data collection stage, and results from USDA's 1987-1988 NFCS are not yet publicly available. If

data from these surveys become available within the necessary time frame, they will be used by the agency in preparing the final rule on serving sizes.

b. Steps for determining standard serving sizes from data base. Using the food intake data from the selected data base (i.e., USDA's 1977-1978 NFCS (Ref. 10)), FDA determined standard serving sizes for 159 food product categories. The agency made its determinations based on the steps listed below. The agency's computations for each product **\*29525** category are on file at the Dockets Management Branch (Ref. 15). The agency welcomes public comment on its method for determining serving size.

i. Step 1. FDA first grouped all food products into 10 major food groups according to the food grouping system used by the USDA for the NFCS (Ref. 15). The 10 groups are milk and milk products; meat, poultry, fish, and mixtures containing these products; eggs, mixtures with eggs, and egg substitutes; dry legumes, nuts, and seeds; grain products; fruits; vegetables; fats, oils, and salad dressings; sugars, sweets, and beverages; and miscellaneous foods such as soy sauce, steak sauce, and vinegar.

FDA further divided the foods within each of these major food groups into smaller food groups by product class. For example, milk and milk products were divided into such groups as milks, cheeses, and ice creams. The agency then further divided foods within each of these product classes into subgroups according to dietary usage and other characteristics that were likely to affect the levels of consumption of foods within the product class. For example, FDA divided cream into two subgroups, fluid cream and powdered cream and pickles into 5 subgroups: dill pickles, sour pickles, sweet pickles, relishes, and olives.

The agency grouped the foods in this way to assure that only those foods that were likely to have similar levels of consumption were included in the final food group used for the consumed serving size data analysis. The resultant food groups represented the preliminary product categories.

ii. Step 2. Because the survey data in the 1977-1978 NFCS were collected for purposes other than for estimating serving sizes, food groupings used in the survey often contained foods differing in consumed serving size. Consequently, FDA had to select the foods from a specific grouping that it would use to calculate the mean serving size for the particular product category.

For example, because incomplete information was obtained from survey respondents, baby foods that were not fully described could have been either the "strained" type (intended for use by younger infants) or "junior" type (intended for use by older infants). These two types of food differ in consumed amount. As a result, the agency did not use these foods to determine serving sizes for either "strained" or "junior" type baby food. In determining the consumed serving size of the "strained" or "junior" type baby foods, the agency based its computations on only those baby foods that were specifically identified as "strained" or "junior" type in their names.

Moreover, some survey foods did not represent the foods available in the marketplace, and thus the agency did not include these foods in estimating consumed serving sizes for nutrition labeling. For example, to estimate consumed serving size of breads, the agency included only untoasted breads, not toasted breads.

iii. Step 3. FDA determined the mean and the median consumed serving sizes per eating occasion for each preliminary product category.

iv. Step 4. FDA converted the g weight of the mean consumed serving size determined in step 3 to measures that are more meaningful for nutrition labeling purposes, i.e., to household measures such as oz, fl oz, cups, tablespoons, and teaspoons. The agency used the g to household measure units described in the USDA's "Manual of Food Codes and Conversions of Measures to Gram-Weight for Use with Individual Food Intake Data from the 1977-1978 Nationwide Food Consumption Survey" (Ref. 16) to convert g weights to household measures. It was necessary to make this conversion at this time, rather than after the aggregation of foods into final standard serving size groups, because of differing densities among similar types of foods. For example, while frozen yogurts and ice milk were ultimately grouped together into one category (see step 6 below) because they

are substitutable in the diet, their conversions to household units were done separately because the average weight of 1 cup of ice milk is about 131 g, and the average weight of 1 cup of frozen yogurt is about 193 g.

In converting the g weight to the household measure, the agency used the following general criteria in determining whether weight or volumetric measures should be used: Volumetric measures were used: (1) For beverages and (2) if all foods in the food group are usually measured on a volume basis by consumers, e.g., honey, syrups. preserves, and salad dressings. Weight measures were used: (1) If foods in the food group are usually not measured on a volume basis, e.g., fish and pizzas; (2) if the food is sold in large distinct shapes or pieces such as muffins, doughnuts, candy bars, and cookies; and (3) if some foods in the group are often measured by weight, but others are measured by volume (e.g., for fruits and vegetables, small berries and green peas may be measured by volume (cup), but many whole fruits and vegetables (e.g., broccoli spears) cannot).

v. Step 5. FDA next rounded the mean consumed serving size in household measures to a more meaningful measure (e.g., 3.8 oz of fish to 4 oz, 0.6 cup of stuffing to 2/3 cup, and 0.9 cup of milk to 1 cup) to establish preliminary serving sizes. In rounding the values, FDA considered the median consumed serving size as well as the mean. For example, if the mean was 2.3 oz and the median was 1.6 oz, the agency rounded the mean down to 2 oz rather than up to 2.5 oz.

vi. Step 6. FDA collapsed the product categories further to combine product categories that had the same or similar preliminary serving sizes to reduce the number of product categories. For example, mayonnaise, sandwich spread, and mayonnaise-type dressings of the fats and oils category had similar preliminary serving sizes, and thus FDA combined them into one product category.

vii. Step 7. Finally, to confirm that all products currently on the market were covered and to test the feasibility of the preliminary serving sizes against current practices in the marketplace, FDA staff checked the labeling of most food products that were available in major chain grocery stores in the greater Washington, DC metropolitan area. The agency also took into account the serving sizes used by the manufacturers, as reported in FDA's Food Labeling and Packaging Survey (Ref. 17) in this step. As a result, the agency made some adjustments to the preliminary serving sizes to make them compatible with the current marketplace.

Because food consumption surveys report amounts of foods as consumed, information on the consumed serving sizes of many foods that are customarily used as ingredients (e.g., tomato paste, tomato sauce, and pie crust) was not available in the NFCS. In addition, many products introduced into the food supply since the 1977-1978 NFCS (such as frozen entrees and meals; snack mixtures; fruit snacks; new varieties of breakfast cereals; and baby fruits, vegetables, and dinners in dry mixes) were identified through the informal survey of the grocery stores. When appropriate food intake information was not available in the food consumption data base, FDA determined serving size by taking into consideration: (1) Serving sizes currently used by the manufacturers, (2) dietary usage of the product, and (3) consumed serving sizes of similar type of products if available.

### 4. Presentation of Serving Sizes

a. Standard Serving Sizes. The standard serving sizes calculated by **\*29526** FDA using the methods and principles discussed above are proposed in § 101.12(b). Paragraph (b) contains two tables. Table 1 lists proposed serving sizes for foods represented or intended to be for use by infants and toddlers, and Table 2 lists proposed serving sizes for foods intended for use by persons 4 years of age and older. For both tables, the agency based the calculations on the appropriate consumed serving sizes reported for the target group.

Because there are only a few products on the market specifically intended for toddlers, the agency grouped these foods with baby foods. However, in determining serving sizes for toddler foods, the agency used the average amounts of these foods consumed by children aged 1 through 3 years.

The standard serving sizes are generally presented in oz and fl oz. For a few product categories, however, the agency has determined that other household measures, such as cups, tablespoons, teaspoons, or g, are more appropriate standards. The

agency made these determinations because the density of the product within the product category differs among brands, or because the amount of the product that is used is too small to be expressed in oz. For example, the serving size for salt is so small (1 g) that it could not be expressed in any meaningful household unit, and thus the agency has tentatively decided to express it in g.

Portion sizes of foods that are almost always consumed as a component of another food, such as pie crust, pie filling, or cake frosting, also present a problem. Consistent with the agency's tentative conclusion that serving sizes should reflect the amount of food commonly consumed, the agency is proposing in § 101.12(c) that the approximate amount normally used to make one serving of the final product, that is, the pie or cake, as consumed, shall constitute the serving size for these types of products.

b. Serving sizes for fresh fruit. Based on consumption data, the standard serving size for fresh fruits is 5 oz. The only exception to this amount is watermelon. Based on consumption data, FDA has calculated that the average amount of this fruit consumed per eating occasion is 12 oz. However, all fruits do not lend themselves equally to 5 oz serving sizes. Some fruits, like grapefruit, are larger than 5 oz. Others, like blueberries and strawberries, are smaller than 5 oz. Therefore, to accommodate these variations in fruit size, the agency is including three food product categories to cover most fresh fruit in § 101.12(b).

The agency recognizes that many fresh fruits (e.g., apples, oranges, and pears) are almost always consumed at a single eating occasion. These foods are analogous to single-serving containers. Thus, one category of fresh fruits that FDA is proposing to establish would include those fruits that, consistent with the agency's general treatment of single-serving containers, per piece weigh 50 percent or more, but less than or equal to 150 percent, of the standard serving size. Since the standard serving size for fresh fruit is 5 oz, fresh fruit with an average edible portion weight of more than 2.5 oz but less than 7.5 oz would fit within this category. The nutrition label for these fresh fruits could state that the serving size is one piece of fruit.

The second category of fresh fruits would include those that generally weigh less than 50 percent of the standard serving size. Fifty percent appears to be a reasonable cutoff level because, for fruits with an edible portion weighing less than 2.5 oz. per piece, consumers generally eat more than one piece per eating occasion. Although these smaller fruits would use the standard serving size (e.g., 5 oz. (140 g) for blueberries), to enable consumers to visualize the serving size, the agency has provided for the additional voluntary declaration of the number of fruits or cups of fruit that approximate the standard serving size (e.g., 1 cup of blueberries or 3 apricots).

The third category would include those fresh fruits that as a whole piece exceed 150 percent of the standard serving size. These fruits generally are served in fractional pieces (e.g., ½ grapefruit). Thus, the serving size for this type of fruit would be a 5 oz. piece of the fruit. In addition, the nutrition label would state the approximate number of servings per fruit.

It is important to bear in mind that nutrition labeling of fresh fruits will generally be based on data bases, as discussed in the document entitled "Food Labeling; Mandatory Nutrition Labeling and Nutrient Content Revisions," published elsewhere in this issue of the Federal Register. The weights of average sizes of the various types of fruits will be determined as a part of the process of developing the data base.

c. Metric Quantity. Column 2 of both proposed Tables 1 and 2 (§ 101.12(b)) specifies the metric quantity equivalent to the standard serving size. As stated earlier, FDA is proposing to require that serving size be declared first on the label in the specified standard serving size followed by the metric quantity in parentheses, e.g., 2 oz. (56 g). Where the metric quantity is left blank in the tables, manufacturers will be required, if this proposal is adopted, to provide the g weight of the standard serving size of their product. (See section IV.A.3., above.)

d. Household Units. In declaring the serving size on the label, manufacturers may also express the standard serving sizes in more easily visualized household units, e.g., pieces, cups, tablespoons, teaspoons, and jar. In the interest of uniformity, FDA is proposing the household units appropriate for each product category in column 3, entitled "voluntary household measures", of Tables 1 and 2 (§ 101.12(b)).

e. Products requiring further preparation. Unless otherwise stated in the product category name (e.g., coffee, instant, dry), serving size values proposed in Tables 1 and 2 represent the amount of the ready-to-serve, or almost ready-to-serve (e.g., heat and serve, and brown and serve), form of the product. For a few categories of dry products, such as dry pastas, dry legumes, and dry coffee, that come in relatively uniform forms, FDA was able to determine a reasonable standard portion size based on the consumed serving size of the prepared form of the food. To convert the amount as consumed to the amount in dry form, the agency used the percent yield reported in "Food Yields," published by USDA (Ref. 18), and other pertinent information (e.g., manufacturer's directions). However, in general, FDA has not listed dry mixes and concentrated products as separate food product categories. These products vary greatly in their ingredients and degree of concentration. Therefore, as proposed in § 101.12(c), portion sizes of dry mixes and concentrates will have to be determined by the manufacturer based on the amount required to make one standard serving of the prepared form of the product.

Other unprepared forms of products such as doughs, batters, and raw fish and shellfish are also not listed as separate categories. It is not possible or practical to determine standard serving sizes for these forms because percent yields may differ among products within the same product category, and appropriate percent yield information is not available for many foods. For example, 4 oz. of several different species of raw fish will yield different cooked weight, depending, in part, on the moisture content of the raw food. Therefore, as proposed in § 101.12(c), the serving size of such products that require further cooking will have to be determined by the manufacturer based on the amount required to make one **\*29527** standard serving of the prepared form of the product.

f. Other related matters. As discussed in section III.A (above), several comments stated that some manufacturers appear to have manipulated serving sizes of their products so that a per serving content would allow claims such as "low calorie" or "low sodium." To address these concerns and similar concerns regarding imitation or substitute foods (as defined in § 101.3(e)), FDA is proposing in § 101.12 (d) and (e) that the serving size for an imitation or substitute food or for a modified version of the food, such as a "low calorie" version of a food, will have the same serving sizes as those of the regular counterpart foods. Thus, imitation foods or foods such as "low calorie" or "low sodium" versions of a food are not listed as separate categories in Table 2 of proposed § 101.12(b).

Certain foods for special dietary use, such as dietary supplements and infant formulas, are not included in Tables 1 and 2. For such products, serving size would be specified by the manufacturer on the label in compliance with other regulations.

### 5. Use of Serving Size To Evaluate Adjectival Labeling Descriptors

For compliance purposes, FDA is proposing to utilize the standard serving sizes, rather than the actual container or package size, to determine whether the use of adjectival labeling descriptors, such as "low calorie" or "low sodium," is appropriate on foods in multi-serving packages and in single-serving containers and packages that contain 100 percent or less of the standard serving size. For example, where a product for which the proposed standard serving size is 12 fl. oz. e.g., carbonated beverages, is sold in an 8-fl. oz. container, a manufacturer would be able to use the term "very low sodium" on the label only if the beverage contains 35 milligrams or less sodium on a 12 fl. oz. basis. However, for single-serving containers and packages that contain more than 100 percent but no more than 150 percent of the standard serving size, the agency is proposing that the entire contents of the container be the basis for determining whether the food meets the criteria for allowable use of an adjectival descriptor.

The major advantage of this proposed requirement is that the adjectival descriptors on all foods in the marketplace will have a consistent basis. This standardization will eliminate a potential source of confusion for consumers. It will also eliminate the motivation for manufacturers to use unreasonably small single-serving containers to qualify for adjectival labeling, particularly for those nutrients for which moderation in intake is recommended, e.g. calories, sodium, fat, and cholesterol.

The major disadvantage to this approach for determining eligibility for use of adjectival descriptors for single-serving packages is the potential for the appearance of inconsistencies between two similar or identical products, one of which falls at or below 100 percent of the standard serving size and the other of which falls between 100 and 150 percent of the standard serving size.

However, in weighing the trade-off of this type of confusion against allowing products whose container size falls between 100 and 150 percent of the standard serving size to base their adjectival descriptors on a smaller serving size value than is actually likely to be consumed, the agency tentatively concluded that accuracy in terms of what consumers would be eating was more critical than reference to a standard serving size. Another disadvantage is the potential for manipulation of the net content of a package to slightly exceed 150 percent of the standard serving size and thus for the food to be considered to contain two servings instead of one. This change might make the product eligible for use of adjectival descriptors. Regardless of where the cutoff is, however, this type of manipulation can occur.

In arriving at the proposed approach, FDA considered two other solutions. The first option would be to always base adjectival descriptors on standard serving sizes, regardless of whether the single-serving container fell above or below the standard serving size. To help avoid confusion for comparisons of the nutritional contents between single-serving and multi-serving containers, however, the term "per container" rather than "per serving" would be used on the nutrition label of single-serving containers.

This approach has the advantage of simplicity. Moreover, like the proposed approach, it would eliminate the motivation for manufacturers to use very small serving sizes to become eligible for use of adjectival descriptors. However, because single-serving containers between 100 and 150 percent of the standard serving size could contain more of the nutrients or food components than is permitted by the definition for an adjectival descriptor, this approach might create confusion and misunderstanding among consumers as to the standards on which foods qualify for use of the descriptor.

A second option would be to allow (or require) dual declaration of nutrition information on single-serving containers. One column of nutrition information would be on the basis of "per container." The second column of nutrition information wold be based on the standard serving size and would also be the basis for use of adjectival descriptors. A major advantage of this approach would be the standardization of eligibility for adjectival descriptors across all single-serving container sizes and also with multi-serving container sizes. Another advantage would be to enhance the ability of consumers to make direct comparisons of the nutritional content of multi-serving containers with single-serving containers. Additionally, consumers could clearly see the relationship between the basis for the adjectival descriptor and the amount of nutrient in the container. The obvious disadvantage of this option is that an extra column of information would be required, which would add information to an already crowded label.

Because of clear advantages and disadvantages to both the proposed approach as well as to the alternate approaches described here, the agency is requesting comments on how best to determine compliance for adjectival descriptors on single-serving containers.

### 6. Petition Process

FDA is proposing in § 101.12(g) to establish, in addition to the current requirements prescribed in 21 CFR part 10, a procedure whereby interested persons may petition the agency to amend an established serving (portion) size or to establish an appropriate serving (portion) size for a product not covered in proposed § 101.12(b).

FDA is proposing to require that a petition to establish or to amend a serving size be consistent with the general determinations set forth in proposed § 101.12(a), and that it must include: (1) A description of the product; (2) a description of the form (e.g., dry mix, frozen dough) in which the product will be marketed; (3) the intended dietary use of the product (e.g., milk as a beverage and not as an addition to cereal); (4) the population group for which the product will be offered for use (e.g., infants, children under 4 years of age); (5) the names of the most closely-related products (or in the case of foods for special dietary use and imitation or substitute foods, the names of the products for which they are offered as substitutes); (6) the suggested serving size (the amount of edible portion of food as consumed, excluding bone, seed, **29528** shell or other inedible components) for the population for which the product is intended; (7) for products that require cooking or the addition of water or other ingredients, the amount of edible portion of food required to make the suggested serving of prepared food; and (8) methodology and procedures that were used to determine the suggested serving size.

**V. Other Affected Rules; Revision of 21 CFR 101.8**

The agency is proposing to revise 21 CFR 101.8(a) to provide that where nutrition information is required, and firms elect to place statements on product labels concerning the number of servings in a package in locations in addition to the location where nutrition information is placed, such statements must be in the same terms as are used for nutrition information. This proposed revision is needed to prevent consumer confusion over serving size.

**VI. References**

The following information has been placed on display in the Dockets Management Branch (address above) and may be seen by interested persons between 9 a.m. and 4 p.m. Monday through Friday.

1. U.S. Department of Agriculture, "Composition of Foods, Raw, Processed, Prepared, Human Nutrition Information Service," Washington, DC, Agriculture Handbook No. 8-1 to 8-21, 1976-1989.

2. U.S. Department of Agriculture, "Food," Home and Garden Bulletin No. 228, Science and Education Administration, Washington, DC, 1979.

3. U.S. Department of Agriculture, "Dietary Guidelines and Your Diet," Home and Garden Bulletins 232-1 through 232-7, Human Nutrition Information Service, Washington, DC, 1986.

4. Committee on Diet and Health, Food and Nutrition Board, Commission on Life Sciences, National Research Council, "Diet and Health, Implications for Reducing Chronic Disease Risk," National Academy Press, Washington, DC, 1989.

5. U.S. Department of Agriculture and U.S. Department of Health and Human Services, "Nutrition and Your Health, Dietary Guidelines for Americans," Home and Garden Bulletin No. 232, U.S. Government Printing Office, Washington, DC, 1985.

6. "The Surgeon General's Report on Nutrition and Health," DHHS (PHS) Publication No. 88-50210 (GPO Stock No. 017-001-00465-1), U.S. Government Printing Office, Washington. DC, 1988.

7. Codex Alimentarius Commission, Codex Alimentarius, vol. VI, Codex Standards and Guidelines for the Labeling of Foods and Food Additives, 2 ed., reference No. CAC/GL-1985, Food and Agriculture Organization of the United Nations/World Health Organization, 1985.

8. Commission of the European Communities, amended proposal for a Council directive on nutrition labeling rules for foodstuffs intended for sale to the ultimate consumer, Com (89) 420 final—Syn 155, Brussels, Belgium, August 1989.

9. Heimbach, J.T., and Stokes, R.C., "Nutrition Labeling for Today's Needs," National Technical Information Service, Springfield, VA, Publication No. PB82154402, 1981.

10. U.S. Department of Agriculture, USDA nutrient data base for individual intake surveys, release no. 1, accession No. PB82-128504, Springfield, VA, National Technical Information Service, 1982.

11. U.S. Department of Health and Human Services, National Center for Health Statistics, National Health and Nutrition Examination Survey, Cycle II, 1976-80, NHANES II 24-hour recall/specific food item, magetic tape no. PB82-142639, Springfield, VA, National Technical Information Service, 1982.

12. U.S. Department of Agriculture, CSFII: four days food intake for women and their children 1-5, 1985, accession no. PB88-201249/HAE, Springfield, VA, National Technical Information Service, 1988.

**AD136**

13. U.S. Department of Agriculture, CSFII: one day's intake data for men 19-50 years of age, 1985-1986, accession no. PB87-197141/HAE, Springfield, VA, National Technical Information Service, 1987.

14. U.S. Department of Agriculture, CSFII: four days food intake for women 19-50, children 1-5, 1986, accession no. PB89-154355/HAE, Springfield, VA, National Technical Information Service, 1989.

15. Park, Youngmee K., memo to file, June 15, 1990.

16. U.S. Department of Agriculture, "Manual of Food Codes and Conversions of Measures to Gram-weight for use with Individual Food Intake Data from the 1977-78," Nationwide Food Consumption Survey, working copy, November 1, 1979.

17. Center for Food Safety and Applied Nutrition, Division of Consumer Studies, food label and package survey (FLAPS), 1986.

18. Agricultural Research Service, "Food Yields Summarized by Different Stages of Preparation," Agriculture Handbook No. 102. Washington, DC, U.S. Department of Agriculture, 1975.


**VII. Preemption**

Numerous comments at the public hearings and on the ANPRM suggested that these Federal serving size regulations should explicitly preempt any State regulations on serving size. The preemption issue is complex and divisive: whether a uniform, national label is necessary for consumers and manufacturers to function in the marketplace versus whether States should be permitted to require additional information for their residents. The input of States, as well as consumers, businesses, and other concerned parties is essential in evaluating this matter. FDA therefore requests comment on the issue of whether preemption is appropriate.


**VIII. Environmental Impact**

The agency has determined under 21 CFR 25.24(a)(11) that this action is of a type that does not individually or cumulatively have a significant effect on the human environment. Therefore, neither an environmental assessment nor an environmental impact statement is required.


**IX. Economic Impact**

FDA is proposing several changes to the food product label: mandatory nutrition labeling, revision of the U.S. RDA's and standardization of serving sizes. Because these proposed changes are related and, if adopted, will become effective concurrently, the agency has considered their combined economic impacts and, where possible, separated out the contribution of each. If the proposed mandatory nutrition labeling requirements are adopted, manufacturers will have to change their food product labels. It is reasonable to expect that any additional label changes made to comply with this proposed rule would be implemented concurrently with those label changes being made in accordance with the mandatory nutrition labeling requirements. Thus, no additional costs are expected to be incurred in satisfying the requirements of this rule, as proposed, beyond those costs estimated for compliance with the mandatory nutrition labeling requirements.

Therefore, in accordance with Executive Order 12291, FDA has prepared a Preliminary Regulatory Impact Analysis (PRIA) that projects the combined economic effects of these proposed rules. In addition, this analysis satisfies the requirements of the Regulatory Flexibility Act (Pub. L. 96-354). FDA certifies that this proposed rule to standardize serving sizes on the food label is not a major rule and will not have a significant impact on a substantial number of small entities, including small businesses. The PRIA is on file and may be seen at the Dockets Management Branch (address above).


**X. Effective Date**

FDA is proposing to make these regulations effective 1 year after the publication of a final rule. The agency's normal practice is to make food labeling regulations effective on the uniform compliance date that follows publication of the final rule. FDA periodically (every 2 years) establishes these uniform compliance dates to limit the economic impact of requiring individual label changes on separate dates and to give industry sufficient lead time to make label changes. (The current **\*29529** uniform compliance date for all FDA final food labeling regulations that are published in the Federal Register after January 1, 1990, and before January 1, 1992, is January 1, 1993 (see 55 FR 276; January 4, 1990).) However, the agency considers that a deviation from this practice is appropriate here because of the importance of the changes that the agency is proposing and because of the great consumer interest in these matters.

The agency recognizes that this proposed action will shorten the amount of time that manufacturers have to exhaust label inventories. However, the reduction in time will not be great, and the agency tentatively concludes that any costs that may result will be outweighed by the benefits from the improved nutrition label.

Therefore, in accordance with Executive Order 12291 and the Regulatory Flexibility Act (Pub. L. 96-354), FDA certifies that this proposed rule is not a major rule and will not have a significant impact on a substantial number of small entities, including small businesses. A threshold assessment supporting these findings is on file and may be seen at the Dockets Managements Branch (address above).

**List of Subjects in 21 Part 101**
Food labeling, Reporting and recordkeeping requirements.

Therefore, under the Federal Food, Drug, and Cosmetic Act and under authority delegated to the Commissioner of Food and Drugs, it is proposed that 21 CFR part 101 be amended as follows:

**PART 101—FOOD LABELING**
1. The authority citation for 21 CFR part 101 continues to read as follows:

Authority: Secs. 4, 5, 6 of the Fair Packaging and Labeling Act (15 U.S.C. 1453, 1454, 1455); secs. 201, 301, 402, 403, 409, 701 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321, 331, 342, 343, 348, 371).
21 CFR § 101.8
2. Section 101.8 is amended by revising paragraph (a) to read as follows:
21 CFR § 101.8

**§ 101.8 Labeling of food with number of servings.**
(a) The label of any package of a food that bears a representation as to the number of servings contained in such package shall bear in immediate conjunction with such statement, and in the same size type as is used for such statement, a statement of the net quantity (in terms of weight, measure, or numerical count) of each such serving; however, such statement may be expressed in terms that differ from the terms used in the required statement of net quantity of contents (for example, cupfuls, tablespoonfuls) when such differing term is common to cookery and describes a constant quantity. Such statement may not be misleading in any particular. Where nutrition labeling information is required in accordance with the provisions of § 101.9, however, the statement of the net quantity of each serving shall be consistent with the requirements for serving size expression set forth in that section (e.g., 10 1-cup (240 milliliters) servings). A statement of the number of units in a package is not in itself a statement of the number of servings.
* * * * *21 CFR § 101.9
3. Section 101.9 is amended by revising paragraph (b) to read as follows:
21 CFR § 101.9

**§ 101.9 Nutrition labeling of food.**

AD138

* * * * *

(b) All nutrient and food component quantities shall be declared in relation to a serving or, where the food is customarily not consumed directly, to a portion. The serving or portion size used for a food shall be the serving or portion size established for that food in § 101.12.

(1) The term "serving" or "serving size" means that amount of food commonly consumed per eating occasion by persons 4 years of age or older, or, when the article purports or is represented to be for infants or for toddlers, by infants up to 12 months of age or by children 1 through 3 years of age, respectively. The term "portion" means the amount of a food customarily used only as an ingredient in the preparation of other foods (e.g., 1 ounce flour or 3 ounces tomato sauce).

(2) Unless exempt under the provisions of paragraph (h)(11) of this section, a package or container containing 150 percent or less of the serving size determined in accordance with § 101.12 shall be considered to be a single-serving container. The entire contents of such a package or container shall be labeled as a serving.

(3) Except as provided in paragraph (b)(2) of this section, a label statement regarding a serving (portion) shall be the serving size as set forth in § 101.12(b) and shall be followed by the equivalent metric quantity in parentheses (with weight expressed in grams and volume in milliliters). In addition, serving size may be declared, in parentheses, in terms of the easily identified unit of household measure listed in § 101.12(b) as a "voluntary household measure" (e.g., "2 ounces (56 grams) (2 slices [or about 2 slices])" for bread). The voluntary statement identifying a unit of household measure shall be declared to the nearest half unit corresponding to the standard serving size (e.g., 2.5 pieces). Rounding may be indicated by use of the term "about."

(4) For labeling purposes, a teaspoon means 5 milliliters (approximately one-sixth fluid ounces); a tablespoon means 15 milliliters (approximately one-half fluid ounces); a cup means 240 milliliters (approximately 8 fluid ounces); 1 fluid ounces means 30 milliliters; and 1 ounce in weight means 28 grams.

(5) Number of servings per package or container shall be declared in the nearest 0.5 serving (e.g., 2.5 servings, not 2.3 servings; 7 servings, not 7.2 servings). Rounding may be indicated by use of the term "about" (e.g., about 7 servings).

(6) The declaration of nutrient and food component quantities shall be on the basis of the food as packaged or purchased. Another column of figures may be used to declare the nutrient and food component information on the basis of 100 grams (or 100 milliliters) of the food as packaged or purchased, in the same format as required by paragraph (c) of this section.
* * * * *21 CFR § 101.12
4. Section 101.12 is added to read as follows:
21 CFR § 101.12

## § 101.12 Serving (portion) size.
(a) The general principles that FDA followed in arriving at the serving or portion size set forth in paragraph (b) of this section are that:

(1) The serving (portion) sizes for persons 4 years of age or older should reflect the approximate average amount of food that persons in this population group consume per eating occasion and should be based on data set forth in an appropriate national food consumption survey.

(2) A serving (portion) size for an infant or child under 4 years of age should be calculated to reflect the approximate average amount of food consumed per eating occasion by infants up to 12 months of age or by children 1 through 3 years of age, respectively, and should be based on data set forth in an appropriate national food consumption survey. Such serving (portion) sizes should only be used when the article of food purports or is represented to be for consumption by an infant or by a child under 4 years of age.

(3) Serving size should be based on only the edible portion of food, and not bone, seed, shell or other inedible components;

(4) Nutrition information on products that are consumed as an ingredient of other foods but that may also be consumed in the form in which they are purchased (e.g., butter) should be declared on the basis of a serving size **\*29530** that is based on their use in the form purchased;

(5) Serving size should be based on the major intended use of the food (e.g., milk as a beverage and not as an addition to cereal); and

(6) Foods that have similar dietary usage and product characteristics that affect consumption should be grouped together (e.g., all chips and similar snacks).

(b) The following standard serving (portion) sizes shall be used for food labeling:

```
Table 1.--Standard Serving Sizes: [FN1] Infant and Toddler Foods
----------------------------------------------------------------------------
Product category Standard Label statement Voluntary
serving size household
[FN2] measures
----------------------------------------------------------------------------
(1) .............. (2) ............. (3)
Cereal, dry instant ....... 1/2 ounce
(oz.) ....... 1/2 oz. (14 gram
(g)) ........... XXTablespoon
(tbsp(s)) or
XX cup(s).
Cereal, prepared .......... 4 oz........... 4 oz. (112 g) .... XXJar.
Cookies, teething biscuits
and toasts .............. 1/4 oz......... 1/4 oz. (7 g) ... XXpiece(s).
Cottage cheese ........... 3 oz........... 3 oz. (84 g) ..... XXJar.
Dinner, dessert, fruit,
vegetable or soup, dry
mix .................... 1/2 oz......... 1/2 oz. (14 g) ... XXtbsp(s) or XX
cup(s)
Dinner, dessert, fruit,
vegetable or soup,
junior type ............ 4 oz........... 4 oz. (112 g) .... XXJar.
Dinner, dessert, fruit,
vegetable or soup,
strained type .......... 3 oz........... 3 oz. (84 g) ..... XXJar.
Dinner, fruit, vegetable,
stew or soup for
toddlers ............... 6 oz........... 6 oz. (168 g) .... XXJar.
Egg/egg yolk ............. 2 oz........... 2 oz. (56 g) ..... XXJar.
Juice, all varieties ...... 4 fluid (fl)
oz........... 4 fl oz. (120
milliliters
(mL)) .......... XXCup(s).
----------------------------------------------------------------------------
1 Unless otherwise noted in the product category name, serving sizes are for
the ready-to-serve (RTS) or almost ready-to-serve form of the product (e.g.,
heat and serve and brown and serve). If not listed separately, serving size
for the unprepared form (e.g., dry cereal) is the amount required to make one
serving of the prepared form.
2 Standard serving size established by the Food and Drug Administration (FDA).
These values have been derived primarily from the amount of food commonly
consumed per eating occasion as reported in the 1977-1978 Nationwide Food
```

**AD140**

**Food Labeling; Serving Sizes, 55 FR 29517-01**

---

```
Consumption Survey conducted by the U.S. Department of Agriculture.
, 55 FR 29531Table 2.--Standard Serving Sizes [FN1] : General Food supply
-----------------------------------------------------------------------------
Product category Standard Label Voluntary
serving statement household
size [FN2] [FN3] measures [FN4]
-----------------------------------------------------------------------------
(1) ........ (2) ............ (3)
Bakery Products:
Bread sticks ................... 1 oz......... 1 oz. (28 g) . XXPiece(s).
Breads (excluding sweet quick
type), biscuits, rolls,
croissants, muffins, bagels,
tortillas .................... 2 oz......... 2 oz. (56 g) . XXPiece(s) for
sliced bread
and distinct
pieces (e.g.,
biscuits,
rolls).
Breakfast bars and toaster
pastries ..................... 2 oz......... 2 oz. (56 g) . XXPiece(s).
Brownies ....................... 2 oz......... 2 oz. (56 g) . XXPiece(s).
Cake with icing, all varieties
except cheese cake ........... 3 1/2 oz..... 3 1/2 oz. (98
g) ......... XXPiece(s) for
distinct pieces
(e.g.,
cupcakes).
Cake without icing, all
varieties except cheese cake . 2 oz......... 2 oz. (56 g) . XXPiece(s) for
distinct pieces
(e.g.,
cupcakes).
Cheese cake .................... 4 oz......... 4 oz. (112 g) XXPiece(s) for
distinct pieces
(e.g.,
individually
packaged
product).
Coffee cakes, doughnuts,
Danish, sweet rolls, sweet
quick type breads ............ 2 1/2 oz..... 2 1/2 oz. (70
g) ......... XXPiece(s) for
sliced bread
and distinct
pieces (e.g.,
doughnut,
danish).
Cookies, graham crackers, or
sandwich type crackers ....... 1 oz......... 1 oz. (28 g) . XXPiece(s).
Crackers, all varieties
excluding graham and sandwich
type ......................... 1/2 oz....... 1/2 oz. (14
g) ......... XXPiece(s).
Croutons ....................... 1/3 oz....... 1/3 oz. (9 g) XXTbsp(s) or
cup(s).
French toast, pancakes ......... 4 oz......... 4 oz. (112 g) XXPiece(s) for
distinct
```

---

AD141

```
pieces.
Pies, cobblers, eclairs,
turnovers, other pastries .... 4 oz......... 4 oz. (112 g) XXPiece(s).
Pie crust ..................... 1/6 of 8
inch (in)
crust ..... 1/6 of 8 in
crust (XXg)
1/8 of 9 in
crust ..... 1/8 of 9 in
crust (XXg)
Taco shell .................... 1 oz......... 1 oz. (28 g) . XXShell.
Waffles ....................... 3 oz......... 3 oz. (84 g) . XXPiece(s).
---------- ----------- ----------------
Beverages:
Carbonated and noncarbonated
drinks including fruit
drinks, wine cooler and
mineral water ............... 12 fl oz..... 12 fl oz.
(360 mL) ... XXCup(s).
Coffee or tea, prepared ........ 8 fl oz...... 8 fl oz. (240
mL) ........ XXCup(s).
Coffee, ground, dry ............ 2 tbsp....... 2 tbsp. (XXg)
Coffee, instant, dry; or tea,
instant or leaf, dry ......... 2 tsp........ 2 tsp. (XXg) . XXCup(s).
Ice tea, prepared .............. 12 fl oz..... 12 fl oz.
(360 mL) ... XXCup(s).
Cereals and other grain
products:
Breakfast cereals (hot cereal
type), hominy grits, dry ..... 1 1/2 oz..... 1 1/2 oz. (42
g) ......... XXTbsp(s) or
XXCup(s)
Breakfast cereals, ready to eat
(weigh >1 oz per cup) ........ 1 oz......... 1 oz. (28 g) . XXCup(s) or
XXPiece(s) for
large distinct
pieces (e.g.,
biscuit type).
Breakfast cereals, ready to eat
(weigh "1 oz but <2 oz. per
cup) ......................... 1 1/2 oz..... 1 1/2 oz. (42
g) ......... XXCup(s) or
XXPiece(s) for
large distinct
pieces (e.g.,
biscuit type).
Breakfast cereals, ready to eat
(weigh "2 but <3 oz. per cup) 2 oz......... 2 oz. (56 g) . XXCup(s) or
XXPiece(s) for
large distinct
pieces (e.g.,
biscuit type).
Breakfast cereals, ready to eat
(weigh "3 oz. per cup) ....... 3 oz......... 3 oz. (84 g) . XXCup(s) or
XXPiece(s) for
large distinct
pieces (e.g.,
biscuit type).
```

AD142

```
Cornstarch ..................... 1 tbsp ...... 1 tbsp. (XXg)
Flours or cornmeal ............. 1 oz......... 1 oz. (28 g) . XXTbsp(s) or
cup(s).
Bran or wheat germ ............. 1/2 oz....... 1/2 oz. (14
g) ......... XXTbsp(s).
Grains, e.g., rice, barley, dry 2 oz......... 2 oz (56 g) .. XXCup(s).
Grains, e.g., rice, barley,
prepared ..................... 1 cup ....... 1 cup (XXg)
Hush puppies ................... 3 oz......... 3 oz. (84 g) . XXPiece(s).
Pastas, dry .................... 2 oz......... 2 oz. (56 g) . XXCup(s).
Pastas, prepared ............... 5 oz......... 5 oz. (140 g) XXCup(s).
Pastas, dry, ready to eat,
e.g., fried, canned chow mein
noodles ...................... 1 oz......... 1 oz. (28 g) . XXCup(s).
Stuffings ...................... 2/3 cup ..... 2/3 cup(XXg)
---------- ----------- ----------------
Dairy products and substitutes:
Cheese, cottage or ricotta ..... 4 oz ....... 4 oz. (112 g) XXCup(s).
Cheese, grated hard, e.g.,
parmesan ..................... 1/3 oz ...... 1/3 oz. (9 g) XXTbsp.(s).
Cheese, all others except those
listed as separate
categories--includes cream
cheese and cheese spread ..... 1 oz ....... 1 oz. (28 g) . XXPiece(s) for
distinct pieces
(e.g., slices,
cubes) or
XXtsbp(s).
Cheese sauce ................... 1/4 cup ..... 1/4 cup (XXg) ----------------
Cocoa .......................... 8 fl oz ..... 8 fl oz. (240
mL) ........ XXCup(s).
Cream or cream substitute,
fluid ........................ 2 tbsp ...... 2 tbsp. (30
mL) ........ ----------------
Cream or cream substitute,
powder ....................... 2 tsp ....... 2 tsp. (XXg) . ----------------
Cream, half and half ........... 2 tbsp ...... 2 tbsp. (30
mL) ........ ----------------
Milk, condensed, undiluted ..... 3 tbsp ...... 3 tbsp. (45
mL) ........ ----------------
Milk, evaporated, undiluted .... 1 tbsp ...... 1 tbsp. (15
mL) ........ ----------------
Milk, eggnog, milk-based
drinks, e.g., instant
breakfast, meal replacement .. 8 fl oz ..... 8 fl oz. (240
mL) ........ XXCup(s).
Milk shake ..................... 12 fl oz .... 12 fl oz.
(360 mL) ... XXCup(s).
Sour cream or dairy-based dips . 2 tbsp ...... 2 tbsp. (XXg) ----------------
Yogurt ......................... 8 oz ....... 8 oz. (224 g) XXCup(s).
Desserts:
Ice cream, ice milk, frozen
yogurt, sherbert ............. 6 fl oz ..... 6 fl oz.
(XXg) ...... XXPiece(s) for
individually
wrapped or
packaged
products and
```

AD143

```
XXcup(s) for
others.
Sundae ........................ 1 cup ....... 1 cup (XXg) .. XXPiece(s) for
individually
wrapped or
packaged
products.
Custard, gelatin or pudding .... 2/3 cup ..... 2/3 cup (XXg) ----------------
Dessert toppings and fillings:
Cake frosting or icing ......... 3 tbsp ...... 3 tbsp. (XXg) ----------------
Dessert toppings, fruits and
syrups ...................... 2 tbsp ...... 2 tbsp. (XXg) ----------------
Dessert toppings, nuts and
sprinkles ................... 1 tbsp ...... 1 tbsp. (XXg) ----------------
Pie filling ................... 3 oz ........ 3 oz. (84 g) . XXCup(s).
Whipped toppings, dairy and
nondairy products ........... 2 tbsp ...... 2 tbsp. (XXg) ----------------
Egg and egg substitutes:
Egg mixture, e.g., Egg Foo
Young ....................... 3 1/2 oz .... 3 1/2 oz. (98
g) ......... XXPiece(s).
Egg (all sizes) ............... 2 oz ........ 1 egg (XXg)
[FN5] ...... XXLarge, medium,
etc.
Egg substitutes ............... 2 oz ........ 2 oz. (56 g) . XXEgg
equivalents.
Omelet or scrambled egg ........ 4 oz ........ 4 oz. (112 g) XXCup(s).
Fats and oils:
Butter, margarine, oil, lard,
shortening .................... 1 tbsp ...... 1 tbsp. (XXg) ----------------
Mayonnaise, sandwich spread,
mayonnaise type dressing ..... 1 tbsp ...... 1 tbsp. (XXg) ----------------
Dressings for salad ........... 2 tbsp ...... 2 tbsp. (XXg) ----------------
Fish, shellfish, and meat, or
poultry substitutes:
Anchovies and caviar ........... 1 oz ........ 1 oz. (28 g) . XXPiece(s) or
tbsp(s).
Dried, e.g., jerky ............. 1/2 oz ...... 1/2 oz. (14
g) ......... XXPiece(s).
Entrees (cooked) with sauce .... 5 oz ........ 5 oz. (140 g) XXPiece(s).
Entrees (cooked) without sauce . 4 oz ........ 4 oz. (112 g) XXPiece(s).
Fish and shellfish, canned ..... 3 oz ........ 3 oz. (84 g) . ----------------
---------- ----------- ----------------
Substitute for bacon ........... 1 oz......... 1 oz. (28 g) . XXPiece(s).
Substitutes for luncheon meat,
sandwich spread,Canadian
bacon, sausage and
frankfurter ................. 2 oz........ 2 oz. (56 g) . XXPiece(s) for
distinct pieces
(e.g., slices,
links).
Smoked or pickled fish or
shellfish .................. 3 oz......... 3 oz. (84 g) . XXPiece(s) for
distinct
pieces, (e.g.,
slices, links).
Used as toppings, e.g.,
substitutes for bacon bits ... 1/4 oz....... 1/4 oz. (7 g) XXXXTbsp(s).
```

AD144

```
Fruits and fruit juice:
Candied or pickled ............. 1 oz......... 1 oz. (28 g) . XXPiece(s).
Dehydrated/freeze-dried ........ 1/2 oz....... 1/2 oz. (14
g) ......... XXPiece(s).
Dried ......................... 1 1/2 oz..... 1 1/2 oz. (42
g) ......... XXPiece(s) for
large pieces
(e.g., dates,
figs, prunes);-
XXCup(s) for
small pieces
(e.g.,
raisins).
Fruit sauce or relish, e.g.,
cranberry sauce or relish .... 3 oz......... 3 oz. (84 g) . XXCup(s).
Fruit for garnish or flavor,
e.g., maraschino cherries,
lemon, lime ................. 1/4 oz....... 1/4 oz. (7 g) XXPiece(s) for
distinct pieces
(e.g.,
cherries).
Fruits used primarily as
ingredients, e.g.,
cranberries ................. 2 oz......... 2 oz. (56 g) . XXCup(s).
All other fruits, fresh,
weighing > 50 percent but >
150 percent of the standard
serving size per piece ....... 5 oz......... 1 fruit (XXg)
[FN5]
All other fruits, fresh,
weighing > 50 percent of the
standard serving size per
piece ....................... 5 oz......... 5 oz. (XXg) .. XXPiece(s) for
large pieces
(e.g.,
strawberries,
prunes,
apricots,
etc.); XXCup(s)
for small
pieces (e.g.,
blueberries,
raspberries,
etc.).
All other fruits, fresh,
weighing > 150 percent of the
standard serving size per
piece ....................... 5 oz......... 5 oz. (XXg) .. XXPiece (e.g.,
1/2 grapefruit,
1/4 cantaloupe,
etc.).
All other fruits, canned or
frozen ...................... 5 oz......... 5 oz. (XXg) .. XXCup(s) for
small pieces
(e.g., fruit
cocktail).
Juice or nectar ............... 6 fl oz...... 6 fl oz. (180
mL) ....... XXCup(s).
```

AD145

```
Juice used as ingredients,
e.g., lemon juice ............ 1 tbsp....... 1 tbsp. (15
mL) ........ ----------------
Watermelon .................... 12 oz........ 12 oz. (336
g) ......... XXPiece(s).
Legumes:
Bean cake (tofu) .............. 4 oz........ 4 oz. (112 g) XXPiece(s).
Dry ........................... 2 1/2 oz..... 2 1/2 oz. (70
g) ......... XXCup(s).
Prepared, plain or in sauce .... 6 oz........ 6 oz. (168 g) XXCup(s).
Meal type trays: [FN6]
Breakfast trays, all varieties . 4 oz........ ------------ ----------------
Lunch or dinner trays .......... 5 oz........ ------------ ----------------
Cracker and cheese trays:
Extra helping type ............ 15 oz....... ------------ ----------------
Trays for children ............ 8 oz....... ------------ ----------------
Trays containing 2 items ....... 8 oz....... ------------ ----------------
Trays containing 3 or 4 items .. 11 oz....... ------------ ----------------
Salad plate served as a meal ... 8 oz........ ------------ ----------------
Sandwich ...................... 5 oz........ ------------ ----------------
Sandwich and soup ............. 11 oz....... ------------ ----------------
Miscellaneous products:
Batter mixes, bread crumbs,
meat/poultry/fish coating
mixes, dry ................... 1 oz........ 1 oz. (28 g) . XXTbsp(s).
Salt, seasoning salt (e.g.,
garlic salt) ................. 1 g......... 1 g.......... XXTsp(s).
Mixed dishes:
Appetizers, not measurable with
cup, e.g., egg roll, pizza
roll ........................ 3 oz........ 3 oz. (84 g) . XXPiece(s).
Appetizers and cocktails in
sauce, measurable with cup,
e.g., shrimp cocktail ........ 1/2 cup ..... 1/2 cup (XXg) ----------------
Entree type, measurable with
cup, e.g., stew, spaghetti,
macaroni and cheese, pot pie,
etc.......................... 1 cup ....... 1 cup (XXg) .. ----------------
Entree type, not measurable
with cup, e.g., pizza,
quiche, etc.................. 6 oz........ 6 oz. (168 g) XXPiece(s).
Oriental noodle with soup base,
dry ......................... 3 oz........ 3 oz. (84 g) . ----------------
Nuts and seeds:
Nut, seed and mixtures ........ 1 1/2 oz..... 1 1/2 oz. (42
g) ......... XXCup(s).
Nut and seed butter or paste ... 2 tbsp....... 2 tbsp (32 g) ----------------
Used primarily as ingredient,
e.g., coconut, nut and seed
flour, etc................... 1 oz........ 1 oz. (28 g) . XXTbsp(s) or
XXcup(s).
Potatoes and sweet potatoes:
French fries, hash browns,
skins, stuffed or pancake .... 3 oz........ 3 oz. (84 g) . XXPiece(s) for
large distinct
pieces (e.g.,
patties,
skins).
```

AD146

```
Mashed, candied or with sauce .. 6 oz......... 6 oz. (168 g) XXCup(s).
Plain, fresh, frozen, canned,
or cooked .................... 4 oz......... 4 oz. (112 g) XXPiece(s).
----------- ----------- ----------------
Salads: (For salads served as a
meal, see meal type trays.)
Egg, Fish or shellfish salad ... 3 1/2 oz..... 3 1/2 oz. (98
g) ......... XXCup(s).
Fruit or pasta salad ........... 5 oz......... 5 oz. (142 g) XXCup(s).
Potato salad ................... 6 oz......... 6 oz. (168 g) XXCup(s).
Vegetable salad ................ 3 1/2 oz..... 3 1/2 oz. (98
g) ......... XXCup(s).
Sauces, gravies, and
condiments:
Barbecue sauce, Hollandaise
sauce, tartar sauce, marinade 2 tbsp....... 2 tbsp. (XXg) ----------------
Main entree type sauce, e.g.,
spaghetti, creole, newburg, a
la king, sweet and sour, etc.. 1/2 cup ..... 1/2 cup (XXg) ----------------
Used as condiments, e.g.,
catsup, mustard, steak sauce,
salsa, worcestershire sauce,
soy sauce, horseradish, etc... 1 tbsp....... 1 tbsp. (XXg) ----------------
Used as topping, e.g., gravy,
white sauce, cocktail sauce,
etc.......................... 1/4 cup ..... 1/4 cup (XXg)
Snacks:
Chips, pretzels, extruded
snacks ....................... 1 oz......... 1 oz. (28 g) . XXCup(s) or
piece(s).
Fruit-based snacks, e.g., fruit
roll-ups, fruit wrinkles ..... 1 oz......... 1 oz. (28 g) . XXPiece(s) for
distinct pieces
(e.g., roll).
Grain-based snack mix without
nuts or fruits ............... 1 oz......... 1 oz. (28 g) . XXCup(s).
Grain-based snack mix with nuts
and/or fruits ................ 1 1/2 oz..... 1 1/2 oz. (42
g) ......... XXCup(s).
Popcorn, popped or unpopped .... 1 oz......... 1 oz. (28 g) . XXCup(s) for
popped;
XXtbsp(s) for
unpopped.
Soups:
All varieties .................. 1 cup ....... 1 cup (XXg)
Sugars and Sweets:
Baking candies, chips, etc...... 1/2 oz....... 1/2 oz. (14
g) ......... XXTbsp(s) or
XXcup(s).
Candies ........................ 1 1/2 oz..... 1 1/2 oz. (42
g) ......... XXPiece(s).
Confectioner's sugar ........... 1/2 oz....... 1/2 oz. (14
g) ......... XXTbsp(s).
Honey, jam, jellies ............ 1 tbsp....... 1 tbsp. (XXg)
Marshmallows ................... 1 oz......... 1 oz. (28 g) . XXCup(s).
Popsicles, snow cones .......... 2 1/2 oz..... 2 1/2 oz. (70
g) ......... XXPiece(s).
Sugar .......................... 2 tsp....... 2 tsp. (8 g)
```

AD147

```
Molasses ....................... 2 tbsp....... 2 tbsp. (XXg)
Syrups ......................... 1/4 cup ..... 1/4 cup (XXg)
Vegetables:
Corn fritters ................. 3 oz......... 3 oz. (84 g) . XXPiece(s).
Dehydrated or freeze-dried ..... 1/2 oz....... 1/2 oz. (14
g) ......... XXPiece(s) or
XXcup(s) or
XXtbsp(s).
Dried .......................... 1 oz......... 1 oz. (28 g) . XXPiece(s) or
XXcup(s) or
XXtbsp(s)
---------- ----------- ----------------
Lettuce and others used
primarily as ingredients,
e.g., onions, mushrooms,
tomatoes [FN7] .............. 2 oz......... 2 oz. (56 g) . XXPiece(s) or
XXcup(s).
Primarily used as garnish or
for flavor, e.g., chili
pepper ....................... 1 oz......... 1 oz. (28 g) . XXPiece(s).
All other vegetables without
sauce or canned in vacuum
pack .......................... 3 1/2 oz..... 3 1/2 oz.(98
g) ......... XXPiece(s) for
large pieces
(e.g., ear of
corn, brussel
sprouts);
XXCup(s) for
small pieces
(e.g., cut
corn, green
peas).
All other vegetables with sauce
or canned in liquid .......... 4 1/2 oz..... 4 1/2 oz.
(126 g) .... XXPiece(s) for
large pieces
(e.g., ear of
corn, brussel
sprouts);
XXCup(s) for
small pieces
(e.g., cut
corn, green
peas).
Juice .......................... 6 fl oz...... 6 fl oz. (180
mL) ........ XXCup(s).
Olives ......................... 1/2 oz....... 1/2 oz. (14
g) ......... XXPiece(s).
Pickles, dill or sour ......... 2 oz......... 2 oz. (56 g) . XXPiece(s).
Pickles, other than dill, sour,
or relish ................... 1 oz......... 1 oz. (28 g) . XXPiece(s) for
distinct pieces
(e.g.,
gerkins).
Pickles, relish ............... 1/2 oz....... 1/2 oz. (14
g) ......... XXTbsp(s).
Vegetable pastes, e.g., tomato
```

AD148

**Food Labeling; Serving Sizes, 55 FR 29517-01**

```
paste ....................... 1 1/2 oz..... 1 1/2 oz. (42
g) ......... XXTbsp(s).
Vegetable sauce or puree, e.g.,
tomato sauce, tomato puree ... 3 oz........ 3 oz. (84 g) . XXCup(s).
-------------------------------------------------------------------------
1 Unless otherwise noted in the product category name, serving sizes are for
the ready-to-serve or almost ready-to-serve form of the product (e.g., heat
and serve and brown and serve). If not listed separately, serving size for
the unprepared form (e.g., dry mixes, concentrates, dough, batter, raw fish
and shellfish) is the amount required to make one serving of the prepared
form.
2 Standard serving size established by FDA. These values have been derived
primarily from the amount of food commonly consumed per eating occasion as
reported in the 1977-1978 Nationwide Food Consumption Survey conducted by the
U.S. Department of Agriculture.
3 In expressing the serving size on the product label, manufacturers shall
first declare the standard serving size followed by the equivalent metric
quantity in parentheses. Where metric quantity is left blank, manufacturers
shall fill in the blank with the metric quantity specific for their product
equivalent to the standard serving size specified by FDA. For unprepared
products (e.g., dry mixes, concentrates, dough, raw fish), manufacturers
shall provide the quantity of the unprepared product required to make one
standard serving of the prepared product in oz. (or fl oz.) followed by the
corresponding metric quantity in parentheses, e.g., 11/2 oz. dry mix (42 g).
4 This column lists other household measures that may be provided by the
manufacturers to express the serving size in easily visualized units for the
specific product. For example, for sliced bread manufacturers may provide the
number of slices that is the nearest equivalent (in half slices) to 2 oz. The
unit "piece" should be expressed in unit of the piece descriptive of the
product, e.g., slice, roll, cookie, muffin, bar, stick or a fraction such as
1/4 pizza.
5 These products are considered to be single-serving products and thus
nutrition information shall be provided per piece followed by the metric
quantity of the edible portion in parenthesis, e.g., one large egg (50 g),
one apple (140 g).
6 These products come in single-serving containers (see the definition of
single-serving containers in § 101.9(b)(2)) and thus nutrition information
shall be provided per container followed by the metric quantity ot the net
content of the container in parenthesis, e.g., one dinner (310 g), one
sandwich (130 g), or one tray (150 g).
7 When these vegetables have been processed or prepared or otherwise offered
for use as vegetable dishes, e.g., onion rings, sauteed mushrooms, or stewed
tomatoes, serving size shall be the same as that of the vegetable dish, i.e.,
31/2 oz. for a vegetable dish without sauce and 41/2 oz. for a vegetable dish
with sauce.
```

**\*29533**  (c) The serving (portion) size of a product that requires cooking or the addition of water or other ingredients, or that almost always is consumed as a component of another food, shall be the amount required to prepare one serving of the final product as established in paragraph (b) of this section.

(d) The serving size of an imitation or substitute food shall be the same as that of the food for which it is offered as a substitute.

(e) The serving size of a modified version of a food, such as "low calorie" version, shall be the same as for the food for which it is offered as a substitute.

(f) For any container with more than one serving, the serving sizes in paragraph (b) of this section will be used for the evaluation of adjectival labeling descriptors, such as "low calorie" or "low sodium". For single-serving containers containing 100 percent

**AD149**

or less of the serving size established in paragraph (b) of this section, the serving size established in paragraph (b) of this section will be used for the evaluation of adjectival labeling descriptors. For single-serving containers containing more than 100 percent, but 150 or less percent, of the serving size established in paragraph (b) of this section, the serving declared on the container (i.e., the entire contents) will be used for the evaluation of whether the food meets the criteria for adjectival labeling descriptors.

(g) The Commissioner of Food and Drugs, either on his or her own initiative or on behalf of any interested person who has submitted a petition pursuant to part 10 of this chapter, may issue a proposal to establish or amend a serving size (or portion) in § 101.12(b). A petition to establish or amend a serving size shall be consistent with the general determinations set forth in paragraph (a) of this section and shall include:

(1) A description of the product;

(2) A description of the form (e.g., dry mix, frozen dough) in which the product will be marketed;

(3) The intended dietary use of the product (e.g., milk as a beverage and not as an addition to cereal);

(4) The population group for which the product will be offered for use (e.g., infants, children under 4 years of age);

(5) The names of the most closely-related products (or in the case of foods for special dietary use and imitation or substitute foods, the names of the products for which they are offered as substitutes);

(6) The suggested serving size (the amount of edible portion of food as consumed, excluding bone, seed, shell or other inedible components) for the population for which the product is intended;

(7) For products which require cooking or the addition of water or other ingredients, the amount of edible portion of food reqired to make the suggested serving of prepared food; and

(8) The methodology and procedures that were used to determine the suggested serving size.

Dated: June 5, 1990.

James Benson,

Acting Commissioner of Food and Drugs.

Louis W. Sullivan,

Secretary of Health and Human Services.

[FR Doc. 90-16729 Filed 7-13-90; 3:14 PM].

BILLING CODE 4160-01-M

---

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.